# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KURDISTAN VICTIMS FUND, A NON-PROFIT 501(C)(3) FOUNDATION,<br>    United States of America<br><br>MAKI REVEND<br>    Berlin, Germany;<br><br>    AND<br><br>JOHN DOES 1-5000.<br><br>        Plaintiffs<br><br>        *v.*<br><br>KURDISTAN REGIONAL GOVERNMENT ("KRG"),<br>    1532 16th St NW<br>    Washington, DC 20036;<br><br>MASOUD BARZANI ("MASOUD"),<br>    1532 16th St NW<br>    Washington, DC 20036;<br><br>MASROUR BARZANI,<br>    1532 16th St NW<br>    Washington, DC 20036;<br><br>WAYSI BARZANI,<br>    1532 16th St NW<br>    Washington, DC 20036;<br><br>MULLA "BABO" MUSTAFA,<br>    Erbil, Kurdistan, Iraq;<br><br>AREEN MASROUR BARZANI,<br>    Erbil, Kurdistan, Iraq;<br><br>SARWAR PEDAWI,<br>    Erbil, Kurdistan, Iraq; | *Case No.* _____<br><br><br><br>**JURY TRIAL DEMANDED** |

LAAWEEN (LAWIN) PEDAWI,
     Dubai;

KARIM SINJARI,
     Erbil, Kurdistan, Iraq;

BAYAN SAMI ABDUL RAHMAN,
     Erbil, Kurdistan, Iraq;

TREEFA AZIZ,
     1532 16th St NW
     Washington, DC 20036;

ENTIFADH KAMAL QANBAR
     6062 Burnside Landing Drive
     Burke, Virginia 22015;

AFAN SALEH OMAR SHERWANI,
     Virginia;

OMAR S. BARZANI,
     9716 Windburn Drive
     Plano, TX 75025-5418;

DINDAR ZEBARI,
     Erbil, Kurdistan, Iraq;

AZIZ AHMAD,
     Erbil, Kurdistan, Iraq;

ASHTI HAWRAMI,
     London, England, United Kingdom;

BAZ KARIM AL-BARZANJI
     Erbil, Kurdistan, Iraq;

GHAFOOR KHOSHNAW
     Erbil, Kurdistan Iraq;

AMEER SAADALLAH RASHEED
     Erbil, Kurdistan, Iraq;

KAMAL KIRKUKI,
      Erbil, Kurdistan, Iraq;

JAFAR AMINKI,
      Erbil, Kurdistan, Iraq;

ZAHEEM ALI,
      Erbil, Kurdistan, Iraq;

AZAD BARWARI,
      Erbil, Kurdistan, Iraq;

HOSHYAR ZEBARI,
      Erbil, Kurdistan, Iraq;

SAYRAN SABER MUSTAFA BARZANI,
      Erbil, Kurdistan, Iraq;

LINA BARZANI,
      United States of America;

DILSHAD BARZANI,
      Erbil, Kurdistan, Iraq;

SIRWAN BARZANI,
      Erbil, Kurdistan, Iraq;

NIHAD BARZANI,
      Erbil, Kurdistan, Iraq;

SIDAD BARZANI,
      Erbil, Kurdistan, Iraq;

SIHAD BARZANI
      Erbil, Kurdistan, Iraq;

HIKMAT BAMARNI,
      3875 B Plaza Drive
      Fairfax, VA 22030;

SHIMAL JAWHAR SALIN,
      Kurdistan, Iraq;

NIZAR HANNA NASRI,
      Kurdistan, Iraq;

DILSHAD YOUSEF,
    Erbil, Kurdistan, Iraq;

ISMAT ARGOSHI,
    Erbil, Kurdistan, Iraq;

BARZAN HERSHA or HERISH RASH,
    Kurdistan, Iraq;

AZAD GERMARI,
    Duhok, Kurdistan, Iraq;

"SHALAWO,"
    Address unknown

RABEA BARZANI,
    Erbil, Kurdistan, Iraq;

GHALIB RABEA BARZANI,
    Erbil, Kurdistan, Iraq;

RUBAR S. SANDI,
    9300 Belle Terre Way
    Potomac, MD 20854;

HIMAL JAWHAR SALIN,
    Kurdistan, Iraq;

DILAL ABBAS,
    Kurdistan, Iraq;

AHMAD KURDU NORI,
    Nuremberg, Germany

MAHMOOD AGAHA,
    Kurdistan, Iraq;

HAMELA GARDI,
    Kurdistan, Iraq;

DILSHAD HASSAN NAJAR,
    Kurdistan, Iraq

JOSEPH TEICHMEULLER,
    Germany;

U.S. PUBLIC OFFICIAL #1,
   Erbil, Kurdistan, Iraq;

U.S. PUBLIC OFFICIAL #2,
   Erbil, Kurdistan, Iraq;

                              *Defendants.*

## COMPLAINT

1.      This civil action is instituted to recover damages from the Defendants, jointly and severally, including Barzani family members and family members by marriage, many of whom are kept secret from public view, and others known and unknown and not named as Defendants, who as individuals acting in some feigned, artificial, connived, or imitated official capacity of the Defendant Iraqi Kurdistan Regional Government but knowingly lacking objective legal reasonableness or untethered to any statute or law or authorization of legal rules clearly established at times of such unlawful acts, unlawfully conspired, confederated, constituted, and agreed together and with each other to commit heinous offenses against the Plaintiffs and against the United States, in ways made more definite below to violate certain laws, treaties, and conventions, through a coldly-efficient transnational criminal organization, corruption scheme, and conspiracy of crimes, continuing to this day, enabled and elided by their Washington representatives, and which in injuring Plaintiffs and others criminally degrades, desecrates, derides, and violates the "norm of international character accepted by the civilized world." *See Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013).

2.      Defendants as individuals engaged in and do engage in unlawful means, each of whom had conduct, knowledge, and intent, and each of whom is aware of the criminal enterprise's contumacious conduct and has some participation in the operation of the enterprise itself, and with orchestrated intent to enrich themselves and further the object of the criminal enterprise, and are directly responsible for various related heinous criminal activities, having the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, knowingly violating basic human principles and international norms including, but not limited to, atrocity crimes; indiscriminate

1

violence; arson; claims for murder; attempted murder; genocide; abduction; hostage taking and kidnapping; torture and other cruel, inhuman, or degrading treatment or punishment; collaboration with terrorist organizations; prolonged arbitrary detention; extrajudicial killing; enforced disappearance; cruel, inhuman, or degrading treatment; crimes against humanity; theft; drug trafficking; counterfeiting; defrauding the United States Government and others; financial crimes; identify theft and access device fraud, mail fraud, wire fraud; laundering of monetary instruments; engaging in transactions with the proceeds of specified unlawful activity; acts involving perjury, false statements and declarations; comprehensive computer data theft and destruction; obstruction of justice; bribery and facilitation payments; deprivation of income and employment; willful concealment of tax data; tax fraud and tax perjury; immigration fraud and immigration perjury; and in violation of the Torture Victim Protection Act of 1991, the Alien Tort Statute of 1789, and other laws and statutes of the United States and the law of nations and international treaties, agreements, and conventions more fully set forth herein; and conspiracy to commit all above criminal acts; and did fraudulently and through material misrepresentations gain control for personal enrichment over money that was property of the Defendant Iraqi Kurdistan Regional Government. Defendants' acts were all carried out with *mens rea* (carried out acts that had substantial effects on the perpetration of a specific crime) and *actus reus* (substantially assisting the act of crimes).

3.      Defendants are not ordinary, and do not stand accused of routine misdeeds. Their crimes are serious violations of U.S. law and undermine American economic and national security.

4.      Defendants, as well as others known and unknown, are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Barzani Continuing Criminal Enterprise. The Barzani Continuing Criminal Enterprise is an association-in-fact within the

2

meaning of 18 U.S.C. § 1961(4) consisting of Defendants, including each of their employees, agents, contractors, servants, and Barzani family members and family members by marriage, and others named and unnamed.

5.      The Barzani Continuing Criminal Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) accumulating wealth for the Enterprise's leadership, through both legal and illegal means; (ii) concealing and refusing to report the criminal activity of its members; (iii) preventing its members' victims, including member victims, from reporting crimes to governmental authorities and/or cooperating with governmental authorities; (iv) preventing witnesses of its members' crimes from cooperating with governmental authorities; and (v) engaging in punitive harassment campaigns against perceived enemies, including victims and witnesses who cooperate with governmental authorities. To achieve their common goals, and to harm Plaintiffs, Defendants hid and do hide the Enterprise's crimes from the public, from governmental authorities, and from Plaintiffs, and prevented or attempted to prevent others, often violently or lethally, including but not limited to Plaintiffs, from approaching governmental authorities regarding Defendants' horrendous crimes.

6.      For two centuries, the United States Supreme Court has affirmed that domestic law of the United States recognizes the law of nations. *See, e.g., Banco Nacional de Cuba v. Sabbatino*, *376 U.S. 398, 423, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964).  Sosa v. Alvarez-Machain, 542 U.S. 692, at 730 (2004).* The United States Supreme Court and the Court of Appeals for the District of Columbia have both affirmed, "The Court is bound by the law of nations which is a part of the law of the land." *THE NEREIDE, BENNETT, MASTER*, 13 U.S. 388, 3 L. Ed. 769 (1815). Also, *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011). Under international law, "every treaty in force is binding upon the parties to it and must be performed by them in good faith." *See Vienna*

3

*Convention on the Law of Treaties, Article 26;* and *Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations.* A treaty enters into force for a State after, *inter alia,* it has provided its consent to be bound by the treaty. Treaties, international agreements, and conventions, each entered into by the sovereign Republic of Iraq of which the Defendant Iraqi Kurdistan Regional Government is a subordinate system and institution, and intergovernmental organizations like the United Nations, are all examples of public international law knowingly, willfully, repeatedly, and contemptuously violated, disobeyed, and dishonored by Defendants to harm Plaintiffs.

7.     The complained of acts occurred at a time when Defendant Masoud Barzani was President of the Defendant Iraqi Kurdistan Regional Government, and after; when Defendant Masrour Barzani was General Director of the KRG Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin) and later the first Chancellor of the Iraqi KRG's Security Council, and subsequently and at present time is the Prime Minister of Iraqi Kurdistan, the presiding and actual head of government and head of the responsible executive power, and a United States person for the entire period of the criminal enterprise; and when Defendant Waysi Barzani was, and before, and continues as the Director of the Iraqi KRG Intelligence and Security Agency, and Director General of Counter Terrorism (CTD), a part of the Iraqi Kurdistan Region Security Council (KRSC) and a unit of the Iraqi Kurdistan Regional Government – a provincial government deliberately operated by Defendants as a government of men and not a government of laws, with powers both devolved from the federal national Iraq state and self-ascribed, and offices which Defendants have used and do use as an instrument of crime. "[C]riminal conduct is not part of the necessary functions performed by public officials." *See United States v. Isaacs,* 493 F.2d 1124, 1144 (7th Cir. 1974).  That is

especially so when the willful acts of substantive crimes, fraudulent behavior, policies of deception, perpetual lawlessness, placing Defendants' financial self-interest, profiteering, and corruption on a grand scale above the public welfare, and imperious perversion of the administration of justice – all rooted in Defendants' self-serving ethos – require criminal intent, as have Defendants' tortious acts to injure Plaintiffs.

8.      It is impossible to overstate Defendants' extreme culpability.  As but one example, Defendants engaged in depraved acts of deliberate indifference in effectively offering up their Iraqi Kurdish countrymen as human sacrifices to a designated terrorist organization.  Transacting quantitatively significant business with terrorists at the cost of innocent human lives, while repugnant to most, was and is business as usual for the Barzani regime in Iraqi Kurdistan, where Defendants by dissembling have continually avoided and evaded responsibility for their crimes. Plaintiffs have each been directly and concretely harmed by the Defendants' egregiously unlawful conduct, scheme, and criminal conspiracy, not by mistake or accident, and by Kurdistan courts lacking and absent the judicial guarantees which are recognized by the District Court of the District of Columbia as "*indispensable by civilized peoples.*"  *See Cabrera v. Islamic Republic of Iran,* Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023).

9.      At all times, Defendants, a force unrestrained by rules or laws, to further their own personal political agenda, and believing themselves to be above the law, placed their own serial criminal and other illegitimate interests, financial enrichment, and political power above the national security interests of the United States, the safety of American lives and others in the Middle East, including Plaintiffs, and the governmental interests of and political, economic, and security conditions conducive to a peaceful Kurdish civil society, democracy, and modern state advancing the interests, ideals, and aspirations of all Kurdish citizens.

5

10.   "By knowingly providing substantial assistance," (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), Defendants' conduct knowingly supported Islamic State's violent global terrorist campaign and acts against Americans in Iraq, Afghanistan, and Syria. Defendants' conduct knowingly translated directly into substantial numbers of terrorists, weapons, and bombs that the Islamic State and the Islamic Revolutionary Guard Corps (IRGC) (two groups formerly identified as complicit with Hamas, officially the Islamic Resistance Movement, in the massacre of Americans and others in Israel in October, 2023, including beheading of babies and the use of inhuman and barbaric sexual violence against women and children. The founding Hamas Covenant spells out clearly Hamas's genocidal intentions, and is branded by the United States as "a genocidal terrorist organization, worse than ISIS", and in which Iran "was complicit". Hamas' violent nature has been noted in several federal court decisions. *See In re Abu Marzook*, 924 F.Supp. 565 (S.D.N.Y. 1996) (recounting numerous incidents of Hamas terrorism against civilians in the Mideast), *U.S. v. One 1997 E35 Ford Van*, 50 F.Supp.2d 789 (N.D.Ill.1999) (describing Hamas' covert financial transactions in the U.S.), (D.D.C. 2000), *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C.2000), *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1 (2001), *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C.2002), and used to harm Plaintiffs and to kill and injure Americans in Iraq, Afghanistan, and Syria. Terrorist sponsors' material support can be a substantial factor in a given terrorist attack even without a direct link between the support and the particular attack at issue. *See*, e.g., *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139 (D.D.C. 2021). As the District Court of the District of Columbia noted, the Islamic Revolutionary Guard Corps ("IRGC") is "the primary driver of Iran's terror activities." *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. July 19, 2022). IRGC, also called Sepah or Pasdaran, is a multi-service primary

6

branch of the Iranian Armed Forces, performs government functions for Iran, and is an instrumentality of that government.

11.   The Circuit Court for the District of Columbia held that "defendant[s] must be generally aware of [their] role as part of an overall illegal or tortious activity at the time [they] provide assistance." (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). "There is no specific intent requirement." *Id.* at 221. A "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*," whether Defendant gave assistance "indirectly or indirectly," *Id.* at 221, and over a significant duration." *Id* at 224. (*See Honickman,* 6 F.4th at 496 (emphasis in original) (citing *Halberstam,* 705 F.2d at 477, 488). Through abundant classified and highly informative U.S. and Allied intelligence provided by U.S. government agents and officials to the leadership of the Iraqi Kurdistan Regional Government and its predecessors in Peshmerga, including Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others, and the guidance of their retained Washington D.C. counsel, lobbyists, and representatives acting within the scope of their employment or office, and widely circulated media reports, and public designations of these organizations as foreign terrorist organizations, Defendants were appreciably and unambiguously more than "generally aware" they were engaged in illegal activity, and were knowledgeable of public, classified, and unclassified U.S. Government and United Nations reports extensively documenting both the Iranian Government's role in terrorism against America and American interests and the primary mission of IRGC, ISIS, and Hamas to engage in terrorist acts. At all times relevant, Defendants retained legal counsel, lobbyists, and compensated staff representatives in Washington D.C. to provide legal, national and economic security information,

contemporaneous executive branch policy guidance, and legislative policy guidance. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and other subordinates, held and do hold frequent and documented informative briefings and consultations with U.S. Government officials, including senior officers of the U.S. Departments of State and Defense and other federal departments and agencies and the National Security Council staff, of the U.S. military and intelligence services, of the U.S. Embassy in Iraq, including the United States Ambassador, of the U.S. Consulate in Erbil, and even with the President of the United States and other officials of the Executive Office of the President, and with Members of Congress and their staffs.

12.     Defendant Masrour Barzani's awareness of Defendants' criminality and illegal activity immeasurably exceeds "generally aware." He is American-educated and appreciably informed and knows Defendants were engaged in illegal activity. He holds a bachelor's degree with honors in International Studies and a master's degree in Peace and Conflict Resolution from a prestigious Washington D.C. university, is the recipient of countless documented U.S. Government policy, intelligence, and law briefings from high-level United States government officials, including classified briefings of and access to detailed national security intelligence and sensitive national defense information by the agencies that comprise the United States Intelligence Community and the United States Departments of State and Defense, and the laws, rules, and agreements governing its usage, and has knowledge, skill, experience, training, and education beyond the ordinary lay person about U.S. law and policy. Defendant Masrour Barzani is a "United States Person", as defined in 18 U.S.C. § 2331(2) and 8 U.S.C. § 1101(a)(22), "a person who, though not a citizen of the United States, owes permanent allegiance to the United States" – and yet through his willful, knowing, and abundant criminal and tortious acts has shown no allegiance to the United States. Defendants Masoud Barzani, Waysi Barzani, and other co-

8

conspirators are also recipients of countless documented U.S. Government policy, intelligence, and law briefings and sensitive information. Numerous public declaration filings by Defendant Iraqi Kurdistan Regional Government with agencies of the U.S. Government also affirm Defendants received substantial continuing legal guidance and assistance from representatives and former senior U.S. Government officials of the United States.

13.     The United States Congress specifically excluded so-designated foreign terrorist organizations from the definition of "military force," 18 U.S.C. § 2331(4), (6), and none of the Defendants' criminal and conspiratorial acts were or are acts-of-war.

14.     "Terrorism is the modern-day equivalent of the bubonic plague: it is an existential threat." *U.S. v. Mehanna, 735 F.3d 32, at 40 (1st Cir. 2013)*. Plaintiffs separately claim elsewhere herein that Defendants be held directly liable for acts of international terrorism they did not merely aid, but themselves committed, and were "a substantial factor in the sequence of events that led to [Plaintiffs'] injuries and that those injuries" were "reasonably foreseeable or anticipated as a natural consequence of [defendants'] conduct." (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 226(D.C. Cir. 2022) (quoting Owens v. Republic of Sudan (Owens III), 864 F.3rd 751, 794, (D.C. Cir. 2017).

15.     Defendants' conduct occurred against the backdrop of several decades of al-Qaeda, Islamic State, and IRGC history as a globalized terrorist campaign in which such designated foreign terrorist organizations needed Defendants' money to kill and injure Americans, and to affect such conduct by mass destruction, assassination, and kidnapping to achieve violent political ends and further the Barzani Continuing Criminal Enterprise. Defendants knew they were dealing with al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC because the people and entities that Defendants interacted with held themselves out as representatives of these terrorist organizations,

and concealed their actions in part because they knew the U.S. and other governments considered such actions to be illegal.

16.     The Court of Appeals for the District of Columbia Circuit characterized and defined torturer: "[F]or purposes of civil liability, the torturer has become – like the pirate and slave trader before him – *hostis humani generis,* an enemy of all mankind" (*See Tel-Oren* v. *Libyan Arab Republic,* 726 F. 2d 774 (CADC 1984)). Applying the definition given by the Court of Appeals, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives including Barzani family members and family members by marriage, as torturers are each "an enemy of all mankind."

17.     The United States Supreme Court declared, "We think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." (*See Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)). Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their co-conspirator agents, representatives, servants, collaborators, and co-conspirators, including Barzani family members and family members by marriage, have, in their unbridled pursuit of power and their expansive illicit transnational Continuing Criminal Enterprise, and unfailingly hiding behind the cloak of the authority and misapplied protections of their authoritarian government offices, and lacking legal reasonableness, and exceeding the outer limits of lawful authority of any official KRG office, consistently, knowingly, and willfully failed to comport with and did act in contravention and abuse of "a norm of international character accepted by the civilized world" and the law of nations.

18.     Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani acted in concert with and exercised command responsibility over other subordinate members of the Defendant Iraqi Kurdistan Regional Government and the indistinguishably complementary Kurdistan Democratic Party ("KDP") political organization, which these Defendants simultaneously controlled and directed, to plan, carry out, and cover up the extrajudicial killing, extrajudicial exile, hostage taking and kidnapping, enforced disappearance, and torture of and other grievous crimes against the Plaintiffs. Further, Defendants failed to prevent or punish the violations of international law, Iraq law, Kurdistan law, United States law, and international treaties, agreements, and conventions committed by their subservient subordinates, agents, and representatives, including the Barzani family members and members of the family by marriage.  Under international law, Iraq law, Kurdistan law, and United States law, Defendants are liable to Plaintiffs for the injuries Plaintiffs suffered.

19.     "It is undisputed that genocide itself is a violation of international law." *See, e.g., Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring); *accord Abelesz,* 692 F.3d at 675-76 (collecting authority).

20.     The Court of Appeals of the District of Columbia Circuit "adopted the definition of genocide set forth in the Convention on the Prevention of the Crime of Genocide." *See Philipp v. Federal Republic of Germany, 894 F.3d 406, 411 (D.C. Cir. 2018).*  The Convention defines genocide as any of five "acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group."  These five acts include killing members of the group, causing them serious bodily or mental harm, imposing living conditions intended to destroy the group, preventing births, and forcibly transferring children out of the group.  Victims are targeted because of their real or perceived membership of a group, not randomly.  The convention further

11

criminalizes "complicity, attempt, or incitement of its commission." Member states [including the Republic of Iraq] are prohibited from engaging in genocide and obligated to pursue the enforcement of this prohibition. All perpetrators are to be tried regardless of whether they are private individuals, public officials, or political leaders with sovereign immunity." These are the criminal acts of Defendants Masoud Barzani and Masrour Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, in aiding and abetting and enabling the killing, harming and destroying of Yazidi people, and creating conditions of life calculated to bring about their physical destruction as a group.

21.     During the 2005 United Nations World Summit, heads of state and government accepted the responsibility of every state to protect its population from four crimes: genocide, war crimes, crimes against humanity, and ethnic cleansing. The first three crimes are legally defined in various international legal documents, such as the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, the obligations under which bind Iraq and its instrumentalities are owed erga omnes and erga omnes partes, the 1949 Geneva Conventions and their 1977 Additional Protocols, and the 1998 Rome Statute of the International Criminal Court. ("Although the United States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute." See *Ofisi v. BNP PARIBAS, SA*, 278 F. Supp. 3d 84, n.16 (D.C. 2017). *Also Almog v. Arab Bank, PLC, 471 F.Supp.2d 257, 275 n.23 (E.D.N.Y. 2007).)* Their status as international crimes is based on the universal belief that the acts associated with them affect the core dignity of human beings, both in times of peace and in times of war. Acts of genocide, as a matter of law and morality, are distinct from other violations of international law and are sanctioned and perpetuated by the Defendant Iraqi Kurdistan Regional Government -- though there is often a close connection between all such

acts – including the serious and ongoing violations of international law associated therewith, including grave breaches of numerous international treaties and agreements, and other crimes against humanity. Defendants' acts and omissions are genocidal in character, as they are committed with the requisite specific intent (*dolus specialis*) to destroy, in whole or in part, including the purposeful targeted elimination of Yazida culture and identify, Yazidis in Kurdistan as a part of the Iraqi Kurdistan Region's broader territorial, racial and ethnical group.

22.     The acts of Defendants' genocide of Yazidi in Sinjar are all attributable to Defendants Masoud Barzani and Masrour Barzani, who as long-established leaders of the Defendant Iraqi Kurdistan Regional Government knew or should have reasonably known, of the jus cogens character of the prohibition of genocide and the erga omnes and erga omnes partes character of the obligations owed by states, including Iraq and Defendant Kurdistan Regional Government, under the Genocide Convention.

23.     Defendants Masoud Barzani and Masrour Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, failed to prevent genocide, facilitated genocide, and committed genocide on non-combatant civilians of minority ethnicity, including the shooting of children and those who posed no imminent threat, in manifest violation of the Genocide Convention, and who have also violated and are continuing to violate its other fundamental obligations under the Genocide Convention, including by failing to prevent or punish the direct and public incitement to genocide. Defendants acts and omissions meet the legal definition of genocide, as contained in the Genocide Convention, and are aimed at not just simply the killing of innocent people and the destruction of their livelihoods but a systematic effort to empty Kurdistan of its Yazidi people. Entire multi-generational families have been wiped out completely and thousands displaced. Further, Defendants knowingly and willfully,

13

directly and indirectly, failed in their governmental duties for protection of civilians and upholding legal and humanitarian obligations.

24.    Defendants' acts included killing members of the Yazidi populace, causing serious bodily or mental harm to members of the Yazidi group, deliberately inflicting on the Yazidi group conditions of life calculated to bring about its physical destruction in whole or in part, imposing measures intended to prevent births within the Yazidi group, forcibly transferring children of the group to another group, and subjecting thousands of Yazidis to physical violence, abuse, humiliation, severe ill-treatment, serious beatings, and other outrages to personal dignity, and trapped tens of thousands of Yezidis on Iraq's Mt. Sinjar with no food or water. The Yazidi victims of the Barzani-orchestrated genocide were and are deliberately targeted – not randomly – because of their real or perceived membership in an ethnical, racial or religious group protected under the Convention.

25.    Because most Yazidis continue to live under the very same political sphere that orchestrated their massacre and enslavement – the Barzani Continuing Criminal Enterprise controlling the Defendant Iraqi Kurdistan Regional Government – most live in tents in refugee camps dotting the Kurdistan region controlled by the Defendant Iraqi Kurdistan Regional Government and in constant fear that another genocide may soon take place, even though ISIS has largely, but not entirely, been vanquished. As internally displaced persons, thousands of Yazidis remain at grave and immediate risk of continuing and further acts of genocide as Yazidi people have sought refuge in refugee facilities across Kurdistan, creating overcrowded, undignified, unhygienic, unsafe, and impoverished conditions.

26.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents, representatives, servants, collaborators, and co-conspirators, including Barzani family members

14

and family members by marriage, and others known and unknown, have knowingly and willfully, directly and indirectly, planned, schemed, orchestrated, aided and abetted, conspired, financed, and committed multitudinous crimes, including acts and omissions, in each of these four criminal categories, only partially delineated herein.

27.    *Atrocity crimes*, constituting crimes of hate and violent crimes of the state and state-like organizations orchestrated against citizens as a means to destroy and to gain or attain power, are the wanton barbarous acts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their servile agents and representatives, including Barzani family members and family members by marriage, in their transnational Barzani Continuing Criminal Enterprise. The White House-led interagency Atrocity Prevention Task Force broadly defines *atrocities* as "widespread, intentional violence against civilians, including genocide, war crimes, crimes against humanity and ethnic cleansing." Executive Order 13729, issued by the President of the United States, further defines atrocities "as large scale and deliberate attacks on civilians, and includes acts falling within the definition 'genocide' as defined in international law and under U.S. domestic statute," and declares "preventing mass atrocities and genocide is a core national security interest and a core moral responsibility of the United States." The United Nations defines *atrocity crimes* as: "… *the most serious crimes against humankind. Their status as international crimes is based on the belief that the acts associated with them affect the core dignity of human beings, in particular the persons that should be most protected by States, both in times of peace and in times of war. However, the victims targeted by acts of genocide, crimes against humanity … differ.*" The United Nations further states, "Apart from the moral and ethical responsibility to protect populations at risk of atrocity crimes, both individually and collectively, there are also well-established legal obligations to do so. Such obligations can be found in the Convention on the Prevention and Punishment of

15

the Crime of Genocide, an instrument of international law acceded to by the Republic of Iraq in 1959 and in force in Kurdistan since that time, in international human rights and humanitarian law, and in customary law of nations and international law. International courts and tribunals have also cited these obligations and clarified their specific content."

14.     Torturers and those who commit genocide are now fairly viewed, like pirates, as "common enemies of all mankind and all nations have an equal interest in their apprehension and punishment." *See Kiobel v. Royal Dutch Petroleum*, 569 U.S. at 129, 131, 133 S. Ct. 1659 (Breyer, J. concurring in judgment) (2013).

15.     Most significantly egregious of the multitude and breadth of heinous crimes committed and being committed by slavishly submissive individuals under the command of, or in collaboration with foreign terrorist organizations, and/or by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, servants, and Barzani family members and family members by marriage, and others known and unknown, in their continuing decades-long (and not sporadic), enterprise-wide pattern of unlawful activity and corruption in their transnational criminal network are:

    (a)    Murder of a United States agent

    (b)    U.S. Immigration Fraud and Perjury

    (c)    Extrajudicial murders and enforced disappearances

    (d)    Genocide and human rights abuses

    (e)    Torture of a U.S. citizen

    (f)    Illegal exile of Kurdish citizens

    (g)    International narcotics trafficking

(The United States Supreme Court defined "pattern", quoting Congress: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results,

16

participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (*See Sedima, SP RL v. Imrex Co.,* 473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985))

16.  In all instances Defendants were and are a substantial factor in the sequence of *events* that caused the plaintiffs' injuries, there was and is reasonable connection between the acts or omissions of the Defendants and the damage which Plaintiffs have suffered, and Plaintiffs' injuries were and are reasonably foreseeable or anticipated as a natural consequence of the defendants' conduct.  (*See Estate of Parhamovich v. The Syrian Arab Republic,* No. 17-cv-61 (GMH) (D.C. Dec. 28, 2022); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 66 (D.D.C. 2010)).  [Defendants']"full knowledge of the greater background conspiracy is not necessary." (*See U.S. v. Okoronkwo,* 46 F.3d 426, 433 (5th Cir. 1995))

17.  The John Doe Plaintiffs; and the Kurdish Victims Fund, a national non-profit 501(c)(3) charitable foundation, incorporated in the United States; and Maki Revend, an individual; hereby institute this civil action for compensatory and punitive damages for torts for a continuing pattern of unlawful activity in violation of international and domestic law and claim relief against Defendants for compensable injuries sustained as a result.  The alleged wrongful behavior can reasonably be expected to recur. Plaintiffs claim compensatory and punitive damages for crimes against humanity for their own mental pain and suffering and claims of torture and crimes against humanity on behalf of their decedent relatives.  Torture victims of the Barzani regime, or their relatives, never received the redress, reparation and rehabilitation they are entitled to under international law, treaty, and convention.

18.  Plaintiffs bring claims of torture and crimes against humanity for their own mental pain and suffering in witnessing the Yazidi (Êzidîs) Massacre. Plaintiffs also bring claims of

17

torture and crimes against humanity on behalf of their decedent relatives.

19.     This Complaint refers to Confidential Human Sources and/or their families in Iraqi Kurdistan and beyond, and foreseeable witnesses, who face grave, specific, and targeted implicit and expressed retributive policies, and statements and disparagement, and threats to their safety and lives, including incitement to violence, which are not imaginary nor wholly speculative, and of which Defendants have a long and well-documented demonstrated history, are likely to suffer largely irreversible retaliation, retribution, and other intimidation measures and further human rights abuses and violence, even murder, and grave threats to the integrity of this proceeding, at the hands of the Barzani Continuing Criminal Enterprise if their identities become public, and thus are listed anonymously herein, the identify of whom is known to Plaintiffs' counsel.  (Title 18, United States Code, Sections 2332(a)(1), 2 and 3551 *et seq*.)  Protecting their identities is also essential to advance the compelling interests of ensuring a fair trial free from outside influence and untainted by harassment, intimidation, and threats directed towards or murder of or enforced disappearance of witnesses and other trial participants.  Courts not only have the power, but the duty, to "protect their processes from prejudicial outside interferences" and to ensure a fair trial. *See Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

## PARTIES

### Plaintiffs

20.     **Plaintiff Kurdistan Victims Fund**: The Kurdistan Victims Fund is a not-for-profit 501(c)(3) charitable foundation incorporated in the United States.

21.     **Plaintiff Maki Revend**:  Maki Revend acting individually, is a German citizen presently residing in Berlin, Germany.  He is of Iraqi Kurdish origin.

18

22. **Plaintiffs John Does 1-5000**: On their own behalf and on behalf of their deceased relatives.

## Defendants
### *(Collectively, the Barzani Continuing Criminal Enterprise Defendants)*

23. **Defendant Kurdistan Regional Government**: The Defendant Kurdistan Regional Government, a subordinate subsidiary subdivision provincial governate and instrumentality of the Republic of Iraq, self-identified in written submission to the United States Government as the same as the Kurdistan Democratic Party, a political party, at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington, DC 20036.

24. **Defendant Masoud Barzani** (AKA Mas'ud Barzani, Massoed Barzani, Massoud Barzani, Massud Barsani, Massud Barzani, Masud Barsani, Masud Barzani, Masúd Barzáni, Masʿūd Barzānī, Mesud Barzani, Mesud Barzanî, Mesut Barzani, Mesûd Barzanî, Mesûd Berzanî, Məsud Barzani, and Serok Barzani): Masoud Barzani is an individual, a citizen of Iraq, born August 16, 1946 in the Republic of Mahabad, Iran, is the former President of the Defendant Iraqi Kurdistan Regional Government, current President of the ruling Kurdistan Democratic Party, is an individual residing at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington, DC 20036.

25. **Defendant Masrour Barzani** (AKA Masrur Barzani, Masrūr Bārzānī, Mesrur Barzani, and Mesrûr Barzanî): Masrour Barzani is an individual, a citizen of Iraq, born March 02, 1969, is the Prime Minister of Defendant Iraqi Kurdistan Regional Government and Chancellor of its Kurdistan Regional Security Council, a leader of the Kurdistan Democratic Party, is an individual with U.S. permanent residence status and therefore a "United States Person", residing at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington,

DC 20036.

26.    **Defendant Waysi Barzani**: Waysi Barzani possessing Iraq citizenship identity card #00802544 issued July 27, 2016, is an individual, a citizen of Iraq, is the Director of the Defendant Iraqi Kurdistan Regional Government Intelligence and Security Agency, and Director General of Counter Terrorism (CTD), a part of the Kurdistan Region Security Council (KRSC), a unit of the Defendant Iraqi Kurdistan Regional Government, is an individual residing at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington, DC 20036.

27.    **Defendant Mulla "Babo" Mustafa**: Mulla "Babo" Mustafa, the youngest son of Defendant Masoud Barzani, is an individual American citizen residing at Erbil, Kurdistan, Iraq.

28.    **Defendant Areen Masrour Barzani.** Areen Barzani, is an individual, is a "United States person", is a son of Masrour Barzani, and resides in Erbil, Kurdistan, Iraq.

29.    **Defendant Sarwar Pedawi**:  Sarwar Pedawi, is an individual, a "United States Person" (a green card holder), as defined in 18 U.S.C. § 2331(2) and 8 U.S.C. § 1101(a)(22), "a person who, though not a citizen of the United States, owes permanent allegiance to the United States", is the Founder and Chairman of North Light Holding, based in Iraq and the U.A.E.  North Light's interests include ICT, various industrial sectors, healthcare, free economic zones and distribution networks. He is the Founder and Chairman of the Ster Group, based in the Kurdistan Region of Iraq. He is economic advisor to the President of the Defendant Iraqi Kurdistan Regional Government, and oversees financial elements of the Barzani Continuing Criminal Enterprise counterfeiting of cigarettes and pharmaceuticals, has dual Netherlands citizenship, and is an individual residing at Erbil, Kurdistan, Iraq.

30.    **Defendant Laaween (Lawin) Pedawi**: Laaween (Lawin) Pedawi is an individual, with Dutch citizenship, brother of Defendant Sarwar Pedawi, residing in Dubai.

31.   **Defendant Karim Sinjari (Sinjiri)**: Karim Sinjari (Sinjiri) is a former Minister of Interior of the Defendant Iraqi Kurdistan Regional Government, former Chief of Staff to Iraqi KRG President Masoud Barzani, and presently Senior Advisor to the President of Defendant Iraqi Kurdistan Regional Government. He is an individual holding Sweden citizenship, residing at Erbil, Kurdistan, Iraq.

32.   **Defendant Bayan Sami Abdul Rahman**:  Bayan Sami Abdul Rahman is an individual, a United Kingdom citizen, and is senior advisor to Kurdistan Prime Minister Masrour Barzani for foreign affairs and climate change, is an individual residing in Erbil, Kurdistan, Iraq, and was previously from 2015 until August 1, 2023, located in Washington D.C. as the High Representative of the Defendant Iraqi Kurdistan Regional Government and a compensated representative of Masoud Barzani and Masrour Barzani and other Iraqi KRG officials, acting within the scope of her office or employment actively advocating Barzani interests including disinformation and deception at the highest levels of the U.S. government, before agencies and officials of the Government of the United States, influencing U.S. financial and military assistance to the Defendant Iraqi Kurdistan Regional Government.  She reported to Masrour Barzani and helped push Barzani/Defendant Iraqi Kurdistan Regional Government talking points with American policymakers, actively advocating for the Defendant Iraqi Kurdistan Regional Government's interests in Washington, D.C. and with a network of influencers coordinated and pushed their positions and priorities at the highest levels of the United States government.  She represented the interests of these foreign entities and principals, issued public written and oral communications and position statements on their behalf to the American public and to elected and appointed U.S. government officials, agencies, and departments, and was employed as spokesperson in the United States for the Barzani's, operating from an office located at 1532 16th

St NW, Washington, DC 20036.  She was previously a journalist, High Representative of the Defendant Iraqi Kurdistan Regional Government to the United Kingdom, and a member of the Kurdistan Democratic Party Leadership Council.

33.   **Defendant Treefa Aziz**: Treefa Aziz, is an individual and a resident of the United States since 1977, a United States citizen, a knowledgeable law-trained member of the Virginia Bar, and a long-time representative of and for the Barzani's.  As of August 1, 2023 she is the designated and employed representative of the Defendant Iraqi Kurdistan Regional Government and Masoud Barzani and Masrour Barzani, and other Defendant Iraqi KRG officials, acting within the scope of her office or employment actively advocating Barzani interests including disinformation and deception at the highest levels of the U.S. government, before agencies and officials of the Government of the United States, influencing U.S. financial and military assistance to the Defendant Iraqi Kurdistan Regional Government.  She has represented and does represent the interests of these foreign principals, issues written and oral communications and position statements on their behalf to the American public and to elected and appointed U.S. government officials, agencies, and departments, and is a compensated spokesperson in the United States for the Barzani's, with offices located at 1532 16th St NW, Washington, DC 20036.  She recently served as a senior advisor to the Defendant Iraq KRG Prime Minister, Masrour Barzani, in Erbil. Previously, she worked in the United States Congress for a member of the House Appropriations Committee, and was previously the Kurdistan Democratic Party (KDP) Representative to the United States.  She holds a Juris Doctorate from the Washington College of Law at American University in Washington, D.C.

34.   **Defendant Afan Saleh Omar Sherwani**:  Afan Saleh Omar Sherwani, is an individual, is a representative, agent, business agent, and financial agent for Defendant Masrour

22

Barzani, a foreign principal, in the United States, though has not submitted a registration statement with the U. S. Attorney General pursuant to the statutory requirements of the Foreign Agents Registration Act, is an individual with U.S. permanent residence status and therefore a "United States Person", residing in Virginia.

35.   **Defendant Omar S. Barzani**:   Omar Barzani is an individual whose current address is 9716 Windburn Drive, Plano, TX 75025, is principal officer of Barzani Charitable Foundation, 5111 Greenville Avenue, Dallas, TX 75206.

36.   **Defendant Entifadh Kamal Qanbar (AKA Entifadh Qanbar, Entfaidh Qanbar, Entifaoh K Qanbar, Entifah Qanbar, Entifadh K Qua Bar, Entifadfh K Qanbar, Etifadh K Qanbar)** is an individual born in Iraq, is a United States citizen since 1999, residing at 6062 Burnside Landing Drive, Burke, Virginia 22015, self-declared he is "presently leading an advocacy campaign that was approved by Kurdish Prime Minister [Defendant] Masrour Barzani." He has served as Senior National Security Advisor for the Iraqi Parliament, the Deputy Military Attache for the Embassy of Iraq in Washington, DC, Spokesman to Member of the Iraqi Governing Council, Director of the Iraqi National Congress Foundation, and and a Special Envoy for the United Iraqi Alliance. He is the founder and president and director of two purported non-profit organizations, Future Foundation, whose legal charitable status of the Internal Revenue Service appears questionable, and Kurdish Protection Action Committee (KPAC). He self-describes as "rendering services for Council of Ministers Kurdistan Regional Government," an entity controlled by Defendant Masrour Barzani. In 2023, he led an advocacy campaign that was approved by Defendant Iraqi Kurdistan Regional Government Prime Minister Masrour Barzani.

37.   **Defendant Dindar Zebari**: Dindar Zebari is an individual, and is the Defendant Iraqi Kurdistan Regional Government's Coordinator for International Advocacy with

23

responsibility to communicate policy clarifications primarily to human rights forums and panels of multilateral treaty forums, residing in Erbil, Kurdistan, Iraq.

38.   **Defendant Aziz Ahmad**:  Aziz Ahmad is an individual, and is Deputy Chief of Staff to Defendant Iraqi Kurdistan Regional Government Prime Minister Masrour Barzani, chief contact for lobbyists including those in the United States, formerly Assistant to the Chancellor of the Defendant Iraqi Kurdistan Regional Government Security Council, formerly holding positions in the Defendant Iraqi Kurdistan Regional Government Department of Foreign Relations, residing in Erbil, Kurdistan, Iraq.

39.   **Defendant Ashti Hawrami, PhD**:  Ashti Hawrami, Ph.D. is an individual, was Minister for Natural Resources and Assistant Prime Minister for Energy Affairs in the Defendant Iraqi Kurdistan Regional Government, was previously an oil executive and was an engineer in the Iraqi National Oil Company.  He resides in London, England, United Kingdom.

40.   **Defendant Baz Karim Al-Barzanji**:  Baz Karim Al-Barzanji is an individual, owner of record and operator of KAR Group and KAR Refinery in Erbil, residing in Erbil, Kurdistan Iraq. Baz Karim Al Barzanji employs multiple U.S. persons including a former U. S. Government Official.

41.   **Defendant Ghafoor Khoshnaw**:  Ghafoor Khoshnaw is an individual, owner or record and operator of Khoshnaw Group in Erbil, residing in Erbil, Kurdistan, Iraq.

42.   **Defendant Ameer Saadallah Rasheed**:   Ameer Saadallah Rasheed is an individual, a United States citizen, owner of record and operator of Renos Company in Erbil, residing in Erbil, Kurdistan, Iraq.

43.  **Defendant Kamal Kirkuki**: Kamal Kirkuki is an individual, formerly Defendant Iraqi Kurdistan Regional Government speaker of parliament and former Kirkuk governor, residing in Erbil, Kurdistan, Iraq.

44.  **Defendant Jafar Aminki**:  Jafar Aminki is an individual, senior official in Kurdistan Democratic Party, is a member of KDP intelligence services, and resides in Erbil, Kurdistan, Iraq.

45.  **Defendant Zaheem Ali**:  Zaheem Ali is an individual, a senior official in the Kurdistan Democratic Party, and resides in Erbil, Kurdistan, Iraq.

46.  **Defendant Azad Barwari**: Azad Barwari is an individual, and resides in Erbil, Kurdistan Iraq.

47.  **Defendant Hoshyar Zebar**:  Hoshyar Zebar is an individual, uncle of Masoud Barzani, was formerly the Deputy Prime Minister, Minister of Finance, and Minister of Foreign Affairs of the Republic of Iraqi where he was a member of the executive committee of the Iraqi National Congress, its Presidential Council, and Iraqi Governing Council.  He was a member of KDP's Central Committee as well as its Political Bureau.  He previously directed KDP foreign relations and represented the party in the United States and United Kingdom, and resides in Erbil, Kurdistan, Iraq.

48.  **Defendant Sayran Saber Mustafa Barzani**:  Sayran Saber Mustafa Barzani is an individual, a spouse of Masrour Barzani, a "United States person" by virtue of permanent resident status, and resides in Erbil, Kurdistan, Iraq.

49.  **Defendant Lina Sirwan Barzani**: Lina Barzani may be a fictitious person of the Barzani Continuing Criminal Enterprise.  It is believed she is an individual born on June 22, 1994 in Arlington, VA, publicly represents herself as Chairman and CEO at Lina Holding and Vice

25

President of J.P. Morgan (though J.P. Morgan does not list her in its global employee directory)..
She is the purported daughter of Sirwan Saber Mustafa Barzani (billionaire owner of Kurdistan
telecommunications monopoly Korek Telecom Co., CS Ltd. and nephew of Masoud Barzani) and
an American citizen alleged to be managing assets gained from the Barzani Continuing Criminal
Enterprise in the United States and internationally, residing at address(es) unknown in Virginia
and/or New York.

50.   **Defendant Dilshad Barzani**: Dilshad Barzani, brother of and "right hand man" to
Defendant Masoud Barzani, was Kurdistan Democratic Party representative to Germany and
Europe, is an individual after fleeing Germany now residing in Erbil, Kurdistan, Iraq, and is a
major beneficiary of the fruits of the Barzani Continuing Criminal Enterprise.

51.   **Defendant Sirwan Barzani**:  Sirwan Barzani is nephew of Masoud Barzani,
billionaire owner of a Kurdistan telecommunications monopoly Korek Telecom Co., CS, is an
individual residing in Erbil, Kurdistan, Iraq.

52.   **Defendant Nihad Barzani**:  Nihad Barzani is an individual, brother of Masoud
Barzani and uncle of Masrour Barzani, reporting to Masrour Barzani, who directs the illicit drug
manufacture and distribution operations of the Barzani Continuing Criminal Enterprise, and
resides in Erbil, Kurdistan, Iraq.

53.   **Defendant Sidad Barzani**:  Sidad Barzani is an individual, occupies a senior
leadership position in Kurdistan Democratic Party headquarters, residing at Erbil, Kurdistan, Iraq.

54.   **Defendant Sihad Barzani**:  Sihad Barzani is an individual, holds the rank of
General in the Defendant Iraqi Kurdistan Regional Government Peshmerga military forces,
residing at Erbil, Kurdistan, Iraq.

55.   **Defendant Hikmat Bamarni**:  Hikmat Bamarni is an individual, a U.S. citizen,

26

and is Director of the Kurdistan Democratic Party Seventh Branch (USA and Canada), officing at 3875 B Plaza Drive, Fairfax, VA 22030.

56.     **Defendant Shimal Jawhar Salin**:  Shimal Jawhar Salin is an individual who for the Barzani Continuing Criminal enterprises manages the counterfeiting of pharmaceuticals and cigarettes, and resides in Kurdistan, Iraq.

57.     **Defendant Dilshad Yousef**:  Dilshad Yousef is an individual and is the head of a Defendant Iraqi Kurdistan Regional Government Asayish security force based in Erbil, is a hitman for the Barzani Continuing Criminal Enterprise, residing in Erbil, Kurdistan, Iraq.

58.     **Defendant Ismat Argoshi**:  Ismat Argoshi is an individual and who is the head of Security Asayesh, the Kurdish security organization, is a hitman for the Barzani Continuing Criminal Enterprise, residing in Erbil, Kurdistan, Iraq.

59.     **Defendant Barzan Hersha Rash**:  Barzan Hersha Rash is an individual and a Kurdish Democratic Party (KDP) hitman, a hitman for the Barzani Continuing Criminal Enterprise, residing in Kurdistan, Iraq.

60.     **Defendant Azad Germari**:  Azad Germari is an individual who is the Director of the Office of Intelligence for the Iraqi Kurdistan Province of Duhok, is a hitman for the Barzani Continuing Criminal Enterprise, and resides in Duhok, Kurdistan, Iraq.

61.     **Defendant "Shalawo"**: "Shalawo" is an individual, whose current address is unknown.

62.     **Defendant Rabea Barzani**:  Rabea Barzani is an individual, an uncle of Masrour Barzani, residing in Erbil, Kurdistan, Iraq.

63.     **Defendant Ghalib Rabea Barzani**:  Ghalib Rabea Barzani is an individual, residing in Erbil, Kurdistan, Iraq.

64.  **Defendant Raber Barzani**:  Raber Barzani is an individual, residing in Erbil, Kurdistan, Iraq.

65.  **Defendant Ghalib Raber Barzani**:  Ghalib Raber Barzani is an individual, residing in Erbil, Kurdistan, Iraq.

66.  **Defendant Rubar S. Sandi**:  Rubar S. Sandi is an American citizen, an individual of Kurdish origin residing at 9300 Belle Terre Way, Potomac, MD 20854.  He is currently an executive of TDS Global Solutions Inc. registered in Washington DC.

67.  **Defendant Dilal Abbas**:  Dilal Abbas is an individual, residing in Kurdistan, Iraq.

68.  **Defendant Ahmad Kurdu Nori**:  Ahmad Kurdu Nori is an individual, whose current address is unknown.

69.  **Defendant Mahmood Agaha**:  Mahmood Agaha is an individual, whose current address is unknown.

70.  **Defendant Hamela Gardi**:  Hamela Gardi is an individual, residing in Kurdistan, Iraq.

71.  **Defendant Afan Saleh Omar Sherwani**:  Afan Saleh Omar Sherwani is an individual whose current address is in Northern Virginia.

72.  **Defendant Dilshad Hassan Najar**:  Dilshad Hassan Najar is an individual, residing in Kurdistan, Iraq.

73.  **Defendant Joseph Teichmueller**:  Joseph Teichmueller is an individual residing in Germany.

74.  **Defendant U.S. Public Official #1**:  U.S. Public Official #1 is an individual, an American citizen, who as a senior United States government official and official of the Coalition Provisional Authority – Iraq, possessed substantial influence over foreign military sales and

28

foreign military financing and assistance to Iraqi Kurdistan, and retired United States military official residing at Erbil, Kurdistan, Iraq.

75.   **Defendant U.S. Public Official #2**:  U.S. Public Official #2 is an individual, an American citizen, who as a senior United States government official and official of the Coalition Provisional Authority – Iraq,  possessed substantial influence over foreign military sales and foreign military financing and assistance to Iraqi Kurdistan, and retired United States military official whose current address is Erbil, Kurdistan, Iraq.

## JURISDICTION AND VENUE

76.   Plaintiffs have suffered severe injury in fact.  These injuries were and are caused by the intentional and knowing conduct of the Defendants.  The requirements of Article III standing are familiar:  First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of –the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *United States v. Windsor, 570 U.S. 744, 133 S.Ct. 2675, 2685-86, 186 L.Ed.2d 808 (2013)*  Plaintiffs satisfy all requirements of standing.

77.   "The D.C. Circuit has translated the requirement into a single question: 'did the [defendant]'s actions materially increase the probability of injury?'" *Huddy v. FCC*, 236 F.3d 720, 722 (D.C.Cir.2001).  <u>All</u> of Plaintiffs' injuries are "the consequence of the defendants' actions...." *Warth v. Seldin, 422 U.S. 490, 504-05, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).*  None of defendants'

29

acts were "acts of war" as defined in 18 U.S.C. § 2331(4).

78.    This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331; and subject matter and personal jurisdiction pursuant to the Torture Victim Protection Act of 1991; 28 U.S.C. 1350; 18 U.S.C. § 1961 *et seq.*; the Anti-Terrorism Act, 18 U.S.C.§ 2333 *et seq.*; the Alien Tort Statute of 1789, 28 U.S.C. 1350; and the Torture Act, 28 U.S.C. § 1350 note § 2(a)(1)-(2).

79.    In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821). Supreme Court precedents have identified a narrow exception to that rule, known as the "political question" doctrine. *See, e.g., Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). The present matter involves no "political question" and presents no nonjusticiable political questions; and thus, this court has jurisdiction of the matters raised herein. *See Zivotofsky Ex Rel. Zivotofsky v. Clinton*, 566 U.S. 189, 132 S. Ct. 1421, 182 L. Ed. 2d 423 (2012). There is no danger of inadvertent interference with foreign relations. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, at 16 (D.C. 1998). Defendants' beliefs, conduct, and assertions notwithstanding, they are not above the law. Defendant Masrour Barzani is a "United States person", and "No man in this country is so high that he is above the law." *See United States* v. *Lee,* 106 U. S., at 220 (1882).

80.    Acknowledging "a defendant must have minimum contacts with the forum reflecting 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum,'" this Court has personal jurisdiction over the Defendants because their extensive forum contacts are all squarely related to Plaintiffs' claims. (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

81.     This Court has personal jurisdiction over the Defendants because the Alien Tort Statute, also called the Alien Tort Claims Act (ACTA), 28 U.S.C. § 1350, provides "the district courts shall have jurisdiction over any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States." Two conditions must exist for this Court to have subject matter jurisdiction under the ATCA. First, Plaintiffs must be aliens. Most of the Plaintiffs are citizens of Iraq; Plaintiff Maki Revend, motivated by relentless debilitating fear of and deadly threats and acts by Defendants, has renounced his Iraq citizenship and accepted German citizenship and residence; and are thus aliens. Second, the tortious conduct Plaintiffs allege must have been committed in violation of the law of nations or a treaty to which the United States is a signatory. In fact, nothing more than a violation of the law of nations is required to invoke jurisdiction under the ATCA. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d at 774, 779 (D.C. Cir. 1984) (Edwards, J. concurring.) In addition, the actions Plaintiffs allege are violations of the law of nations. Courts have held that torture, summary execution, crimes against humanity and cruel, inhuman and degrading treatment are acts that violate international law; therefore, they meet the ATCA's criterion that Plaintiffs' claims violate the law of nations. *See FIS*, 993 F. Supp. at 4, 8; *Xuncax*, 886 F. Supp. 162. The Torture Act establishes federal jurisdiction and liability for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ..." 28 U.S.C. § 1350 note § 2(a)(1)-(2).

82.     In committing these tortious acts against Plaintiffs, Defendants knowingly, willingly, and substantially violated treaties, as defined by the Vienna Convention on the Law of Treaties:

(a) Article 2(a): "treaty" means an international agreement concluded between States in written form and governed by international law, whether embodied

31

in a single instrument or in two or more related instruments and whatever its particular designation;

(b) Article 2 (b): "ratification", "acceptance", "approval" and "accession" mean in each case the international act so named whereby a State establishes on the international plane its consent to be bound by a treaty;

(c) Article 2(g): "party" means a State which has consented to be bound by the treaty and for which the treaty is in force;

(d) Article 18: A State is obliged to refrain from acts which would defeat the object and purpose of a treaty when: (a) it has signed the treaty or has exchanged instruments constituting the treaty subject to ratification, acceptance or approval, until it shall have made its intention clear not to become a party to the treaty; or (b) it has expressed its consent to be bound by the treaty, pending the entry into force of the treaty and provided that such entry into force is not unduly delayed.

(e) Article 27: A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.

(f) Article 29: ...a treaty is binding upon each party in respect of its entire territory.

83.    This Court has personal jurisdiction over the Defendants because Defendants had contacts constituting purposeful activity with the District of Columbia and/or the United States. *See International Shoe Company v. Washington*, 326 U.S. 310, 316 (1945), and could have anticipated being brought into court here. *See World-wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980). At all times relevant, Defendants had "continuous and systematic" contacts

32

between themselves and the District, a staffed office with continuous operations in the District, retained lobbyists, representatives, and counsel in the District, and through the acts of its authorized agents, which give rise to general jurisdiction over Defendants as they traveled to the United States. *See Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 416 (1984).

84.     This Court has personal jurisdiction over all the Defendants because the Alien Tort Statute enacted as part of the Judiciary Act in 1789 provides jurisdiction for the federal courts to hear lawsuits regarding torts "committed in violation of the law of nations." 28 U.S.C. § 1350. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 29 (D.C. Cir. 2011).   "The Alien Tort Statute in its entirety states '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.' 28 U.S.C. § 1350.  The Torture Act establishes federal jurisdiction and liability for '[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ...' 28 U.S.C. § 1350 note § 2(a)(1)-(2)".  *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, at 22 (D.C. 2005).

85.     This Court has personal jurisdiction over all the Defendants because the "aiding and abetting liability is well established under the Alien Tort Statute" enacted as part of the Judiciary Act in 1789, "that the principle of aiding and abetting liability is well established in customary international law, and that the *mens rea* and *actus reus* requirements are those set out by the Nuremberg Tribunals and the international courts created by the United Nations, which reflect the standard under federal common law." *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 15 (D.C. Cir. 2011).   Federal courts have relied on international criminal law norms in establishing the content of the law of nations. *See, e.g., Khulumani*, 504 F.3d at 270 (Katzmann, J., concurring); *Kadic*, 70 F.3d at 241-43; *see also Sosa*, 542 U.S. at 762-63, 124 S.Ct. 2739

33

(Breyer, J., concurring).  The Court of Appeals for the District of Columbia has acknowledged it is "guided by our recognition of established and fundamental principles of international law." *See FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1304 (D.C. Cir. 1980). On September 28, 2016, Congress enacted the Justice Against Terrorism Act ("JASTA"), which expands ATA civil liability to reach "any person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

86.    Authorities and sources set forth in instant Complaint confirm that aiding and abetting and material support or resources liability is clearly established in the law of nations and consequently such liability is available in this Court.  18 U.S.C. 2339A defines the term "material support or resources" to mean currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

87.    This Court has personal jurisdiction over all the Defendants because "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.  A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.  He need not even have planned or known about the injurious action, as in the case of the getaway driver in *Davidson* [*Davidson v. Simmons*, 203 Neb. 804, 280 N.W.2d 645 (1979)], so long as the purpose of the tortious action was to advance the overall object of the conspiracy."  In "civil conspiracy", "a conspirator can be liable even if he neither planned nor knew about the particular overt act that

34

caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy." *See Halberstam v. Welch*, 705 F.2d 472, at 481 (D.C. Cir. 1983).

88.    With respect to conspiracy, the Supreme Court further stated:  "Secrecy and concealment are essential features of successful conspiracy.  The more completely they are achieved, the more successful the crime.  Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *See Blumenthal v. United States*, 332 U.S. 539, at 557.

89.    This Court has personal jurisdiction over the Defendants in that the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 78 (1992) (codified as 28 U.S.C. § 1350 note), does provide subject matter jurisdiction because Plaintiffs did exhaust, or were obstructed in exhausting, local Kurdistan legal remedies, in that such remedies are neither credible nor available as there is no fair administration of justice, before seeking relief in a United States court. The TVPA states "a court shall decline to hear a claim ... if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note 2 (emphasis added).  "Adequate and available remedies" indisputably do not exist for the Plaintiffs in Iraqi Kurdistan, the "place in which the conduct giving rise to the claim occurred."  Plaintiffs cannot find relief in any Defendant Iraqi Kurdistan Regional Government tribunal, which are manifestly unjust and oppressive, due to the legacy highly documented (by agencies of the United States Government and the United Nations, and in many contemporaneous public accounts) of an incorrigibly corrupt judiciary, political obstruction, systemic intimidation, administrative sabotage, illicit and arbitrary interference, an absence of judicial independence, deploying instruments of oppression, an absence of accountability or transparency, infliction of

35

harm or injury unjustifiable by any government interest, deliberate indifference to and deprivation of due process and rights of Iraq constitutional law, lacking all protection of the individual against arbitrary action of government and the exercise of power against the individual without any reasonable justification in the service of a legitimate governmental objective, with no reasonable access to documents for purposes of discovery, with magistrates closely aligned with and politically beholden to the Defendants who politicize legal disputes, and where Defendants invent their own judicial standards and contort facts to their liking – all to a degree that would shock the contemporary conscience. The European Union Agency for Asylum reports Defendant Iraqi Kurdistan Regional Government "Judges are frequently appointed based on partisanship rather than merit or independence." "There is an overall mistrust in the criminal justice system in Kurdistan with respect to the lack of effective investigations and the atmosphere of impunity, particularly regarding attacks on media professionals." The Defendant Iraqi Kurdistan Regional Government judiciary does not resolve cases of abuse filed by civilians against the Defendant Iraqi Kurdistan Regional Government and its officials, leaders, associates, and subordinates, and any pursuit of remedies against the Defendants in Iraqi Kurdistan would be futile and presents a substantial and serious real threat of severe, even deadly, physical or mental harm reprisals against those raising the allegations. Examples of such, and as detailed elsewhere herein, is the two-year torture of American citizen Sidqi Bradosti in a Defendant KRG prison, as straightforwardly acknowledged by a judge of the court. The District Court of the District of Columbia has made it clear that "exhaustion is a prudential doctrine that should be applied flexibly and not when further pursuit of remedies is futile." *See Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.C. 2005); *Cutler v. Hayes*, 818 F.2d 879, 890-91 (D.C.Cir. 1987).

36

90.    Because the TVPA is not a jurisdictional statute, a failure to comply with its requirements will not preclude a U.S. court from hearing a claim under it. *See Al-Odah v. United States*, 321 F.3d 1134, 1146 (D.C. Cir. 2003) (Randolph concurring). (*See also Abiola v. Abubakar*, 267 F. Supp. 2d 907,910 (N.D. 1112003.)) The statute provides a cause of action for damages to "anyone who suffered torture anywhere in the world at the hands of any individual acting under the law of any foreign nation." *Id.* Further, any case brought under the TVPA will also arise under federal law and jurisdiction can then be based on 28 U.S.C.- 16 - § 1331, which expressly grants general federal question jurisdiction. *Id.*

91.    This Court "must assume the truth of facts plausibly alleged in plaintiffs' ... Complaint and draw all reasonable inferences in plaintiffs' favor." *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). *Owens v. BNP Paribas, S.A. (Owens IV)*, 897 F.3d 266, 272 (D.C. Cir. 2018).

92.    This Court has personal jurisdiction over the Defendants because they are individual, non-state defendants that have been and are doing business in Washington, D.C., and operate in concert as an operative criminal conspiracy with an element of pecuniary gain and economic and physical threat and injury, and have a registered address at 1532 16th St NW, Washington, DC, where at all times relevant a staff was and is employed, are not immune from suit, are not relieved of responsibility under law, can point to no statute, decree, order, resolution, or comparable evidence of sovereign authorization for any of the actions in question, and are subject to this Court's jurisdiction. See 515 F.3d 1279 (D.C. Cir. 2008), 115 F.3d 1020 (D.C. Cir. 1997), and *Paul Rusesabagina, et al. v The Republic of Rwanda, et al.* (Civil Case No. 22-469(RJL), U.S.D.C.D.C March 16, 2023).

93.    The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 et seq., does not

provide immunity for Defendants. A foreign state is "presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). However, and indisputably, Iraqi Kurdistan is not a foreign state.

94.     Plaintiffs do not dispute that sitting heads of state (i.e. Presidents and Prime Ministers) of *nation states* are entitled to immunity in United States courts and, with some exception, categorically immune from suit in American courts. *See Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019).

95.     However, neither Defendant Masoud Barzani nor Defendant Masrour Barzani nor any Defendant is, or has ever been, a "sitting head of a nation state", their persistent and knowingly deceptive misrepresentations, declarations, and prior claims of sovereignty notwithstanding. As the United States Supreme Court pointed out, "'[s]overeignty' is a term ... much abused." *See Boumediene v. Bush*, 553 U.S. 723, 2252, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008). First, Defendant Masoud Barzani, at present, holds no provincial regional presidential or prime ministerial position, within the subdivision governate of the nation state of the Republic of Iraq or any nation state. Second, provincial Iraqi Kurdistan is indisputably not a nation state. Loosely and inconclusively demarcated, and with boundary lines unclearly defined, fluid, and imprecise, "Kurdistan", land of the Kurds, is an ill-defined geographic area existing within the borders of four nation states: Iraq, Syria, Turkey and Iran. These four nation states are sovereign, whereas the Iraqi Kurdistan provincial governorate, located within and a subdivision of the Republic of Iraq – where Defendants Masoud Barzani and Masrour Barzani and Waysi Barzani, and many co-conspirators, hold limited regional government executive positions -- is indisputably not a nation state. Third, customary international law recognizes a nation state, and not a geographical or political subdivision within a nation state, as deserving immunity for the head of that nation state.

38

96.    Iraqi Kurdistan enjoys an asymmetrical federalism; the boundaries separating Kurdistan from the rest of Iraq were not clearly defined and there is a substantial contested area between Kurdistan and the rest of Iraq. Second, it was never established who was included in the population of Kurdistan, because Saddam Hussein had moved many Arabs into the region and the Kurds wanted them removed; Article 140 of the Iraq constitution provided for a process to establish who belonged in the region, but the process was never implemented. Further, the financial autonomy of the Kurdistan region was always tenuous. The issue hinges on control over Kurdistan's abundant oil and gas reserves, and to a lesser extent on control over custom duties on imports into Kurdistan from neighboring countries, most importantly Turkey. All three issues remain unresolved to this day. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, each of whom did at times relevant occupy the senior-most regional government positions of executive authority of the Defendant Iraqi Kurdistan Regional Government, a constitutionally recognized autonomous regional government within the Republic of Iraq, the federal parliamentary sovereign state. The federal Republic of Iraq did not appoint them to these positions of executive command authority and they do not report to the Republic of Iraq. In this constitutional arrangement, the federal state discharges minimal to no practical governmental function; nor does the federal state exercise control over the Defendant Iraqi Kurdistan Regional Government's operations, administration, legislation, judiciary, policing, or military; nor is the Defendant Iraqi Kurdistan Regional Government in general compliance with federal Republic of Iraq government goals, mandates, laws, and rules. The Defendant Iraqi Kurdistan Regional Government is virtually free of and persistently challenges, including via armed combat, or countermands intermittent and irregular efforts of Iraq to exercise any federal government control.

97.    The Foreign Sovereign Immunities Act (FSIA) establishes a default rule granting foreign sovereigns immunity from the jurisdiction of United States courts. *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C.Cir.2015). That baseline grant of immunity, however, is subject to a number of exceptions. *See* 28 U.S.C. §§ 1605-07; see also id. § 1604. Moreover, the non-commercial tort "exception to the FSIA does not apply to any claim arising out of malicious prosecution, abuse of process ..., misrepresentation, [or] deceit," id. § 1605(a)(5)(B). *See MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), modified 823 F.2d 606 (D.C. Cir. 1987). *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), modified, 823 F.2d 606 (D.C. Cir. 1987).

98.    While the FSIA "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," there are "a number of exceptions" to that rule that apply here. *See Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, Case 1:22-cv-00245-RJL Document 17-1 Filed 06/11/22 Page 14 of 33 9 13–14 (D.C. Cir. 2015). Should the court determine Iraqi Kurdistan is a sovereign state, Plaintiffs herein produce evidence that the exception applies. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Once Plaintiffs make this showing, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.*

99.    Defendants might contend that the FSIA itself obligates a plaintiff to exhaust domestic remedies before attempting to bring suit against a foreign sovereign (which Plaintiffs do not herein do and Defendants are not a foreign sovereign) in United States courts. The Court of Appeals for the District of Columbia Circuit, however, has held that the FSIA itself imposes no exhaustion requirement. *See Simon v. Republic of Hungary*, 812 F.3d 127, 148 (D.C. Cir. 2016);

*Chabad*, 528 F.3d at 948-49; *accord Abelesz*, 692 F.3d at 678.

100.    In the FSIA, the Congress enacted a "comprehensive framework for resolving any claim of sovereign immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 699, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004).  The purpose of the FSIA was "to free the Government from . . . case-by-case diplomatic pressures." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. at 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)  The statute effectuates this purpose by "set[ting] forth 'the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States.'" *MacArthur*, 809 F.2d at 919 (emphasis added) (*quoting* H.R. Rep. 94-1487, at 12.)  Iraqi Kurdistan is indisputably not a foreign state.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani have no absolute immunity, and their criminal conduct falls outside the outer perimeter of any lawfully empowered official responsibilities.  FSIA does not immunize criminal conduct.  "No officer of the law may set that law at defiance with impunity." *United States v. Lee*, 106 U.S. 196, 220 (1882).

101.    Nonetheless, should the Defendant Iraqi Kurdistan Regional Government or its Defendant officials incorrectly assert that such sovereign immunity is applicable, the FSIA terrorism exception strips immunity from a foreign state that "specifically instructs" a terrorist organization to carry out an attack and from a foreign state that "only provides general support, but was not involved with the" specific act.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).  Under the causation standard imposed by the FSIA, a plaintiff need not establish but-for causation and instead may articulate a claim by showing (1) the defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff's injury; and (2) the plaintiff's injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *See Owens v. BNP Paribas, SA*, 897 F.3d 266,

41

794 (D.C. Cir. 2018). Further, this Court has held "Political assassinations ordered by foreign states outside their territory, however, are not valid acts of state." *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, at 24 (D.C. 1998).

102.    With respect to Defendant Masoud Barzani, no longer an official of the Defendant Iraqi Kurdistan Regional Government since 2017, the United States Supreme Court held that a former official is not covered by the FSIA. *See Samantar v. Yousuf,* 560 U.S. 305, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010). Former Presidents of Defendant Iraqi Kurdistan Regional Government enjoy no special conditions on their criminal and civil liability.

103.    "The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him or her of responsibility under international law." *See U.N. International Law Commission, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, in Report of the International Law Commission on its Second Session, 5 June to 29 July 1950, (Document A/1316), reprinted in II YEARBOOK OF INTERNATIONAL LAW COMMISSION 1950, 374, 375 U.N. Doc. A/CN. 4/SER.A/1950/Add. 1 (Jun. 6, 1957) ("PRINCIPLE III)* "The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him from responsibility under international law." *See U.S. Department of Defense Law of War Manual, 2015, p. 1150.*

104.    "The official position of any accused person, whether as Head of State or Government or as a responsible Government official, shall not relieve such person of criminal responsibility nor mitigate punishment." *See U.S. Department of Defense Law of War Manual, 2015, p. 1150.*

105.   Acting pursuant to orders does not relieve a person of responsibility. The International Law Commission has declared:

"The fact that a person acted pursuant to orders of his or her Government or of a superior does not relieve that person from responsibility under international law, provided it was possible in fact for that person to make a moral choice." *See U.S. Department of Defense Law of War Manual, 2015.*

The standard for Defendants' liability for criminal acts exceeds that for civil liability of those acts.

106.   The Supreme Court has been equally clear on federal court jurisdiction regarding treaties. "It is a general principle of construction with respect to treaties that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them." *Geofroy v. Riggs*, 133 U.S. 258, 10 S. Ct. 295, 33 L. Ed. 642 (1890).  With relevance in the instant matter, with respect to another "Convention" the Supreme Court said it is "a multilateral treaty to which approximately 160 countries, including the United States. . . are signatories. As a ratified treaty, [it] has the status of federal law." "[T]reaties are recognized by our Constitution as the supreme law of the land." <u>Breard v. Greene, 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998)</u>. U.S. Constitution, Article VI, clause 2 (all treaties shall be supreme law of the land).  Defendants have abused and dishonored treaties as set forth herein with impunity and reckless abandon to, knowingly and willfully, criminally and tortiously harm Plaintiffs.

107.   Further, although "[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts" such as extrajudicial killing, courts in this District have concluded that injuries "resulting from 'deliberate' attempts to kill fall within the scope" of the terrorism exception. *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, 81 (JDB) (D.C. Jan. 27, 2023); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.C. 2019); accord *Gill v. Islamic*

43

*Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).

108.    Defendants have purposefully directed tortious activity at residents of this forum. Plaintiffs' claims arise out of, and relate to, Defendants' long-running conspiracy to cause pain and sow terror in the United States injuring Plaintiffs.  Plaintiffs are not the only link between Defendants and the forum; rather, Defendants' tortious conduct also forms the necessary connection. Defendants have repeatedly, purposefully, knowingly, and willingly defrauded businesses of the United States; Defendants have repeatedly, purposefully, knowingly, and willingly defrauded the United States Government; and Defendants have repeatedly and expressly intended to affect the United States and its economic, military, and national security interests and the conduct of U.S. foreign policy and U.S. citizens through their violent, incessant, and expansive criminal conspiracy conduct.  This tortious and criminal conduct by Defendants has provided the means for Defendants to damage Plaintiffs.

109.    Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in the United States District Court for the District of Columbia because the Defendant's principal place of business in the United States is in the District of Columbia, where Defendants for all times relevant have and do maintain an office and employed staff, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

110.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have been killed, maimed, injured or otherwise harmed by reason of acts of international terrorism at a depth of self-enriching evil beyond horrific; to also include foreign nationals pursuant to 28 U.S.C. 1350 harmed by the Barzani Continuing Criminal Enterprise operating worldwide, including in the United States; and their estates, survivors, and heirs.

44

111.    This court has subject matter jurisdiction because "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. § 1350. (*See Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)).

112.    This court has subject matter jurisdiction pursuant to 28 U.S. C. § 1331; 28 U.S.C. §§ 1391(b), and (d); 28 U.S.C. § 2331; 18 U.S.C. § 2333(d); and, 18 U.S.C. § 2334(a), as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

113.    Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k).

114.    As explained in greater detail below, and upon information and belief, and at all times relevant hereto, Defendants' conduct had a substantial nexus to the United States and to Washington DC, including by virtue of repeated and systematic use of U.S. dollar transactions and banks in the United States to pay, conspire with, and aid and abet terrorists or to launder proceeds from such transactions. Defendants thereby purposefully availed themselves of U.S. jurisdiction to commit the tortious acts described in the Complaint, which enabled ISIS (the terrorist extremist group Islamic State in Iraq and al-Sham ("ISIS" a.k.a. "ISIL" a.k.a. "IS" a.k.a. "Islamic State")) and IRGC (Islamic Revolutionary Guard Corps), a unit of the Government of Iran, to carry out terrorist attacks that killed or harmed U.S. citizens and foreign national Plaintiffs in Iraqi Kurdistan and elsewhere, and further a global covert influence campaign, thereby injuring Plaintiffs. "Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States." "The IRGC is 'the primary driver of Iran's terror activities.'" "The IRGC protects Iran's regime and attempts to impose its clerical regime on other Muslim nations throughout the Middle East,

45

providing military forces, directing much of Iran's economy, and implementing a global campaign of terrorist activity." *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023). The United States designated Iran as a state sponsor of terrorism in 1984, and that designation has remained in place ever since. (The U.S. government often designates one element of a terrorist group before the group itself, like the IRGC's Qods Force (designated as an SDGT organization in 2007) and its parent group, the IRGC (designated in 2017)). (*See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) at 17 (D.C. Jan. 27, 2023).)

115.   The Islamic State of Iraq and Syria, or ISIS, is a Sunni Islamist militant group known for documented extreme violence and radical interpretation of Islamic law. It emerged from the remnants of the al-Qaeda terrorist group in Iraq and is also known as the Islamic State, ISIL or Daesh. "Al-Qaeda provided significant operational support to the Taliban in planning and authorizing terrorist attacks" against Americans in Afghanistan. *See Cabrera, et al. v. Islamic Republic of Iran*, 2022 WL 2817730, at 9 (D.D.C. July 19, 2022).

116.   To carry out their operative transnational criminal enterprise conspiracy, upon information and belief, and at all times relevant hereto, Defendants purposefully made and do make U.S. dollar payments to terrorist and sanctioned intermediaries and others and wired funds through U.S. banks for money laundering purposes.

117.   Defendants knew that their strategy to generate hard-to-trace off-the-books cash sources through uncontrolled slush funds for their illicit transactions caused U.S. dollar, cash-based protection payments to terrorists. Defendants knew that terrorists craved access to U.S. dollars, most of all the American cash that was the currency of choice for terrorists worldwide. Numerous United States government reports alerted Defendants, and their Washington D.C. agents, representatives, attorneys, and advisors, that bulk U.S. dollar cash payments and associated

cash smuggling were a key strategy to route payments to terrorists.

118.   Confidential Human Sources #1 and #2, who have direct clandestine access to senior ranking Barzani subordinates, from the previously impenetrable inner circle of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, confirm that numerous other payments in furtherance of their conspiracy with ISIS and IRGC and others were made in U.S. dollars. International U.S. dollar banking transfers are cleared through financial institutions that deal in U.S. dollars in the United States, known as intermediary banks.

119.   By routinely and purposefully engaging in U.S. dollar-denominated transactions Defendants, upon information and belief, and at all times relevant hereto, purposefully availed themselves of the benefit of doing business in the United States.

120.   Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS and IRGC, whose actions were at all relevant times directed at the United States, including the killing of Americans.

121.   First, Defendants, upon information and belief, and at all times relevant hereto, and ISIS and IRGC were in an operative conspiracy to provide material support to foreign terrorist organizations ("FTOs") in violation of U.S. criminal law, namely, 18 U.S.C. § 2339B.  ("A conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." (*See United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003)* (internal quotation marks omitted))   As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *See United States v. Gordon, 987 F.2d 902, 906–07 (2d Cir. 1993)*.

122.   Second, Defendants, upon information and belief, and at all times relevant hereto,

participated in that conspiracy by making millions of dollars in transactions with ISIS and IRGC, which allowed ISIS and IRGC to carry out terrorist attacks and engage in other unlawful acts.

123. Third, ISIS's and IRGC's terrorist attacks were expressly directed at the United States. In one representative instance, in August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another American journalist, Steven Sotloff, if President Obama did not end military operations in Iraq. Tellingly, the beheading videos of both Foley and Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively. ISIS stated that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq.

124. Fourth, Defendants knew that they were dealing with the Islamic State and IRGC, because the people and entities that Defendants interacted with held themselves out as representatives of these terrorist organizations and because it was common knowledge in Iraqi Kurdistan, that their payments were being used to support terrorist activities and affiliates. Al-Qaeda, serving as a global network and umbrella group that organized the anti-American terrorist campaigns of its branches (like al-Qaeda-in-Iraq) and affiliates or allies (like the Taliban) - which in effect merged with ISIS in Iraq, subsequently (the court found) "provided significant operational support to the Taliban in planning and authorizing terrorist attacks against Americans in Afghanistan." *See Cabrera, et al. v. Islamic Republic of Iran*, 2022 WL 2817730, at *9 (D.D.C. July 19, 2022).

125. Through al-Qaeda's global network, al-Qaeda terrorists enjoyed a force-multiplier effect by establishing links with other like-minded organizations around the globe, and the resultant terrorist interconnectivity, changed the nature of terrorism. At all times, al-Qaeda emphasized unity with other Islamists – as long as they sought to attack America. Under this

48

approach, al-Qaeda's strategy was to use its money, polyterrorists, and good offices to try to build bridges and otherwise unite Islamists who targeted Americans in order to expel the U.S. from the Middle East. Al-Qaeda's doctrinal emphasis on unity, and the cooperation with other terrorists demanded by it, served al-Qaeda's programmatic interests by positioning al-Qaeda as the leader of an anti-American vanguard, facilitating cooperation with potential Islamist allies who might otherwise be enemies (like the IRGC).

126.    Beyond paying al-Qaeda-in-Iraq, the Islamic State, and IRGC directly, Defendants also knew that their partners, consultants, and subcontractors were using the money they received through their illicit transactions with Defendants to flow through Defendants' money to terrorists on Defendants' behalf. With respect to the Iraqi Kurdistan corruption economy – meaning the economy concerning illicit transactions in Iraq Kurdistan – that practice was an open secret in the Iraqi and Syrian areas that were contested by al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC, and was communicated repeatedly to firms operating (or transporting goods) there. When Defendants paid their crooked local partners, consultants, and subcontractors for "security" in that environment, they knew full well where the money was going. Given what the Barzani regime knew about the payments it was making, the operating environment in Iraq, and the sophistication of the FTOs' protection-money schemes, it is certain that the Barzani regime's money ultimately ended up in the hands of violent terrorists.

127.    Defendants simultaneously kept secret their knowledge of the transactions that were instrumental in financing attacks on Americans in Iraq, Afghanistan, and Syria. Defendants did so even when they had affirmative legal obligations requiring disclosure to the U.S. government, among others. By fraudulently concealing such transactions with foreign terrorist organizations (FTOs) when Defendants had a duty to share what it knew, Defendants also provided

vital operational aid to the functioning of al-Qaeda's, al-Qaeda-in-Iraq's and Islamic State's activities – independent of the U.S. dollars that Defendants paid such FTOs – by depriving the U.S. government of actionable intelligence and accurate information, which prevented U.S. military, intelligence, diplomatic, and law enforcement pressure that would otherwise make it harder for the terrorists to extract comparable value from their activities in Iraqi Kurdistan, and harm Plaintiffs.

128.    Defendants' payments funded attacks by al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC that were acts of "international terrorism." 18 U.S.C. § 2333(a).  At all relevant times, the United States designated al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC as FTOs, which reflected their status as four of the world's deadliest terrorist groups.  Since the start of U.S.-led humanitarian efforts in Iraq, Syria, and Afghanistan following 9/11, each FTO's core purpose has been to expel Americans from Iraq, Syria, and Afghanistan and overthrow Iraq's and Afghanistan's then-existing U.S.-backed democratic governments, which mission succeeded in Afghanistan in August 2021.  To date, al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC have collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded roughly 30,000 more, primarily in Iraq and Afghanistan, but also in Syria and other countries in the Middle East, Europe, Asia, and Africa.  Defendants' payments helped finance those attacks.

129.    Plaintiffs' allegations are not speculative nor implausible. They are based on Confidential Human Source witnesses, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP officials, with direct and indirect knowledge of the alleged facts; unclassified and declassified military and intelligence agency reporting; U.S. diplomatic and military cables; Congressional fact finding; U.S. executive branch reports to Congress; internal U.S. executive branch reports, documents, and papers; personal

50

witness knowledge of U.S. executive branch and military persons;  papers and communiques of the Iraqi Kurdistan Regional Government and its principals; submissions of the Defendant Iraqi Kurdistan Regional Government to agencies of the United States government; United Nations and Financial Action Task Force reports; media accounts; and Plaintiffs' recollections.

130.    In September 2014, ISIS spokesperson Shaykh Abu Muhammad Al-Adnani ash-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out the anti-American objectives of the ISIS movement, stating, for example:

> *"O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. They prevent us from establishing your religion and your hudūd (fixed punishments), and ruling by what you revealed. O Allah, you know our weakness. We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true]. O Allah, we have believed in you and relied upon you. You are sufficient for us and the best disposer of affairs. O Allah, America and its allies disbelieve in you and associate partners with you."*

A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the U.S. House of Representatives Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

131.    ISIS's and IRGC's overt acts targeted the United States and U.S. citizens. Defendants conspired with ISIS and IRGC to target, torture, and kill American citizens. As a result of the conspiracy between Defendants and ISIS and IRGC, ISIS's and IRGC's overt acts targeting the United States and U.S. citizens, including Plaintiffs, are attributable to Defendants.

132.    This Court has jurisdiction because acts or omissions in furtherance of the criminal offense occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.  The United States Department of the Treasury is a federal government agency located in Washington, D.C.  Through its Office of Foreign Assets Control ("OFAC"), also located in Washington, D.C., the United States

51

Department of the Treasury administered and enforced economic and trade sanctions against certain foreign countries, including Iran, as well as individuals and entities associated with those countries. OFAC was empowered to grant or deny license applications for the export or re-export of U.S. goods to Iran.

133. Further, the United States Department of Commerce is a federal government agency located in Washington, D.C. Through its Patent and Trademark Office ("PTO"), the United States Department of Commerce grants U.S. patents and registers trademarks, administers and enforces trademarks and trademark infringement, protects new ideas and investments in innovation and creativity, and enforces intellectual property infringement, including patent infringement, trademark counterfeiting, copyright piracy, and trade secret theft which cause significant financial losses for American right holders and legitimate businesses around the world. In its most pernicious forms, as accomplished by Defendants' criminal acts, intellectual property infringement endangers the public and harms American workers whose livelihoods are tied to America's innovation-driven sectors.

134. Further, the United States Department of Health and Human Services is a federal government agency located in Washington D.C. Through its Food and Drug Administration ("FDA"), the United States Department of Health and Human Services is responsible for protecting public health by ensuring products intended for human use are safe and effective, including human pharmaceutical and biological products, medical devices, and tobacco products, and to protect human exposure to drugs that may be counterfeit, stolen, contaminated, or otherwise harmful – as are the counterfeit products of the Barzani Continuing Criminal Enterprise.

135. As explained in greater detail below, and upon information and belief, and at all times relevant hereto, Defendants' conduct had a substantial nexus to the United States and to

Washington, D.C., including by virtue of repeated and systematic use of U.S. dollar transactions and banks in the United States to pay, conspire with, and aid and abet terrorists. Defendants thereby purposefully availed themselves of U.S. jurisdiction to commit the tortious acts described in the Complaint, which enabled ISIS to carry out terrorist attacks that killed U.S. citizens in Syria, Iraq, and Libya, thereby injuring Plaintiffs.

136.   To carry out their conspiracy, upon information and belief, and at all times relevant hereto, Defendants, and their agents, representatives, and collaborators, purposefully made U.S. dollar payments to terrorist intermediaries and others that were wired through the United States. Indeed, Defendants' "preferred option" for paying terrorists was to make "bank transfer[s] in USD," which were designed to avoid detection by Defendants' auditors and governmental entities.

137.   Upon information and belief, and at all times relevant hereto, Defendants communicated that in furtherance of their conspiracy with ISIS payments were made in U.S. dollars.

138.   In addition, upon information and belief, and at all times relevant hereto, Defendants regularly used email accounts serviced by U.S.-based email service providers, to coordinate and carry out elements of their partnership with ISIS.  U.S.-based email service providers are considered more secure than non-U.S.-based providers.

139.   Upon information and belief, and at all times relevant hereto, Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS, whose criminal and tortious actions were at all relevant times directed at the United States.

140.   Upon information and belief, and at all times relevant hereto, Defendants' conduct occurred within the District of Columbia and the extraterritorial jurisdiction of the United States in conspiring to provide material support to terrorists. The offenses occurred in part within the

United States, the offenses occurred in and affected interstate and foreign commerce, and the defendants conspired with enemies of the United States. Based on these contacts with the United States, the Court has jurisdiction over the Defendants and the subject matter of this action.

141.    An official, employee, or agent of a foreign state designated as a state sponsor of terrorism ... while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under [28 U.S.C. § 1605(a)(7)] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [§ 1605(a)(7)]. 28 U.S.C. § 1605 note. Defendants at times relevant have been and are agents and collaborators and co-conspirators of an instrument of a foreign state – the Islamic Republic of Iran, not provincial Defendant Iraqi Kurdistan Regional Government – designated as a state sponsor of terrorism.

142.    Upon information and belief, and at all times relevant hereto, Defendants from, through, and by their Washington D.C. office and their Fairfax Virginia office and through and by their appointed, deputized, designated, and closely supervised Washington D.C. representatives and employed staff, have repeatedly and recurrently violated requirements of the Foreign Agents Registration Act (FARA) which establishes a registration, reporting (of accurate and complete information), and disclosure regime for agents of foreign principals (which includes foreign non-government individuals and entities) so that the U.S. government and the people of the United States are truthfully informed of the source of information and the identity of persons attempting to covertly and overtly influence U.S. public opinion, policy, and law. Persons subject to the requirements of FARA have a legal duty and among other things are required to submit periodic

54

registration statements containing truthful information about their activities and the income earned

from them.  Specifically, in part:

> FARA states that "[n]o person shall act as an agent of a foreign
> principal unless he has filed with the Attorney General a true and
> complete registration statement." 22 U.S.C. § 612(a). Disclosure of
> the required information allows the United States Government and
> the American people to evaluate the statements and activities of such
> persons in light of their function as foreign agents.

By fraudulently making a false and misleading statement of a material fact and omitting to state a

material fact necessary to make the statements made, and disregarding, concealing, and masking

a mountain of incriminating evidence in periodic registration statements required to be filed and

other required documents, records, and oral representations, which did not, in reasonable detail,

accurately and fairly reflect truths, with the intent to deceive and defraud, and thereby improperly

influencing the conduct of United States officers and officials, and to promote and conceal their

ongoing transnational criminal schemes, Defendants, especially co-conspirator Defendants Bayan

Sami Abdul Rahman, Treefa Aziz, and Hikmat Bamarni, as individuals demonstrated reckless,

purposeful, knowing, and willful disregard for the truth in public declarations and filings with

agencies of the United States Government.  Defendants and their Washington, DC-based agents,

representatives, advisors, consultants, and attorneys falsified and caused to be falsely stated and

certified and submitted or caused to be submitted by the Washington D.C. office of the Defendant

Iraqi Kurdistan Regional Government and by its Defendant Iraqi KRG Washington representatives

and employed staff, and by the Fairfax, Virginia office of the Kurdistan Democratic Party

representative, designated, appointed, empowered, and directed by and reporting to Defendants

Masoud Barzani and Masrour Barzani, and its retained Washington D.C. consultants and advisors

functioning under their direction, did, with intent to promote, manage, establish, carry on, and

facilitate the promotion, management, establishment, and carrying on of one and more unlawful

55

activities, repeatedly, knowingly, and purposefully contained untruthful, fabricated, incomplete, deceptive, misleading, fictitious, and mendacious information, at a time contemporaneous with the Barzani continuing criminal enterprise and by trick, scheme, and device did cover up and knowingly failed to disclose and fraudulently concealed material facts and adverse information and failed to disavow their wrongful conduct and misrepresented the truth about the Barzani Continuing Criminal Enterprise in furtherance of the conspiracy and to effect the illegal object thereof, issuance and submission thereof to the executive branch of the United States Government taking place in the District of Columbia and elsewhere and published in English and targeting a United States audience as part of a broad, premeditated, and calculated effort to covertly and overtly influence, distract, and shape public perceptions of Defendants Masoud Barzani and Masrour Barzani and their subordinates in the United States and around the world, and engaging in an act, practice, and course of conduct which operated and would operate as a fraud and deceit upon an official person, and with the intent to impede, obstruct, mislead, deceive, defraud, or influence the foreign and military policy, opinion, and law decision-making of the Government of the United States and citizens of the United States who relied on said filings to be truthful, and took substantial actions domestically that aided and abetted violations of treaties, conventions, and law, including collaboration with officially designated terrorist organizations, all at all times relevant hereto and in furtherance of the Barzani continuing criminal enterprise and were major factors responsible for the acts complained of herein. Based on these actions repetitively occurring and originating, over a period of years, and at all times relevant, within the District of Columbia, the Court has jurisdiction over the Defendants and the subject matter of this action.  Upon information and belief, and at all times relevant hereto, the true names and capacities, whether governmental or otherwise, of additional prospective Defendants are unknown to Plaintiffs at this

56

time. When the true names and capacities of all said Defendants have been ascertained, Plaintiffs will move to amend this Complaint accordingly.

143.   The United State of America, through its Department of State, does not accord official diplomatic mission or consular status to the Defendant Iraqi Kurdistan Regional Government office in Washington D.C. nor grant diplomatic privileges and immunities to its Washington D.C. office representatives, employees, and advisors.

144.   Upon information and belief, and at all times relevant hereto, Defendants inclusive, and unknowns, are responsible, criminally, and/or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to Plaintiffs John Does 1-5,000 as hereinafter alleged.

145.   At all times relevant herein, Defendants, and each of them, acting as individuals, were the agents, servants, partners, representatives, associates, and employees of and co-conspirators with each and every other Defendant, including Barzani family members and family members by marriage, and were acting within the course and scope of their agency, partnership, agreement, association, and employment, and, to the extent permitted by law, are jointly and severally liable.

146.   The United States Supreme Court has held that "a conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *See Salinas v. United States*, 522 U.S. 52, 63 (1997). The 3rd Circuit Court of Appeals emphasized that "one who opts into or participates in a conspiracy is liable for the acts of his [or her] co-conspirators ... even if the defendant did not personally agree to do, or conspire with respect to, any particular element." See *Smith v. Berg*, 247 F. 3rd 532, 537 (3rd Cir. 2001).

147.   The United States Supreme Court also held that "an overt act of one partner may

57

be the act of all without any new agreement specifically directed to that act." *See United States v. Kissel*, 218 U.S. 601, 608.

148. The United States Supreme Court further held that "The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all." *See Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489, at 647 (1946).

149. Plaintiffs' claims meet the Supreme Court's "touch and concern" test with sufficient force to displace the general presumption against jurisdiction over extraterritorial claims, first articulated in *Kiobel v. Royal Dutch Petrol. Co.*, and, therefore, the Court has jurisdiction over Plaintiffs' ATS claims. 569 U.S. 108, 124-25, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013).

## DEFENDANTS' MINIMUM STATUTORY VIOLATIONS

150. By reason of the conduct alleged herein, the criminal and civil violations of U.S. federal law, Presidential Executive Orders having force of law, and regulations, and treaties, agreements, conventions, and international laws, knowingly or recklessly, directly or indirectly, committed or caused to be committed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirators, agents, representatives, servants, Barzani family members and family members by marriage, are inordinately extensive in number, scope, depth, breadth, magnitude, gravity, continuity, longevity, and criminal severity, and danger to the

58

economic and national security interests of the United States and its citizens, and injured Plaintiffs, have repeatedly, purposefully, knowingly, and in furtherance of multiple international and transnational criminal schemes and to effect its illegal objects, including supportive acts of international terrorism that killed and injured Plaintiffs named and unnamed, in a continuing series of overt acts and violations which undermined the rule of law and violated the law of nations, treaties, agreements, and conventions, and at a minimum the following distinct U.S. federal statutory provisions, the criminal violations condoned, taken, and being taken, directly and indirectly, by the Defendants of each have provided the means for Defendants to injure Plaintiffs:

(g)   18 U.S.C. 2339C(a)(1)(B) – Financing Terrorism: The Barzani Continuing Criminal Enterprise is in the global business of financing its own terrorism and that of its co-conspirators.

(h)   21 U.S.C. 848 – Continuing Criminal Enterprise: The Barzani Continuing Criminal Enterprise is a global continuing criminal enterprise that has committed or caused to be committed a legion of felonies involving hundreds of people on a global scale and obtained for itself and its partners in the Barzani Continuing Criminal Enterprise billions of dollars. The Barzani family wealth obtained from their criminal enterprise is currently estimated to be in excess of US$100 billion dollars.

(i)   31 U.S.C. 3729 – False Claim Act: The Barzani Continuing Criminal Enterprise has repeatedly overcharged the United States by billing for "Ghost personnel", presented false invoices for jet fuel supplied to the U.S. military in Iraq, and created false records of the disposition of U.S. property and materiel.

(j)   18 U.S.C. 2332d – Financial Transactions: Masrour Barzani, a permanent resident alien of the United States, has engaged in financial transactions and suspicious financial structures with Iran and other designated terrorist states and organizations, subjecting him to ten years in prison for each transaction – of which transactions there have been hundreds, if not thousands.

(k)   18 U.S.C. 2339A – Providing Material Support to Terrorists: The Barzani Continuing Criminal Enterprise has been doing business with, and providing material support to designated terrorist organizations for decades, including the Islamic State of Iraq (ISIS).

(l)   18 U.S.C. 1203; 18 U.S.C. 2332(b)(2); 18 U.S.C. 1114; 18 U.S.C. 1116 – Hostage taking resulting in death; Conspiracy to Murder United States Citizens Outside the United States; Protection of Officers and Employees of the United

59

States; Murder … of Internationally Protected Persons: Masoud Barzani, Masrour Barzani and Waysi Barzani directing the Barzani Continuing Criminal Enterprise kidnapped and murdered an official of the United States in Balay, Iraqi Kurdistan. He was beaten to death, and his lifeless body was left in Barzan Creek, in the village of Barzan (a town controlled by the Barzani Continuing Criminal Enterprise) in November, 2021. This kidnapping and murder was done with the express purpose of compelling the Government of the United States to act in a manner dictated by the Barzani Continuing Criminal Enterprise and to thereby financially benefit and perpetuate the Barzani Continuing Criminal Enterprise, all to the detriment of Plaintiffs.

(m)   18 U.S.C. 1958 – Murder for hire:  As identified by Confidential Human Source number #2, who has direct clandestine access to senior ranking Iraqi KRG government officials, the Barzani Continuing Criminal Enterprise under the direction of Masoud Barzani, Masrour Barzani, and Waysi Barzani, during the past several decades and continuing to the present time, have paid as agents of the Barzani Continuing Criminal Enterprise and of the Iraqi KRG Parastin to carry out the extrajudicial murder directives of Masoud Barzani, Masrour Barzani, and Waysi Barzani, Defendants Karim Sinjari, Sidad Barzani, Sirwan Barzani, Fazel Mirani (a U.S. citizen) (AKA Fathal Mirini, Fadal Mirani), Herish (Hersha) Rash, Dilshad Hassan Najar, Ismat Argoshi, Ahmad Kurdu Nori, Wahid Bakukusi, Barzan Kassab, Azad Germari, Azad Germavi, Adil Butani, Ferset Sonofai, Wahid Kuvili, Rajab Germavi, Reco Warmavi, Subhi Male, Subhi Bedouin, Faisal Rustinki, Shukri Hetti, Muhsin Siari, Abu Enter, Peace Kucher, Shepherd Kucher, Shepherd Sindi, Mahdi Boti, Ahmed Kocher ,Tahsin Kemeki, Adib Sindi, Muhammad Rashid Spindari ,Sami Bedouin ,Hakim Kurmei, Khalid Hazani, Shihab Remaini, Agid Doski, Karim Hatuti, Mislih Germavi, Abucurc Germavi, Salim Korean, Saeed Bamerni, Kamiran Sindi, Muhsin Siari, Kovan Kocher Zedki, Muhammad Mirza Zakhoyi, Masud Chalki, Persian Jesus Silvanei, Segvan Jamil, Abu Serko, Ferhan Korean, Kamiran Mufti, Mahdi Boti, Abdulsitar Sonami, Hamza Kocher, Sheikh Seo Mizuri ,Nizar Muhammad, SelimAdib Sindi, Khalid Hamzani, Abuzero Zakho, Aziz Weysi, Ismet Orei, Hikmet Son, Kemal Kurmeyi, Salah Mirani, Saeed Shingali, Ramadan Kocher, Ahmad Hava, Badal Bendi, Ekrem Kovili, Chavu Kovili, Ashur Goran, Muhyiddin Miziri, Jamal Finished, Meki Tayib Amedi, Shawkat Barbhari, Saeed Ahmed Bewab, Selim Zebari, Kharib Akrei, Muhammad Suleiman Sulaymaniyah, Siamend Sulaymaniyah, Behcet Avdel, Azad Majid Boti, Newzad Boti Doski, Khalil ShaxiMuhammad Sa'don, Bijar Khilbishi, Naji Karbili, Abdullah Bani Mizuri, Herbi Korean, Ibrahim Hamid Pedayi, Bashir Muhammad Tahir, Etrushi, Abdulaziz Etrushi, Hamid Abdlwahid Bendi, Naji Banki Doski, Hamid Emer Sindori, Shihab Mullah Saeed Rekani, Feroq Hetti, Ibrahim Kocher, Meawy Shilani, Dilo Mizo Akrei, Nazim Mirad Ebo Riş, Bapir Abdulqadir Bagheri, Yonis Bagheri, Badal Bagheri, Muhammad Amin, Sorchi, Ahmed Osman, Kamiran Sinduri, Nezhet Haley, Ali Teter Nerwei, Naji Ahmed Bedihi, Sheikh Elo, Emer Orei, Ali Ewni, Sarbest Tirwanishi, Sarbest Babiri, Babekr Zebari,

Zeim Ali,, Fahmi Salman, Abdullah Salih, Dilzar Nuri Abbas Shingali, Ilmi Hassan Mizur, Jamal Quasim, United Tribuns mafia, Baval Talibani, "Shalawo", and Sheikh Zanna to murder, attempt to murder, enforced disappearance, and/or torture in excess of five thousand John Doe Plaintiffs and members of their families located in the United States and in many nations of the world, including the nations of the European Union, and nations in the Middle East.

(n)   18 U.S.C.§§ 1116(a), 1116(c), and 1111(b) – Murder of an Internationally Protected Person. The Barzani Continuing Criminal Enterprise did in 2021 murder, by means of physical beating, a U.S Government agent employee, an internationally protected person.

(o)   18 U.S.C. 1956 – Laundering Money: The Barzani Continuing Criminal Enterprise has for decades been laundering money that is the proceeds of unlawful activity including drug dealing, trading with designated terrorist organizations, arms trading, counterfeiting U.S. brand pharmaceuticals, alcohol, and tobacco. Much of the laundered money passes through U.S. banks and U.S. properties.

(p)   18 U.S.C. 641 – Stealing from the United States: The Barzani Continuing Criminal Enterprise acting through the Iraqi Kurdistan Regional Government that it controls knowingly enrich themselves by embezzling, stealing, obtaining by fraud, and otherwise without authority knowingly converting to the use of any person other than the rightful owner and intentionally misapplying, property and money that was owned by, and was under the care, custody, and control of the United States Government, that is, foreign aid and military assistance funds, converts to its own use and the use of others without authority money and property of the United States Government and agencies and departments thereof. The Barzani's receive "Ghost Money" by inflating the number of fighting Iraqi Kurdistan Peshmerga soldiers supported by the United States and diverting arms and other military equipment supplied by the United States received by Barzani's to ISIS and Iran's IRGC, U.S.-designated terrorist organizations and combatant enemies of the United States, in violation of U.S. law.

(q)   22 U.S. C. § 2778 – Arms Export Control Act – The Barzani Continuing Criminal Enterprise did broker and attempt to broker multiple illicit weapons deals, including other materials constituting "defense articles" on the United States Munitions List, in knowing violation of the Arms Export Control Act, and among other acts traveled to meetings with Iranian representatives and received and passed documentation needed to secure the deals; and subsequently lied to United States diplomatic, intelligence, and law enforcement agents about that conduct.

(r)   28 U.S.C. § 1350 note § 2(a)(1)-(2) – The Torture Act establishes federal jurisdiction and liability for "[a]n individual who, under actual or apparent

61

authority, or color of law, of any foreign nation . . . subjects an individual to torture . . ."; Torture is defined to include acts specifically intended to inflict severe physical or mental pain or suffering. (It does not include such pain or suffering incidental to lawful sanctions.) The statute applies only to acts of torture committed outside the United States. The Barzani Continuing Criminal Enterprise routinely tortures its enemies, including Plaintiffs, to advance the objects of its conspiracy.

(s)     18 U.S.C. § 2340A. defines "Torture" as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1).

   18 U.S.C. § 2340A provides as follows: (a) Offense. – Whoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life. (b) Jurisdiction. – There is jurisdiction over the activity prohibited in subsection (a) if – (1) the alleged offender is a national of the United States; or (2) the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender. (c) Conspiracy. – A person who conspires to commit an offense under this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.

(t)     28 U.S.C. §1350 – Extrajudicial Killing.  Killings constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. §1350, in that they were in violation of customary international law prohibiting extrajudicial killings as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities. The many killings were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(u)     18 U.S.C. §1091 – Genocide.  The horrific crimes of genocide perpetrated against Plaintiffs described herein, whether in time of peace or war, with specific intent to destroy, in whole or substantial part, an ethnic or religious group, by killing members, causing serious bodily injury, causing permanent impairment through torture or similar techniques, subjects the group to conditions of life that are intended to cause the physical destruction of that group in whole or in part, imposes measures intended to prevent births within the group, or transfers by force children of that group, has committed genocide. The Defendants knowingly and willfully, directly and indirectly, with malice and forethought, conspired and aided and abetted in genocide of the non-

62

combatant Yazidi religious minority of Kurdistan, for which the criminal punishment may be death or life imprisonment. The U.S. Supreme Court held "The international-law norm against genocide, for example, imposes obligations on all actors. Acts of genocide thus violate the norm irrespective of whether they are committed privately or in concert with the state." See *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018). The U.S. Supreme Court further held "The international-law norm against genocide, for example, imposes obligations on all actors. Acts of genocide thus violate the norm irrespective of whether they are committed privately or in concert with the state. See Convention on the Prevention and Punishment of the Crime of Genocide, Art. II, Dec. 9, 1948, 102 Stat. 3045 (defining "genocide" as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group"); see also 18 U.S.C. § 1091(a). See *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018).

(v)   28 U.S.C. §1350 – Crimes Against Humanity. The crimes against humanity perpetrated against Plaintiffs described herein constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Claims Act, 28 U.S.C. §1350, in that they constituted a violation of customary international law as part of the "the law of nations." The acts of torture, arbitrary detention, rape and other inhumane acts alleged herein constitutes crimes against humanity under customary international law. These acts were committed in the context of a widespread and systematic attack against a civilian population. These acts were instigated and/or directed by Defendants and their subordinates, agents and/or co-conspirators in the Iraqi Kurdistan Regional Government and the indistinguishable complementary KDP forces. Defendants and their subordinates and/or co-conspirators sought to conceal and cover up these acts. Further, Defendants failed to prevent abuses or punish the perpetrators.

(w)   22 USC Ch. 108 – Gross Violations of Internationally Recognized Human Rights. The term ''gross violations of internationally recognized human rights'' has the meaning given that term in section 502B(d)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2304(d)(1). The Global Magnitsky Human Rights Accountability Act prohibits the conduct and myriad violations by the Barzani Continuing Criminal Enterprise, and of Iraqi Kurdistan Prime Minister Masrour Barzani specifically, and authorizes the President to impose economic sanctions and deny entry into the United States to any foreign person identified as engaging in human rights abuse or corruption. (1) is responsible for extrajudicial killings, torture, or other gross violations of internationally recognized human rights committed against individuals in any foreign country who seek – (A) to expose illegal activity carried out by government officials; or (B) to obtain, exercise, defend, or promote internationally recognized human rights and freedoms, such as the freedoms of religion, expression, association, and assembly, and the rights to a fair trial and democratic

elections; (2) acted as an agent of or on behalf of a foreign person in a matter relating to an activity described in paragraph (1); (3) is a government official, or a senior associate of such an official, that is responsible for, or complicit in, ordering, controlling, or otherwise directing, acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation or transfer of the proceeds of corruption to foreign jurisdictions; or (4) has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, an activity described in paragraph (3). The term "gross violations of internationally recognized human rights" has the meaning given that term in section 502B(d)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2304(d)(1). Such an individual is no longer eligible for admission to the United States and any issued visa or other documentation shall be revoked in accordance with section 221(i) of the Immigration and Nationality Act (8 U.S.C. 1201(i)).

(x)     8 U.S.C. § 666 – Theft from Programs Receiving Federal Funds and Bribery: The Barzani Continuing Criminal Enterprise participates in contracts and programs funded by the United States Government and submits false documents to obtain money for its participation. Money obtained by the Barzani's by fraud from the United States Government exceeds millions of dollars each year.   Money fraudulently received from the United States Government by the Barzanis is then partially used to bribe or otherwise improperly influence and covertly recruit and pay U.S. officials acting in their official capacity, to act for and to the benefit of and beneficial to foreign principals of the Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise, and to undermine the efforts of the Department of Defense to lawfully contract overseas.   Additionally, Confidential Human Sources number #1 and #8, who have direct clandestine access to senior ranking KRG government officials, have witnessed the repeated falsification, directed by Masrour Barzani, of fictitious Peshmerga personnel records submitted to United States foreign military partner capacity building financing programs for financial reimbursement of thousands of non-existent Peshmerga soldiers. The United States subsidizes Peshmerga salaries nearly a quarter billion dollars annually, issuing these funds through the KRG Ministry of Peshmerga Affairs, controlled by Masrour Barzani, much of which disappears to the Barzani Continuing Criminal Enterprise. Many Peshmerga, especially those who do not serve Masrour Barzani's personal political agenda or hail from his tribe, have not received their salaries.

(y)     18 U. S. C. § 201(c)(1)(A) – Illegal Gratuity.  The "illegal gratuity statute," which prohibits giving "anything of value" to a present, past, or future public official "for or because of any official act performed or to be performed by such public official."  Inducements and gratuities were given because of the U.S. public officials' official positions to provide favorable treatment and

64

influence U.S. contracts and policies.

(z)   22 U.S.C. § 611 – Failure to File Required Registration Statement: Representatives of the Barzani Continuing Criminal Enterprise, including but not limited to corrupted officials of the United States Government acting in their official capacity, acted for the benefit of and beneficial to foreign principals of the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise and corruptly publicly supported certain beneficial policies, repeatedly failed to file a required registration statement as an agent of a foreign principal with the Attorney General of the United States.

(aa)  18 U.S.C. 1959 – Violent Crimes in Aid of Racketeering:   The Barzani Continuing Criminal Enterprise as part of its vast criminal operations for decades has engaged in, and continues to engage in, murder, threats of murder, kidnapping, robbery, bribery, and dealing in illegal controlled substances. These criminal operations are defined as "Racketeering Activity" in 18 U.S.C. 1961 and perpetrators are subject to the death penalty.

(bb)  18 U.S.C. 1621 – Perjury: Masrour Barzani, in his applications to the United States Citizenship and Immigration Services (USCIS), to which he swore an oath to the United States, to obtain the permanent resident status that he presently holds, with premeditated deceit and a knowledge of the falsity (See *Forbes v. INS*, 48 F.3d 439, 442), and with misrepresentations which were material as they had a natural tendency to influence the decisions of the USCIS [then INS]," (*See Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)), and was aided by a co-conspirator, was fraudulently or unlawfully obtained in that he willfully and knowingly committed or caused to be committed perjury on the forms that he signed attesting to his truthfulness, and filed. In answering the question: "Have you ever ... ordered... incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion? Masrour Barzani's answer of "NO" was false. Further, his declared purpose of asylum was and is materially false; at the time his father was ruling Iraqi Kurdistan so his submitted fear argument justifying asylum was false, and thus constitutes asylum fraud. (United States law generally renders such a person forever inadmissible for entry to the United States.)

(cc)  18 U.S.C. 371 – Immigration, Conspiracy to Defraud the United States: Masrour Barzani conspired with a citizen of the United States (Confidential Human Source #7) to report relevant immigration information on his immigration application that did not happen. Masrour Barzani also conspired with senior officers and officials of the U.S. Departments of State and Defense and of United States military units, U.S. Agency for International Development, and others, to defraud the United States.

(dd)  16668 U.S.C. 1958 (a) – Travel In or Use of Foreign Commerce or cause

65

another to do so with the intent that a murder be committed in violation of the laws of the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani used and caused others to use facilities of foreign commerce, including international telecommunications, and with the intent that murder be committed in violation of the laws of Iraq, Iraqi Kurdistan, and the United States in exchange for a promise of money or other pecuniary compensation.

(ee)   18 U.S.C. 371 and 3551 et seq. – Conspiracy to Defraud the United States, the Foreign Account Tax Compliance Act (FATCA). Masrour Barzani, as a resident alien (a green card holder) is required by statute, as a term of such granted status, to follow the same tax laws as U.S. citizens and must report worldwide income from all sources, that is, income from both within and outside the United States, must report financial assets outside the United States, and must disclose foreign bank accounts and other offshore international assets & investments. Masrour Barzani willfully and criminally conspired to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue, specifically, failing to comply with FATCA, in an effort to defraud the United States, increase illicit wealth, and use wealth to injure Plaintiffs. Defendant Masrour Barzani had the funds to pay his U.S. tax liabilities.

(ff)   26 U.S.C. § 720 – Attempt to evade or defeat tax: Masrour Barzani knowingly attempted to evade or defeat any tax due the United States and signed, filed, and caused to be filed false and fraudulent or elected to not file U.S. tax documents, knowing it/them to be false and fraudulent, and failed to properly and honestly comply with his legal and substantial tax obligations as a United States person. Failure to pay proper taxes enriches the criminal enterprise which directly provided the means for Defendants to commit these criminal acts to harm Plaintiffs. Defendant Masrour Barzani had the funds to pay his U.S. tax liabilities.

(gg)   18 U.S.C. 371 – Conspiracy to Defraud the United States: Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired with Public Official #1 and Public Official #2 who were officers of the United States operating in Iraq. The purpose of the conspiracy was to impair, obstruct, and defeat the lawful functions of United States officers of the U.S. Department of State and the United States Department of Defense in the solicitation, award, procurement, supervision and payment contracts, licenses, permits, concessions, and other forms of licensure issued by or facilitated by the United States Government and the Iraqi Kurdistan Government. It was a purpose of the conspiracy to defraud the United States of its right to the conscientious, loyal, faithful, disinterested, and unbiased services, decisions, actions and performance of duties by Defendants Public Official #1 and Public Official #2 in their official

66

capacities as officers in the United States Military operating in Iraq, free from corruption, partiality, improper influence, bias, dishonesty, and fraud in the approval, award, funding and supervision of contracts with the Iraqi Kurdistan Regional Government controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their subordinate co-conspirators in the Barzani Continuing Criminal Enterprise.

(hh)   15 U.S. Code § 78dd–1 The Foreign Extortion Prevention Act (FEPA) –which enables criminal prosecution of foreign officials who solicit and receive bribes, including payments, gifts, or even offers of "anything of value" to an official for the purpose of influencing the official or otherwise "securing any improper advantage" in obtaining, retaining or directing business. In order to make money to provide means to harm Plaintiffs, Defendants bribed and criminally induced U.S. Public Official #1 and U.S. Public Official #2 and others.

(ii)   18 U.S.C. 201 (b)(1)(A) and (C) and (b)(2)(A) and (C) – Conspiracy to Commit Bribery. The defendants, and others known and unknown, willfully and knowingly, directly and indirectly, combined, conspired, confederated, and agreed with each other to commit bribery of a United States government employee in performance of official duties.

(jj)   18 U.S.C. 1519 – Falsification of Records with Intent to Influence Immigration Decision: Defendant Masrour Barzani, assisted by Confidential Human Source #14, who has direct clandestine access to senior ranking Iraqi KRG government officials, who did willingly and knowingly make and did cause to be made materially false, fictitious, misleading, and fraudulent statements and representations in the matter within the jurisdiction of the executive branch of the Government of the United States, and filed or caused to be filed a false document with the US. Immigration and Naturalization Service and USCIS with the intent to influence the investigation and proper administration of his application for permanent resident status in the United States when he was actually inadmissible at the time of admission but for the fraud or misrepresentation. Defendant Rubar S. Sandi, an American citizen, aided and abetted and facilitated the fraudulent falsification and misrepresentation of immigration documents for Defendant Masrour Barzani with intent to untruthfully influence the U.S. Immigration and Naturalization Service (predecessor agency to USCIS) decision to grant Defendant Masrour Barzani permanent resident status (a green card).

(kk)   31 U.S.C. § 3729 – False Claims, with Intent to Influence a Tax Decision: Defendant Masrour Barzani, as chairman of the Barzani Charity Foundation and as part of the Barzani Continuing Criminal Enterprise, and his subordinates, including Omar Barzani as the Fund's principal officer, who acting under direction of Masrour Barzani as Fund chairman committed or caused to be committed perjury on submitted Internal Revenue Service forms, as described in more detail below, conspired to fraudulently obstruct the federal tax function, and with premeditated deceit, fraudulently or unlawfully

67

obtained, as a benefit to the Barzani Continuing Criminal Enterprise to avoid U.S. taxes, a charitable non-profit tax designation and treatment in that he/they knowingly and with deliberate disregard of the clearly delineated requirements of law falsely declared or caused to be falsely declared to the Internal Revenue Service, and knowingly failed to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement, while omitting critical qualifying information, including making actionable misrepresentation and providing materially false information by answering NO to the following questions: (a) Did the organization maintain an office, employees, or agents outside of the United States?; (b) Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign Investments valued at $100,000 or more?; (c) Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization?; (d) Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals?; (e) At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)?; and knowingly and willfully failed to disclose officers, directors, and trustees. *See Universal Health Servs. Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 2001 (2016).*

(ll)    50 U.S.C. 1701, et seq: International Emergency Economic Powers Act (IEEPA) – Defendants as part of the Barzani Continuing Criminal Enterprise, conspired, brokered, attempted to broker, and traded in Iran oil in willful violation of the U.S. sanctions against Iran and the prohibitions of Emergency Economic Powers Act; and brokered deals for sanctioned Iran oil and other goods and services, contrary to the national security, foreign policy, and economic security interests of the United States; and subsequently lied to U.S. diplomatic, intelligence, security, and law enforcement agents about that conduct. Properties purchased, owned, or controlled by Defendants through shell companies or other vehicles is property which constitutes or is derived from proceeds traceable to violations of IEEPA and other criminal violations.

(mm)   22 U.S.C. 2778 – Export of Arms to Iran and ISIS: The Barzani Continuing Criminal Enterprise has traded in arms with Iran and its IRGC and ISIS and made false reports of its transactions to the United States. Defendants Masoud, Masrour Barzani, and Waysi Barzani, and others, are subject to penalties of $1,000,000 fines and 20 years imprisonment for each of their multiple and continuing violations of the statute.

(nn)   18 U.S.C 2339B – Knowingly and Intentionally Combine, Conspire, Confederate, and Agree to Knowingly and Unlawfully Provide Support and Resources to a Foreign Terrorist Organization. The Barzani Continuing Criminal Enterprise conspired to and has provided property, personnel,

68

intelligence, services, and other material support to a designated foreign terrorist organization, namely the Islamic State of Iraq and the Levant, knowing that the organization was a designated terrorist organization, and knowing that the organization had engaged in and was engaging in terrorist activity as that term is defined in Title 8, United States Code, Section 1182(a)(3)(B), and knowing that the organization had engaged in and was engaging in terrorism as that term is defined in Title 22, United States Code, Section 2656f( d)(2), resulting in thousands of deaths and untold numbers of people being tortured.

(oo)  21 U.S.C. 1901-1906 – Foreign Narcotics Traffickers: The Barzani Continuing Criminal Enterprise is a significant foreign narcotics trafficker that threatens the national security, foreign policy, and economy of the United States and whose criminal operations subject its members to the imprisonment and sanctions of 21 U.S.C. 1906.

(pp)  18 U.S.C. 1952 – Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises: The Barzani Continuing Criminal Enterprise is engaged in unlawful interstate and foreign commerce distributing proceeds of unlawful activities, and committing crimes of violence to further its unlawful activities. The unlawful activities include, but are not limited to, promoting and managing counterfeiting of cigarettes, pharmaceuticals, and alcohol; promoting and managing the unlawful manufacture, sale and distribution of methamphetamine; promoting and managing the distribution and sale of cocaine; providing arms and aid to designated terrorist organizations and terrorist states including ISIS and Iran and its IRGC; and paying bribes and financial or favoritism inducements to and otherwise corrupting officials of the United States.

(qq)  18 U. S. C. § 1952 – Violation of the Travel Act. The Travel Act makes it unlawful to use any facility in interstate commerce to distribute the proceeds of an unlawful activity. The Barzani Continuing Criminal Enterprise and its lead principals, particularly Masoud Barzani and Masrour Barzani, have repeatedly and frequently traveled to the United States, and engaged in interstate and foreign commerce, and used and do use facilities in interstate or foreign commerce, including the instrumentalities of mail, telecommunications, wire transfers, or interstate or foreign travel, with intent to (1) distribute the proceeds of any unlawful activity; and (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of any unlawful activity, including bribery of U.S. officials. The definition of "unlawful activities" also includes certain specific violations of federal law, including money laundering offenses under the Money Laundering Control Act and violations of certain financial reporting requirements of the Bank Secrecy Act as amended by the USA Patriot Act. A "facility in interstate or foreign commerce" could include

69

anything that crosses state or national borders, including telecommunications, and that the defendant used a facility of commerce "for the purpose of facilitating the unlawful activity".

(rr)   18 U.S.C. 2320 – Trafficking in Counterfeit Goods: The Barzani Continuing Criminal Enterprise trades in counterfeit goods using counterfeit marks in connection with the counterfeit goods, including counterfeit drugs, pharmaceuticals, and tobacco products.

(ss)   26 U.S.C. 7201 – Attempt to Evade or Defeat Tax: Masrour Barzani is a permanent resident of the United States, and is required to pay U.S. taxes on his worldwide income. Masrour Barzani has knowingly and willfully attempted to evade and defeat a substantial part of the income tax due and owing to the United States for multiple tax years, continuing to the present time in that he signed, filed, and caused to be filed fraudulent and false, or willfully and knowingly failed to file, U.S. Individual Income Tax Returns, Form 1040, and other forms, knowing the returns or omissions to be false and fraudulent. Defendant Masrour Barzani had the funds to pay his U.S. tax liabilities.

(tt)   21 U.S. Code § 848 – Continuing Criminal Enterprise – crimes which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (B) from which such person obtains substantial income or resources." Section 408(a) [21 U. S. C. § 848(a)] provides that any person who engages in a continuing criminal enterprise shall upon *conviction* for that *offense* be sentenced to a term of imprisonment for not less than 10 years and up to life . . . . If the person engages in this activity subsequent to one or more *convictions under this section,* he shall receive a penalty of not less than 20 years' imprisonment.

(uu)   18 U.S. Code § 2314 – Transportation of Stolen Monies – forbids the transfers in foreign commerce any securities or money, knowing the same to have been stolen, converted or taken by fraud; or devising any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

(vv)   Public Law 113-54, incorporated in numerous U.S. Codes – Defendants' repeating criminal violations of the Federal Food, Drug, and Cosmetic Act and the Drug Supply Chain Security Act (DSCSA) of 2013, enabled Defendants' widespread illicit prescription pharmaceutical manufacturing and distribution. Criminal actor defendants' illicit pharmaceutical supply chain – from raw materials, to active ingredients, to initially processed products, to finished products, to repackaged products, finally to patient delivery – is inherently dangerous to human life, producing counterfeit substandard medicines.

70

## STATEMENT OF FACTS

151.    The criminal activities of Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, associates, representatives, servants, employees, collaborators, co-conspirators, and Barzani family members and family members by marriage, and others known and unknown, in the Barzani Continuing Criminal Enterprise, at all times relevant to the conduct described in this Statement of Facts, conducted with impunity, and unfailingly as individuals hiding behind the cloak of the authority and contrived protections of their authoritarian government offices and appointments, were undertaken to provide the substantial money and resources needed to cause injury to the named Plaintiffs herein and to the John Doe Plaintiffs.

152.    The defendants' utterly lawless conduct as described herein has concretely and foreseeably damaged the Plaintiffs.

153.    Each of the individual Plaintiffs have suffered *past* injuries-in-fact, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). There exists a "substantial risk" that threatened *future* injury will occur. (See *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019)).  Thoroughly documented past harms constitute an injury-in-fact for purposes of pursuing injunctive relief as they cause "continuing, present adverse effects."  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

154.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and named and unnamed co-conspirator Defendants, including Barzani family members and family members through marriage, are directly liable as individuals for extrajudicial killings, murder and attempted

71

murder, genocide, enforced disappearances, hostage taking and kidnapping, torture, inhumane treatment, mental and physical pain and suffering, and other crimes against Plaintiffs. These Defendants exercised command responsibility at all times relevant to this complaint over subordinates engaged in a joint criminal enterprise, were responsible for security and military operations, such as planning, commanding, supervising, controlling, and execution of Defendant Iraqi Kurdistan Regional Government Peshmerga military forces plans, and advocated tactics, with, and/or aided and abetted by their subordinates, including officers in the Defendant Iraqi Kurdistan Regional Government Peshmerga (the name in Kurdish means "those who risk their lives") military and Asayish Security Forces who planned and/or carried out the operations to commit extrajudicial killings, genocide, inhumane treatment, hostage taking and kidnapping, torture, and crimes against humanity, and other gross crimes. (Asayish Security Forces and Peshmerga military forces are each dependent subordinate units of and wholly controlled by the Defendant Iraqi Kurdistan Regional Government.) Accordingly, Plaintiffs assert that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives and co-conspirators, including Barzani family members and family members by marriage, bear direct responsibility for their roles in these acts, bear command responsibility, and bear responsibility for engaging in a joint criminal enterprise with, conspiring with, and/or aiding and abetting their subordinates who planned and carried out the crimes, and are liable under United States and international law for the injuries, pain and suffering by Plaintiffs and their decedent relatives endured.

155.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives and co-conspirators, including Barzani family members and family members by marriage, unlawfully exercised raw power and lethality

unconstrained by statutory requirements, constitutional limits, any notions of due process, conflict of interest rules, any rules-based order, or even basic fairness, and where they "pursue[d] their personal predilections." *See Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

156.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani possessed and exercised command and effective control over their subordinate agents and representatives and permitted them to commit murder, extrajudicial killings, genocide, hostage taking and kidnapping, enforced disappearances, inhumane treatment, torture, rape, crimes against humanity, transactions with terrorists which cost human lives, and multitudinous other unlawful and material acts and gross crimes.

157.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the legal authority and practical ability to exert control over their subordinates, including Barzani family members and family members by marriage, including those who participated in extrajudicial killings, murder, genocide, hostage taking and kidnapping, enforced disappearances, crimes against humanity, and multitudinous other unlawful acts.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's command over their subordinate agents and representatives, and family members and family members by marriage, included the authority and responsibility to give orders and discipline their subordinates and family members and family members by marriage.  Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the actual authority and practical ability and capacity to prevent abuses and committal of crimes and punish those responsible.

158.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known of the pattern and practice of crimes and abuses

committed by their subordinate agents and representatives, servants, and Barzani family members and family members by marriage.

159.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, in their official positions with the Defendant Iraqi Kurdistan Regional Government, had a duty under international law, multilateral treaties and conventions, and Iraq law to ensure the protection of civilians, to prevent violations of international and Iraqi law and United States law by their subordinates, agents, and representatives, and Barzani family members and family members by marriage, and to ensure that all persons under their command were trained in, and complied with, international and Iraqi law, including the prohibitions against inhumane treatment, extrajudicial killings, genocide, hostage taking and kidnapping, torture, rape, enforced disappearances, crimes against humanity, and multitudinous other unlawful acts.  Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were under a duty to investigate, prevent, and punish violations of international and Iraq and United States laws committed by their subordinates.

160.   As the commanders, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani failed or refused to take all reasonable and necessary measures to prevent inhumane treatment, murder, extrajudicial killings, genocide, hostage taking and kidnapping, torture, enforced disappearances, rape, crimes against humanity, and multitudinous other crimes, or to investigate or punish their subordinates for committing such crimes and abuses.

161.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known that by making payments and resource aid to terrorists, they were playing a role in violent anti-American terrorism and necessarily intended that the money or value will reach the violent actor.  An Assistant United States Attorney General said

74

it plainly in a 2007 criminal resolution concerning similar conduct: "corporations are on notice that they cannot make protection payments to terrorists." Multiple U.S. agencies set up task forces designed to interrupt the flow of money to terrorists in Iraq and Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive. Applicable regulations and financial rules also required companies to ensure that their contracting practices – including the money spent by their subcontractors – did not finance terrorism. Defendants violated those requirements and concealed their payments in part because they knew the U.S. government considered such payments to be illegal.

162.    The extrajudicial killings, genocide, enforced disappearances, torture, rape, crimes against humanity, and other crimes were part of a pattern and practice of widespread and systemic criminal activity. At all relevant times, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known of the pattern and practice of gross criminal activity perpetuated.

163.    In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also conspired with their subordinates, including Barzani family members and family members by marriage, who planned and carried out widespread criminal activity. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired and acted in concert with one or more subordinate agents and representatives, and Barzani family members and family members by marriage, pursuant to a common plan, design, and scheme to carry out and commit or facilitate committing murder, extrajudicial killings, genocide, hostage taking and kidnapping, torture, rape, enforced disappearances, and multitudinous other high crimes against civilians, including the Plaintiffs.

164.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and

representatives, and Barzani family members and family members by marriage, knew about and agreed to facilitate the scheme and knowingly joined and participated in carrying out the common plan, design, and scheme. In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of their co-conspirators, including Barzani family members and family members by marriage, all of which were actions undertaken in furtherance of a common plan, design, scheme, and interrelated pattern to commit crimes against civilians including Plaintiffs, motivated by or the effect of which was pecuniary gain and economic threat and physical threat and injury.

165.   In addition to their direct responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also aided and abetted their subordinates, including Barzani family members and family members by marriage, who planned and carried out the criminal actions of the Barzani Continuing Criminal Enterprise. They knew or should have known that their actions and omissions would assist in the commission of these and other crimes at the time they provided assistance to the Barzani Continuing Criminal Enterprise. In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and Barzani family members and family members by marriage, are jointly and severally liable for the actions of those they aided and abetted.

166.   In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also engaged in a joint criminal enterprise with their subordinates, including Barzani family members and family members by marriage, who planned and/or carried out gross criminal activity. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others, had knowledge of and were active participants in the enforcement of this system of flagrant transnational criminality.

167.    The extrajudicial killings, murder, genocide, enforced disappearances, hostage taking and kidnapping, torture, rape, crimes against humanity, and multitudinous other gross crimes were "reasonably foreseeable or anticipated as a natural consequence of" a common shared intention on the part of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their subordinate agents and representatives, and Barzani family members and family members by marriage, who planned and carried out the crimes enumerated herein and continuing to the present time and are directly liable. *See Owens v. BNP Paribas, SA*, 897 F.3d 266 at 794 (D.C. Cir. 2018). In the instant case, plaintiffs' injuries were not only foreseeable: they were the intended result.

168.    These direct acts and omissions were and are outside the scope of lawful authority of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, and were not authorized by international law, Iraqi law, or Kurdistan law, or any regulation or lawful proclamation thereof. Their conduct was wholly inconsistent with the laws and rules in effect at the time of the conduct and was not due to inadvertent mistakes.

169.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and all named Defendants, cannot point to any "statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question" or any act "imbued with some level of formality" to show that the actions enumerated herein were or are "the official policy" or "the officially sanctioned policies of" or "statute, decree, order or resolution" of the Republic of Iraq, the foreign sovereign. "To qualify as official, an act must be imbued with some level of formality, such as the authorization by the foreign sovereign through an official statute, decree, order or resolution." *See Kashef v. BNP Paribas S.A.*, 925 F.3rd 53, 60 (2nd Cir. 2019).

170.    Defendants' acts clearly fall within the Foreign Sovereign Immunities Act

77

("FSIA") commercial activity exception to sovereign immunity. *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), and *United States v. Turkiye Halk Bankasi AS,* 16 F. 4th 336 (2nd Cir. 2021). A foreign state engaging in "commercial" activities "do[es] not exercise powers peculiar to sovereigns"; rather, it "exercise[s] only those powers that can also be exercised by private citizens." *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992), quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 704 (1976). Illicit commercial activity, in other words activity for financial or pecuniary gain, comprises a substantial component of the gravamen of Plaintiffs' Complaint.

171.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are recognized, acknowledged, and admitted senior controlling officials of the Defendant Iraqi Kurdistan Regional Government (KRG), a corrupt, oppressive, violent, and oil-rich kleptocratic regime, and of the complementary parallel Kurdistan Democratic Party (KDP), led by the Barzani family since its establishment in 1946. As such they have occupied and do occupy positions of public trust representing the people of Iraqi Kurdistan and have a duty to serve and a responsibility to protect that community. Instead, the Barzani regime, in willful and deliberate concert with its non-governmental instrumentalities, shirks basic governance obligations of building a functional civil society in favor of funding, conducting, and celebrating, *inter alia*, misinformation, coercive repression, and violent transnational criminal conduct, feigned and used as instruments of governance. The preamble to the Constitution of the Republic of Iraq, of which the Defendant Iraqi Kurdistan Regional Government is a constituent subdivision governate, instrumentality, and part, adopted March 8, 2004, declares:

> "The people of Iraq, striving to reclaim their freedom, which was usurped by the previous tyrannical regime, rejecting violence and

78

*coercion in all their forms, and particularly when used as instruments of governance, have determined that they shall hereafter remain a free people governed under the rule of law."*

*Article 10 thereof further states:*

*"...the governments of the regions, governorates, municipalities, and local administrations shall respect the rights of the Iraqi people..."*

172.   The United Nations High Commissioner for Human Rights in its 2021 report entitled *Human Rights and Freedom of Expression: Trials in the Kurdistan Region of Iraq*, an evidence-based analysis of the administration of justice in Iraqi Kurdistan, declares:

*"The Constitution of Iraq guarantees the independence of the judiciary and the right to be treated with justice in judicial and administrative proceedings. The Constitution also stipulates that the proceedings of a trial are public unless the court decides to make it secret. In addition, the Iraqi Criminal Procedure Code and other relevant domestic laws contain procedural safeguards aimed at ensuring fair proceedings and protection against arbitrary application of the law, such as the right to a lawyer in all phases of investigation and trial."*

173.   The Defendant Iraqi Kurdistan Regional Government is the regional government of the Kurdistan Region of Iraq. The Kurdistan Region of Iraq is a constituent subdivision region of the Republic of Iraq, having been established as such by the 2005 Iraqi Constitution (Article 117(First)).

174.   Iraqi Kurdistan is a geographical area in northern Iraq. Autonomous provincial Iraqi Kurdistan is recognized in Iraq's constitution as a geographical political and governance federal region. As a federal region, Iraqi Kurdistan is a subdivision part of the sovereign nation of the Republic of Iraq from which the Defendant Iraqi Kurdistan Regional Government ("KRG") derives any and all its subordinate governmental authorities. The Defendant Iraqi Kurdistan Regional Government also has its own provincial government and its own soldiers who exercise authority (independent of Iraq) within Kurdistan. *See* 28 U.S.C. § 1603(a); *Ministry of Oil of*

79

*Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard United Kalavrvta,* CIV.A. G-14-249, 2015 WL 93900, at *281 (S.D. Tex. Jan. 7, 2015) (noting that Kurdistan "administers a subsidiary region and political subdivision of the Republic of Iraq" and "Kurdistan is a political subdivision of Iraq.") The Iraqi legal system is the foundation of and governing law in the Iraqi Kurdistan region.

175.   As an acknowledged subordinate subdivision governmental entity of and empowered by the sovereign Republic of Iraq, the Defendant Iraqi Kurdistan Regional Government and its officials are subject, without exception or excusal unless specifically so declared, to all provisions of bilateral and multilateral treaties, agreements, and conventions to which the Republic of Iraq is a party.

176.   In the *Washington Agreement* executed by Defendant Masoud Barzani on behalf of the Defendant Iraqi Kurdistan Regional Government and by the U.S. Secretary of State on behalf of the United States of America, the Iraqi KRG endorsed "a federative basis" for Iraqi Kurdistan.

177.   Official documents submitted by the Defendant Iraqi Kurdistan Regional Government (KRG) to the United States Government declare the two organizations, Defendant Iraq KRG and the Kurdish Democratic Party (KDP), are, established by their own self-understanding and declaration, one-and-the-same.  In one representative instance, in a KRG Supplemental Statement filed on May 31, 2009 by the Washington KRG Representative with the U.S. Department of Justice, a department within the Executive Branch of the United States Government, pursuant to Section 2 of the Foreign Agents Registration Act of 1938, as amended, their authorized and signed submittal states Defendant Iraqi "Kurdistan Regional Government (previously known as Kurdish Democratic Party)."

80

178.   Defendant Masoud Barzani has been listed in documents filed by Defendant Iraqi Kurdistan Regional Government (KRG) with the U.S. Departments of State and Justice, and in written communications with the White House and the Executive Office of the President, as the President of the Iraqi Kurdistan Region, a position he vacated in 2017.

179.   Confidential Human Sources #1, #2, and #3, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP officials, identify Jowaira as Defendant Masoud Barzani's wife and his cousin and mother of eight known children, five known sons: Masrour, Mansour, Mustafa "Babo", Muksi, and Waysi; and three known daughters: Nabila, Monira, and Urfa.

180.   Confidential Human Sources Number #1, #2, and #3 identify Defendant Masrour Barzani's first wife as his cousin Siran Saber Mustafa, an American permanent resident and therefore a "United States person". With her, Defendant Masrour Barzani has four children, Defendant Areen, Yasmin, Barzin and Aran. Two of them, Aran Barzani and Barzin Barzani, were born in the United States and are American citizens. All of the Barzani family members participated in and aided and abetted and have informed insider knowledge of the Barzani Continuing Criminal Enterprise, in particular example the assassination attempt firebombing of Plaintiff Maki Revend's residence bragged about by knowing Defendant Areen Barzani.

181.   Defendant Masrour Barzani, Masoud Barzani's eldest son, a "United States person," previously listed in documents filed by the Iraqi KDP and KRG with the United States Government and in written communications with the White House and the Executive Office of the President of the United States, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin), was later appointed by his father as the first Chancellor

of the Defendant KRG's Security Council, and succeeded to Prime Minister of Defendant Iraqi Kurdistan Regional Government when Defendant Masoud Barzani left office.  Defendant Waysi Barzani, now entrusted with the Kurdistan Democratic Party's intelligence and counter-terrorism portfolios, is Masrour's younger brother.  Inside sources advise that among all his several brothers, Defendant Masrour Barzani's ties to Waysi are strongest.  The two share a bond of trust, tactics, criminality, and common vision and objectives for the Barzani Continuing Criminal Enterprise and pursuit of illicit wealth and power.

182.    Insider Confidential Human Source #8, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, confirms that all major business, including but not limited to oil, aviation, commercial buildings, fuel, infrastructure, and especially business that relies on airport or oil industry revenue, must now go through Defendants Waysi Barzani and Masrour Barzani.

183.    In order to provide substantial money to fund the Barzani Continuing Criminal Enterprise (BCCE) and pay fees, salaries, and expenses to co-conspirator managers and agents of the BCCE engaged in the torture, attempted murder, and murder of Plaintiffs and Plaintiffs' families, Defendants Ameer Saadallah Rasheed, an American citizen residing in Erbil, Kurdistan, Iraq, and Baz Karim Al-Barzanji, also residing in Erbil, Kurdistan, Iraq, knowingly and willfully combined and conspired with Defendant Masrour Barzani, and continue to conspire with Masrour Barzani, to corrupt the economy of Iraqi Kurdistan. As Prime Minister of Defendant Iraqi Kurdistan Regional Government, Masrour approves Defendant Iraqi Kurdistan Regional Government contracts only to those businesses endorsed by Defendants Rasheed, Al-Barzanji, Sarwar Pedawi, Mulla "Babo" Mustafa, and other co-conspirators. The monopoly power granted businesses referred by Defendants Rasheed, Al-Barzanji, Sarwar Pedawi, Mulla "Babo" Mustafa,

and other corrupt individuals allows those favored businesses to corruptly inflate the prices for the goods and services provided to the Defendant Iraqi Kurdistan Regional Government. In return for the award of the contracts, Defendants Rasheed, Al-Barzanji, Sarwar Pedawi, Mulla "Babo" Mustafa, and other co-conspirators are paid kickbacks by the businesses receiving the contracts from the Defendant Iraqi Kurdistan Regional Government. As part of the conspiracy, Defendant Masrour Barzani is paid hundreds of thousands of dollars per month by Defendants Rasheed, Al-Barzani, and other co-conspirators from funds received by favored businesses from the Defendant Iraqi Kurdistan Regional Government headed by Defendant Masrour Barzani, its Prime Minister.

184.    As a part of the BCCE effort to obtain funds to enable the torture, attempted murder, and murder of Plaintiffs and Plaintiffs' families, Defendant Baz Karim Al-Barzanji, acting for and in conspiracy with Defendant Masrour Barzani, knowingly and willfully, in violation of Iraq law and international law and the provisions and requirements of IEEPA, operates the KAR Group Refinery and oversees and manages smuggling oil to Iran and other prohibited destinations. Defendant Al-Barzanji purposely employs United States persons and a former United States Government official in his criminal operations.

185.    Defendant Ameer Saadallah Rasheed, who controls the Renos Company, corruptly solicits and receives contracts from the U.S. Defense Logistics Agency.  Acting in conspiracy with Defendant Masrour Barzani and his agents Defendants Serwan Perdawi and Shimal Jawhar Salin, Defendant Rasheed is successful in securing these U.S. Government procurement contracts because Defendants Masrour Barzani and his agents block other companies from competing for contract awards.  As a result of their criminal conspiracy, Renos can rig bids, and fix prices – thus enabling Defendant Masrour Barzani and Defendants conspiring and acting with Masrour Barzani to use aid provided to the Defendant Iraqi Kurdistan Regional Government

by taxpayers of the United States to substantially fund the BCCE and enable the torture, attempted murder, and murder of Plaintiffs and Plaintiffs' families.

186.    Defendant Masrour Barzani, as a U.S. permanent resident (i.e., a "green card holder") is deemed a "United States Person." "United States person" means a citizen of the United States, or an alien lawfully admitted for permanent residence..." "United States person" is defined by the Foreign Intelligence Surveillance Act of 1978, and other federal statutes. 50 U.S.C. § 1801(i). (as defined in section 1101(a)(20) of title 8).  The term ''United States person'' has the meaning given in section 595.315 of title 31, Code of Federal Regulations, and elsewhere.

187.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and complicit Defendants, including Barzani family members and family members by marriage, and others known and unknown, and at all times relevant to this Complaint, acting with Masoud Barzani, Masrour Barzani and Waysi Barzani, with excessive rapacity and by means of coercion and violence controlling the engines of centralized power and wealth of Iraqi Kurdistan, concentrated in the Barzani family and family members by marriage and close conspirator insiders, and dictating authoritarian controls of the administrative, bureaucratic, judicial, military, and commercial structures, with policies and governance driven by self-interest and self-protectionism, with the rule of law eviscerated, and with the intent to assure secrecy and concealment, who rule by force and fear, which is not imaginary nor wholly speculative, and not by the verifiable consent of the governed, and in more detail described below and incorporated by reference as if fully set forth herein, have for the past several decades willfully and knowingly, directly and indirectly. combined, conspired, confederated, and agreed together and with each other to operate a significant worldwide criminal conspiracy network and enterprise in an international racketeering scheme to obtain money and retain political power by fraud, torture, murder, coercion, and

abduction, the criminal conduct giving rise to this complaint having all occurred during their concurrent tenure, but not as an official or lawfully authorized act, as leaders of the Kurdistan Democratic Party and Defendant Iraqi Kurdistan Regional Government. The criminal enterprise spans the globe in its scope, has resulted in acts of murder, genocide, inhumane treatment, hostage taking and kidnapping, torture, rape, enforced disappearance, which according to the United Nations Committee on Enforced Disappearances report of November 2022 "continue to occur" and is a "problem of massive proportions in Iraq", and murder and extermination of over 5,000 people, mostly civilians including men, woman, and children, who were not victims of a sovereign state military action or war, the torture of Plaintiffs, and the corruption of public officials of the United States and other nations, massive illicit financial enrichment, concealment of said enrichment (often through Barzani family members or family members by marriage) in numerous countries including the United States, and continues at the present time in violation of the laws, treaties, and conventions of the Republic of Iraq and the United States.

188.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani played essential and controlling roles in coordinating, with other high-ranking senior Iraqi Kurdish political and military leaders under their direct command, the design and implementation of the abovementioned overwhelming criminality and criminal acts, and were in full control of all branches of the "apparatus" of the administratively corrupt [Defendant] Iraqi Kurdistan Regional Government, lacking all accountability and transparency, including the Peshmerga Armed Forces, the Defendant Iraqi Kurdistan Regional Government Police Force, the Defendant Iraqi Kurdistan Regional Govenrment Asayish Security Force (Barzani's blunt-force strength and unforgiving enforcement arm), and the Defendant Iraqi Kurdistan Regional Government Parastan Intelligence Service; and that they used and do use such control to secure the implementation of the common

plan of inhumane treatment, hostage taking and kidnapping, torture, rape, enforced disappearance, murder and extermination, and crimes of counterfeiting, finance, trade, and commerce.

189.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, together with subordinate agents and representatives under their command, including Barzani family members and family members by marriage, are each criminally responsible as perpetrators or as an indirect co-perpetrator, intentionally directing attacks against a civilian population as such or against individual civilians not taking direct part in hostilities of war, murder as a crime against humanity, extermination as a crime against humanity, enforced disappearance as a crime against humanity, hostage taking and kidnapping as a crime against humanity, torture as a crime against humanity, and rape as a crime against humanity.

190.   In furtherance of their criminal object, Defendants, as well as others not named as defendants, serving under the command and control of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, conspire, plan, utilize, and deploy torture, a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering, as a primary and principal tool and mechanism to achieve their criminal objectives.

191.   In their malevolent and inhumane criminal enterprise, Defendants, as well as others not named as defendants, including those who acted as an agent, representative, employee, or servant, or any person who acted in any other capacity at the order, request, or under the direction or control of Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani, including Barzani family members and family members by marriage, who at all times relevant to this complaint possessed all relevant levers of power and exercised the power and authority to control all actions

86

referred to herein and engage in the wrongful acts complained of herein, and used the means and instrumentalities of that power to further their criminal enterprise and committed or caused to be committed overt acts to effect the objectives of the enterprise, or their subordinate agents and employees, and associates, or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani or their subordinate agents and employees and associates and servants, and Barzani family members and family members by marriage, and any person who agreed, consented, assumed or purported to act as, or who is or holds himself/herself out to be, whether or not pursuant to contractual relationship, an agent of Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani or their subordinate agents and employees and associates and servants, including Barzani family members and family members by marriage, or acted for or in the interests of Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani, did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown, and did knowingly become a member of the conspiracy, and while aiding and abetting one another did play some part in the agreed course of conduct in furtherance of the criminal purpose which the agreed course of action was intended to achieve, and have materially assisted or provided consultative, representational, financial, material, or technological support for or goods or services to or in support of corruption, and have unlawfully and persistently consolidated, misused, and abused the acquired power of the political, economic, judicial, and security apparatus of their official offices and the cloak of officialdom for personal privilege and massive illicit personal financial gain, and using a deadly mixture of hard power, secrecy, inflicted fear, and corruption have methodically dismantled or neutered real and perceived political opposition, have organized a centralized authoritarian power structure and a Barzani-centric

87

hierarchical administrative bureaucracy, informal and unwritten, are responsible for, complicit in, or have directly or indirectly engaged in serious widespread human rights abuse, and have treated the public treasury of the Defendant Iraqi Kurdistan Regional Government as a personal piggy bank, including for the past two years stealing the salaries of public employees of Defendant Iraqi Kurdistan Regional Government and putting the money in their own pockets, creating and expanding under the leadership of Defendant Masrour Barzani a Barzani-controlled kleptocratic system of sweeping implications of corruption and deceit with a robust portfolio of opaque commercial and trade interests throughout Kurdistan and cozy relationships with some of the region's most notable terrorist organizations as the Barzani Continuing Criminal Enterprise seeks to hide the sources of their illicit wealth and use international institutions to launder ill-gotten gains in rule-of-law societies abroad; and by means of overt acts in furtherance of the crimes through the criminal enterprise and conspiracy Defendants have enriched themselves by billions of U.S. dollars using the tools of violence, fraud, theft, and bribery, all in a climate of complete impunity as they assertively ignore the rule of law. (In one instance example, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, and the Barzani family and family members by marriage, and with no lawful authority, arbitrarily and unilaterally took what they and the central federal Iraq Government have later publicly acknowledged as $4-5 billion of Kurdish depositors' monies from the TBI Bank, and publicly stated they would repay and never have. Presently, of the central Iraq Government's current monthly budget distribution of approximately $350 million to the Defendant Iraqi Kurdistan Regional Government, the central federal Iraq Government is deducting amounts to repay depositors who Barzanis have not repaid.) Because of their many types of privileges and other unearned advantages of the seat of power and money in Iraqi Kurdistan, and having mastered the tools of authority and with a recurrently

repeated claim (albeit disputed) of elite tribal superiority and entitlement, and using the proceeds of their continuing criminal enterprise to consolidate control, privilege, and dominance, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, as the leaders of the criminal enterprise, and those in their innermost circle, especially the far more opaque, concentrated, and unaccountable Barzani family members and family member by marriage, Defendants, acting as individuals with and for them, by facilitating criminal actions of Defendants and manipulating the apparatus of Defendant Iraqi Iraqi Kurdistan Government for personal, non-governmental, non-official purposes and by exercising political clout and raw power to evade or finesse jeopardy, by repeatedly and widely disseminating, including in official submissions to the United States Departments Justice and State and to the executive office of the President of the United States and to Members of the United States Congress, untruthful information and claims in the United States and worldwide to create the appearance of legitimacy and by untruthfully claiming to have no knowledge of or responsibility for innumerable heinous acts, have largely been able to escape serious and meaningful consequences and evade legal accountability and tangible legal consequences for their decades-long crime spree which includes a conspiracy to harm Americans, including Plaintiffs, and American national security, defense, and economic interests.

192.    The remarkable global criminality of Defendants is knowingly, willingly, and substantially contrary to the protocols of the United Nations Convention Against Transnational Organized Crime, a treaty to which the United States and the Republic of Iraq are parties.  The treaty states, in relevant part:

(a) Article 2(a): "'Organized criminal group' shall mean a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offenses

established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit;"

(b) Article 5(a): "Either or both of the following as criminal offenses distinct from those involving the attempt or completion of the criminal activity: (i) Agreeing with one or more other persons to commit a serious crime for a purpose relating directly or indirectly to the obtaining of a financial or other material benefit and, where required by domestic law, involving an act undertaken by one of the participants in furtherance of the agreement or involving an organized criminal group; (ii) Conduct by a person who, with knowledge of either the aim and general criminal activity of an organized criminal group or its intention to commit the crimes in question, takes an active part in: a. Criminal activities of the organized criminal group; b. Other activities of the organized criminal group in the knowledge that his or her participation will contribute to the achievement of the above-described criminal aim; (b) Organizing, directing, aiding, abetting, facilitating or counseling the commission of serious crime involving an organized criminal group. 2. The knowledge, intent, aim, purpose or agreement referred to in paragraph 1 of this article may be inferred from objective factual circumstances."

(c) Article 6 (a) (i): "The conversion or transfer of property, knowing that such property is the proceeds of crime, for the purpose of concealing or disguising the illicit origin of the property or of helping any person who is involved in the commission of the predicate offense to evade the legal

consequences of his or her action; (ii) The concealment or disguise of the true nature, source, location, disposition, movement or ownership of or rights with respect to property, knowing that such property is the proceeds of crime; (b) Subject to the basic concepts of its legal system: (i) The acquisition, possession or use of property, knowing, at the time of receipt, that such property is the proceeds of crime; (ii) Participation in, association with or conspiracy to commit, attempts to commit and aiding, abetting, facilitating and counseling the commission of any of the offenses established in accordance with this article." These crimes are committed, aided and abetted by prominent Iraqi Kurdistan business persons Defendants Baz Karim Al-Barzanji, Ghafoor Khosnaw, and Ameer Saadallah Rasheed acting in conspiracy with Defendant Iraqi Kurdistan Prime Minister Masrour Barzani.

193.   Each and every named defendant conspirator has not withdrawn from nor ceased participation in the Barzani Continuing Criminal Enterprise, nor has any Defendant conspirator committed "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. United States Gypsum Co.,* 438 U.S. 422, 464-65 (1978); *see Pinkerton v. United States,* 328 U.S. 640, 644-46 (1946).

194.   Each and all of the crimes of the brazen Barzani continuing criminal enterprise were committed or caused to be committed by one or more individuals, including Defendant Iraqi Kurdistan Regional Government and non-government actors, involved in the corrosive Barzani kleptocracy conspiracy. The U.S. National Endowment for Democracy, an agency of the United States Government, declares:

*"'Kleptocracy' literally means 'rule by thieves.'" "Autocracies are not run by one bad guy but by sophisticated networks composed of kleptocratic financial structures, security services (meaning police, military, paramilitary groups, and surveillance), and professional propagandists."*

195.   Defendant Masrour Barzani, Prime Minister of Defendant Iraqi Kurdistan Regional Government, a United States person, is considered a strongman who ignores and flouts the rule of law, rules by decree, violates civil rights, suppresses freedom of expression and speech, – each a defense against tyranny, – suppresses democratic participation, illegally detains and tortures his own citizens, orders extrajudicial murder, and terrorizes many of Iraq's Kurdish population in Iraqi Kurdistan and worldwide.

196.   The United Nations Convention Against Corruption (UNCAC), of which the Republic of Iraq is a ratifying nation state, is the only legally binding universal anti-corruption instrument, containing many mandatory provisions, foremost of which are prevention of public corruption, transparency, accountability, standards of conduct, prosecution of offenders, and seizure and confiscation of the proceeds of corruption.  The egregiously corrupt practices of the Defendant Iraqi Kurdistan Regional Government and its principal leaders Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives of the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, are in knowing, willful, flagrant, blatant, and grievous violation, disregard, and desecration of this ratified controlling international convention.

197.   Nation states, in this instance the Republic of Iraq, and thus its inferior subdivision parts, including Defendant Iraqi Kurdistan Regional Government and the officials thereof, are bound by those obligations to which they have consented (*pacta sunt servanda*), arguably the oldest principle of international law, and no treaty-based immunities have any relevance in this

case and have no material significance for the Defendants.

198.   The United Nations states:

> "*Corruption undermines democratic institutions, slows economic development, contributes to governmental instability, attacks the foundation of democratic institutions, pervert[s] the rule of law and creat[es] bureaucratic quagmires whose only reason for existing is the soliciting of bribes. Economic development is stunted because foreign direct investment is discouraged and small businesses within the country often find it impossible to overcome the 'start-up costs'' required because of corruption.*"

199.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives of the Barzani Continuing Criminal Enterprise, in ceaseless, calculated, and corrupt pursuit of personal illicit wealth and unaccountable political and governance power, willfully and knowingly and void of humanity sacrificing human lives in pursuit of greed, power, and wealth, have willfully and knowingly, directly and indirectly, inflicted this injury and lasting damage to the Plaintiffs and to the Iraqi Kurdistan region, potentially an existential risk to Iraqi Kurdistan in political, economic, and, perhaps most fundamentally, moral terms, and harmed not only the well-being of their own citizens but also that of Kurdish people elsewhere.

200.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their sycophantic subordinate co-leaders, agents and representatives, including Barzani family members and family members by marriage, serving under their command and control in the Defendant Iraqi Kurdistan Regional Government and the corresponding and interchangeable Kurdistan Democratic Party apparatus and in the Barzani Continuing Criminal Enterprise, have also used their power and privilege, often arrogated, with privileged access to everything from regulatory exemptions to generous pensions, to pay themselves exorbitant salaries; and, to help establish and promote their nepotistic networks and ensure the loyalty of their cronies, have overseen a system in which countless others are generously rewarded, thereby pirating from the Iraqi Kurdistan

economy resulting in severe economic injustice and extreme hardship throughout the Iraqi Kurdistan populace. Since its inception, the party has had a history of fierce power struggles; losers, often along with their families, are usually eliminated in the most horrible and permanent ways. Barzani's have competed for power and assumed prestige over decades. Confidential Human Sources #1, #2, #3, #4, #5, and #7, and others, declare that if you cross Defendant Masrour Barzani, ultimately, you're likely to die.

201.   Under the leadership of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their family members and family members by marriage, many of whom actively distrust and fear Defendant Masrour Barzani, Defendant Iraqi Kurdistan Regional Government has become an entrenched transnational kleptocracy, with the Barzani Continuing Criminal Enterprise dominating every public and enterprise sector in the region including armed forces, law enforcement, the judiciary, and banking, communications, media, construction, and oil and gas sectors with massive revenues and enormous illicit diversion of petrodollars and other criminal proceeds, and spreading purposely and knowingly deceptive and manipulative news through their rigorously controlled satellite television channels and print media.

202.   Former Defendant Iraqi Kurdistan Regional Government President and Defendant Masoud Barzani, having seemingly secured lifelong immunity from prosecution and retained power post-presidency, and his son, current Defendant Iraqi Kurdistan Regional Government Prime Minister and Defendant Masrour Barzani, perfected these internal power struggle mechanisms, transforming the Iraqi Kurdistan region into a supposed modern liberal democracy governed more by the principles of its former Soviet-trained past rather than by the rule of law, mirroring (and aligning with) the deceptive, unscrupulous, brutal, violent, and vicious tactics of the Bathist regime of former Republic of Iraq President Saddam Hussein responsible for the

94

genocide against the Kurds and the architect of state-sponsored Kurdish destruction by way of the Anfal Campaign in 1988 and once branded by *U.S. News and World Report* "the World's Most Dangerous Man," who Voice of America said maintained power "by force and fear, not by the consent of the governed," and who current U.S. President Biden said "provided safe havens for the world's most infamous terrorists," by whom Defendant Masoud Barzani and his close associates were once tutored and were once secretly and duplicitously loyal – notwithstanding Saddam's documented genocidal slaughter (murders) of over 182,000 of Iraq's Kurdish peoples (a number officially provided by the Defendant Iraqi Kurdistan Regional Government and by the Defendant Iraqi Kurdistan Regional Government parliament) – aiding and abetting and acting in secret concert and traitorous collaboration with Saddam Hussein, who was emboldened to believe himself immune from consequence as the Defendants now do, including the unauthorized and unlawful sharing of American national security intelligence information, much of which is classified and sensitive U.S. national defense information, gathered and owned by and under the control of the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, including information on defense and weapons capabilities of both the United States and foreign countries, potential vulnerabilities of the United States and its allies to military attack, and plans for retaliation in response to foreign attack, to agents of designated foreign terrorist states and organizations, and operating the lucrative smuggling trade with Iran and Turkey, all while publicly professing friendship to the United States.   The United Nations Committee on Enforced Disappearances report dated April 2023 states "an estimated 100,000 Kurds were forcibly disappeared as part of Saddam Hussein's genocidal campaign in Iraqi Kurdistan," with which Defendants Masoud Barzani, and Masrour Barzani deliberately, deceptively, and perfidiously

95

collaborated in their effort to maintain power and control, inviting Saddam's tanks and Republican Guards army into the Kurdish provincial capital city of Erbil on the condition they weed out Barzani's Kurdish opponents. The United Nations estimates hundreds of thousands of men, women and children were executed during a systematic attempt – by Barzani's collaborator associate Saddam Hussein – to exterminate the Kurdish population in Iraq in the Anfal operations in the late 1980s. Men, women, and children were tied together and shot – falling into mass graves.

203. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, under their direction and command, during the period of United States military presence in Iraqi Kurdistan and continuing to this day, were sharing, always verbally and never in writing, and with actual knowledge such transfer was unlawful, sensitive and classified U.S. national defense information and intelligence, gathered and owned by and under the control of the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense which are responsible for the protection of U.S. national security, including information on defense and weapons capabilities of both the United States and foreign countries, potential vulnerabilities of the United States and its allies to military attack, plans for retaliation in response to foreign attack, and about U.S. operations and personnel in the Iraqi Kurdistan region, received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government, to the mortal endangerment of United States diplomatic and military personnel with, and took other illicit steps that secretly aided the senior officials of the Islamic Republic of Iran, which since 1984 has been designated by the United States as a state sponsor of terrorism.

204. At all times relevant, Defendants Masoud Barzani, Masrour Barzani, Waysi

96

Barzani, and their agents and representatives, knew that Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States. (U.S. Department of State's 2007 Country Reports of Terrorism describing Iran as "the most active state sponsor of terrorism".) See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 , 19 (JDB) (D.D.C. Jan. 27, 2023).

205.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, knew the disclosure of this and any classified and sensitive information owned, sourced, or provided by the United States intelligence community was unlawful and that their conduct was *ultra vires* and contrary to U.S. law, and could and did put at risk the national security of the United States, its foreign relations, the safety of the United States military and diplomatic personnel, human sources, the continued viability of sensitive intelligence collection methods, and Plaintiffs.

206.    Confidential Human Sources #2, #3, and #4, who have direct clandestine access to senior Defendant Iraqi Kurdistan Regional Government and KDP officials, confirm the conduit for this classified information was "Masoud", an Iranian spy operating in the Iraqi Kurdistan city of Erbil under the cover of a construction company. This sensitive classified U.S. national defense information and intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, was then carried to the Iranian Supreme Leader.  In return for sharing with and conveying to Iran sensitive and classified U.S. national defense intelligence and information, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, and other steps that secretly aided Iran, the Barzani Continuing Criminal Enterprise received and maintains secret Iranian permission and collaboration to smuggle

contraband drugs, money, oil, weapons, and other goods and services through controlled checkpoints, operated by the Iraqi KDP under the command and control of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, into and through Iran.

207. The Islamic State, also known as the Islamic State of Iraq and the Levant, Islamic State of Iraq and Syria, ISIL and ISIS, and by its Arabic acronym Da'ish or Daesh, is a transnational militant Islamist terrorist group self-declaratively dedicated to the destruction of the United States of America. The thoroughly documented United Nations Committee on Enforced Disappearances report dated April 2023 states:

> "Over the 2014–2017 period, Da'esh also carried out abductions and mass killings of members of the Iraqi army and security forces, such as the Camp Speicher massacre. Ethnic and religious minorities were also targeted by acts amounting to enforced disappearance. On 3 August 2014 in the Yazidi-majority district of Sinjar, Da'esh abducted and disappeared thousands of women and girls for forced marriage or sexual slavery, while men and boys were separated, massacred and buried in mass graves. It is estimated that around 6,800 Yazidis were abducted and around 3,100 killed over a period of a few days. An estimated 3,000 are still disappeared. Hundreds of Assyrian Christian, Shabak and Shia Turkmen women were also abducted from areas under Da'esh control, and the fate of many of them remains unknown."

208. The Islamic State is also known as the Islamic State of Iraq and the Levant, Islamic State of Iraq and Syria, and by its Arabic acronym Da'ish or Daesh, and as ISIS. Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, Islamic State's: (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) a multinational corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon money payments extracted from companies to finance terrorist

98

operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.

209.    The U.S. Government has also recognized these connections through the close partnership between the IRGC and al-Qaeda.   In July 2011, the U.S. Treasury Department designated as Specially Designated Global Terrorists (SDGTs) six members of al-Qaeda operating in Iran under a secret agreement between the IRGC and al-Qaeda.   In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities."  The U.S. Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to Asia."  Indeed, al-Qaeda has honored its commitment to the IRGC despite its attacks on Shiite Muslims elsewhere in the Middle East.

210.    "Al-Qaeda is a Sunni jihadist organization that seeks to establish a global caliphate."  *See Cabrera v. Islamic Republic of Iran,* Civ. A. No. 18-2065 (JDB), 2022 WL 2817730, at 17 (D.D.C. July 19, 2022).

211.    Islamic State copy-catted or otherwise absorbed al-Qaeda's hatred of the United States and targeting of Americans in the Middle East to drive the U.S. from the region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures.  Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe

99

houses, logistics pipelines, facilitators, and protection rackets (including the associated relationships with business and their agents) in Iraq and Syria. Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of al-Qaeda-in-Iraq from its inception in 2014 through the present. For example, Islamic State's finance apparatus was structurally similar to that of Qaeda-in-Iraq, and Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars, and through which the Barzani Continuing Criminal Enterprise surreptitiously participated, aided and abetted, and benefitted.

212.   Islamic State viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate Islamic State's caliphate there. Abu Bakr al-Baghdadi, the leader of Islamic State until his death in 2019, repeatedly called for Islamic State supporters worldwide to facilitate Islamic State's attacks against Americans in Iraq, Afghanistan, and Syria through his public statements from 2014 through 2019.

213.   Islamic State followed al-Qaeda's time-honored playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed, or cross-pollinated, with terrorists in other theaters. Al-Qaeda and al-Qaeda-in-Iraq, from whose ranks Islamic State populated its fighters, routinely did so from the 1990s through 2021. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda, al-Qaeda-in Iraq, and Islamic State inextricably linked their campaigns in Iraq and Afghanistan together.

214.   Defendants knew that through their criminal enterprise and collaboration they were supplying resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were intent on

attacking Americans in Iraq, Syria, and Afghanistan. Defendants engaged in corrupt practices of funneling illicit payments, weapons, sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, (received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government), and other assistance, often through others, which only heightens Defendants' culpability. Defendants intentionally used oblique, circuitous, and scheming methods to insulate themselves from the illicit payments and weapons transfer on paper while avoiding accountability. Defendants knew their unlawful acts were occurring and purposefully orchestrated them. That is because Defendants could only obtain their desired criminal enterprise outcome by ensuring that their money. weapons, and sensitive U.S. national defense intelligence actually reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

215.    From 2004 through present time, it was common knowledge among operatives and businesses operating in Iraqi Kurdistan, including Defendants, that illicit transactions were typically designed for the purpose of causing U.S. dollars, weapons, oil, and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to flow to terrorists in Iraq and Iraqi Kurdistan, including al-Qaeda and al-Qaeda-in-Iraq (from 2004 through 2014) and Islamic State (from 2014 through 2021), in the form of transactions that were usually plainly illicit on their face. Because al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and the Barzani Continuing Criminal Enterprise, always openly demanded the money – and because local agents usually paid it through relatively straightforward, albeit highly illegal, means – the prevailing understanding that their illicit Iraqi Kurdistan transactions

were foreseeably flowing to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and the Barzani Continuing Criminal Enterprise.

216.   Indeed, Defendants knew that their large money payments, weapons transfers, and sharing of sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, (received by Defendants' in their official capacities with the Defendant Iraqi Kurdistan Regional Government) to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State strengthened the Foreign Terrorists Organizations' (FTOs') racketeering enterprise both through resourcing its operation, and by generally causing dramatic inflation in the prices – and associated terrorist finance extracted by the FTOs – attendant to the illicit economy in Iraqi Kurdistan.  Thus, Defendants knew that their conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire protection money racket while simultaneously (b) causing dramatic price inflation, pricing out people at the lower end of the new illicit economy Defendants helped birth and sustain.  Although Defendants' protection payments to and collaboration with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to such violations. Defendants' transactions with the specific intent of routing money directly to terrorist groups targeting the United States – which intermediaries flowed through Defendants' resources to their intended terrorist recipients – supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with U.S. dollars, sourced from transactions processed by U.S. banks in the U.S., and valuable U.S. free goods, including valuable American high-tech communications technologies that provided encrypted communication and doubled as cash-equivalents in Iraqi Kurdistan, which al-Qaeda, al-

Qaeda-in-Iraq, and Islamic State used to fund attacks against Americans in Iraq, Afghanistan, and Syria.

217.    Defendants knew that al-Qaeda waged a global terrorist campaign against the United States in which al-Qaeda and its branches and allies in Iraq, Afghanistan, Syria, and elsewhere attacked Americans to drive the United States out of the Middle East.

218.    Defendants knew resources and weapons transfers and sharing of sensitive U.S. national defense intelligence aided al-Qaeda's and Islamic State's operations worldwide.

219.    United States government reports, readily apparent to Defendants' Washington DC representatives, agents, attorneys, and advisors, and frequent briefings by U.S. Government officials in Iraqi Kurdistan, alerted Defendants that their resource transfers and payments aided al-Qaeda-in-Iraq and Islamic State.  From 2003 through the present time, the U.S. Government, media, terrorism scholars, and others published reports and statements have alerted and informed Defendants, and especially their representatives, agents, attorneys, and advisors in Washington DC, that resource payments, weapons transfers, and sharing of sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense,  received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government,  aided al-Qaeda-in-Iraq's and Islamic State's terrorist campaign against the United States.  Indeed, these and other sources alerted Defendants to four ways that al-Qaeda and Islamic State operatives in Iraqi Kurdistan, and beyond, aided their counterparts in Afghanistan: (a) funding; (b) fighters; (c) training; and (d) logistics.

220.    At all times relevant, Defendants, and their agents and representatives including Barzani family members and family members by marriage, understood and knew their actions to

103

provide resources, including weapons, and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to al-Qaeda and Islamic State in and around Iraqi Kurdistan was detrimental, damaging, and injurious to U.S. interests, national security and economic security. Indeed, Defendants always knew that al-Qaeda-in-Iraq and Islamic State terrorists regularly provided key training to al-Qaeda and Islamic State core terrorists, and their Taliban (including Haqqani Network) allies in Afghanistan and Pakistan. Defendants further always knew that al-Qaeda-in-Iraq and Islamic State terrorists regularly provided key logistical aid to al-Qaeda and Islamic State terrorists in Afghanistan and Pakistan.

221.    Defendants knew that Islamic State waged a global terrorist campaign against the United States in which Islamic State attacked Americans in Iraq, Syria, Afghanistan, and elsewhere to drive the United States out of the Middle East.

222.    Defendants had highly culpable mental states because Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani occupied sophisticated positions as, respectively, leaders of the Defendant Iraqi Kurdistan Regional Government, and well knew that their sharing of resources, weapons, materiel, and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would aid anti-American terrorism. The decision of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, to provide resources, cash, oil, weapons, and sensitive U.S. national defense intelligence, gathered and owned by the United States government,

including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was highly culpable and Defendants chose, knowing full-well the resources, weapons, materiel, cash, oil, and shared sensitive U.S. national defense intelligence would be used for bombs and weapons to take the lives of others.

223.   Defendants' robust culpability is also demonstrated by Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani's pattern and practice of rewarding its key operatives, agents, and representatives, while retributively retaliating against whistleblowers, dissidents, and opponents. Disparate treatment between involved agents and representatives, including Barzani family members and family members by marriage, also demonstrated Defendants' intent to seek profit rather than prevent the financing of terrorist activities or follow basic societal, legal, and treaty norms. Defendants' behavior was especially culpable because a substantial portion of the resources, weapons, cash, oil, and sensitive U.S. national defense intelligence gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, unlawfully but willfully shared by the Barzanis with foreign terrorist organizations, occurred while Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their Washington D.C. agents, representatives, and advisors, were publicly and in filings with the United States Government, including to the Executive Office of the President of the United States, expressing allegiance, fidelity, and cooperation with and to U.S. interests and policy, and respect for anti corruption while simultaneously scheming to route resources, weapons, materiel, cash, oil, and sensitive U.S. national defense intelligence to al-Qaeda and al-Qaeda-in-Iraq and Islamic State.

224. Each Defendant had close relationships with the relevant tortfeasors. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others known and unknown, and often through their own personnel and their Defendant Iraqi Kurdistan Regional Government agents and representatives, including Barzani family members and family members by marriage, partners, consultants, and contractors, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

225. Confidential Human Sources #1, #2, #3, #4, and #5, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials and Barzani Continuing Criminal Enterprise leadership, state that Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their subordinate agents and representatives and co-conspirators in the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, knowingly, willingly, purposefully, and intentionally conspired, affiliated with, and murderously collaborated with Saddam Hussein and Islamic State (ISIS), and its affiliates, in atrocities against the Iraqi Kurdish people for the purpose of expanding Barzani political power and the Barzani Continuing Criminal Enterprise and to harm Plaintiffs.

226. Defendants knew, and intended, that their illicit transactions with their agents and representatives, employees, and partners, consultants, and contractors were designed to, and were, for facilitating payments and sensitive U.S. national defense information, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, (received by Defendants' in their official capacities with the Defendant Iraqi Kurdistan Regional Government) transfer through such intermediaries on behalf of Defendants. Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-

106

described agents and representatives, partners, consultants, and security, transportation, and logistics contractors was a tactic to conceal Defendants' regular payments to terrorists. Defendants knew their illicit transactions with intermediaries facilitated protection payments to terrorists because Defendants' employees and agents and representatives in Iraqi Kurdistan knew such facts to be true. Defendants knew that the excessive fees they illicitly routed to their intermediary agents, representatives, partners, consultants, and contractors were red flags for unlawful payments. Defendants knew that their inability to document the services provided by their intermediary agents, representatives, partners, consultants, and contractors was a red flag that such intermediaries were passing value along to another, i.e., the terrorists. Defendants knew that a substantial percentage of corrupt value they helped flow to their intermediaries reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

227.   The U.S. Attorney for the District of Columbia publicly warned: "Funding a terrorist organization can never be treated as a cost of doing business. . . They are crimes."

228.   In so doing, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, knowingly engaged in illegal transactions that foreseeably caused money to flow to terrorists and obstructed U.S. counterterrorism efforts.

229.   Defendants knew that their corrupt payments and collaboration foreseeably aided terrorists. Defendants, including representatives in the United States, knew that corruption in Defendant Iraqi Kurdistan Regional Government and in Iraqi Kurdistan, which Defendants practiced as a matter of strategy, was always inextricably linked to terrorist violence given the unique features of the Barzani's Iraqi Kurdistan business, political, and terrorist context.

230.   Defendants knew they operated in an Iraqi and Iraqi Kurdistan business environment that posed extreme terrorist finance risks because Iraq was hyper-corrupt and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments to terrorists as the cost of doing business. These conditions were always obvious to Defendants, who willfully and knowingly, directly and indirectly, participated in such transactions.

231.   On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Islamic State leaders and agents.

232.   An analysis in the National Defense University publication, Prism, concerning the nexus between organized crime and terrorism in Iraq, reported, among other things, that "The development of a 'political-criminal nexus' [in Iraq] … undermined U.S. interests [in Iraq.]"

233.   Confidential Human Sources #1, #2, and #3, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP officials, confirm that Defendant Masoud Barzani, and his subordinate agents and representatives, disclosed, gave-up, and rendered an estimated thirty operatives of the United States Government in the Kurdistan region to Saddam Hussein, of whom thirteen escaped – and Saddam Hussein and his agents and representatives with the aid of Defendant Masoud Barzani and his agents tortured and murdered those remaining.

234.   The United Nations Committee on Enforced Disappearances report dated April 2023, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, further describes the atrocities perpetuated under command of Defendants Masoud Barzani,

Masrour Barzani, Waysi Barzani, and their agents, representatives, and subordinates, including

Barzani family members and family members by marriage:

> *"The Committee received allegations that the Kurdistan Regional Government and its intelligence forces, the Asayish, were also implicated in abuses, including the enforced disappearance of individuals detained on suspicion of affiliation with Da'esh, mainly in Kirkuk Governorate.*

> *"It is alleged that families fleeing the city were stopped at screening sites run by Iraqi, Popular Mobilization Forces and Kurdish forces: "Men and boys were separated from their families and their names checked against the government 'wanted lists' of ISIS affiliates. However, names on the wanted lists included individuals who allegedly held non-combat roles with ISIS (such as cooks or drivers), individuals who were related to someone affiliated with ISIS, or people who had been accused by members of their community of belonging to ISIS.*

> *"Moreover, due to the prevalence of similar names in Iraq, individuals could be detained simply for having the same name as someone on the list. Men and boys who did not pass the screening process were taken away, without notice to their families. Since then, the families have been searching for their relatives, and many allege that State agents deny holding them, or refuse to provide information about their whereabouts.*

> *"In the aftermath of the 2018–2020 protests, the delegation received a large quantity of similar allegations referring to enforced disappearances that had occurred following an illegal arrest or detention, or a detention in an unknown place. Testimonies refer to direct involvement by State authorities of the central Government, or by authorities of the Kurdistan Regional Government such as the Peshmerga, the municipal police and the Asayish. Some victims interviewed reported that their relatives had been abducted while going about their daily lives at home, or on their way to work, school or shopping centers. Some were seen being picked up by groups of men wearing uniforms or insignia related to the local police, or to the security forces, and others by uniformed militias.*

> *"In this context, one common pattern reported to the Committee can be summarized by the following testimony received during the visit: 'My son went to visit his cousin. I called him soon after he left because he had forgotten the bread I wanted him to offer to my nephew. He replied saying that he was at a checkpoint and that some men in uniform were checking him, and that he would call me*

109

*immediately afterwards. He never did. And when I tried to call him back, he did not reply. He never arrived at my nephew's place. Since then, I have been searching for him everywhere, in every prison, with all the authorities. But nothing, nothing, nothing.'*

*"Women, children and migrants are particularly affected. Victims disappear into the hands of trafficking networks, with no possibility of contacting their families or relatives.*

*"As the mother of three disappeared men mentioned: "Every time I explain the disappearance of my sons to the authorities, I feel very bad. I shake, I cry and I cannot sleep anymore. I have lost all hope. And now, I am very sick. Papers, papers, and nothing else happens. We have no support."*

235.   The United Nations Committee on Enforced Disappearances report dated April 2023, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, concluded this "reveal[s] the multidimensional violence of the situation faced by victims" and "that impunity and revictimization prevail."

236.   Neither Defendants Masoud Barzani or Masrour Barzani has ever hesitated to forcefully and mercilessly eliminate lieutenants, including by enforced disappearance, hostage taking and kidnapping, and murder, including those hand-picked, and Barzani family members and family members by marriage, when he/they felt someone got too close to or threatened, real or imagined, their unfettered power center, based on how it affected his/their own self-interest, caring little for anything other than what he/they might gain, or what he/they needed to achieve their criminal objectives.

237.   Especially and increasingly under the leadership of Defendant Masrour Barzani, defendants' governing reign of ubiquitous corruption, vindictive grandiosity, and autocratic tyranny in Defendant Iraqi Kurdistan Regional Government and Iraqi Kurdistan and extending to expatriate Kurds worldwide, Defendant Masrour Barzani and other defendants, including Barzani

family members and family members by marriage, use extreme measures to maintain absolute control over the government and population and increase their autocratic power and weaken the perceived or real political and media opposition, falsely under the color of law, statute, ordinance, regulation, or custom, including deprivation of rights, systematic heinous acts of enforced disappearance, hostage taking and kidnapping, murder, and imprisonment against opposition, maintains preferential, inequitable, and invidious patronage systems by distributing wealth, employment, contracts, and privilege among their patronage members, trusted supporters and affiliated businesses, all acts done beyond the bounds of Defendant Masrour Barzani's lawful authority. This behavior has produced a high level of economic inequality and insecurity, leaving the Iraqi Kurdish people, including the Plaintiffs and Confidential Human Sources who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, afraid, alienated, and frightened with paranoid fears, which are not imaginary nor wholly speculative, of personal and/or familial murder, hostage taking or kidnapping, torture, physical harm, enforced disappearance, economic deprivation, or imprisonment.

238.   The Global Magnitsky Human Rights Accountability Act was enacted on December 23, 2016. The executive branch of the United States Government has used Executive Order 13818, issued on December 20, 2017, to implement and build on the act's provisions. When issuing E.O. 13818, the President of the United States additionally invoked emergency authorities to deal with unusual and extraordinary threats to the national security and foreign policy of the United States as set out in the National Emergencies Act (NEA) and International Emergency Economic Powers Act (IEEPA), as well as authority under the Immigration and Nationality Act (INA).

239.   In its official report to the Congress of the United States entitled *The Global*

*Magnitsky Human Rights Accountability Act*, the Congressional Research Service, an agency of the United States Government, reported:

> The Global Magnitsky Human Rights Accountability Act, enacted in December 2016, authorizes the President to impose economic sanctions on, and deny entry into the United States to, foreign individuals or entities identified as engaging in gross violations of internationally recognized human rights violations or corruption. The executive branch has implemented the Global Magnitsky Act through Executive Order (E.O.) 13818 of December 20, 2017. E.O. 13818, utilizing other presidential authorities, expands the scope of sanctionable targets as compared to the Global Magnitsky Act, including broader networks of individuals and entities associated with perpetrators of human rights abuse or corruption. When issuing E.O. 13818, the President additionally invoked emergency authorities set out in the National Emergencies Act (NEA) and International Emergency Economic Powers Act (IEEPA), as well as authority under the Immigration and Nationality Act (INA). The President determined that serious human rights abuse and corruption "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," declaring that they "undermine the values that form an essential foundation of stable, secure, and functioning societies; have devastating impacts on individuals; weaken democratic institutions; degrade the rule of law; perpetuate violent conflicts; facilitate the activities of dangerous persons; and undermine economic markets."

> With regard to human rights, the Global Magnitsky Act authorizes the President to impose sanctions on any foreign person that the President identifies as "responsible for extrajudicial killings, torture, or other gross violations of internationally recognized human rights" against an individual in any foreign country.

> E.O. 13818 states that the entry into the United States of aliens determined to meet one or more of the order's sanctionable criteria "would be detrimental to the interests of the United States," and suspends their entry. It states that such persons shall be treated as persons denied entry under Presidential E.O. 13818 states that the entry into the United States of aliens determined to meet one or more of the order's sanctionable criteria "would be detrimental to the interests of the United States," and suspends their entry. It states that such persons shall be treated as persons denied entry under Presidential Proclamation 8693, which in part prohibits entry into the United States of aliens subject to economic sanctions pursuant to IEEPA authorities.

112

240.    The Global Magnitsky Human Rights Accountability Act refers to "gross violations of internationally recognized human rights" as it is statutorily defined in Section 502(B)(d)(1) of the Foreign Assistance Act of 1961, to include "torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of these persons, and other flagrant denial of the right to life, liberty, or the security of the person." Any foreign person who has "acted as an agent of or on behalf of" a perpetrator of such acts against the above categories of persons can be subject to sanctions.

241.    The Republic of Iraq and the United States are each a party to the International Covenant on Civil and Political Rights (ICCPR), which says in part:

Article 9(1):
"Everyone has the right to liberty and security of person.  No one shall be subjected to arbitrary arrest or detention.  No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law."

Article 9(4):
"Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."

242.    With regard to corruption, the President of the United States may impose sanctions on any foreign government official, or any senior associate of such official, that the President determines is "responsible for, or complicit in, ordering, controlling, or otherwise directing acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts, or the extraction of natural resources, bribery, or the facilitation or transfer of the proceeds of corruption to foreign jurisdictions." In addition, the President may designate any foreign person who has "materially assisted, sponsored, or provided financial, material, or technological support for, or goods and services in support of" such acts.

243.   Payments and obstruction of American counterterrorism activities against al-Qaeda-in-Iraq and Islamic State occurred in contracting environments in Iraqi Kurdistan marked by widespread insecurity and endemic corruption.  Private sector enterprises sought to profit from economic transactions in this corruption-based economy – including those linked to U.S. government dollars directly through U.S. government contracts or indirectly through Iraqi government contracts funded by the U.S. government – they therefore faced unusually high corruption and money laundering risks, including the associated terrorism risks.

244.   Executive Order 13818 widens the scope of potentially sanctionable targets from foreign persons responsible for gross human rights violations against certain categories of individuals (as described above), to those determined "to be responsible for, or complicit in, or to have directly or indirectly engaged in, "serious human rights abuse," without reference to the status of the victim, criminal enterprise includes many individuals, including the Individual Defendants, and a number of corporate entities.

## DEFINITION OF CONTINUING CRIMINAL ENTERPRISE ("CCE")

245.   The Defendants as participants, contributors, accomplices, co-conspirators, partakers, and beneficiaries deriving improper advantage of the Barzani Continuing Criminal Enterprise, have each and all engaged in innumerable and uncountable gross violations of internationally recognized human rights violations and corruption as described above, and employed many sophisticated methods to violate U.S. law  – detrimental to the interests of the United States and of the Plaintiffs.  Defendants' entry into the United States has not yet been suspended, revoked, and prohibited, though refusal to allow Defendants entry or withholding entry is fully merited.

246.   A continuing criminal enterprise (CCE) is a separate substantive offense and not a conspiracy offense because it requires completion of the criminal objective and not merely an agreement. *See Garrett v. United States,* 471 U.S. 773, 779, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764, 778 (1985); *Pinkerton* v. *United States,* 328 U. S. 640, 643 (1946).

247.   U.S. federal criminal statute forbids any "person" from "engag[ing] in a continuing criminal enterprise." 84 Stat. 1264, 21 U. S. C. § 848(a).  A "continuing series of violations," 21 U.S.C. § 848(c)(2), requires participation in three or more predicate offenses, one of which may be a drug conspiracy charged under 21 U.S.C. § 846. *See United States v. Harris,* 959 F.2d 246, 252-54 (D.C.Cir.1992), overruled on other grounds, *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *See US v. Moore,* 651 F.3d 30 (D.C. Cir. 2011).  Commission of a continuing criminal enterprise offense requires concerted action with "five or more other persons." 21 U.S.C. § 848(c)(2)(A).

248.   The United Nations Office on Drugs and Crime defines organized crime as "a continuing criminal enterprise that rationally works to profit from illicit activities that are often in great public demand.  Its continuing existence is maintained through corruption of public officials and the use of intimidation, threats or force to protect its operations" (UNODC).  This definition accurately and explicitly describes the Barzani Continuing Criminal Enterprise, and is especially descriptive of the knowing and willful tortious acts of co-conspirator Defendant Mulla "Babo" Mustafa who specializes in extortion threats, enforcing payments for Kurds for their right to work, and other unlawful financial acts to enrich Defendants and harm Plaintiffs.

249.   For a period of decades, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their family members and family members by marriage, and agents, representatives, employees, associates, servants, and others, far in excess of five persons, have associated-in-fact

together for a common purpose of engaging in criminal conduct (*See Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)), with no particular organizational structure, separate or otherwise but functioning as a continuing unit (*See Odom*, 486 F.3d at 551) and with a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit associates to pursue the enterprise's purpose (*See Boyle*, 556 U.S. at 945-46), where defendants were each aware of the essential nature and scope of the enterprise and intended to participate in it, (*See United States v. Christensen*, 801 F.3d 970, 985 (9th Cir. 2015), and have engaged in a prolonged, sustained, and open-ended continuity of criminal enterprise that has become their regular way of doing business. *See Allwaste*, 65 F.3d at 1528; see, *e.g., Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990).

250.    Defendants Masrour Barzani and Waysi Barzani, with co-conspirator Defendant Nihad Barzani functioning as a principal subordinate, are the heads of a sophisticated, well-entrenched, successful criminal narcotic drug distribution enterprise.

251.    Proceeds of the illicit Barzani-controlled narcotic drug distribution enterprise are deployed to financially enrich the Defendants and to further their other criminal activities and to harm Plaintiffs.

252.    Title 18 U.S.C. § 1961 (4) provides: "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

253.    "The mere fact that a given enterprise is favored with a legal existence does not prevent that enterprise from proceeding along a wholly illegal course of conduct." "To establish the existence of such enterprise, a plaintiff must allege 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" *See*

116

*United States v. Turkette,* 452 U.S. 576, 583 (1981). The Barzani Continuing Criminal Enterprise has proceeded and is proceeding "along a wholly illegal course of conduct," is "an ongoing organization", and the "various associates function as a continuing unit."

## I.     The Barzani Continuing Criminal Enterprise

254.    "The business of a criminal enterprise is crime." *See US v. Eufrasio*, 935 F.2d 553, 566 (3d Cir. 1991) and *United States V. Masters*, 924 F.2d, 1362, 1366 (7th Cir. 1991)

255.    Defendant Masrour Barzani is the undisputed and unquestioned leader of this criminal enterprise and derives extraordinary illicit financial benefit from its wide reaching criminal, unlawful, and tortious activities, predominantly unreported, concealed, and secreted from public or taxing authority exposure, frequently through Barzani family members and other co-conspirators named and unnamed herein. The Barzani Continuing Criminal Enterprise's money-making schemes are criminal in nature.

256.    The criminal activity and the pattern of criminal activity of the Barzani Continuing Criminal Enterprise alleged herein and Defendant Iraqi Kurdistan Regional Government are not separate and distinct from each other; as state-embedded criminal actors, together with corrupted law enforcement and military under command and control of Defendants Masrour Barzani and Waysi Barzani and their agents and representatives, and Defendant KRG politicians all have an interest in maintaining and expanding the illicit economy. The Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise have effectively integrated terror and criminal tactics and strategies, and converged economic and ideological goals creating a *hybrid criminal-political entity*. In the fluidity of the crime-terror nexus, the operational and organizational evolution of the two have converged, made possible by the weakened and fragile

state apparatus of Kurdistan controlled by the Barzani Continuing Criminal Enterprise which in some respects constitutes *de facto* government while furthering its criminal activities. The corruption of the Barzani Continuing Criminal Enterprise is a crucial instrument for crime, to prevent any Republic of Iraq government attempt to disrupt its illicit activities, and to injure Plaintiffs.

257.    The United States Supreme Court held: "For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." *United States* v. *Rabinowich,* 238 U.S. 78, 88.

258.    The extensive, calculated, and intentional criminal activities of the Barzani Continuing Criminal Enterprise, a multibillion-dollar, transnational criminal organization ongoing for decades and to the present time, formally and informally, deliberately plotted to subvert the laws, in concert and conspiracy with individuals and a group of five or more individuals associated in fact, with supervisors, although sometimes not a legal entity, and functioning as a continuing unit, with a continuing series of violations and very substantial income, to extensively pursue the enterprise's habitual criminal practices and purpose, include, but are not limited to, murder, attempted murder, extrajudicial murder, genocide, hostage taking and kidnapping, murder-for-hire ("carefully contemplated murders", quoting *Gregg v. Georgia,* 428 U.S. 153, 186, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)), murder of a U.S. government agent, enforced disappearance, deprivation of freedom, torture, arson, robbery, bribery, extortion, dealing in controlled substances,

counterfeiting, embezzlement, misappropriation, and peculation of public funds, trafficking weapons, violation of international sanctions, trading with the enemy, sale or trade of classified U.S. intelligence documents and information, fraud and related activity in connection with immigration documents, wire fraud, financial institution fraud, disguised financial structures, theft of depositor funds, repression and suppression of speech and expression and democratic participation, targeting of dissidents who oppose the regime's violations of human rights, procurement of United States citizenship or nationalization unlawfully, fraud of naturalization or citizenship papers, fraud of offshore asset disclosures, fraud of resident alien tax compliance, obstruction of criminal investigations, retaliating against a witness, victim, or an informant, false statement in application and use of visa, false use of visas, permits, and other documents, categorically and materially false, fictitious, and fraudulent statements to the U.S. Government, economic espionage and theft of trade secrets, interference with commerce, laundering of monetary instruments, monetary transactions in property derived from specified unlawful activity, illegal money transmitters, international transportation of stolen property, criminal infringement of a copyright or trademark, international trafficking in certain motor vehicles or motor vehicle parts, trafficking in contraband cigarettes, felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, acts indictable under the Currency and Foreign Transactions Reporting Act, acts indictable under the Immigration and Nationality Act, acts indictable under the Torture Victims Protection Act, acts indictable under the Alien Tort Statute, acts indictable under multiple other U.S. federal statutes, and violation of numerous international treaties, conventions, and international law.

259.   True to its multinational structure, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and

119

family members by marriage, calculated, devised, and oversaw the financial structure, mechanisms, and apparatuses and operation of the Barzani Continuing Criminal Enterprise throughout Iraqi Kurdistan and Iraq, and beyond, which they operationalized and executed at the national, provincial, and local levels throughout Iraq, and beyond, and purposely built to ensure that the money at any level was optimized to maximize the lethality and profitability of Barzani's control in Iraqi Kurdistan and beyond, and to harm Plaintiffs.

260.    The Barzani Continuing Criminal Enterprise includes many individuals, including the named individual Defendants, and a number of corporate and affiliated non-profit entities. Agents, employees, contractors, servants, and/or representatives of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, including Barani family members and family members by marriage, in committing the criminal acts alleged herein were at all times acting within the course and scope and purpose of their authority as such agents, employees, contractors, servants, representatives, and/or with the permission and consent of Defendants Masoud Barzani, Masrour Barzani, and/or Waysi Barzani.

261.    At all relevant times, all Defendants and their co-conspirators were aware of the essential nature and scope of the Barzani Continuing Criminal Enterprise and intended to participate in it. Each co-conspirator of the Barzani Continuing Criminal Enterprise has a systemic linkage to each other participant through corporate ties, employment, family relationship, political party membership, and other contractual relationships, and agency relationships, and function as a continuing unit for the purpose of furthering the scheme and common purposes of the Enterprise.

262.    Each criminal activity of Defendants was related, had similar purposes – to harm Plaintiffs and enrich Defendants – involved the same or similar participants and methods of

commission, and had similar results affecting similar victims, including Plaintiffs. Defendants'
conduct is part of their on-going business and constitutes a continuing threat to Plaintiffs.

263.    While presenting itself outwardly as a respectable organization, Defendants
Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, and Barzani
family members and family members by marriage, and other co-conspirators unnamed, the Barzani
Continuing Criminal Enterprise has implemented a conduct or disposition or demonstrated
behavior of terrorizing victims (and witnesses) of its crimes – especially amongst Kurds – into
keeping Barzani's crimes secret. As with many criminal enterprises, the Barzani Continuing
Criminal Enterprise takes significant lawful and unlawful steps to protect itself and its co-
conspirators from governmental authorities not of Defendant Iraqi Kurdistan Regional
Government, and terrorizes any who speak out about its unlawful activity in order to intimidate
them and dissuade them from seeking protection from law enforcement or cooperating with
governmental authorities that would otherwise come to their aid.   For those who do find the
courage to go to authorities, the Defendants and their agents and representatives engage in a
coordinated effort to wreak havoc on that person's life through a targeted campaign of harassment,
intimidation, persecution, oppression, financial ruination, reputational devastation, physical
beating, torture, enforced disappearance, and even extrajudicial murder. The Barzani Continuing
Criminal Enterprise also uses its significant resources – including the proceeds of its criminal
endeavor – to hire outside agents to implement and carry out its targeted harassment and
intimidation campaigns, and to hide evidence of their multitudinous crimes.

264.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents
and representatives, and Defendant Iraqi Kurdistan Regional Government have a longstanding
policy and practice of operating an intelligence and spying organization that tracks, monitors, and

directs retaliation campaigns and ruinous and malicious litigation against critics of Defendants and/or those who publicize the Barzani Continuing Criminal Enterprise or reports its crimes to law enforcement or other public authorities.

265.   All of the criminal actions and tortious actions taken in furtherance and support of criminal activities described above were committed by Defendants, their agents, employees and/or representatives, Barzani family members or family members by marriage, or were carried out by or at the direction of Defendants and their employees, agents and/or representatives, to harm Plaintiffs.

## CRIMINAL ACTS OF DEFENDANTS
## (A REPRESENTATIVE BUT INCOMPLETE LISTING)

I.   **Murder of a U.S. Government Employee by the Barzani Continuing Criminal Enterprise**

266.   It is a criminal offense to murder a U.S. national or U.S. Government employee outside the United States, if the murder occurred within the jurisdiction of a foreign country.

267.   The Vienna Convention on Diplomatic Relations, ratified by the United States in 1972, declares that "[t]he person of a diplomatic agent shall be inviolable." Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes, Art. 29, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972). *See Usoyan v. Republic of Turkey*, 6 F. 4th 31, Court of Appeals, Dist. of Columbia Circuit (2021).

268.   The Assistant Director-in-Charge of the Federal Bureau of Investigation declared, "An attack on U.S. government personnel, whether domestic or abroad, is an attack on the United States."

269.   Insider Confidential Human Source #1, who has direct clandestine access to senior

122

ranking Iraqi KRG government officials, stated: In but one representative instance, in November, 2021, operating under direct orders from Defendants Masoud Barzani, Masrour Barzani [at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power,] and Waysi Barzani, agents of the Barzani Continuing Criminal Enterprise, participated in the supporting, planning, preparation, conducting, or concealing for and did, to gain political or economic advantages, conspire to take hostage and kidnap and murder and did take hostage and kidnap and murder an officer and employee (not herein named to protect his surviving family in the United States from Barzani Continuing Criminal Enterprise terrorist retribution and retaliatory physical or mental harm) of the United States Government and agencies in the executive branch of the United States Government, who was performing official duties, with malice aforethought, willfully, deliberately, maliciously, and with premeditation and during the perpetration of, and attempt to perpetrate, a hostage taking and kidnapping, while such officer and employee was engaged in and on account of the performance of his official duties, in the village of Balay in Iraqi Kurdistan, within the Republic of Iraq. with intent to kidnap and sell or otherwise trade the agent employee to the Islamic Revolutionary Guard Corps and/or Iranian intelligence agents, did commit murder, as defined in Title 18, United States Code, Section 1111(a), by killing an officer and employee of the United States and agencies in the executive branch of the United States Government, with malice aforethought, willfully, deliberately, maliciously, and with premeditation and during the perpetration of, and attempt to perpetrate, a hostage taking and kidnapping, while such officer and employee was engaged in and on account of the performance of his official duties. (Murder of an officer or Employee of the United States, in violation of Title 18, United States Code, Sections 1114 and 1111; Aiding and Abetting and Causing an Act to Be

Done, in violation of Title 18, United States Code, Section 2).

270.   Under the direction and command of Defendant Masrour Barzani, agents known and unknown did attempt to take hostage and kidnap a United States agent employee, an internationally protected person, who was performing official duties, with malice aforethought, willfully, deliberately, maliciously, and with premeditation, directly and indirectly, with intent to sell or otherwise trade the agent employee to the Islamic Revolutionary Guard Corps and/or Iranian intelligence agents, and during the perpetration of, and attempt to perpetrate, a hostage taking and kidnapping. (Attempted Murder of an Internationally Protected Person, in violation of Title 18, United States Code, Sections 1116(a) and 1113; Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2).  Defendants' actions were "a 'substantial factor' in the sequence of events that led to" the death of the American agent. *See Owens v. BNP PARIBAS, SA*, 897 F.3d 266, 794 (D.C. Cir. 2018).

271.   The Foreign Sovereign Immunities Act (FSIA) incorporates the definition of "hostage taking" from "Article 1 of the International Convention Against the Taking of Hostages," 28 U.S.C. § 1605A(h)(2), which defines a hostage taker as "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage," International Convention Against the Taking of Hostages art. 1, ¶ 1, Dec. 18, 1979, 1316 U.N.T.S. 205. "The Convention does not proscribe all detentions, but instead focuses on the intended purpose of the detention," (*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002)); "[t]he essential element of a hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the Convention." (*Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 161

124

(D.D.C. 2017), (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359

(D.C. Cir. 2006)).

272.     "That one of Iran's proxies acted to abduct and detain Americans is not only a

'reasonably foreseeable' 'natural consequence,' but a desired result of Iran's training and

directives. That one of the Americans was also brutally killed was, 'by any reasonable measure, a

foreseeable consequence of Iran's support.'" (citation omitted)); cf. *Foley v. Syrian Arab Republic*,

249 F. Supp. 3d 186, 204 (D.D.C. 2017) (applying similar reasoning with respect to Syria's support

for a terrorist group)" *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, at 89.

(JDB) (D.D.C. Jan. 27, 2023).

273.     In the Barzani-protected isolated provincial village of Balay in the Barzani tribal

headquarters and Barzani-controlled section of Iraqi Kurdistan, within the sovereign nation of the

Republic of Iraq, Defendants did willfully, deliberately, maliciously and with premeditation,

directly and indirectly, murder an employee of the United States Government, who was performing

official duties, an internationally protected person, in violation of 18 U.S.C.§§ 1116(a), 1116(c),

and 1111(b), which killing would have constituted murder as defined in Title 18, United States

Code, Section 1111(a), entitled pursuant to international law to special protection against attack

upon his person, freedom, and dignity.

274.     Confidential Human Source #1, who has direct clandestine access to senior ranking

Iraqi KRG government officials, disclosed that within the extraterritorial jurisdiction of the United

States, Defendants, together with others, while outside the United States, did knowingly,

intentionally and with malice aforethought conspire to take hostage and kidnap and/or kill one or

more nationals of the United States, to wit Defendants planned to take hostage and kidnap the

American intelligence agent, who was performing official duties, and trade him to the Islamic

Revolutionary Guard Corps, a U.S.-designated foreign terrorist organization. During the hostage taking and kidnap, the American agent struggled, battled, and physically resisted whereupon Defendants violently, brutally, and viciously applied overwhelming force, and mercilessly beat to death this American citizen employee of the United States Government and callously and with abject disregard for human dignity dumped his lifeless body, covered in cuts and bruises and abrasions, in Barzan Creek, and quickly exited the area of the abduction. Below is a photograph of the discarded lifeless body of the United States intelligence agent in the dry creek bed of Barzan Creek left there in 2021 by agents of the Barzani Continuing Criminal Enterprise acting under the direction and command of Defendants Masrour Barzani and Waysi Barzani.



275.    In a cover-up effort orchestrated, planned, coordinated, and directed by Defendant Masrour Barzani and his subordinate agents and representatives, the local police, controlled by Defendant Masrour Barzani, purposefully, misleadingly, and fallaciously, and with planned

126

misdirection and purposeful concealment, ruled his death a heart attack.

276.    This murdered American government intelligence agent employee, engaged in official duties, leaves behind a wife and children in the United States.

277.    In a second example of an earlier Barzani-ordered murder of a U.S. defense intelligence agent, confirmed and verified by evidence in possession of Confidential Human Sources #1 and #2, upon orders from Defendant Masoud Barzani, Sheikh Zanna, a secret KDP member but openly a member of the Muslim Brotherhood, did receive instructions from Defendant Karim Sinjiri, who himself received command orders from Defendant Masoud Barzani, to murder the agent. Zanna followed orders to kill the U.S. agent by using a large improvised explosive device ("IED"), a type of bomb. With no judicial proceedings or authorization, Defendant Masoud Barzani unilaterally ordered Sheikh Zanna hanged to silence him.

## II.    Murder, Attempted Murder, Assassination and Enforced Disappearances – as a Primary Tool of the Barzani Continuing Criminal Enterprise

278.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, with intent and malice aforethought, are murderers.

279.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, have a long well-documented demonstrated history of using murder as a tool and mechanism of and to achieve and maintain power, control, and illicit wealth.

280.    The Kurdistan Democratic Party (KDP), predecessor to the Defendant Iraqi Kurdistan Regional Government (KRG) and its corollary political entity partner, was founded by Mustafa Barzani, father of Defendant Masoud Barzani and grandfather of Defendants Masrour Barzani and Waysi Barzani. As he aged and his health deteriorated, in keeping with the patrilineal

traditions of the Barzani tribe, Mustafa was under enormous pressure from his last wife, Hemauil, to designate her son as successor. Hemauil was of the Zebari tribe and was not a Barzani; thus, Masoud is only half Barzani. Her clan were well known as collaborators with the central Iraq government, against the Kurds. As a youth, Defendant Masoud Barzani was raised by his godfather, Mahmood Agaha, a well-known murderer, gangster, smuggler, and traitorous collaborator where Defendant Masoud Barzani learned and was tutored in criminality and mistrust throughout his childhood. It is that traditional and common style of Zebari mercenary, murderer, collaborator, and criminal leadership that Defendant Masoud Barzani brought to his provincial regional presidency and which his sons Defendants Masrour and Waysi continue and perpetuate.

281.   In this family succession power struggle, several of Mulla Mustafa's sons, including sons Obaydulla and Luqman, and 36 other family members who opposed Defendant Masoud Barzani's succession to the Presidency of the Defendant Iraqi Kurdistan Regional Government, were eliminated by assassination ordered by Defendant Masoud Barzani. In his grandiose and manic quest for power, Defendant Masoud Barzani benefitted from and capitalized on the assassination of his own brother by Saddam Hussein. When Mustafa Barzani died, his wealth was left to Masoud's mother. Nothing was left to the other wives. Thus, every means of power remained with Masoud and his mother.

282.   When Defendant Masoud Barzani's parents were alive and with the help of his mother, Masoud arranged for his brothers Ubaidullah, the eldest son of Defendant Mustafa Barzani, Lokman, and Saber to go to Baghdad and there be killed by Saddam Hussein. Defendant Masoud had his brothers killed so that the way would be safe and free for Masoud to direct, control, and conduct the Barzani Criminal Enterprise.

283.    In Iraqi Kurdistan, Defendant Masoud Barzani became "the Saddam Hussein" of Defendant Iraqi Kurdistan Regional Government, a position now held by his son, Defendant Masrour Barzani.  Confidential Human Sources #1, #2 #3, #4, and #5, who have direct insider clandestine access to senior Defendant Iraqi Kurdistan Regional Government and KDP officials, confirm that Defendants Masoud Barzani and Masrour Barzani have followed and do today follow the murderous Baath doctrine of brutality authored by Saddam Hussein – including but not limited to atrocity, barbarism, barbarity, cruelty, inhumanity, oppression, savagery, hostage taking and kidnapping, enforced disappearances, and murder.

284.    In just one typical representative instance of murder and the unrivaled, disproportionate, and barbarous brutality of Wajih Mustafa Barzani and Defendant Masoud Barzani against Barzani family members, Confidential Human Source 9# and #10 witnessed the following:

> "Kurd citizens Swar Mohammed Amin Swar, Khalil Miran, Rashid Mohammed Amin Swar (Swar's brother), Mustafa Mohammed, Aziz Mustafa Mohammed (the driver), went to Pirmam, in Masif Salahaddin to meet Masrour Barzani for assistance, who directed them to his uncle Wajih Mustafa Barzani who is the special brigade commander.  A few days later, an estimated twenty-five to thirty Barzani operatives of the Special Brigade force commanded by Wajih Mustafa Barzani, acting under the direction of his brother Masoud Barzani, in eight vehicles, converged on the Sebiran community, Khabat sub-district, of Erbil province to arrest Fatah Issas and Issa Majid.  Three of these men, each agents of the KDP, were identified as Ahmad Osman Mohammed, Mohammed Jawhar Hussein, and Mushir Fariq Mohammed; the other men were not identified.  Fatah and Issa were arrested for unspecific charges and were hauled to Masif Salahuddin, a special brigade prison operated by Wajih Mustafa Barzani, acting under the direction of his brother Masoud Barzani, and were locked up in the same room as Swar Mohammed Amin and Khalil Miran.  They were personally physically attacked by Wajih Mustafa Barzani and Masoud Barzani.
>
> "Ghazi Haji Agha was at the time a houseguest of Masif Salahaddin at the home of his sister, Amina Haji Aagha.  Amina is the wife of

129

*Luqman Mustafa, who is the brother of Masoud Barzani. Shvan Luqman, who is Amina's son and Ghazi's nephew, sent word of the arrest to Wajih Mustafa Barzani that Ghazi was a house guest. Ghazi was imprisoned by Wajih Mustafa Barzani and transferred to the same prison and same room as Fatah and Issa.*

*"At the command of Masoud Barzani and his brother Wajih Mustafa Barzani, the men were held for forty days, without charges or trial, in Masif Salahaddin prison operated by the KRG, whereupon Rashid Mohammed Amin was released and the others were transferred by Barzani agents to an unknown location and disappeared forever.*

*"Luqman Mustafa is Masoud Barzani's brother. His wife is Amina Haji Aagha. Her son is Shvan Luqman, who is the uncle of Ghazi Haji Agha. He was disappeared and never seen again."*

285.    For the purpose of perpetuating their power base and governance positions and financially enriching the continuous Barzani Continuing Criminal Enterprise, under the direct command and control of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and to the harm and detriment and life safety of the Plaintiffs and others, most especially Iraqi Kurdish citizens, arrest, murder, hostage taking and kidnapping, and enforced disappearances are a primary means and instrument of the Barzani Continuing Criminal Enterprise.  Murder and enforced disappearances directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, with intent and under apparent, assumed, fabricated, or imagined authority, or feigned color of law, of the inferior provincial Defendant Iraqi Kurdistan Regional Government, absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the superior Republic of Iraq (the foreign sovereign), the Defendant Iraqi Kurdistan Regional Government, or international treaty, convention, or bilateral agreement, and not as any act of war, are frequently and repetitively inflicted on individuals, including Plaintiffs and agents and employees of the United States Government.

130

286.   Enforced disappearances are flagrant violations of human rights, encompassing multiple facets like the right to life, the prohibition of torture, the right to liberty and security, and the right to a fair trial. Global instruments such as the International Convention for the Protection of All Persons from Enforced Disappearance aim to prevent such heinous acts, ensure that culprits are penalized, and victims and their families receive reparation.

287.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, have continuously, knowingly, and willfully, directly and indirectly, failed to abide by, observe, obey, adhere to, confirm to, or act in accordance with the International Convention for the Protection of All Persons from Enforced Disappearance, enacted by the United Nations and ratified by the Republic of Iraq of which the Defendant Iraqi Kurdistan Regional Government is a subordinate part. The Convention addresses the act of enforced disappearance where individuals are secretly abducted or imprisoned by a state or political organization, followed by a refusal to acknowledge the person's fate and whereabouts, with the intent of placing the victim outside the protection of the law. The Convention obliges states to take effective action to prevent and punish acts of enforced disappearance in their jurisdictions. It establishes the right of individuals to know the truth about the circumstances of an enforced disappearance and the fate of the disappeared person, and the right to reparations and prompt, fair, and adequate compensation. The Convention's article seven says: "The widespread or systematic practice of enforced disappearance constitutes a crime against humanity as defined in applicable international law and shall attract the consequences provided for under such applicable international law."

**EXTRAJUDICIAL MURDER**

288.    The Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1650A(h)(7),

defines "extrajudicial killing" to mean "a deliberated killing not authorized by a previous judgment

pronounced by a regularly constituted court affording all the judicial guarantees which are

recognized as *indispensable by civilized peoples*," but does not include "any such killing that,

under international law, is lawfully carried out under the authority of a foreign nation."   "There

are three elements to this definition: '(1) a killing; (2) that is deliberated; and (3) is not authorized

by a previous judgment pronounced by a regularly constituted court.'"   *See Cabrera v. Islamic*

*Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.D.C. Jan. 27, 2023).

289.    Section 1605A(h)(7) of the FSIA also provides that the term "extrajudicial killing"

has the meaning given to it in § 3(a) of the Torture Victim Protection Act of 1991, which defines

an extrajudicial killing as:

> "a deliberated killing not authorized by a previous judgment pronounced by a
> regularly constituted court affording all the judicial guarantees which are recognized as
> indispensable by civilized peoples. Such term, however, does not include any such killing
> that, under international law, is lawfully carried out under the authority of a foreign nation."
> "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated;
> and (3) is not authorized by a previous judgment pronounced by a regularly constituted
> court. *See Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017).

290.    Plaintiffs "need only establish that [the attack] was unauthorized, deliberate, and

that there were casualties"; "[i]t is not necessary . . . for one of the plaintiffs to have died in the

attack in order for the state-sponsor-of-terrorism exception to apply." (*Cabrera v. Islamic*

*Republic of Iran*, Civil Action No. 19-3835, 81 (JDB) (D.D.C. Jan. 27, 2023); *Cohen v. Islamic*

*Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).

291.    Unlawful extrajudicial killings, also known as an extrajudicial execution or

extralegal killing, is the deliberate killing of a person without the lawful authority granted by

a judicial proceeding, which in implementation may have become attempted murders, sanctioned

and ordered by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty or convention, and not as any act of war, who did knowingly and intentionally combine, conspire, and confederate with their subordinate agents and representatives, including hired assassins, such as Defendant Kamal Kirkuki, for the purpose of perpetuating, financially enriching, and expanding the Barzani Continuing Criminal Enterprise and thus its capacity to harm, injure, threaten, harass, intimidate, silence, discredit, torture, take hostage and kidnap, and murder Plaintiffs, may be categorized in eight general groupings:

    (a)    Widespread killing of political and ethnic opponents of its own citizens.

> The United Nations Human Rights Council Special Rapporteur on extrajudicial, summary or arbitrary executions in Iraq reports "arbitrary arrests by Kurdish security forces and in some cases were forcibly disappeared." "retaliatory attacks" especially against "internally displaced persons (IDPs)." "Tens of juveniles remain detained by the Kurdish authorities under the counter-terrorism regime, which due to a lack of procedural guarantees places them at risk of human rights violations, including of death in detention. This risk is increased by the severely limited access to detention facilities by local and international organizations rendering monitoring of the situation almost impossible."

> Extensively documented evidence confirms the Iraqi KDP, under the command and direction of Masrour Barzani, and his agents and representatives, especially Defendant Dindar Zebari, a prime communicator of purposeful misinformation for Defendant Masrour Barzani to agencies and representatives of the United Nations, and including Barzani family members and family members by marriage, to preserve and expand the Barzani political power base and expand the Barzani Continuing Criminal Enterprise did and do plan, conspire and act in concert to use internally displaced Iraqis ("IDFs") as propaganda and a purposefully misrepresented messaging tool of the Barzani Continuing Criminal Enterprise to motivate and secure sympathy and funding from the international community, and to present a false, fabricated, and intentionally misleading public image of a regime concerned with human rights, which itself constitutes human rights

abuse, and at a time when hundreds of thousands of IDPs are housed in tents in currently 25 IDP camps (hosting some 180,000 IDPs, the majority being Sunni Arabs) in Iraqi Kurdistan, facing security and protection risks, lacking local integration opportunities, having limited livelihood opportunities and financial resources, lacking civil documents. and lacking basic human necessities and suffering malnutrition, sickness, and death at a time the Barzani Continuing Criminal Enterprises continues to enrich itself.

(b)    Targeted killing of individual name-specific perceived threats of its own citizens.

(c)    Targeted killing of individual name-specific journalists.

In a report, *Mountain of Impunity Looms Over Kurdistan Journalists*, the independent New York–based Committee to Protect Journalists painted a very grim picture of the lack of rule of law in the Defendant Iraqi Kurdistan Regional Government.

The Special Rapporteur of the United Nations Human Rights Council was informed of several attacks on journalists and media professionals in recent years, including threats, intimidation, physical assaults and killings, in particular in the Kurdistan region of Iraq.

One Kurdish journalist calls Kurdish journalism "a profession of death. There is no room for any criticism."

(d)    Targeted killing of individual name-specific American citizens.

(e)    Targeted killing of individual name-specific political opponents of its own citizens.

(f)    Targeted killing of individual name-specific perceived threats of its own citizens.

(g)    Targeted killing of individual name-specific American agents and employees.

292.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their associates and subordinate agents, including Barzani family members and family members by marriage, in order to enrich themselves and hold onto political, civil, and governance power and authority over the Defendant Iraqi Kurdistan Regional Government legislative, executive, and judicial branches of the governate and the Iraqi Kurdistan commercial, enterprise, financial, and

134

business sectors, most especially its oil and gas sectors, over which they maintain authoritarian and tyrannical control, have knowingly, admittedly, and willfully, directly and indirectly, sanctioned and deployed willful murder and extrajudicial killing, willful hostage taking, kidnapping, and enforced disappearances, willful causing of great suffering, abducting and sequestration, and attacks against the civilian population, as an unsanctioned and unallowed tool of power and governance, for suppression of human rights, for silencing journalists and political opponents and those who present perceived threats to Defendants' political, economic, and commercial power, and for concealing, facilitating, and expanding Defendants' widespread criminal actions in pursuit of illicit wealth and to injure Plaintiffs.

293.   All murders, attempted murders, and assassinations of their regime are personally sanctioned and ordered by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani – for which each are responsible for these murders and are themselves therefore murderers.

294.   These extrajudicial murders were neither "authorized by a previous judgment pronounced by a regularly constituted court" nor "lawfully carried out under the authority of a foreign nation." Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992); cf. Han Kim, 774 F.3d at 1050–51. No regularly constituted Iraq or Defendant Iraqi Kurdistan Regional Government court or legislative body ever authorized such attacks and murders. The Defendant Iraqi Kurdistan Regional Government was, nor is, neither a foreign nation nor a military force. See Cabrera v. Islamic Republic of Iran, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023).

295.   Contemporary international criminal law holds that head of state immunity – which does not apply to any Defendant Barzani – does not extend to atrocity crimes. Extrajudicial murders are atrocity crimes. Nothing in American jurisprudence justifies the absolute immunity that principal Defendants often claim.

135

296.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were and are so cruel and malevolent that their murder victims were and are often members of their own family and community, often people they had known for most of their lives. These murders are perpetrated for no other reason than the oldest, most predictable of all time: money and power.

297.    Having a long, sordid, and well-documented history of murder as a tool, apparatus, and instrument of the Barzani Continuing Criminal Enterprise, and with malice and forethought, after attaining political power and governance control of the Defendant Iraqi Kurdistan Regional Government, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and at their direction their associates and subordinate agents, including Barzani family members and family members by marriage,  and especially Defendant Dilshad Barzani, orchestrated, decreed, and sanctioned extrajudicial murder and assassination – aimed directly and primarily (but not exclusively) at the citizens of Iraqi Kurdistan – to pursue their twin objectives of countering real or perceived threats, challenges, and opponents of their prevailing political power system and the accumulation of wealth, and to injure Plaintiffs.

298.    These killings flout the absolute universal principle that governments must protect their citizens against arbitrary deprivation of life, which cannot be abandoned under any circumstances, however grave. Such killings are crimes for which Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their subordinate agents are responsible and accountable under Iraq and international law and the laws of the United States, and all executive and judicial measures are warranted and overdue to ensure that those responsible are brought to justice and compensate their victims.

299.    The International Organization for Migration, a United Nations agency, at the time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional

GOvernment, the presiding and actual head of government and head of the executive power, reports hundreds of thousands of refugees from Iraqi Kurdistan, including women, children and ill persons, have tried to cross the Belarus-Poland border to enter the European Union and are making perilous journeys across open waters to reach Europe. Unknown thousands have perished in the journey. The reasons given by the United Nations agency are Kurdish anger at the growing authoritarianism by the Barzani family rule, endemic Barzani corruption, rising unemployment, state payrolls unlawfully withheld by the Barzani Defendant Iraqi Kurdistan Regional Government regime, and employment illegitimately limited by Defendants Masoud Barzani and Masrour Barzani to favored Iraqi KDP members.

300.    Under orders from Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their subordinate agents have staged false encounters with criminals and political opponents in order to eliminate them without a public trial – since there is no evidence of their victims' committing criminal acts. Staged incidences have included "suicide whilst under cross-examination", "battle encounters", "escape from prison" and "resistance to arrest". In fact, these are terms intended to mask "official" extrajudicial murder orders that were ordered and sanctioned by Defendants Masrour Barzani and Waysi Barzani.

301.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, have also hunted down opponents like mad dogs and arranged assassinations and assassination attempts of political opponents and of journalists and of leaders of international movements or organizations by secret police or other illegal underground operatives under their command and control, and arrested or caused to be arrested men and women who were never seen again.

302.    In its extensive wide-ranging criminal scheme, the Barzani Continuing Criminal

137

Enterprise (CCE) has repeatedly violated and does repeatedly violate numerous laws of the United States and international treaties, agreements, and conventions to which Iraq is a signatory nation. Human rights monitors and Confidential Human Sources #1, #2, and #5 say that members of the business community who do not pay Barzani's kickbacks are imprisoned, and official records of the United States and the United Nations confirm journalists and activists who criticize the Barzani's disappear, often forever.

303.     Murders for political purposes extrajudicially authorized by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and accomplished by their agents and representatives, including Barzani family members and family members by marriage, have taken the form of enforced disappearances, hostage taking and kidnapping, staged incidents, "suicides", or death "caused by tribal warfare." Barzani-appointed officials of the Defendant Iraqi Kurdistan Regional Government, which they dominate and authoritatively control, often try to dismiss such events, whether by denying that they have taken place at all, by attempting to attribute them to opposition forces, or by alleging they resulted from armed confrontation with government forces, or that the victim was murdered while attempting to escape from custody. The killings are often accompanied by intimidation of witnesses and relatives of victims, and suppression of evidence. Victims have often been chosen for their political or other beliefs and activities, or tribal origin and affiliation. There is occasionally a staged and orchestrated show trial to falsely demonstrate lack of Defendant Iraqi Kurdistan Regional Government involvement and, given the nature of the complicity, it is virtually impossible to judicially appeal against the verdict or otherwise hope for justice.

304.     Such actions are prohibited by international law, multiple international treaties, agreements, and conventions known to the Defendant Iraqi Kurdistan Regional Government and

138

to which the controlling superior federal Government of the Republic of Iraq is a signatory party, including but not limited to the United Nations Charter, the United Nations Declaration of Human Rights, the Convention on the Prevention and Punishment of the Crime of Genocide, and the International Covenant on Civil and Political Rights.

305.    The United Nations Charter in its preamble affirms "faith in fundamental human rights, in the dignity and worth of the human person." The Charter further sets forth as one of its purposes the "promoting and encouraging respect for human rights and for fundamental freedom for all…" Contrary to their lawful and binding obligations as officials operating under professed color of law, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives acting under the direction of Defendants, including Barzani family members and family members by marriage, have used abduction, hostage taking, kidnapping, enforced disappearance, imprisonment, murder, attempted murder, and assassination as tools of Iraqi Kurdistan state governance to maintain power and financially enrich their family and themselves personally and injure Plaintiffs.

306.    Unlike the United Nations Charter, the Declaration of Human Rights contains a list of specific rights and freedoms, including those traditionally found in state constitutions and others which are the expression of modern, cultural, and social ideas.   Article 2 of the Universal Declaration provides that "[e]veryone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sect, language, religion, political or other opinion, national or social [tribal] origin, property, birth, or other status." These two provisions, taken together, have been universally construed to cover governmental mass killing. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, acting under

139

the direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, have used murder, attempted murder, and assassination as a tool and apparatus of Defendant Iraqi Kurdistan Regional Government governance to maintain power and financially enrich their family and themselves personally and injure Plaintiffs in knowing and willful violation of Article 2.

307.    The International Covenant and Civil and Political Rights, in Article 6 Section 1, provides "that every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, acting under the direction of Defendants have used murder, attempted murder, and assassination as a tool of Defendant Iraqi Kurdistan Regional Government to maintain power and enrich themselves personally in violation of Article 6, Section 1.

I.    **Genocide Orchestrated and Collaborated by Defendants in Confederation with Foreign Terrorist Organizations**

308.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and members by marriage, did conspire, plan, facilitate, command, collaborate, confederate, and aid and abet to commit genocide, to further the Barzani Continuing Criminal Enterprise.

309.    It is undisputed that genocide itself is a violation of international law. *See Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016). *e.g., Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring); *accord Abelesz*, 692 F.3d at 675-76 (collecting authority). Genocide perpetrated by a state against its own nationals of course is a violation of international law. *See Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), *generally* Genocide Convention art. 2; *see, e.g., Kadic v. Karadzic*, 70 F.3d 232, 241-

140

42 (2d Cir.1995).

310. In international law, the Genocide Convention of 1948 makes it clear one way to commit the crime is by "deliberately inflicting on [a] group conditions of life calculated to bring about its physical destruction in whole or in part." (Article II c)

311. The Circuit Court of Appeals of the District of Columbia Circuit defines genocide:

*"It is undisputed that genocide itself is a violation of international law. See, e.g., Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring); accord Abelesz, 692 F.3d at 675-76 (collecting authority).*

*"The Convention on the Prevention of the Crime of Genocide, adopted by the United Nations in the immediate after-math of World War II and ratified or acceded to by nearly 150 nations (including the United States), defines genocide as follows:*

*[A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; [or] (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part ... (Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277 (emphasis added)). That definition is "generally accepted for purposes of customary [international] law." Restatement (Third) of the Foreign Relations Law of the United States § 702 cmt. d. It appears not only in the Genocide Convention itself, but also in numerous other international treaties. See, e.g., Rome Statute of the International Criminal Court art. 6, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for Rwanda Art. 2 (1994); Statute of the International Criminal Tribunal for the Former Yugoslavia Art. 4 (1993). The offense of genocide under our domestic law uses the same definition. See 18 U.S.C. § 1091(a). (See Simon v. Republic of Hungary, 812 F.3d 127, 141 (D.C. Cir. 2016))*

*"Even though international human rights law did not even exist when the First Congress enacted the Alien Tort Statute in 1789, the statute's reference to 'law of nations' encompasses conduct universally accepted as violating international law today, see Sosa v. Alvarez-Machain, 542 U.S. 692, 732-33, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), including genocide and certain other offenses*

141

> *committed by a sovereign against its own subjects, e.g., Kadic, 70*
> *F.3d at 242 (genocide); Abebe-Jira v. Negewo, 72 F.3d 844, 845-46*
> *(11th Cir. 1996) (torture); Tel-Oren, 726 F.2d at 791 n. 20*
> *(Edwards, J., concurring) (genocide, torture, summary execution,*
> *slavery)."*

312.    This definition was amplified by the United States Supreme Court: "...genocide

perpetrated by a state even against its own nationals is a violation of international law." *Id.,* at 410-

411 (*See Federal Republic of Germany v. Philipp,* 141 S. Ct. 703, 715 (2021) (*Philipp III*), quoting

*Simon v. Republic of Hungary,* 812 F.3d 127, 145 (CADC 2016).

313.    The Court of Appeals of the District of Columbia Circuit emphasized that "the

definition of genocide includes an '*intent* to destroy.'" The Court further declared, "We adopted

the definition of genocide set forth in the Convention on the Prevention of the Crime of Genocide.

*Id.* at 143. '[A]dopted by the United Nations in the immediate aftermath of World War II,' *id.,* the

Convention defines genocide, in relevant part, as '[d]eliberately inflicting" on "a national, ethnical,

racial or religious group.... conditions of life calculated to bring about its physical destruction in

whole or in part,' Convention on the Prevention and Punishment of the Crime of Genocide

(Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277." *See Philipp v. Federal Republic*

*of Germany,* 894 F.3d 406 (D.C. Cir. 2018).

314.    Where their continued use of political rhetoric provides a cover for their criminal

activities, in furtherance of the pursuit of growth of illicit earnings capacity, to maintain and

expand its political power base, to marginalize certain social, poltical, ethnic, and religious groups,

to gain control over lucrative economic sectors of Iraqi Kurdistan, and to preserve and swell the

power of its commercial monopoly of the Barzani Continuing Criminal Enterprise, often using

terror tactics, and to restrict religious freedom and belief by destroying a minority religious and

ethnic group by aiding and abetting the killing of members of the group in large-scale, systematic

violence against civilian populations; aiding and abetting the causing of serious bodily and mental harm to members of the group; aiding and abetting a real risk and imminent risk to the health and life of the Yazidi population; and deliberately aiding and abetting the infliction on the group conditions of life calculated to bring about its physical destruction in whole or in part, with a clear intent to destroy, Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, are directly responsible for the deaths of over 10,000 citizens of Iraqi Kurdistan and the torture of a far larger number, for having committed the acts directly, jointly with others and/or through others and for failing to exercise control properly over civilian and military subordinates who under the command and direction of Defendants Masoud Barzani and Masrour Barzani committed the acts, which harmed Plaintiffs.

315.    Defendants Masoud Barzani, then President of the Defendant Iraqi Kurdistan Regional Government, and Masrour Barzani, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin), and later the first Chancellor of the Defendant Iraqi Kurdistan Regional Government's Security Council, and at present the Prime Minister of Defendant Iraqi Kurdistan Regional Government, and their subordinate agents and representatives, including Barzani family members and family members by marriage, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty, and not as any act of war, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully provide material support and resources, including actionable intelligence, and did assist

143

to organize, manage, or otherwise direct the operation of an anti-American foreign terrorist organization, had knowledge that the organization is a designated terrorist organization, and that the organization has engaged or engages in terrorist activity, not the acts of rogue units but rather part of a deeply disturbing and meticulously documented pattern of terror, resulting in the deaths of over 10,000 persons and recurring torture to even greater numbers, in violation of Title 18, United States Code, Section 2339B in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, namely but not limited to, property, personnel (including oneself), intelligence, accommodation, and services, to a foreign terrorist organization, namely Islamic State of Iraq and the Levant, knowing that the organization was a designated terrorist organization, and knowing that the organization had engaged in and was engaging in terrorist activity as that term is defined in Title 8, United States Code, Section 1182(a)(3)(B), and knowing that the organization had engaged in and was engaging in terrorism as that term is defined in Title 22, United States Code, Section 2656f(d)(2).

316.   "A terrorist attack constitutes extreme and outrageous conduct." (*Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 85 (D.D.C.2006) (*Bodoff I*) (citing *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C.2002)).

317.   Defendants Masoud Barzani and Masrour Barzani, and their agents and representatives and servants, including Barzani family members and family members by marriage, cannot point to any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question to show that the actions enumerated herein were or are the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign.  To qualify as official, an act must be imbued with some level of formality, such as the authorization by the foreign sovereign through an official statute, decree, order or resolution.  No

144

such relevant official statute, decree, order or resolution or comparable evidence of sovereign authorization existed or exists.

318.   Section 1189(a)(1), as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub L. No. 104-132, § 302, 110 Stat. 1214, 1248, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, § 356, 110 Stat. 3009, 3009-644, empowers the Secretary of State to designate a "foreign terrorist organization" if the Secretary finds three things: "(A) the organization is a foreign organization"; "(B) the organization engages in terrorist activity" as defined in the provisions set forth in the margin; and "(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." Such activities threaten the "national security" when they threaten the "national defense, foreign relations, or economic interests of the United States." *(See* 8 U.S.C. § 1189(c)(2)).

319.   The knowing provision of material support or resources to a designated organization is a crime punishable by a fine or up to ten years imprisonment, or both. *See* 18 U.S.C. § 2339B(a)(1). Alien members or representatives of designated organizations may not be admitted to the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(IV), (V).

320.   Defendants Masrour Barzani and Waysi Barzani, and their agents and subordinates, including Barzani family members and family members by marriage, were in fact "representatives" of designated foreign terrorist organizations in their active and willful role of collaborators and co-conspirators.

321.   In a January 2004 letter to al-Qaeda attributed by the U.S. Government to one of its most notorious terrorist leaders, Abu Musab al-Zarqawi, al-Zarqawi asked for al-Qaeda's aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> *"We need to create armies of mujahidin ... to fight the enemy—the Americans ... We are continuing to train ourselves and strengthen our ranks. We will strike at them with suicide operations and car bombs. ... If you are of the same opinion, if you adopt it as your program, ... and you are convinced by the idea of fighting the infidels, we will be your soldiers, under your banner, obeying your orders ..."*

Powered in substantial part by the reliable, potent, and hard-to-trace U.S. dollars gained by al-Qaeda through its rackets in Iraq, al-Qaeda launched a devastating terrorist campaign in Iraq in 2004 that was designed to expel America from Iraq and the Middle East, which al-Qaeda and its branches have pursued ever since.

322.    On May 15, 2014, the Unted States Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section l(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyaa fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  Although the group has never called itself Al-Qaeda in Iraq (AQI), this name has frequently been used to describe it throughout its history.  On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section l(b) of Executive Order 13224.  On December 17, 2004, the U.S. State Department designated al-Qaeda-in-Iraq as an FTO, and it has maintained that designation ever since.  On February 3, 2014, al-Qaeda-in-Iraq split from al-Qaeda core and Jabhat al-Nusra and asserted its identity as ISIS, which was led by former al-Qaeda/al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi.  On June 29, 2014, Abu Bakr al-Baghdadi announced from

Mosul, Kurdistan – long Islamic State's Iraq headquarters – that the group known as al-Qaeda-in-Iraq and ISIS was now a caliphate that would henceforth be known as "Islamic State." To date, ISIL remains a designated FTO. ISIL is engaged in a concerted campaign to acquire by force substantial land in Syria and Iraq in order to create an Islamic caliphate. ISIL has engaged in terrorist activity against United States citizens and against the national security interests of the United States. This activity includes the capture and murder of non-military United States citizens.

323.    From Islamic State's formation in 2014 through the present, Islamic State – secretly aided and abetted by the Barzani regime – has sought to expel Americans from the Middle East through a campaign of terrorist violence targeting Americans worldwide, all of which was in service of Islamic State's existence as a purported "caliphate" dedicated to propagating its radical Salafist Sunni terrorist ideology.    The U.S. Under Secretary for Terrorism and Financial Intelligence, at the U.S. Department of the Treasury, publicly stated in 2014 that Islamic State "terrorists have slaughtered thousands of innocent people" and "threatened "American personnel and facilities in Iraq," and "could ultimately pose a direct threat to [U.S.] citizens … outside of the Middle East."

324.    The objective of the terrorist organization is the forcible acquisition of territory for the stated goal of creating an Islamic State without recognizing any national boundaries. ISIL seeks to accomplish its goals through the commission of various criminal acts and acts of terror against the United States and the world community.    The criminal acts committed by members of the organization include murder, kidnapping, hostage taking, enslavement of women, sex trafficking, and more. On or about September 22, 2014, the chief spokesman for ISIL, Abu Mohammad Al Adnani, referenced the United States of America and other opponents of ISIL and stated that the organization intended to "enslave your women" and called for attacks on U.S. citizens around the

world in retaliation for American airstrikes against Islamic State terrorists in Iraq.

325.    At the time Defendant Masoud Barzani was President of Defendant Iraqi Kurdistan Regional Government and Masrour Barzani was General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin), and with specific calculated intent to, and did, knowingly and willfully, directly and indirectly, facilitate the systematic and deliberate murderous slaughter of their own religious minority citizens and to destroy a religious minority who did not embrace the Muslim religious beliefs of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, in a manifest pattern of traitorous, barbaric, and uncivilized conduct, knowingly and willfully, directly and indirectly, deploying customary tools of extrajudicial murder and enslavement, and in unrestrained ambition, to secure new territories, to access untapped oil reserves, to amass weapons, to garner international backing for Iraqi Kurdistan, to eliminate a religious minority, to further their continuing criminal enterprise, and to injure Plaintiffs, did secretly plan, scheme, conspire, and act with others, especially with anti-American ISIS terrorists, and did purposefully, knowingly, and willingly plan and scheme to and did mislead the executive, military, and diplomatic offices of the United States.  For the crime of genocide to be complete, both mental (*mens rea*) and physical (*actus reus*) elements must be present.  Under the *mens rea* component, Article 30 of the Rome Statute of the International Criminal Court has two components: (1) knowledge threshold; and (2) specific intent.  Both elements are integral in the determination of whether legally defined genocide has been committed against a specifically targeted group and set it apart from other international crimes.  To find legal genocide, the acts committed must be intended to destroy a specific group, "in whole or part."

326.    The massacre of non-combatant Yazidis, orchestrated, accommodated, and facilitated, and without moral or legal consideration, by Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, has been officially recognized as the *Genocide of Yazidis* by several bodies of the United Nations and the European Parliament.

327.    On August 3, 2023, Defendant Dindar Zebari, the Defendant KRG Coordinator for International Advocacy, speaking for the Defendant Iraqi Kurdistan Regional Government, albeit purposely and knowingly with misleading concealment and misrepresentation to further the object of the Barzani Continuing Criminal Enterprise, acknowledged, "The atrocities committed against the Yazidi community were nothing short of unspeakable.  Thousands of Yazidis were uprooted, captured, or slaughtered during ISIS's 2014 invasion of Sinjar.  Many people took refuge atop Mount Sinjar, where they suffered for months from lack of food and water.  In the aftermath of the attack 'no free Yazidis remained in the Sinjar region, the 400,000-strong community had all been displaced, captured, or killed'."

328.    The United States Department of State, in its *2021 Report to Congress Pursuant to Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018,* stated: "The U.S. government is committed to combating ISIS and the risk it poses to civilians, particularly in Iraq and Syria." "...then-U.S. Secretary of State John Kerry determin[ed] in 2016 that ISIS was responsible for genocide against groups in areas under its control in Iraq and Syria, including Yazidis... He found that ISIS was also responsible for crimes against humanity and ethnic cleansing against these same groups."

329.    Under the Genocide Convention and the Rome Statute of the International Criminal Court, ISIS genocidaires are guilty by the commission, in a systematic manner, of all five enumerated acts of genocide: (1) killing, primarily of non-combatant Yazidi men by targeted

149

execution; (2) causing serious bodily or mental harm, primarily to non-combatant Yazidi women by sexual violence and enslavement; (3) deliberately inflicting conditions of life calculated to bring about physical destruction, primarily of besieging trapped non-combatant Yazidi civilians men, women, and children; (4) imposing measures to prevent births, primarily by forced abortions and the separation of Yazidi men and women; and (5) forcible transfer of children, primarily by abduction.

330. Sufficient evidentiary findings support the legal inference of a requisite specific intent "to destroy, in whole or in part" the Yazidis as a protected group.

331. Documented evidence confirms that in a matter of a few days, nearly 10,000 Yazidis were killed. Yazidi men were systematically executed, and thousands of Yazidi women and children, fearing genocide, were forced to flee en masse, abducted, tortured, enslaved, systematically raped and subjected to reprehensible, barbaric acts of sexual violence, and sold into slavery. Among those killed were pregnant women and elderly citizens. These reprehensible, barbaric acts have been unequivocally and universally condemned.

332. Documented evidence shows such systematic abuses, committed simultaneously throughout the Yazidi region of Sinjar, a region under the control, security, and administration of the Defendant Iraqi Kurdistan Regional Government, commanded and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, and coordinated within a short time frame, affirms that ISIS genocidaires, in concert and with the duplicitous and traitorous collaboration of Defendants Masoud Barzani and Mansour Barzani, acted on a specific intent to exterminate the Yazidis, a religious minority in Iraqi Kurdistan not sharing the Muslim religious beliefs of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and the Barzani

150

family members and family members by marriage.

333.   Ethnic, cultural, and religious discrimination played dominant roles in the killing and inhumane mistreatment the Yazidi endured at the hands of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and subordinates, and the Barzani family members and family members by marriage and their co-conspirators.

334.   ISIS militants have systematically expelled Yazidis from their homes and have forced those seeking shelter to flee into the wilderness surrounding their villages.  During their attacks on Sinjar in August 2014, ISIS militants trapped terrified and defenseless Yazidi refugees on Mount Sinjar.  By surrounding and blockading these refuges in the mountains above Sinjar, ISIS members have caused the starvation and malnutrition of women, children, and elderly within the community.  The Yazidis seeking refuge on Mount Sinjar were forced from their homes by ISIS militants.  An officially estimated fifty-thousand Yazidis sought refuge on the mountain, surrounded by ISIS soldiers threatening to kill them, similar to the situation in the Al-Anfal case. Without water and food, intentionally withheld, many within the community fell ill and perished.

335.   These actions constitute a deliberate infliction of inhumane conditions calculated to destroy the Yazidis and are thus genocide under Article 6(c) of the Rome Statute of the International Criminal Court, and at a time Defendant Masoud Barzani was President of Defendant Iraqi Kurdistan and Defendant Masrour Barzani was General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency, which he controlled and directedly absolutely, and formerly Director of the Defendant Iraqi Kurdistan Regional Government's Intelligence and Security Agency (the successor agency to Parastin), which is controlled and directed absolutely.

336.   United Nations investigators compiled evidence that ISIS doctors performed

151

abortions on women who were previously pregnant with "infidel" children. One woman described how an ISIS doctor sat on her stomach, aiming to kill her unborn child. Two other women detailed how they were also forced to undergo abortions, being first injected and then forced to take pills. Prior to the procedure, one witness heard an ISIS fighter state: "We do not want more Yazidis to be born." One week after their abortions, the two women were sold.

337.    Direct documented evidence of child kidnappings and forced transfer to ISIS military bases is abundant. In some instances, Yazidi boys as young as eight have been forced into becoming child soldiers. Those deemed inadequate for fighting are subjected to ideological indoctrination of radical Islam. Child soldiers and those subject to intense Islamic radicalization were severely beaten when ISIS instructors found their performance subpar. ISIS propaganda publicized child soldiers in videos, sometimes with children carrying AK-47s and grenades.

338.    The Kurdish-speaking Yazidi are mostly rural farmers and sheep herders, with little defensive capacity to stop massacres. The Yazidis are one of many religious minorities in Iraq; they follow Yezidism, which is not the religious belief of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and the Barzani family members and family members by marriage. One of the massacres occurred in the small village of Kocho, where hundreds of women and children were enslaved and their men executed. As ISIS gained more territorial control, local Yazidi law enforcement and security personnel were executed. In one instance, eleven members of one family were executed. In the United Nations account *Report on the Protection of Civilians in Armed Conflict in Iraq*, investigators confirmed Defendant Iraqi Kurdistan Regional Government/KDP collaboration with ISIS – intrinsically connected to the command actions of Defendants Masoud Barzani and Masrour Barzani and their agents and representatives – with planned, calculated, and purposeful ethnic and religious targeting.

339.   As is their established practice and custom, Defendants Masoud Barzani and Mansour Barzani co-opted Iraqi minority politicians to propagate false narratives casting blame on Sinjar's Sunni Arabs.   Defendant Iraqi Kurdistan Regional Government Peshmerga military forces, under the direct command and control of Defendants Masoud Barzani and Masrour Barzani, had taken the solemn duty to safeguard the Yazidi.   Defendant Masrour Barzani, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistan Regional Government's Intelligence and Security Agency (the successor agency to Defendant Iraqi Kurdistan Regional Government intelligence ageny Parastin), both of which he controlled and directly absolutely, and later the first Chancellor of the Defendant Iraqi Kurdistan Regional Government's Security Council, and at present the Prime Minister of Defendant Iraqi Kurdistan Regional Government, instructed the Yazidi men, women, and children to remain in place, telling them Peshmerga (military) forces of the Defendant Iraqi Kurdistan Regional Government, under the command and control of Defendants Masoud Barzani and Masrour Barzani, would and will protect them, knowing full well the command order to Peshmerga to leave had already been issued by Defendants Masoud Barzani and Masrour Barzani.   Abruptly and on command from Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, Peshmerga forces abandoned their posts in the early hours of the morning of the massacre, leaving the Yazidis defenseless against ISIS.   Defendant Iraqi Kurdistan Regional Government/KDP security officials also confiscated weapons from Christian communities in the Nineveh Province before abandoning those communities to ISIS.   Defendants Masoud Barzani and Masrour Barzani thus ensured that ISIS would successfully massacre and enslave the non-Muslim Yazidi religious minority, depriving Yazidis access to adequate shelter, food, clothes, medicines, hygiene and

153

sanitation, and imposing vicious and barbarous measures intended to prevent Yazidi births.

340.    Defendants "conduct thus qualifies as torture and violates the norm only when done by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 114 See Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018).*

341.    Confidential Human Sources #1, #4, and #5 confirm there was an explicit agreement between Defendant Masoud Barzani and ISIS in a territory sharing agreement, in exchange for which the Peshmerga would not prevent or interfere with ISIS in perpetrating the genocidal massacres and inhumane torture.

342.    According to Confidential Human Sources #1, #4, and #5, who have direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, KDP party officials, and Barzani Continuing Criminal Enterprise leadership, the traitorous agreement made between Defendants Masoud Barzani and Masrour Barzani with ISIS also provided for Barzani supplying weapons and materiel to ISIS, which Defendants Masoud Barzani and Masrour Barzani and their agents and representatives did, including Kornet anti-tank missiles, which ISIS used to destroy U.S.-provided M1A1 Abram tanks in battles against the Iraqi army.

343.    To this day in Iraqi Kurdistan, now led and governed by Defendant Iraqi Kurdistan Regional Government Prime Minister and Defendant Masrour Barzani, most Yazidi live under extreme religious persecution emanating from Defendant Masrour Barzani, have been unable to return to their homes, and most live in tents in refugee camps in the Iraqi Kurdistan region, living in constant fear, which is not imaginary nor wholly speculative, of another religious discrimination

persecution genocidal massacre and further enslavement or death by the Barzani regime. Yazidi people exist with the constant and real threat of wholesale genocide within their towns and villages.

344.    Karim Asad Ahmad Khan, Special Adviser and Head of the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD), established clear and convincing documented evidence that genocide was committed by ISIL against the Yazidi as a non-Muslim minority religious group, noting that the intent of ISIL to destroy the Yazidi, physically and biologically, is manifest in its unlawful and extrajudicial ultimatum – applied remorselessly to all members of their Yazidi religious community – to convert to Islam or die.

345.    Thousands were killed pursuant to this unlawful and extrajudicial ultimatum, facilitated and made possible by the knowing and willful collaboration of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, and Barzani family members and family members by marriage, either executed en masse, shot as they fled, or dying from exposure on Mount Sinjar as they tried to escape, said Karim Asad Ahmad Khan, Special Adviser and Head of the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD), adding that thousands more were enslaved, with women and children abducted from their families and subjected to the most brutal abuses, including serial rape and other forms of unendurable sexual violence, with many women and girls trafficked into sex slavery. For many this documented abuse lasted for years, often leading to death.

346.    The intent of these unlawful and extrajudicial genocidal acts was to permanently destroy the capacity of these women and children to have children and to build families within the non-Muslim Yazidi community.

155

347.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, as commanders, took no steps to prevent their subordinates in the Peshmerga military, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP, or any other subordinate capacity, which Defendants control absolutely, from committing gross abuses and violations of internationally recognized human rights against civilians, including those committed during the Yazidi Massacre.

348.    The acts described herein were carried out under actual or apparent authority or feigned color of law of the Defendant provincial regional government of Iraqi Kurdistan. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani bear direct responsibility for their role in these acts, bear command responsibility as the commanders of the Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP, and bear responsibility for engaging in a joint criminal enterprise with, conspiring with, and/or aiding and abetting their subordinates as well as officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP who planned and/or carried or aided and abetted or assisted in carrying out these gross genocidal atrocities.

349.    At all relevant times, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, as absolute commanders of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP, possessed and exercised command and effective control over the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and permitted them to commit flagrant grotesque human rights abuses.

350.    At all relevant times as commanders of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the legal authority and practical ability to exert

156

control over their subordinates, including those who participated in extrajudicial killings, genocide, torture, and crimes against humanity during the Yazidi Massacre. Defendants Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's command over such forces included the authority and responsibility to give orders to and discipline their subordinates. Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the actual authority and practical ability to prevent abuses and punish those responsible.

351. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known about human rights abuses committed by their subordinates and collaborators including those committed during the Yazidi Massacre. Moreover, human rights abuses committed by the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces were widely reported in Kurdistan, Iraq, United States, and international media, and to which Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knowingly, purposefully, and deceitfully supplied misleading and untruthful information to intentionally mask and conceal their role, leadership responsibility, and complicity. Politicians, human rights organizations, and others openly voiced their concerns about these abuses. At all relevant times, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known of the pattern and practice of human rights abuses perpetrated by the Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces operating under their command and control.

352. As the commanders of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had an established and known duty under

international law, multilateral treaties and Iraq and provincial Iraqi Kurdistan law, known to Defendants, to ensure the protection of civilians, to prevent violations of international and Iraq and provincial Iraqi Kurdistan law by their subordinates and collaborators, and to ensure that all persons under their command were trained in, and complied with, international, Iraq, and provincial Iraqi Kurdistan regional law, including the prohibitions against extrajudicial killings, genocide, torture, and crimes against humanity.

353. As the commanders of the Defendant Iraqi Kurdistan Regional Government Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani failed or knowingly refused to take all reasonable and necessary measures to prevent genocide, extrajudicial killings, torture, and crimes against humanity, or to investigate or punish all subordinates for committing such abuses.

354. In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also knowingly and willfully conspired with their subordinates as well as officers in the Defendant Iraqi Kurdistan REgional Government Peshmerga military forces, which Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani control and direct absolutely, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other subordinate collaborator forces who planned and/or carried out these atrocities. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired and acted in concert with one or more members of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces, pursuant to a common plan, design, and scheme to carry out and commit human rights abuses against civilians. Defendants Masoud Barzani, Masrour Barzani, and Waysi

Barzani knowingly joined and participated in carrying out the common plan, design and scheme. In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of their co-conspirators and subordinates, all of which were actions undertaken in furtherance of a common plan, design and scheme to carry out and commit human rights abuses against civilians.

355.   In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also knowingly and willfully conspired with and aided and abetted their subordinates as well as officers in the Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these human rights abuses and genocidal atrocities.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knowingly and willfully substantially assisted their subordinates and co-conspirator collaborators who committed genocide, extrajudicial killings, torture, and crimes against humanity.  They knew or should have known that their actions and omissions would assist in these gross blatlant abuses at the time they provided the assistance.  In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of those they aided and abetted.

356.   In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also engaged in a joint criminal enterprise with their subordinates as well as officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these human rights abuses and atrocities. The extrajudicial killings, genocide, torture, and crimes against humanity committed during these human rights abuses and

159

atrocities, and the Yazidi Massacre, carried out in an intimidatory manner unrelated to security, disrespectful of all civilian well-being and going well beyond the needs of any legally valid military or police necessity, were a part of an organized system of repression against the civilian Kurdish population in Iraqi Kurdistan. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had knowledge of and were active participants in the enforcement of this system of repression against the civilian population of provincial Iraqi Kurdistan. It was the intent of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives including Barzani family members and family members by marriage, to further this system of orchestrated repression politically and financially advantageous to the Barzani Continuing Criminal Enterprise and thereby harmful to Plaintiffs.

357.    The genocide, extrajudicial killings, torture, and crimes against humanity committed during these human rights abuses and atrocities and the Yazidi Massacre were foreseeable, probable, and desired consequences of a common, shared intention on the part of Defendants Masoud Barzani, Masrour Barzani, and Waysi Bartzani, their subordinates and officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these gross human rights violations, abuses, and atrocities against Kurdish civilians and the Yazidi Massacre.

358.    These acts and omissions were outside the scope of Defendant Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's lawful authority, or any subordinate agents and representatives, and were not authorized by any international, Iraq, or provincial Iraqi Kurdistan tribunal, law, regulation, or policy. The Yazidi Massacre, orchestrated and schemed by Defendants, was "an act of international terrorism" and not an "act of war" at 18 U.S.C. § 2331, and therefore non-international armed conflict combatant status *does not exist*.

160

359.    "Genocide perpetrated by a state even against its own nationals is a violation of international law." *See Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 592 U.S. (2021). *Id.*, at 709  (quoting *Simon v. Republic of Hungary*, 812 F.3d 127, 145 (CADC 2016).

360.    Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were under a duty to investigate, prevent and punish violations of international, Iraq, and Iraqi Kurdistan law committed by their subordinates; no such action was taken.

361.    Furthermore, the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD) established and documented that numerous other crimes were also committed against the targeted non-Muslim religious minority Yazidi community, including extermination, enslavement, sexual violence, forcible transfer, persecution on religious and gender grounds, and conscription of children into an armed group, and acknowledges these crimes are ongoing.

362.    To increase their profit margins by redirecting attacks away from their business interests, Defendants knowingly facilitated protection money or "tax" payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists in Iraq and Syria between at least 2004 and at least 2019, and thereby provided millions in U.S. dollars to these FTOs each year.

363.    Islamic State continuously ran a sophisticated protection money operation in Iraq, including Iraqi Kurdistan, and Syria from 2014 through 2021. Throughout, Islamic State's campaign in Iraq, Syria, and Afghanistan was powered by its protection rackets in Iraq and Syria. According to one confidential U.S. government report published in 2015, Islamic State raised hundreds of millions of U.S. dollars through protection money it extracted from businesses in Iraq, including Iraqi Kurdistan, with the knowledge and facilitation of Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, and Barzani family members and

161

family members by marriage. Islamic State's Finance Council oversaw its protection rackets and illicit taxation of goods and cash that, with Barzani foreknowledge and facilitation, transited territory where Islamic State operated.

364.    In late 2014, Islamic State reached what amounted to a global protection money agreement with Defendants Masoud Barzani and Masrour Barzani, which the two sides reached even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria. Defendants Masoud Barzani and Masrour Barzani prioritized their own power and financial interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today. Under this accord, Defendant Iraqi Kurdistan Regional Go Defendant Iraqi Kurdistan Regional Government vernment agents collected protection money for and provided weapons and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to the Islamic State.

365.    Through these rackets, and with facilitation of Defendants Masoud Barzani and Masrour Barzani, Islamic State generated millions in monthly cash flow – mostly denominated in U.S. dollars – from businesses in Iraq, including Iraqi Kurdistan, which Islamic State styled as zakat, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.

366.    Defendants, using their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them by paying off Iraqi insurgents with protection money, resulting in American money sustaining al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Defendants actively facilitated and benefited from such payments that their agents and subcontractors delivered on their behalf.

**II.    Murder, Assassinations, Enforced Disappearances, Torture, and Other Acts of Lethal Violence Sanctioned and Ordered by the Barzani Continuing Criminal Enterprise**

367.    Murder, enforced disappearances, and torture are among the most egregious, lethal, and malevolent crimes committed by the Barzani Continuing Criminal Enterprise in support of its continuing criminal enterprise.

368.    The Republic of Iraq, as a sovereign state of which Iraqi Kurdistan is part, ratified the International Convention for the Protection of All Persons from Enforced Disappearance (ICPPED) in 2010.   The crime of enforced disappearances is defined therein as "the arrest, detention, or abduction of an individual by state actors or persons or groups of persons acting with the state's authorization, support or acquiescence, and the latter's subsequent refusal to acknowledge the deprivation of liberty of the disappeared person or concealment of their fate or whereabouts."   In other words, this occurs when an individual disappears without a trace, while their loved ones are left with uncertainty and long-term anguish, loss, despair, and the yearning for closure.

369.    Enforced disappearances are flagrant violations of human rights, encompassing multiple facets like the right to life, the prohibition of torture, the right to liberty and security, and the right to a fair trial.   Global instruments, treaties, and conventions, including the International Convention for the Protection of All Persons from Enforced Disappearances, aim to prevent such heinous acts, ensure that culprits are penalized, and victims and their families receive reparation. No realistic opportunity or assured mechanism for such exists in the Barzani-controlled judicial system of Iraqi Kurdistan.

370.    The International Convention for the Protection of All Persons from Enforced Disappearance, to which Iraq is a party, codifies the prohibition on enforced disappearances and, among other things, sets out the obligations of states to prevent, investigate, and prosecute all enforced disappearances.

371.    Enforcement of law has not and does not occur, except occasionally for show, under the Defendant Iraq Kurdistan Regional Government leadership of Defendants Masoud Barzani and Masrour Barzani.  Affected families find their voices stifled and unheard within the Defendant Iraqi Kurdistan Regional Government, under the then presidency of Defendant Masoud Barzani and now prime ministership of Defendant Masrour Barzani, and in the Defendant Iraqi Kurdistan Regional Government Parliament's corridors of power, as the Barzani-controlled legislative body is incapable of action.  Simultaneously, due to the lack of judicial independence in the Kurdistan Region of Iraq, the Defendant Iraqi Kurdistan Regional Government judicial system is bereft of credibility, integrity, impartiality, objectivity, independence of the courts, and independence of judicial power.

372.    Since its decades ago beginning, the Barzani Continuing Criminal Enterprise, directed and commanded by Defendants Masoud Barzani, then President of the provincial Iraqi Kurdistan Regional Government, and Masrour Barzani, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistan Regional Government Intelligence and Security Agency (the successor agency to Parastin), and later the first Chancellor of the Defendant Iraqi Kurdistan Regional GOvernment's Security Council, and at present the Prime Minister of the Defendant Iraqi Kurdistan Regional Government, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, has, under

164

the claimed cloak of Defendant Iraqi Kurdistan Regional Government authority, yet absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, or any international treaty, and not as any act of war, in pursuit of their ambitions, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully provide sanctioned murders, staged encounter killings, sanctioned assassinations, and authorized political murders, extrajudicial executions, and enforced disappearances. Barzani-directed agents and killers state-sanctioned by the President of Defendant Iraqi Kurdistan Regional Government Masoud Barzani and the Defendant Iraqi Kurdistan Regional Government Prime Minister Defendant Masrour Barzani, have staged false encounters with criminals and political opponents in order to eliminate them because they cannot obtain confessions or efficient evidence to bring them to justice before Iraq courts of law.  Staged incidences have included suicide whilst under interrogation, escape from prison, and resistance to arrest.  Explanations of the basis for the killings were and are intended to mask and conceal official extrajudicial murder and attempted extrajudicial murder.

373.    Political murders, frequently exceptionally violent and brutal, and authorized by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, are many and have also taken the form of enforced disappearances and staged incidents.   The Defendant Iraqi Kurdistan Regional Government has often tried to deceitfully and misleadingly dismiss such events, whether by denying that they have taken place at all, by attempting to attribute them to opposition forces, or by untruthfully alleging that the murders resulted from armed confrontation with government forces, or that the victim was murdered while attempting to escape from custody.  The killings are often accompanied by intimidation of witnesses and relatives of victims, and suppression of

evidence.

374.    Victims have been selected by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, and by their subordinate agents and representatives, for their political beliefs, religion, ethnic origin, tribe, or language; but most often victims are selected when they are perceived to be a political threat to the Barzani Continuing Criminal Enterprise.  These victim selections are driven by the paranoia, insecurity, and anxiety of the leaders of the Barzani Continuing Criminal Enterprise – Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.  There is occasionally a show trial in a tightly controlled court of the Defendant Iraqi Kurdistan Regional Government to "prove" lack of government involvement; but Plaintiffs, and others, had and have a reasonable fear of reprisals and retribution against themselves and members of their families which served as an insurmountable deterrent and makes it impossible to appeal to any part of the government of Defendant Iraqi Kurdistan to obtain redress for the murders and other atrocity crimes committed by the Barzani Continuing Criminal Enterprise which completely administers, controls, and directs the government including its judiciary.

375.    One of the Barzani Continuing Criminal Enterprise hitmen, "Shaker," confessed on a video, now in possession of German police officials, admitting to the murder of over three hundred individuals, of which all murders were directly ordered by Defendants Masoud Barzani and Masrour Barzani, leaders of the Barzani Continuing Criminal Enterprise.

376.    Defendant Karim Sinjari is the former Minister of Interior of Defendant Iraqi Kurdistan Regional Government, and now serves as a senior advisor to Nechirvan Barzani, President of the Defendant Iraqi Kurdistan Regional Government.  He is from Shingal ("Sinjar" in Arabic), his mother is Arab and his father is a Muslim Kurd.  He started in Baghdad and, according to Confidential Human Source number 2, who has direct clandestine access to senior ranking

166

Defendant Iraqi Kurdistan Regional Government officials, when he was a law student he collaborated with the Muslim Brotherhood. He came to the Kurdish Galla Mountains near the Iran border in 1973 and was recruited to manage part of the KDP Parastin. He received progressively senior positions in Masoud Barzani's Defendant Iraqi Kurdistan Regional Government, and as the Minister of Interior of Defendant Iraqi Kurdistan Regional Government he created a "hit squad" to carry out Barzani-ordered extrajudicial killings.

377.   Confidential Human Sources #1, #2, #3, #4, and #5, who have direct clandestine access to senior Defendant Iraqi Kurdistan Regional Government and KDP party officials, state that Defendant Karim Sinjari, *always* under the command of Defendants Masoud Barzani and Masrour Barzani, is responsible for the coordination and hiring of hitmen to kill approximately five thousand individuals – Arabs, ethnic Kurds, Yazidis, Iranians, Americans, and others – all for the purpose of keeping Barzanis in control of KDP and perpetuating the Barzani Continuing Criminal Enterprise – and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty, and not as any act of war, or an official authorized act of state, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully act in furtherance of the Barzani Continuing Criminal Enterprise, and that Defendant Karim Sinjari *only* acts upon orders from Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and *never* acts independently of them.

378.   Confidential Human Source #11, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials and senior leaders of the Barzani Continuing Criminal Enterprise, affirms that Defendant Karim Sinjari, in

willing and knowing concert, planned and acted with co-conspirator Defendant Sidad Barzani by entering into a KDP jail and ordered the Asayish jailers to brutally and forcibly rape male dissident prisoner Azhin Ahmed, a defined type of torture – while Defendants Sinjari and Barzani watched and videotaped the inhumane and brutal torture.

379.    A male prisoner of Barzani's, Asheen Abdulah, held without lawful arrest or imprisonment, and a Confidential Human Source herein and presently living, as a result of an extrajudicial order of exile by Defendant Masrour Barzani, in Stutgardt, Germany, was forcibly and brutally raped, a defined type of torture, by Defendant Karim Sinjari, always acting under command and direction of Masrour Barzani.

380.    Confidential Human Sources #1, #2, #3, #4, and #5 state that the Baath doctrine of killing to preserve power was written and perfected by Saddam Hussain and is followed and embraced today by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. Hitmen include Dilshad Hassan Najar, who is the head of a Defendant Iraqi Kurdistan REgioanl Government security force based in Erbil; Defendant Ismat Argoshi, who is a senior Defendant Iraqi Kurdistan Regional Government/KDP operative, leader, and attack planner, the head of Security Asaysh, the Defendant Iraqi Kurdistan Regional Government security organization, in Kirkuk; Defendant Barzan Hersha Rash, a Kurdish Democratic Party (KDP) hitman; and Defendant Azad Germari, who is the Director of the Office of Intelligence for the Defendant Iraqi Kurdistan Regional Government Province of Duhok and who assisted in the torture of journalist Wadad Duhoki, using an electric drill.

### III.    Killing, Attempted Killing, and Torture of Journalists by the Barzani Continuing Criminal Enterprise

381.    The United States Supreme Court has declared:

*"In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people..." – United States v. Washington Post Co. et al., on certiorari to the United States Court of Appeals for the District of Columbia Circuit. 403 U.S. 713 (1971)*

382.    The United Nations Educational, Scientific and Cultural Organization (UNESCO),

of which the Republic of Iraq is a member nation since 1948, declared in 1997:

*"to condemn assassination and any physical violence against journalists as a crime against society, since this curtails freedom of expression and, as a consequence, the other rights and freedoms set forth in international human rights instruments;*

*"to urge that the competent authorities discharge their duty of preventing, investigating and punishing such crimes and remedying their consequences;*

*"Calls upon Member states to take the necessary measures to implement the following recommendations:*

*"that governments adopt the principle that there should be no statute of limitations for crimes against persons when these are perpetrated to prevent the exercise of freedom of information and expression or when their purpose is the obstruction of justice;*

*"that governments refine legislation to make it possible to prosecute and sentence those who instigate the assassination of persons exercising the right to freedom of expression;*

*"that legislation provide that the persons responsible for offenses against journalists discharging their professional duties or the media must be judged by civil and/or ordinary courts."*

383.    In a November 2003 statement, UNESCO reinforced its earlier positions:

*"Putting an end to impunity for crimes against journalists ... constitutes a fundamental issue in guaranteeing the full exercise*

*of the right to freedom of expression and the open, free and dynamic exchange of ideas and information for all people."*

384.     While the constitution and laws of the government of the Republic of Iraq purport to guarantee its citizens the freedom of speech and expression, the Defendant Iraqi Kurdistan Regional Government leadership – Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinates, agents, employees, and representatives, including Barzani family members and family members by marriage – regard any political dissent as a threat not only to their own political interests, but also to the Defendant Iraqi Kurdistan Regional Government's dominant one-party system of government itself and to the monopolistic continuation of the Barzani Continuing Criminal Enterprise.     Thus, the Defendant Iraqi Kurdistan Regional Government's security and law enforcement agencies, tightly directed, controlled, empowered, and extrajudicially deployed by Defendants Masrour Barzani and Waysi Barzani, regard political dissent as a security threat and routinely monitor and actively censor political speech inconsistent with Barzani-approved political viewpoints, as well as speech that threatens to damage the reputation of the Barzani regime or the Iraqi KDP which they control, or threatens to undermine the Barzani's Iraqi KDP-dominated social order, or weaken, imperil, impede, or expose the Barzani continuing criminal enterprise, thereby having created a chilling effect on freedom of expression and democratic participation.

385.     When a government acts illegally and violently, in this instance the Defendant Iraqi Kurdistan Regional Government under the command and control of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, it loses its legitimacy and some citizens turn to resistance.

386.     Attacking the people responsible for holding Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members

and family members by marriage, to account is one of Defendants' specialties.

387.    A primary focus of the Defendant Iraqi Kurdistan Regional Government censorship scheme of its unchallenged and undisputed leaders Masoud Barzani, Masrour Barzani, and Waysi Barzani is the control of information that is available to Kurdish citizens within the Iraqi Kurdistan autonomous region of Iraq, and in the worldwide Kurdish diaspora. The Barzani Continuing Criminal Enterprise, in order to continue its existence, suppresses messengers and information that could allow for the dissemination and discussion of content that runs afoul of messaging approved by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinates, agents, and representatives, including Barzani family members and family members by marriage, and the Defendant Iraqi Kurdistan Regional Government they unilaterally operate and control, to manipulate public perceptions of the Barzanis, by seeking to undermine and discredit the systems and policies of perceived adversaries (including the United States government), democracy, and open societies generally, to suppress and censor political dissent, to promote the Barzanis' preferred and often fabricated narratives and messaging, and deter critics from continuing to criticize the Defendant Iraqi Kurdistan Regional Government and its leaders Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani – all with the object of preserving, perpetuating, and prolonging their control of the Defendant Iraqi Kurdistan Regional Government and their counterpart Barzani Continuing Criminal Enterprise – all enabling them to harm and damage Plaintiffs.

388.    Under the leadership of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, it is an object of the conspiracy to threaten and intimidate individuals, by means of physical and psychological intimidation, false imprisonment, torture, attempted murder, or murder, to silence journalists, authors, and protestors who have raised their voices against

171

corruption and injustice, to ensure the unimpeded continuance of the Barzani Continuing Criminal Enterprise. It is also an object of the conspiracy to intimidate journalists by demonstrating through torture what could happen to them if they try to interfere with or shed the light of public exposure on the Barzani continuing criminal enterprise, to commit acts, in furtherance of the Barzani Continuing Criminal Enterprise, specifically intended to inflict severe physical and mental pain and suffering (other than pain and suffering incidental to lawful actions), commit and attempt to commit torture, while acting under the color of law, by committing and causing and aiding and abetting others to commit acts against another person.

389.    Confidential Human Sources #1, #4, and #5, who have direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, disclosed that in an extraordinary act of duplicity against the United States, and without legal foundation, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty, and not as any act of war, Defendant Masrour Barzani, acting as Prime Minister of Defendant Iraqi Kurdistan Regional Government, did knowingly. intentionally, unlawfully, and arbitrarily order the arrests of journalists on charges of treason for meeting with the United States Consul-General in Erbil.

390.    The Barzani Continuing Criminal Enterprise, commanded and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, provided the essential means by which the Plaintiffs and similarly situated persons were tracked, detained, and tortured.

391.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents, representatives, and Barzani family members and family members by marriage, did knowingly and intentionally aid, abet, counsel, command, induce, and procure each other's

participation in the commission of said offenses.

392.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the acts, in furtherance of the Barzani Continuing Criminal Enterprise, described below, among many others, were committed in the Kurdistan region of Iraq and beyond.

393.    Under the administration of Defendant Masoud Barzani and Masrour Barzani, who have full control and command of the Peshmerga military, which overshadow the official Defendant Iraqi Kurdistan Regional Government police forces, police, and Defendant Iraqi Kurdistan Regional Government intelligence services, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, not of any international treaty or convention, and not as any act of war, journalists have been harassed, jailed, tortured, taken hostage and kidnapped, enforced disappeared, and murdered.  Journalists who write, broadcast, or podcast critically of Defendant Masrour Barzani or his father Defendant Masoud Barzani often disappear or are imprisoned and never seen again.  As a result of this repression of journalists, Plaintiffs continue to suffer enforced disappeareances, torture, and harm.

394.    It is well documented by agencies of the United Nations and the United States Government, and by Confidential Human Sources #1, #3, #3, #4, and #5, who have direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, have conspired, planned, and acted in concert to undermine and discredit the systems and policies of perceived adversaries (including the United States of America), democracy, and open societies generally, and unlawfully targeted individuals who have engaged

in actions they deem hostile or unsympathetic to their governance power and thus to their continuing criminal enterprise.

395.    The Defendant Iraqi Kurdistan Regional Government is tyrannically and fiercely dominated by one political party controlled by the Barzani Continuing Criminal Enterprise and is in practicality a one-party substate whose government, deriving any and all legal authorities delegated from the central government of the Republic of Iraq, is in practicality entirely controlled by the Kurdistan Democratic Party (KDP).  While the constitution and laws of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government purport to guarantee Iraqi Kurdistan citizens the freedom of speech and expression and association and democratic participation, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, regard any political dissent as a threat not only to their own political interests, but also to the KDP's one-party system of government itself.  Thus, the Defendant Iraqi Kurdistan Regional Government's state security and law enforcement agencies, acting under direct and unquestioned command and control of Defendant Mansour Barzani, arbitrarily and autocratically regard political dissent as a state security threat and routinely monitor and actively censor political speech and expression inconsistent with KDP-approved political viewpoints, as well as speech and expression that KDP officials, acting without any lawfully prescribed measurement or assessment formula, deem to threaten or may threaten to damage the reputation of the Barzani-controlled and dominated Defendant Iraqi Kurdistan Regional Government or its Barzani leaders or the KDP, or which Defendant Masoud Barzani or his agents and representatives arbitrarily and autocratically deem to threaten to undermine the Defendant KRG/KDP-dominated and controlled social order.

396.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by

174

marriage, have conducted a campaign of, but not limited to, verbal, visual, electronic, print, broadcast, and physical harassment and implicit and expressed threats of financial and physical harm against dissidents and journalists, including inflicting physical assault, as part of their broader effort to marginalize, prevent, impede, and silence dissent or public criticism of their regime and its Barzani leaders.

397. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, have used and do use U.S.-based social media accounts to disseminate propaganda and narratives that mirror and amplify the Barzani-controlled Defendant Iraqi Kurdistan Regional Government's and the KDP's orchestrated and misleading, slanted, biased, and often calculatedly untruthful public messaging. This content – often featuring claims that appear to sow discord and distort facts about issues and persons in the United States and elsewhere – is meant to appear as if generated organically by users unaffiliated with the Defendant Iraqi Kurdistan Regional Government and the KDP, many of whom are purportedly located in the United States.

398. A primary focus of the deliberate and calculated censorship scheme, under the direction of Defendants Masrour Barzani and Waysi Barzani, is the control of information that is available to Kurds within the Iraqi Kurdistan region and beyond. With the advent of the digital age, Defendant Iraqi Kurdistan Regional Government has built a system of controls operated and enforced primarily by agents of Defendant Masrour Barzani, and used to monitor and prevent Kurdish citizens from accessing Internet platforms and services, including on U.S.-based platforms, that might allow for the dissemination and discussion of truthful information that runs afoul of messaging approved by the Defendant Iraqi Kurdistan Regional Government and the KDP under personal control and direction of Defendant Masrour Barzani.

175

399.   Defendant Iraqi Kurdistan Regional Government's efforts, directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their agents and representatives, including Barzani family members and family members by marriage, to censor political dissent do not end at the Defendant Iraqi Kurdistan Regional Government's regional borders. Indeed, the Defendant Iraqi Kurdistan Regional Government and the KDP have identified the unchecked use of foreign social media sites beyond the jurisdiction of the Defendant Iraqi Kurdistan Regional Government as a threat to them because of content that portrays the Defendant Iraqi Kurdistan Regional Government and the KDP, and the dictatorial and despotic leadership of Defendant Masrour Barzani, in a manner they arbitrarily deem unfavorable.  Although Asayish, reporting directly to and commanded by Masrour Barzani, is generally identified as the Defendant Iraqi Kurdistan Regional Government's primary domestic law enforcement agency, responsible for public safety, general criminal investigation, state security and Internet security, its mission extends beyond law enforcement and into functions more associated with an intelligence service. The Asayish, under command and control of Defendants Masrour Barzani and Waysi Barzani, routinely monitors, among others, perceived Kurdish political dissidents and democracy advocates who live in the United States, Europe, and in other locations outside Iraqi Kurdistan. The Asayish regularly uses cooperative contacts both inside Iraqi Kurdistan and around the world to both overtly and covertly influence, threaten, coerce, and often physically harm perceived political dissidents and democracy advocates abroad. Asayish has developed, used, and uses various practices and procedures for targeting and threatening individuals, including those residing in the United States, and for propagating Defendant Iraqi Kurdistan Regional Government and KDP official statements through misattributed and falsely labeled social media accounts. The Defendant Iraqi Kurdistan Regional Government also engages in active measures, frequently distorted,

misleading, and untruthful, to shape public and other governmental perception, both domestically and abroad, through broad dissemination of propaganda and narratives favored and often fabricated by the Defendant Iraqi Kurdistan Regional Government via official substate social media accounts of the Defendant Iraqi Kurdistan Regional Government, as well as anonymized fake accounts that often appear to belong to users located outside of Iraqi Kurdistan.

400.    The fear, which is not imaginary nor wholly speculative, motivating the individual Plaintiffs' self-censorship is far from hypothetical.  Rather, the fear is grounded in the very real censorship injuries they have previously suffered to their expression and speech and association and democratic participation on social media, which are evidence of the likelihood of a future injury, and it is clear the alleged wrongful behavior could reasonably be expected to recur. Supported by this evidence, the individual Plaintiffs' self-censorship is a cognizable, ongoing harm resulting from their past censorship injuries, and therefore constitutes injury-in-fact upon which those Plaintiffs pursue relief.  *See Los Angeles v. Lyons*, 461 U.S. 95, 102-103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983).

401.    As the U.S. Supreme Court has recognized, this chilling of the individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972).

402.    The KDP party-backed and shadow media, under the command of Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, occupy most of the broadcast, print, and social media space in Iraqi Kurdistan, and the KDP provides jobs for journalists, co-opts some journalists, strengthens the personality cults of some leaders, provides KDP party propaganda, forms and influences public opinion, and attacks independent media.

177

403.    The Defendant Iraqi Kurdistan Regional Government/KDP, under the direction and command of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including the Barzani family and family members by marriage, has created and used and does use a host of accounts under false names on U.S. social media platforms to disseminate and amplify messages as part of a broad effort to influence and shape public perceptions of the Defendant Iraqi Kurdistan Regional Government, the KDP and especially its Barzani co-conspirator leaders in the United States and around the world.  The Defendant Iraqi Kurdistan Regional Government/KDP uses its misattributed and purposefully misleading social media accounts to accomplish this mission both by disseminating and amplifying messages that promote what the Defendant Iraqi Kurdistan Regional Government and KDP perceive to be favorable attributes of the Defendant Iraqi Kurdistan Regional IGovernment's KDP dominated political system, and by seeking to undermine and discredit the systems and policies of perceived adversaries (including the United States Government), democracy, and open societies generally.

404.    The social media accounts controlled by the Barzani Continuing Criminal Enterprise often purport to belong to authentic individual users, and unlike the official social media accounts of Defendant Iraqi Kurdistan Regional Government agencies and officials, conceal from social media services and U.S. users that their content is posted on behalf of the Defendant Iraqi Kurdistan Regional Government or the Barzani Continuing Criminal Enterprise.  As described herein, some of these social media accounts are created to give the appearance that they are controlled by U.S.-based users, and, in certain instances, communicate directly with U.S. users about subjects of interest to the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise.  This practice gives users of the social media platforms the false impression that multiple U.S. persons, especially exiled Kurds, unaffiliated with the Defendant

178

Iraqi Kurdistan Regional Government, agree with narratives generated by the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise about a variety of topics, and disagree with the publicly held views of Kurdish dissidents and democracy advocates. By hiding the Defendant Iraqi Kurdistan Regional Government or KDP or Barzani Continuing Criminal Enterprise affiliation of the accounts from other users, social media platforms and the U.S. Government, the Barzani Continuing Criminal Enterprise seeks to misleadingly influence and manipulate online discourse, including public and Iraqi Kurd policy discourse in the United States, toward positions favored by the Defendant Iraqi Kurdistan Regional Government, the KDP, and the Barzani Continuing Criminal Enterprise.

405.    The Barzani Continuing Criminal Enterprise has utilized social media platforms to publicize "dissidents" actual physical location, a harassment tactic known as "doxing," which is a well-known and documented tool of unlawful transnational repression.

406.    The Barzani Continuing Criminal Enterprise uses its misattributed social media accounts to threaten, harass and intimidate, and to identify, detain, and torture, specific victims, located in the United States, Europe, and elsewhere, that the Defendant Iraqi Kurdistan Regional Government and the KDP perceive as critical of the Defendant Iraqi Kurdistan Regional Government, the KDP and especially Masrour Barzani, and the policies of the Defendant Iraqi Kurdistan Regional Government.  Through this campaign of implicit and expressed threats, harassment and intimidation, the Barzani Continuing Criminal Enterprise seeks to undermine the credibility of these critics, promote the Barzani-controlled and dominated Defendant Iraqi Kurdistan Regional Government's preferred and often untruthful narratives and calculated messaging, deter these and other critics from continuing to criticize the Defendant Iraqi Kurdistan Regional Government and the KDP and especially Masrour Barzani, and to compromise

journalists' ability to locate witnesses, cultivate sources, obtain information, and communicate confidential information to their sources and news agencies.

407.    Defendant Masrour Barzani and his agents and representatives have repeatedly and continuously attempted to pressure U.S. social media companies to remove Plaintiff, Maki Revend, and U.S.-based and Europe-based associates from social media platforms.

408.    The U.S. Department of State *2016 Country Report on Human Rights*, issued at the time Defendant Masoud Barzani was then President of the Defendant Iraqi Kurdistan Regional Government, and Defendant Masrour Barzani was General Director of the Defrendant Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistaan Regional Government's Intelligence and Security Agency (the successor agency to Parastin), and later the first Chancellor of the Defendant Iraqi Kurdistan Regional Government's Security Council, and at present the Prime Minister of Defendant Iraqi Kurdistan Regional Government, contains a staggering description and inventory of violence, including unlawful or arbitrary killings by members of the Defendant Iraqi Kurdistan Regional Government security forces, directed by Defendant Masrour Barzani, and non-state groups, hostage taking and kidnapping, enforced disappearances, torture, restrictions on free expression the press and the Internet, widespread official corruption, violence against and restrictions on women, violence against lesbian gay, bisexual, transgender, and intersex (LGBT) individuals and the effective criminalization of LGBT status, violence against internationally displaced persons and restrictions on worker rights.

409.    Human Rights Watch documented "torturing children" by the Barzani-controlled Defendant Iraqi Kurdistan Regional Government.

410.    The U.S. Department of State has documented use by Defendant Iraqi Kurdistan

180

Regional Government assets directed by Defendant Masrour Barzani and his agents and representatives, including Barzani family members and family members by marriage, to collect information about, among other things, individuals and groups viewed by them as potentially adverse to the interests of the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise.

411.   Records of the Parliament of Defendant Iraqi Kurdistan Regional Government reveal that more than television journalists and opposition activists were arrested in the Duhok province for criticizing the government and its leaders and for organizing peaceful civil demonstrations.   Among those arrested, two journalists and six activists were sentenced by Barzani-subjugated courts of the Defendant Iraqi Kurdistan Regional Government to six years in prison – based on their social media activities and exchanging journalistic information over messaging apps.

412.   According to media watchdog Metro Center for Journalists Rights and Advocacy, an Iraq organization established by journalists and human rights advocates and supported by the international Institute for War and Peace Reporting and aimed at monitoring free press situations in Kurdistan Region of Iraq, more than 385 violations against 291 journalists were lodged in 2021. One of the most striking crackdowns occurred in 2020, when Barzani arrested and put more than 80 journalists and activists behind bars in Duhok province after demonstrating against corruption and poor public services.   Metro Center reported that between 2011 and 2020 more than 2,100 violations against journalists and media outlets were recorded in Iraqi Kurdistan.   In a long and documented history these violations ranged from harassment and destruction of equipment, to kidnappings and assassinations.

413.   The United Nations' Iraq Mission and the Office of its High Commissioner for

Human Rights in 2021, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reported:

> *"Over the last year, journalists, human rights activists and protestors who questioned or criticized actions by the Kurdistan regional authorities have faced intimidation, threats, and harassment as well as arbitrary arrest and detention."*

414.   The United Nations report further exposed that thirty-three journalists, activists or human rights defenders had been arrested without being told why, denied access to lawyers or held without their families being notified.

415.   The Special Rapporteur of the United Nations Human Rights Council reported at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power:

> *"Concerns raised focused in particular on the reported lack of effective investigations into the killings of Kurdish journalists and media professionals, and little or no accountability. This impunity has led to an overall mistrust in the criminal justice system and in turn increased fear among the media community to continue their critical reporting. This fear is heightened by their impression that the powerful figures who were the subject of criticism by the deceased journalists might be behind their killings and may even enjoy the protection of the justice system."*

416.   Confidential Human Sources #1, #2, #3, #4, #5, and #6, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates, have documented extrajudicial killing or attempts to kill dozens of activists, including journalists, coordinated, planned, and implemented by Defendants Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, often killed by men on motorcycles or in vehicles with blacked-out side windows – killed by gunshots to the head or

chest – are Barzani Continuing Criminal Enterprise representatives, instances of what the United

Nations Educational, Scientific and Cultural Organization *Director-General's Report on the Safety

of Journalists and the Danger of Impunity* condemns as the "assassination and any physical

violence against journalists as a crime against society."

417.    Murder, attempted murder, torture and disappearance of journalists has enabled in

substantial part the continuation and expansion of the Barzani Continuing Criminal Enterprise that

has damaged Plaintiffs.

### Plaintiff Maki Revend

418.    A globally respected professional Kurdish journalist and admired chronicler of

Barzani Continuing Criminal Enterprise abuses, crimes, and atrocities, with a worldwide audience

of his writings and podcasts, Plaintiff Maki Revend is an openly vocal and peaceful critic and

exposer of Barzani governance policies, political exploitation, oppression of speech and media,

deprivation of rights and human dignity, denigration of human rights, suppression of basic civil

liberties, limits on political pluralism, ruthless intimidation, plots to subdue and control the

citizenry, embezzlement, pilfering, theft, sanctions violations, theft of U.S. government assets,

manipulation, mistreatment, violence, genocide, enforced disappearances, murder, hostage taking,

terror, and other heinous crimes pervasively perpetrated by the Defendants. He is known through

Confidential Human Sources to be perceived by the Barzani regime to be a provocative and

challenging threat to their concentration of despotic governance power.

419.    Plaintiff Maki Revend, a native Kurd, was born in Iraqi Kurdistan in 1965.

420.    In a concerted plan, intent, and effort to silence and oppress Plaintiff, Maki Revend

was targeted by Defendant Masrour Barzani and his agents and representatives, exercising

imagined and feigned authority not granted by the laws, regulations, or policies of the Republic of

Iraq or the Defendant Iraqi Kurdistan Regional Government, subjected to acts of harassment, surveillance, intimidation, invasion of privacy, and/or stalking carried out by or at the direction of Defendants and their employees, agents and/or representatives, intentionally caused Plaintiff Maki and his family emotional distress to silence and intimidate them, and forced Plaintiff Maki to leave his home in Iraqi Kurdistan and abandon his family members. Defendants Masrour Barzani and his agents and representatives thereby intentionally and recklessly inflicted extreme emotional distress upon Maki which could foreseeably lead to violence. Fearing for his life, in 1993 Plaintiff Maki involuntarily fled from his native and beloved Iraqi Kurdistan to Germany where he sought political asylum, at which time he necessarily (but regrettably) renounced his Iraqi citizenship and was granted citizenship and safe haven by the Republic of Germany; and where he now maintains residence. German law enforcement currently protects Plaintiff Maki by armed police guard.

421.    Because of his open and widespread public analysis, evaluation, condemnation, disparagement, and exposure of the criminality of the Barzani governance regime and criminal enterprise, Plaintiff, Maki Revend has been repeatedly unlawfully targeted, through violent threats and repetitive unlawful acts of transnational repression for kidnapping, torture, and attempted murder by the Defendants, and lives in existential dread and fear of assassination by Defendants, and in constant hiding and 24-hour police protection from assassins of the Barzani Continuing Criminal Enterprise, as described more fully herein. These actions have the object of facilitating economic, political, military, financial, and commercial decision making and improper advantage in and for the Barzani Continuing Criminal Enterprise.

422.    The ability of Defendant's malicious cyber activity to steal data allowed them to alter or destroy Plaintiff, Maki Revend's, electronic content.

423.    The Defendant Iraqi Kurdistan Regional Government's efforts under the direction

184

and control of Masrour Barzani, acting without any and all lawful authority of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, to overtly and covertly censor, influence, coerce, and sometimes murder political dissidents to silence them extends far beyond the Iraqi KRG's ill-defined regional borders.

424.   Plaintiff, Maki Revend, a resident of Germany, has on at least five distinct occasions, each thoroughly documented by police, been the target of assassination attempts and aggravated assault with a deadly weapon by the Defendants' agents and representatives, in furtherance of a criminal enterprise, including:

a.  In September, 2017, German police advised Plaintiff Maki Revend his life was in danger from the Barzani Continuing Criminal Enterprise, and that unsuccessful attempts on his life had been made. From this event, to protect Plaintiff Maki Revend, police began to visit the Revend residence every two hours.

b.  On May 14, 2018, Plaintiff Maki Revend was physically attacked by eight people, confirmed by police to be members of the Kurdistan Democratic Party, a parallel organization to the Defendant Iraqi Kurdistan Regional Government directed and controlled by Defendants Masrour Barzani and Waysi Barzani. A colleague of Plaintiff Revend was severely beaten and injured as a result. Revend was able to protect himself from death by deploying eye-burning gas during the attack.

c.  A third assassination attempt was made on July 15, 2020, as two masked agents of Defendants Masrour Barzani and Waysi Barzani dressed in the false counterfeit uniform of postal workers attempted an attack at his residence. They attempted to gain uninvited entry to the residence but were thwarted by a family member. From that day, police placed a permanent 24-hour police guard around the residence through the end

185

of 2021.

d.  On October 2, 2022, two male agents of Defendants Masrour Barzani and Waysi Barzani came to the residence of Plaintiff, Maki Revend, in the middle of the night and in an assassination attempt deployed a hand-thrown incendiary weapon, known as an incendiary bomb, constructed from a frangible container filled with flammable substances in an attempt to assassinate Plaintiff Maki Revend by firebombing Plaintiff's residence while Plaintiff was sleeping.  Firebombs combine high explosive and incendiary effects and release a large quantity of extremely flammable material (gelled-fuel mixtures, magnesium, white phosphorus, etc.) which immediately bursts into flame.  Incendiary weapons are weapons or munitions designed to set fire to objects or cause burn or respiratory injury and death to people through the action of flame, extreme heat, or combination thereof, resulting from a chemical reaction of a flammable substance such as napalm or white phosphorus.  Plaintiff, Maki Revend, and his wife were sleeping inside the residence and were exposed to and dangerously endangered by smoke inhalation.  The house and Plaintiff were saved from fatal fire by an iron door.  At this time continuous 24-hour police guard was reinstated and continues to the present time.

e.  On September 21, 2023, two persons, identified by police as Russian assassination agents hired by Defendants Masrour Barzani and Waysi Barzani, attempted an assassination at the residence of Maki Revend but were apprehended in the act by police officers.  Two other criminal assassins fled the scene, escaped, and have not yet been identified.

Each of these assassination attempts are known to the German police and are documented by them.

Below are snapshots of concealed security surveillance camera video recordings taken during the assassination attempt firebombing of Maki's residence on October 2, 2022:





425.     Subsequent to the firebombing of Maki's residence, Defendant Areen Barzani, son of Defendant Masrour Barzani, while attempting to scare, control, and intimidate a confidential

187

informant hostile to him, acknowledged and boasted of the conspiratorial activities of the Defendants to incendiary bomb the Revend residence in an effort to intimidate, silence, and assassinate Plaintiff, Maki Revend. Defendant Areen Barzani could only have access to such incriminating information of activities by the Barzani Continuing Criminal Enterprise by himself being an insider co-conspirator.

426. In the calculated and planned efforts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, representatives, and Barzani family members and family members by marriage, to silence or to spread disinformation, often to falsely denigrate Plaintiff, Maki Revend, agents and representatives of Defendants Masoud Barzani and Masrour Barzani, directed and deployed by them, have visited known associates and family members of Plaintiff, Maki Revend, including Maki's associates and family members in the United States, and attempted through intimidation, implicit and expressed threats and acts of attempted bodily harm, enforced disappearance, or assassination, family imprisonment and isolation, to overtly and covertly dissuade and coerce Plaintiff, Maki Revend, from further critical social media postings, writing, and peaceful justice, accountability, and democracy advocacy with the object to discredit and smear the respected and trusted reputation of Plaintiff, Maki Revend. To avoid accountability and divert attention away from the Barzani Continuing Criminal Enterprise acts, Defendants consistently disseminated lies through electronic and other means, not tethered to facts or reason, about Plaintiff, Maki Revend, to a global audience.

427. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, operating under their command, did knowingly and willfully, directly and indirectly, and with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate one or

more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and transmitted through interstate and foreign commerce in one or more communications containing one or more implicit and expressed threats to injure the person of another, including Plaintiff Maki Revend, and used one or more other facilities of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to one or more persons and their immediate family members, contrary to Title 18, United States Code, Section 2261A(2)(B), all part of a broader concerted Barzani Continuing Criminal Enterprise effort to ban from their venues people whom they say are adversarial toward him/them and to send a message to millions of involuntarily exiled Kurds worldwide that if they don't fall in line and do what the Barzani political establishment tells them to do – then they too will be targeted for investigation, indictment, arrest, imprisonment, enforced disappearance, or even murder, thereby alienating and disenfranchising much of the Iraqi Kurdistan population.

428.    In knowing and willful violation of the Computer Fraud and Abuse Act (CFAA), codified under Title 18 U.S. Code § 1030, by using U.S.-based and other technologies, Defendants have gained illicit and unauthorized access to Plaintiff Maki Revend's computers with intent to damage or defraud, to deploy destructive malware and take other disruptive actions, for the strategic benefit of the Barzani Continuing Criminal Enterprise, through unauthorized access to Plaintiff Maki Revend's computers.  Masking their identities, Defendants' acts included cyber-enabled malicious actions aimed at supporting broader Barzani regime efforts regardless of the consequences to innocent parties and critical infrastructure worldwide, to undermine, retaliate against, or otherwise destabilize journalistic independence essential to democratic society, to probe Plaintiff Maki Revend's computer networks, register malicious websites and domains with names

189

mimicking legitimate ones, send spear phishing emails and other intrusion communications, store and distribute additional malware, manage malware, transfer stolen data, and negatively influence the public perception of Plaintiff Maki Revend. The conspirators reused some of the same infrastructure to unlawfully target multiple individuals in order to protect and promote the Barzani Continuing Criminal Enterprise.

429.    The Defendants performed a variety of functions targeting Plaintiff, Maki Revend, and designed to identify, collect, package, and view targeted data on Plaintiff Maki Revend's computers, including stealing credentials that allowed the Defendants to move laterally and exponentially throughout Maki's computer networks. The Defendants also overwrote files and erased data from Maki's computers. In addition, both during and after operational activity, the Defendants made efforts to cover their tracks by deleting information from their operational accounts and deleting data on servers they controlled or had compromised.

430.    Further, in knowing and willful violation of the U.S. Identity Theft and Assumption Deterrence Act, codified under Title 18 U.S. Code § 1028(a)(7), and involving violations of other statutes such as identification fraud (18 U.S.C. § 1028), computer fraud (18 U.S.C. § 1030), and wire fraud (18 U.S.C. § 1343), as acts of aggravated identity theft Defendants have without lawful authority fraudulently and knowingly transferred or used identification of another person, Plaintiff Maki Revend, in violation of 18 U.S. Code § 1028A(a)(1) with the intent to commit, or aid or abet, an unlawful activity by creating hundreds of counterfeit video accounts on Facebook in the name of and impersonating Plaintiff Maki Revend and using other personally identifiable information, and conveying and publishing demonstrably false information, resulting in Facebook implementing administrative use prohibitions, cancellations, and injunctions against Plaintiff Maki Revend.  Additionally, Defendants have aggressively and with malice aforethought attempted to

190

deplatform Plaintiff Maki Revend on every social media platform available, an action or practice of preventing publication of views regarded by Defendants as unacceptable or politically threatening, thereby creating financial harm, reputational annihilation, and emotional and mental anguish and suffering to Plaintiff Maki Revend.

431.   In order to monitor his perceived political rivals, adversaries, and antagonists, Defendant Masrour Barzani's agents and representatives, including Barzani family members and family members by marriage, have scrutinized and disrupted individuals who post online content, commonly and frequently using U.S.-based internet providers.  It was and is an object of the Barzani conspiracy to instigate, perpetuate, and commit acts in furtherance of the Barzani Continuing Criminal Enterprise specifically intended to threaten and intimidate Plaintiff Maki Revend and his family, and other Plaintiffs, by inflicting severe physical and mental pain and suffering upon them.  These repeating and unforeseen torturous attacks by Defendants have changed every aspect of Plaintiff Maki Revend's and his family's lives, home, work, and their sense of safety and mental health.  Without lawful authority, including unlawfully using identification of another person, the conspirators did affect, disrupt, and impede foreign electronic commerce of Plaintiff Maki Revend, all with the object of preserving the Barzani power base and perpetuating the Barzani Continuing Criminal Enterprise, all to the harm of the Plaintiffs.

432.   When Masrour Barzani and his agents and representatives hacked the Internet connection of Plaintiff Maki Revend's residence, they stole many of his family's personal documents and personal photos of his children and his wife, and without authorization published them on social media platforms.

433.   Defendant Masrour Barzani and his agents and representatives, frequently employing U.S. technology and expertise and personnel, have attempted to pressure and otherwise

overtly and covertly intimidate and threaten and coerce U.S. social media companies and platforms, through private communications and legal threats, into censoring certain social-media content and divisive deplatforming, in violation of the First Amendment, to remove posts and stories the content of which touched on topics deemed problematic and unacceptable by Defendant Masrour Barzani, which were authored by Plaintiff Maki Revend and supportive U.S.-based and European-based associates from social media platforms posts and stories removed or downgraded by the platforms.

434.   To this day, Defendants persist in their pattern of willful, extreme, and malicious criminal conduct, including attempted assassination and extreme damage to and destruction of property, with knowing and conscious disregard for Plaintiff Maki Revend's rights.  Plaintiff Maki Revend continues to be threatened, alarmed, harassed, followed, stalked, photographed, and surveilled by Defendants and/or their agents, employees, and/or representatives.  As as result of the foregoing, Plaintiff Maki Revend and his family continue to be reasonably in fear for their lives and the safety of their family, and have suffered significant damage to be determined at trial.  The Defendants' pattern of conduct outlined above, including information suppression, invasion of privacy and/or capturing visual images of Plaintiff's private, personal and/or familial activities, and trespassing upon Plaintiff Maki Revend's land by Defendants, would cause a reasonable person to suffer substantial emotional distress.  The foregoing conduct of the Defendants was and is a part of a continuous course of conduct which was intentional, outrageous, malicious, and done with ill will on the part of the Defendants, done with the intent of causing Plaintiff Maki Revend to suffer humiliating mental anguish, cruel and unjust hardship, interference with income, and emotional and physical distress, and with the knowledge that Plaintiff Maki's emotional and physical distress would thereby increase.

435.    Defendant Dindar Zebari, as the Defendant Iraqi Kurdistan Regional Government's Coordinator for International Advocacy acting under the direction of Defendant Masrour Barzani, and aiding, abetting, and agreeing in the planned scheme to perpetuate their false arrest and provide the public with calculated misdirection and knowingly false and untruthful statements and to facilitate the unlawful imprisonment of at least the eight example journalists referenced herein, acting under direct command of Defendant Masrour Barzani fabricated and issued knowingly false, fallacious, fraudulent, and misleading public statements, declaring "neither conviction was related to the defendants' journalistic work" and that they "were found guilty of gathering sensitive and classified U.S. national defense information (received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government) and passing it covertly to foreign actors in exchange for substantial sums of money", of "illegally possessing weapons, engaging in forgery, and using false fingerprints or signatures."

(a)     **Sardasht Osman Hassan Hamad (Zardasht Osman)**

On or about May 6, 2010 a young journalist was kidnapped and assassinated in the Iraqi Kurdistan capital of Erbil and killed in the vicinity of the Iraqi city of Mosul. Osman criticized corruption, family rule, and nepotism; and specifically criticized the Barzani's in several pieces. Confidential Human Source #1, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, confirms that Defendant Masrour Barzani was involved in Osman's Murder.

Voice of America, an agency of the United States Government, reports credible evidence that authorities of the Defendant Iraqi Kurdistan Regional

193

Government were directly involved in the murder, and that in the years since Osman's death, at least 22 other journalists have been killed in Iraq, including several who died in KRG-controlled areas.

**(b)**     **Wedat Hussein (Wadat Hussein Ali)**

Hussein, an ethnic Kurd, worked as a journalist for Roj News, a newspaper affiliated with the PKK, archrival of Defendant Iraqi Kurdistan Regional Government and KRG.  Confidential Human Source #1, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, credits his murder to Barzani's loyal security forces.  Witnesses saw Hussein, 28, being dragged from his car at gunpoint by two men in the Malta district of the northern Iraqi city of Duhok and abducted. The men forced a mask onto Hussein's face and drove away. Road cameras show vehicles heading toward the KDP intelligence agency, but later all the road cameras were deleted by KDP security agents.  Amir Daud, the owner of a nearby supermarket. who witnessed the incident, posted a descriptive explanation on Facebook the same day, but deleted it one hour later after expressed threats by Barzani security agents.  Two hours later Hussein's lifeless body was discovered near Semel with signs of severe torture on the Semel-Duhok highway in Iraqi Kurdistan that night.  They had assassinated him in a cruel way. They had cut off three of his fingers, broken his leg and popped out both of his eyes.  The United Nations Human Rights Council Special Rapporteur reported "his body showing clear marks

194

of torture."   Multiple witnesses are incorporated herein as Confidential Human Sources.

**(c)**   **Qaraman Shukri**

Iraqi Kurdish photojournalist Qaraman Shukri works as a freelance photographer and has contributed to the news website Roj News and the broadcaster Sterk TV, which support the opposition Kurdistan People's Party.   KDP Asayish security forces arrested Shukri at his home in Shilazdeh, a village near Duhok.  Asayish agents, who arrived in seven or eight cars and wore full face masks, did not disclose any reason for Shukri's arrest and did not present a warrant or any court papers. They handcuffed Shukri and shoved the journalist's mother during the raid.  After being convicted on or about June, 2021 on anti-state charges during a closed trial in the northwestern Kurdish city of Duhok without a defense lawyer present, he is serving a prison term in Zirka prison in Duhok, a jail where prisoners often cannot access toilet paper and walls are speckled with feces and blood.

**(d)**   **Kawa Garmyane (Garmyani)**

Garmyane was the editor-in-chief of the news website Rayel and a correspondent for the Kurdish-language newspaper Awene.  Garmyane had published several reports alleging corruption among Kurdish politicians, Unknown gunmen shot and killed Garmyane on or about December 5, 2013, outside his home in the town of Kalar, south of the Kurdish Iraqi city of Sulaymaniyah.  Confidential Human Sources #1 and #11, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional

Government officials, and Sulaymaniyah-based Press Freedom Group Metro Center for Journalist Rights and Advocacy, say Garmyane was murdered in retaliation for his work.

(e)      **Soran Mohammed Aziz**

At 9pm on 21 July 2008 in Shorja-Karkuk in Iraqi Kurdistan, there was a knock on the family residence door. When Soran opened the door, he was met by three men who shot him. His last words spoken were "they killed me." Confidential Human Sources #12 and #13, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, were previously told by Soran that he was being seriously threatened by the KDP for his journalist work, and identified the assassins as Iraqi KDP agents. Contemporaneously, Confidential Human Source #1, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, was informed by the Kirkuk branch of the Union of Journalists and by Levin magazine about the implicit and expressed KDP death threats to Soran.

The Barzani-ordered assassination of Soran was also witnessed by Confidential Human Source #13.

(f)      **Guhdar Zebari**

Zebari reports and edits for the news website Wllat Media in Akre, a northern Kurdish city. At the time of his arrest, Kurdish security forces in 13 vehicles raided Zebari's house and arrested him. After pleading not guilty, on 16 February 2021 the politically-directed criminal court of the

Defendant Iraqi Kurdistan Regional Government convicted him of being part of a group that gathered information about Iraqi Kurdistan and sentenced journalist Guhdar Zebari to six years imprisonment on charges of destabilizing the security and stability of Iraq's Kurdistan region and is serving his sentence at the Asayish general directorate in Erbil. In the weeks leading up to the arrest Zebari had been "living in fear" and hiding because he had received threatening messages. Confidential human source #1, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, said witnesses of the trial said prosecutors produced flimsy, circumstantial, and fabricated evidence to substantiate the allegations against Zebari and his co-defendant, journalist Sherwan Amin Sherwani.

(g)    **Sherwan Sherwani**

Sherwani is editor-in-chief of monthly magazine Bashur, which is critical of the semi-autonomous Kurdish region's political elite and especially the Kurdistan Democratic Party (KDP) and the powerful Barzani family. He was arrested on 7 October 2020 by Asayesh security forces at his home in Sebiran, a village on the outskirts of the Iraqi Kurdistan provincial capital city of Erbil, and accused of "endangering the Kurdistan region's security". He was held in solitary confinement for nearly two months and was tortured by security forces in Erbil. The Barzani-controlled puppet judiciary in the Defendant Iraqi Kurdistan Regional Government sentenced Sherwani of 18 February 2021 to six years, and subsequently on

20 July 2023 further sentenced Sherwani to an additional four years in jail on charges of alleged forgery, in a jail where prisoners are threatening suicide every day and no psychological treatment is available. Sherwani has been arrested multiple times in Kurdistan by agents of Defendant Masrour Barzani.

(h)    **Arkan Sharifi**

On the morning of 30 October 2017 Arkan Sharifi, a cameraman for Kurdistan TV, was stabbed to death in his home by eight Barzani agents in front of his family in Daquq in north central Iraq.

436.    Journalists Sherwan Sherwani and Guhdar Zebari, imprisoned by Defendant Iraqi Kurdistan Regional Government since October 2020, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, following a biased trial manipulated and fabricated by Barzani agents and representatives operating under the command and control of Defendants Masoud Barzani and Masrour Barzani using torture-tainted confessions and refusing to allow defense attorneys timely access to case files, are facing new spurious charges. Guhdar Zebari was scheduled to be released on 16 August 2023 but was informed by Defendant Iraqi Kurdistan Regional Government officials on the same day that he has been charged with another offense. Sherwan Sherwani was due to be released on 9 September 2023, but on 20 July 2023 a controlled court sentenced him to an additional four years in prison. The journalists were initially sentenced to six years in prison by the Erbil Criminal Court in February 2021 along with three democracy and freedom of expression activists.

437.    Confidential Human Sources #1, #2, #3, #4, #5, #9, #10, #11, #12, and #13, who

198

have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, describe conditions where these journalists have been jailed as "horrendous", "a political prison for the enemies of the Barzani regime," "a veritable hell on earth," "a permanent measure of repression and violations of human rights," and meeting no international standards, as 120 prisoners are placed in a hall that was designed for 40 people and without ventilation. The prisoners must take turns sleeping, where some of them sleep at night and the other part during the day, because the place is very small. The food is very bad and health care is almost non-existent. Prisoners suffer from dehydration, malnutrition, severe body insect infestation, untreated decompensated schizophrenia, filthy housing teeming with insects, rampant violence resulting in death and injuries, and officers using excessive force, overcrowding, inmate deaths, excessive force from officers, structural issues, outbreaks of lice and scabies, and muscle wasting commonly seen in people with late-stage cancers. These prisons contain hundreds of unindicted prisoners.

438.    Defendants Masrour Barzani and Waysi Barzani, together with their agents and representatives, including Barzani family members and family members by marriage, together did knowingly and intentionally aid, abet, command, induce, agree, scheme, and procure each others' participation in and did commit overt acts, in furtherance of the Barzani Continuing Criminal Enterprise, in the commission of the heinous crimes against these eight example and representative instance journalists (there are countless other examples), as a mechanism, strategy, and act to perpetuate and expand the Barzani Continuing Criminal Enterprise and power base and harm Plaintiffs.

439.    By reason of the conduct alleged herein, the criminal and civil violations of U.S. federal law, Presidential Executive Orders having force of law, and regulations knowingly or recklessly, directly or indirectly, committed or caused to be committed, or aided and abetted by

Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirators, including Barzani family members and family members by marriage, are inordinately extensive in number, scope, depth, magnitude, gravity, and criminal severity, and danger to the national and economic security interests of the United States and its citizens, and injure Plaintiffs, and have violated at a minimum the distinct statutory provisions enumerated herein.

440.   The criminal activities of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and associates, including Barzani family members and family members by marriage, in the Barzani Continuing Criminal Enterprise were undertaken to provide the money and resources needed to cause injury to the named Plaintiffs herein and to the John Doe Plaintiffs.

## OTHER HUMAN RIGHTS ABUSES, TRANSNATIONAL REPRESSION, AND CRIMES AGAINST HUMANITY

441.   Defendants Masoud Barzani and Masrour Barzani, in their unapologetic authoritarian and autocratic control of the Defendant Iraqi Kurdistan Regional Government and the Kurdistan Democratic Party, at variance with free market liberal democracy they publicly espouse, treat political dissent, real or imagined, and free expression and democratic participation as a threat not only to their own political interests and imperiling their centralized grip on power, but also to the Defendant Iraqi Kurdistan Regional Government's one dominant political party system of government and their continuing criminal enterprise. The Defendant Iraqi Kurdistan Regional Government's efforts, and those of the complementary and interrelated Barzani Continuing Criminal Enterprise, each directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their agents and representatives, including Barzani family members and family members by marriage, to suppress and censor political dissent and free expression and

200

association and democratic participation, even violently, inflicting unending cruelties and miseries, beyond the loosely defined regional borders of Defendant Iraqi Kurdistan Regional Government, including into the United States of America, is well documented.

442.    The Defendant Iraqi Kurdistan Regional Government, and in particular the subordinate Defendant Iraqi Kurdistan Regional Government Security Protection Agency and the subordinate Defendant Iraqi Kurdistan Regional Government's Intelligence and Security Agency (the successor agency to Parastin), which are the intelligence and secret police agencies of the Defendant Iraqi Kurdistan Regional Government responsible for counterintelligence, espionage and political security, and which are tightly directed, commanded, and controlled by Defendant Masrour Barzani – absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and who has without lawful authority of either the superior Republic of Iraq and the inferior provincial Defendant Iraqi Kurdistan Regional Government, broadened and expanded its mission to extend beyond law enforcement and into functions more associated with a personal international intelligence service – conduct improper cross-border operations and often unlawfully censor disfavored political speech that is deemed or perceived to potentially be damaging to the reputation of the Defendant Iraqi Kurdistan Regional Government or the Barzani Continuing Criminal Enterprise, collect information through extraterritorial clandestine and covert human source operations, and monitor, and conduct illegal surveillance at residence and places of work.  Persons targeted include those voicing peaceful Iraqi Kurdish political dissent or counter viewpoints, particularly Ayoub Barzani, a respected and revered Kurdish leader and voice of democracy amongst Iraqi Kurds worldwide, and vocal journalistic critic of the dangerous Barzani Continuing Criminal Enterprise, among many others.

443.    In recent years, expatriates of Iraqi Kurdistan lawfully residing in other countries,

including in the United States, and including U.S. citizens, and in other locations outside Iraqi Kurdistan, conducting their lives in a manner understood to be lawful, are also unlawfully targeted for kidnapping, torture, and murder, as described more fully herein.

444.  All of these actions have the object of facilitating economic, political, military, financial, and commercial decision making and improper advantage in and for the Barzani Continuing Criminal Enterprise.

445.  Ayoub Barzani is an internationally recognized Kurdish writer and admired critic. He is the son of Babo Barzani, nephew of Ahmed Barzani (the head of the Barzan tribe), and brother-in-law and first-cousin of Defendant Masoud Barzani, the former President of Iraqi Kurdistan Region.  He is presently extrajudicially exiled under threat of death should he return to Kurdistan, and is living in existential dread, and isolated from his family by Defendants Masoud Barzani and Masrour Barzani in Switzerland, where he is a co-founder of a democracy advocacy organization, counter to the Barzani-controlled KDP, and known as Kurdistan Democratic Alliance, and lives every day in his hope of seeing his children and grandchildren again which keeps him, amidst mental torture, from wishing to die.

446.  The Defendant Iraqi Kurdistan Regional Government's efforts under the direction of Defendant Masrour Barzani, acting without any and all lawful authority of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, to overtly and covertly censor, influence, coerce, and sometimes murder political dissidents to silence them extends far beyond the Defendant Iraqi Kurdistan Regional Government's regional borders.  In order to monitor his perceived enemies, agents and representatives, including Barzani family members and family members by marriage, Defendant Masrour Barzani has scrutinized and disrupted individuals who post online content, frequently using US-based internet providers.  Ayoub Barzani, who at extreme

personal cost and sacrifice, has been and is a distinguished, venerated, peaceful, outspoken advocate for human rights, the advance of democracy, and of fair and impartial and accountable justice and the rule of law in the territory of Defendant Iraqi Kurdistan Regional Government, was targeted by Defendant Masrour Barzani and his agents and representatives, was forced and ordered by Defendants Masoud Barzani and Masrour Barzani, exercising imagined and feigned authority not granted by the laws, regulations, or policies of Republic of Iraq nor the Defendant Iraqi Kurdistan Regional Government, to leave his home in Iraqi Kurdistan and abandon his family members, thereby intentionally and recklessly inflicting extreme emotional distress.   Ayoub Barzani has been an unlawfully exiled Iraqi Kurd living for many years as a long-time expatriate resident of Switzerland.

447.   In the calculated and planned efforts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, representatives, and Barzani family members and family members by marriage, to silence Ayoub Barzani, agents and representatives of Defendants Masoud Barzani and Masrour Barzani, directed and deployed by them, have visited known associates and family members of Ayoub Barzani and attempted through intimidation, implicit and expressed threats of bodily harm, enforced disappearance, or assassination, family imprisonment and isolation, to overtly and covertly dissuade and coerce Ayoub Barzani from further critical social media postings, writing, and peaceful justice, accountability, and democracy advocacy with the object to discredit and smear the respected and trusted reputation of Ayoub Barzani.

448.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, operating under their command, did knowingly and willfully, directly and indirectly, and with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate one or

203

more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and transmitted through interstate and foreign commerce in one or more communications containing one or more implicit and expressed threats to injure the person of another, including Ayoub Barzani, and used one or more other facilities of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to one or more persons and their immediate family members, contrary to Title 18, United States Code, Section 2261A(2)(B), all part of a broader concerted Barzani Continuing Criminal Enterprise effort to ban from their venues people whom they say are adversarial toward him/them and to send a message to millions of exiled Kurds worldwide, including American citizens of Kurdish origin, that if they don't fall in line and do what the Barzani political establishment tells them to do – then they too will be targeted for investigation, indictment, arrest, imprisonment, enforced disappearance, or even murder, thereby alienating and disenfranchising much of the Iraqi Kurdistan population.

449.   Defendant Masrour Barzani and his agents and representatives, frequently employing U.S. technology and expertise and personnel, have attempted to pressure and otherwise overtly and covertly intimidate and threaten and coerce U.S. social media companies and platforms, through private communications and legal threats, into censoring certain social-media content and divisive deplatforming, in violation of the First Amendment, to remove posts and stories the content of which touched on topics deemed problematic and unacceptable by Defendant Masrour Barzani, which were authored by Ayoub Barzani and supportive U.S.-based and European-based associates from social media platforms posts and stories removed or downgraded by the platforms.

450.   In an 8 July 2022 notice, when Defendant Masrour Barzani was at the time and is

Prime Minister of Iraqi Kurdistan, the presiding and actual head of government and head of the executive power, the U.S. Department of States defined transnational repression as:

> *"activities includ[ing] attempts by a government to target individuals located outside of its territory for peacefully exercising their human rights and fundamental freedoms, through various forms of harassment, intimidation, and coercion"* ...with *"condemnation of transnational repression activities occurring in the United States and elsewhere. Such activities include attempts by a government to target individuals located outside of its territory for peacefully exercising their human rights and fundamental freedoms, through various forms of harassment, intimidation, and coercion."*

451. The United States Government in its *Declaration of Principles to Combat Transnational Repression*, issued at the time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, affirms that "transnational repression is a threat to democracy and human rights worldwide."

452. Transnational repression is governments reaching across borders to silence dissent among diasporas and exiles, including through assassinations, illegal deportations, abductions, digital threats, Interpol abuse, and family intimidation. Autocrats today have access to a range of tools to extend their reach by thousands of miles, sometimes in fractions of a second. Some schemes rely on 21st century technologies to hack, surveil, and intimidate targets, while others use blunter tactics such as extortion, abduction, and assassination. This practice of transnational repression constitutes a wholesale assault on the rule of law internationally.

453. Insider Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, have documented a growing number of instances where Defendants Masrour Barzani and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and

family members by marriage, operating under their command, did knowingly and willfully conspire, commit, and aid and abet, and in connection with, did commit unlawful activity by using the tools of transnational repression, including violence and intimidation, to reach beyond the loosely defined borders of Defendant Iraqi Kurdistan Regional Government, to silence peaceful dissent, and are becoming more aggressive and more coordinated in their efforts to target, silence, and harass Kurdish opposition voices, including in Europe and the United States, and perceived threats to their power, commercial money-making ventures both licit and illicit, and continuing criminal enterprise.

454.    Without lawful authority and in an effort to police the Kurdish diaspora worldwide, including in the United States, silence political opposition, and suppress or quash the free exchange of information about their regime, and in furtherance of its continuing criminal enterprise, the Barzani regime, directed, commanded, and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and its co-conspirators, including Barzani family members and family members by marriage, did knowingly and willfully, directly and indirectly, conspire, commit, and aid and abet, and in connection with, unlawful activity, with the intent to harass and intimidate one or more persons, to place that person and persons in reasonable fear, that is not imaginary or wholly speculative, of the death, enforced disappearance, and serious bodily injury, did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations, and to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress and anguish, severe financial deprivation, extreme familial isolation and separation, travel limitations and restrictions, and forced exile, each and all a form of extrajudicial imprisonment and mental torture, absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the

actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, the Defendant Iraqi Kurdistan Regional Government, or international law or treaty, on Ayoub Barzani in Switzerland, his children and grandchildren and extended family members in Iraqi Kurdistan and elsewhere, and others.

455. From Europe, far outside the territory of Defendant Iraqi Kurdistan Regional Government, Ayoub Barzani has continually, repeatedly, and peacefully exercised his human rights and fundamental freedoms and as a result has for more than twenty years suffered endless planned harassment, intimidation, Defendant Iraqi Kurdistan Regional Government surveillance, monitored voice conversations, coercion, and the eliciting and publicizing of false derogatory information about Ayoub Barzani. Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani have engaged other agents to assist in the scheme to undermine Ayoub Barzani – attempting to falsely discredit him in the eyes of his extended family, fellow Kurds, and the United States and Europe and the international public. These agents have been directed by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, aided and abetted by their co-conspirators, subordinates, and representatives, including Barzani family members and family members by marriage, each and all deceptively, knowingly, and falsely professing to act under the color of lawful authority of Defendant Iraqi Kurdistan Regional Government, which lawful authority did not and does not exist.

456. It was and is an object of the Barzani conspiracy to instigate, perpetuate, and commit acts in furtherance of the Barzani Continuing Criminal Enterprise specifically intended to threaten and intimidate Ayoub Barzani and his family, and Plaintiffs, by inflicting severe physical and mental pain and suffering upon them. Without lawful authority the conspirators did affect, disrupt, and impede foreign commerce of Ayoub Barzani, all with the object of preserving the

Barzani power base and perpetuating the Barzani continuing criminal enterprise, all to the harm of the Plaintiffs.

457.    Ayoub Barzani, without lawful authority from the government of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, and contrary to international law and treaties and the laws of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government, was extrajudicially expelled from the territory of Defendant Iraqi Kurdistan Regional Government by Defendant Masoud Barzani after an unsuccessful attempt on Ayoub Barzani's life ordered by Defendant Masoud Barzani. Ayoub Barzani was involuntarily and forcefully expelled from his Kurdistan home without due process or judicial engagement or lawful authority. Defendant Masoud Barzani, without lawful authority, personally ordered and told Ayoub Barzani: "Leave Kurdistan or be killed." He was and is forced to live without his family, including his wife, in isolated exile in Switzerland. In Kurdish Middle East culture, there are two ways to inflict pain: physically, and damage the family name.

458.    During his unlawfully and extrajudicially forced extrajudicial exile, Ayoub Barzani continues to be the recipient of emotional torment, distress, and familial separation anguish instigated by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and enforced by their agents and representatives, including Barzani family members and family members by marriage. His children and grandchildren are unlawfully kept from him by Defendant Masrour Barzani and his agents and representatives and detained in territory of Defendant Iraqi Kurdistan Regional Government, without due process or judicial engagement or lawful authority, by the Barzani regime controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. These acts, in furtherance of the Barzani Continuing Criminal Enterprise, of attempted murder, forced extrajudicial exile, and continuing intimidation and physical, financial, and other

endangering threats against him and his extended family, have inflicted severe mental and extreme emotional pain and suffering for over twenty years. For over twenty years the Barzani regime, directed and commanded by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, has inflicted constant and severe humiliation on Ayoub Barzani's brothers, who at the command and direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and public and social media humiliation efforts under their command and direction, are treated like lepers.

459.    Through unlawful orchestrated intimidation and fear, which is not imaginary nor wholly speculative, induced by violence at the unlawful command and direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, resulting in forced societal isolation and financial deprivation of Ayoub Barzani, and intentional destruction of his family reputation and association (the biggest and most severe form of torture and suffering in Kurdish culture), including preventing people from speaking to them.

460.    The most extreme, severe, and purposeful mental torture and painful familial humiliation inflicted by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, acting contrary to the laws of the Government of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government and international law, was their coordinated, willful, and wholly unlawful denial and prevention of Ayoub Barzani to attend the funeral of his beloved wife in Iraqi Kurdistan – an intentionally inflicted pain and public humiliation, a form of torture very significant in Kurdish culture, which was widely noted throughout Iraqi Kurdistan and the global Kurdish diaspora.

461.    Under the doctrine of command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are legally responsible for the unlawful torture, suffering, and prolonged and sustained mental, emotional, psychological, and reputational anguish of Ayoub

Barzani and his family members inflicted at the command of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and perpetuated as part of the Barzani Continuing Criminal Enterprise and the pursuit of its objectives for illicit financial gain and to injure Plaintiffs.

462.    Another representative example of a Kurd living in constant fear, which is not imaginary nor wholly speculative, in forced exile – among thousands of other such refugees – is "Kamal", a peaceful scholarly dissident and advocate for democracy, accountability, legality, and transparency of governance, who with his immediate family, was extrajudicially forced to flee Iraqi Kurdistan by Defendants Masoud Barzani and Masrour Barzani, without legal authority of the laws, regulations, or policies of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, and has lived in Sweden in fear, which is not imaginary nor wholly speculative, in arbitrarily and extrajudicially imposed exile for twenty years. In furtherance of the objectives and purposes of the Barzani Continuing Criminal Enterprise, and absent lawful evidence or proper due process, Confidential Human Source #1 reports "Kamal" has been indicted in the acquiescent Defendant Iraqi Kurdistan Regional Government judicial system controlled and commanded by Defendants Masoud Barzani and Masrour Barzani in at least eighty-seven mostly secret legal cases. While living in Sweden, Kamal has been the victim of at least two Barzani-directed (and unsuccessful) assassination attempts in Sweden.

463.    Another representative example of a Kurd living in constant fear, anxiety, fright, and worry, which is not imaginary nor wholly speculative, in extrajudicial exile, ordered, forced, and persisted by Defendants Masoud Barzani and Masrour Barzani, and their agents and representatives serving at their command and direction, is Twana Noder Karim, aka Qader Nader, a Kurdish activist journalist living in exile in Sweden. He was physically attacked in Stockholm, outside his home, by two men of the United Tribuns organized crime mafia employed in Europe

210

by the Iraqi Parastin, a subordinate agency of the Defendant Iraqi Kurdistan Regional Government and who function at the command and control of Defendant Masrour Barzani, and directed by Defendant Herish Rash, head of Parastin who became Peshmerga in 1987. At the command of Defendants Masoud Barzani and Masrour Barzani, and absent any and all legal authority, Iraqi KDP Parastin has killed hundreds of people. KDP Parastin is directly commanded and controlled by Defendant Masrour Barzani, and by Defendant Ahmad Kurdu Nori, the Barzani's and Rash's representative and agent in Nuremberg, Germany. Confidential Human Source #5 and #8, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates, reports that Parastin officials, aiding and abetting and acting as directed by Defendant Masrour Barzani, issued the assassination order, and which was communicated to an Iraqi KDP hitman Defendant "Shalawo". Confidential Human Source #9, a servant in the Barzani household, and who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates and family, witnessed the order being given to assassinate three exiled Kurds in Europe, including Twana. All such orders in Defendant Iraqi Kurdistan Regional Government are verbal.

464.    Confidential Human Source #1 disclosed yet another example of an Iraqi Kurd unlawfully forced into exile by Defendant Masrour Barzani – Kurdish exile Fatah Zaxoiy. Mr. Zaxoiy was the target of a Barzani ordered assassination attempt that failed. Zaxoiy now lives in forced extrajudicial exile in Canada.

465.    American citizen Sidqi Bradosti was detained and falsely imprisoned by Asayish

211

(Kurdish Security) agents of the Defendant Iraqi Kurdistan Regional Government acting under the direction and command of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani. Defendants, and their agents and representatives, including Barzani family members and family members by marriage, knew and intended that the arbitrary arrest on false criminal charges would be utilized by Iraqi KDP officers, each an employee or agent of the Defendant Iraqi Kurdistan Regional Government and operating under Defendants' command and direction, to eavesdrop, tap and intercept the communications of Sidqi Bradosti while incarcerated; surveil, detect, monitor and track his online communication; apprehend, interrogate, ideologically persuade  and in other ways torture and detain him because of his political beliefs, with the specific purpose of suppressing Sidqi Bradosti's political beliefs through the perpetration of these and other egregious human rights abuses against him, all in violation of international, United States, Iraq, and Defendant Iraqi Kurdistan Regional Government law.

466.    The Court of Appeals for the District of Columbia Circuit held that "Government conduct that 'shocks the conscience' violates the Fifth Amendment guarantee against deprivation of 'life, liberty, or property, without due process of law.'" See *Harbury v. Deutch*, 233 F.3d 596, 602 (D.C. Cir. 2000), quoting *Rochin V. California,* 342 U.S. 165, 172-173, 72 S. Ct, 205, 96 L. Ed. 183 (1952). The conduct of the agents of the Defendant Iraqi Kurdistan Regional Government, under the command and control of Defendant Masrour Barzani, a United States person, though acting without lawful authority but in the name of government, shocks the conscience, (noting that the Due Process Clause must at least "give protection against torture, physical or mental"). *Benton v. Maryland* 395 U.S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969).

467.    The state security service Asayish (al-amn al-'am, or asayish in Kurdish) is not an ordinary crime control apparatus.  While it does perform some standard crime control police

functions, Asayish differs exponentially from all standard crime control initiatives in scale, complexity, intelligence, and technological sophistication – all of which are directly related to its major purpose or functionality, i.e., to find, track, and suppress, through arbitrary and discriminatory enforcement, dissenters to the Barzani regime wherever found in Iraqi Kurdistan and worldwide. Defendant Masrour Barzani and Waysi Barzani, along with other subordinate Defendant Iraqi Kurdistan Regional Government officials and KDP party officers, set policy for Asayish and micromanage the persecution and elimination of political dissidents, and provide extensive resource support to the persecutory purpose of its Asayish apparatus. This resource support includes technology to secure provincial security databases, allowing for thorough cross-checking of names, affiliations, political behavior, family history, and "footprints" for the surveillance, apprehension, and suppression of unlawfully targeted individuals, including Sidqi Bradosti. It even includes the capacity and technology needed to read the content of email, figure out if someone had uploaded a new website, and monitor the Internet surfing history and email of designated persons, for repressive uses in furtherance of the Barzani CCE persecutory objective. According to a recent Human Rights Watch report, the Asayish has detained hundreds of suspects without trial and often for years, most of whom were allegedly tortured and ill-treated in establishments which, over time, have morphed into symbols of oppression, where dissent is crushed, and voices silenced.

468. The arrest of Sidqi Bradosti, on false and fabricated criminal charges, was just such – conducted outside of the authority of the state and without the constraint of legal due process or any form of objective hearing or regulation or law. Instead, Asayish agents, each an employee or agent of the Defendant Iraqi Kurdistan Regional Government, aware of the widespread persecutory campaign against so-called dissidents and under the command of Defendants Masrour Barzani and

Waysi Barzani who exercise a high level of control over day-to-day operations, relied on party orders and officers to identify targets, ban targets and their activities, initiate their condemnation in the KDP's official mouthpieces, and then subject them to violent persecution either through direct action by KDP personnel or via low-level Defendant Iraqi Kurdistan Regional Government officers. The scope of the campaign by the Barzani Continuing Criminal Enterprise, including the inhumane treatment and torture and other forms of severe abuse employed to persecute so-called dissidents, is common knowledge amongst Kurds both inside and outside of Iraqi Kurdistan, has been documented by the Special Rapporteur of the United Nations Human Rights Council, and continues at the present time.

469. The life of Sidqi Bradosti, who's previously sterling reputation has been dragged through the mud, and those of his family are irreparably altered by his baseless arrest and prosecution.

470. Targets of the Barzani Continuing Criminal Enterprise, including Sidqi Bradosti, are purposefully and calculatedly subjected to public, community, familial, and personal demonization and humiliation, beatings, ideological conversion and other forms of inhumane treatment and torture in ad hoc Iraqi KDP detention facilities, a system of initial administrative detention imposed without judicial authorization or review. Beginning in his first week in detention, Sidqi was tortured and interrogated.

471. The demonization of such individuals, including Sidqi Bradosti, as state enemies, anti-humanity, anti-society, dangerous criminals and other dehumanizing comparisons has been used by the Iraqi KDP and the Barzani Continuing Criminal Enterprise to instigate, incite and justify the human rights abuses carried out against successive target individuals including Sidqi Bradosti, peaceful reformist intellectuals, and pro-democracy advocates.

214

472.    So-called dissidents, including Sidqi Bradosti, are demonized by Defendant Masrour Barzani, Waysi Barzani, and their agents and representatives, as "party enemies," "hostile elements," "terrorists" and other dehumanizing and discrediting imagery to legitimize their regular subjection to human rights abuses.

473.    At all relevant times, defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, acting as senior Defendant Iraqi Kurdistan Regional Government officials, were and are part of a pattern and practice of systematic, systemic, and unlawful human rights violations committed in Iraqi Kurdistan, and bear personal responsibility.

474.    As members of the highest Defendant Iraqi Kurdistan Regional Government leadership, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had and have a duty – under customary international law, multilateral treaties, Iraq law, and Kurdistan law – to ensure the protection of prisoners; to prevent violations of international law by the prison and security personnel; and to ensure that all persons under their command were trained in, and complied with Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international law, including the Iraq, Defendant Iraqi Kurdistan Regional Government, and international law prohibitions against torture, crimes against humanity, arbitrary detention, and cruel, inhuman and degrading treatment or punishment.  Further, the Defendants were under a duty to investigate, prevent and punish violations of Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international law committed by officials and staff of the prison and Asayish security forces under their command.

475.    Defendants Masrour Barzani and Waysi Barzani, and their co-conspirators, conspired to violate Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international and domestic law and carried out a series of overt acts in furtherance of this

conspiracy, including inter alia, detaining and torturing Sidqi Bradosti and forcing him to witness the torture of others. Defendants and their co-conspirators further conspired to conceal and cover up these violations of Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international and domestic law in furtherance of this conspiracy.

476.    As an ulterior but parallel motive of the efforts by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents, representatives, including Barzani family members and family members by marriage, through anti-competitive practices, to control and monopolize all Iraqi Kurdistan commerce, licit and illicit, by holding and increasing its monopolistic market share and continuing to generate enormous profits, conspired and acted to destroy, degrade, and eliminate commercial competition by sabotaging and debasing the established and respected reputation of a prominent family and the long-established relationship of the Bradosti family with the government of Turkey.   Under the command and control of Defendants Masrour Barzani and Waysi Barzani, the Iraqi KDP broadcast the videoed photographs of Sidqi Bradosti, characterized as a terrorist, on Iraqi KDP owned and controlled television with the willful, purposeful, and calculated objective to soil Sidqi Bradosti's established reputation for Barzani Continuing Criminal Enterprise economic and financial gain, with the object of taking for their own commercial businesses contracts Sidqi Bradosti and his business interests had with the United States Government military.

477.    Under Iraq and Defendant Iraqi Kurdistan Regional Government law, its citizens are free to associate and practice their beliefs and speak and express freely without fear, that is not imaginary or wholly speculative, of systematic persecutory reprisal anywhere.  However, under the command, control, and direction of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, the Defendant Iraqi Kurdistan Regional Government and KDP, operationally

indistinguishable in practicality, and both controlled by Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, including Barzani family members and family members by marriage, as masters of deception and centralized power, emphasized the Barzani leadership over all aspects of governance, and breached their duties and have implemented a widespread persecutory campaign against those Iraqi Kurds, including Sidqi Bradosti, politically opposed to the Barzani regime to ideologically convert and suppress political and ideological opponents, real and perceived, controlling the message, censoring speech and expression, and controlling the opposition, through inhumane treatment, torture, enforced disappearance, murder and in other unlawful ways, frequently aiding and abetting foreign intelligence activities in alleged human rights and trade violations, all contrary to and not authorized by Iraq law or Defendant Iraqi Kurdistan Regional Government law.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Iraqi KDP party agents and low-level security officers under their direct command and control have operated and continue to operate ultra vires, i.e., outside of and beyond the constraints of statutory law or precedent or government regulations or treaties and agreements.

478.    To ensure the suppression of Iraqi Kurdish citizens, and family members including their sons and daughters, where they live etc., who are deemed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, Barzani family members and family members by marriage, to be a real or potential threat to Barzani influence and ideological and commercial control and the Barzani Continuing Criminal Enterprise, are still today systematically targeted, often using proprietary American technology, that they specifically tailor and deploy to surveil, torture and in other ways suppress dissent and for human rights abuse.  These activities include, but are not limited to, arbitrary arrest, detention, harassment, inhumane

217

treatment, mental and physical torture, and death resulting from torture and other abuse, and instill

a reasonable fear of reprisals against themselves and members of their families. The resulting

reasonable fear of reprisals against themselves or members of their families residing in Kurdistan

and the impossibility of safely conducting investigation and discovery in Iraqi Kurdistan, serves

as an insurmountable deterrent to obtain any form of legal redress.

479.   Parallel and complementary to technology abuses, Defendants Masoud Barzani,

Masrour Barzani, Waysi Barzani, and their agents, representatives, and Barzani family members

and family members by marriage, regularly employ, retain, contract, and otherwise engage recent

former diplomatic, administrative, intelligence, and military personnel of the United States

Government who were trained by the United States Government and thus knowledgeable as to its

inside workings, policies, procedures, rules, tactics, and secrets, who thus become collaborative,

complicit, and conspirator agents and representatives in the Barzani Continuing Criminal

Enterprise to further, expand, and profit from its illicit continuing criminal enterprise.

480.   Defendants furthered, facilitated, purposefully authorized, participated in, and

ratified alleged realistic and impending threat of direct injury, abuses, and all tortious conduct in

all factual allegations herein, with knowledge and intent, and who's activities were the proximate

cause of Sidqi Bradosti's injury in fact. Sidqi Bradosti as an incarcerated prisoner was in no

position or capacity to evade or avoid injury.

481.   In a clear and premeditated miscarriage of and denial of justice against a citizen of

the United States, and with an astounding paucity of credible evidence, criminal charges against

Sidqi Bradosti were fabricated and material facts were knowingly misstated, ignored, or hidden in

an orchestrated malicious prosecution, abuse of process, misrepresentation, and deceit, and in a

culture of sustained impunity at the command of Defendants Masoud Barzani, Masrour Barzani

and Waysi Barzani as part of Defendants' criminal enterprise object to maintain power, unlawfully enrich themselves, eliminate commercial competition, avoid appropriate accountability, and sow fear, that is not imaginary or wholly speculative, in the hearts of opponents and perceived potential opponents including precipitating a retaliatory spiral, to enrich themselves and provide a means to harm Plaintiffs, all of which are criminal activities in violation of 18 U.S.C. §§ 242 and 2.

482.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their direct subordinates operating under their command and control, have, contrary to Iraq law and Defendant Iraqi Kurdistan Regional Government law and without lawful authority, repeatedly, frequently, nefariously, and extrajudicially used the force of Defendant Iraqi Kurdistan Regional Government to target and imprison their real and perceived political, commercial, and financial opposition, as they have done to Sidqi Bradosti, perpetrating on him human rights violations, especially violations of privacy, freedom of expression, freedom of association, and freedom of liberty, and physical abuse in the form of unlawful arrest and detention.

483.   While deprived of individual liberty and incarcerated by and at the direction of Defendants, and as a direct and proximate result of Defendants' breach of official duties, Sidqi Bradosti suffered bestial, brutish, and barbaric action injuries, including pain and suffering, which required medical treatment, and a resultant prolonged detrimental effect on his physical and mental health.

484.   Sidqi Bradosti has long suffered from epilepsy, predating his incarceration. At the beginning of his incarceration, and despite his blatantly ignored pleas and pleas by his family, Sidqi's essential prescription medications were knowingly, intentionally, and sadistically withheld from him at the direction of Defendants.  Sidqi's arrest and incarceration on fabricated charges, with inclusion of fictitious evidence and not supported by the facts of their investigation, was

219

directed by Defendant, Masrour Barzani, and carried out by Defendant, Waysi Barzani, head of Defendant Iraqi Kurdistan Regional Government intelligence; Defendant Dilshad Yousef, of Defendant Iraqi Kurdistan Regional Government security, and Ismat Argoshi, of Defendant Iraqi Kurdistan Regional Government security. These individuals, as well as other employees and agents operating under their direction, engaged in a systematic fabrication accompanied by prejudicial outside influences, preventing a fair and orderly administration of justice, in order to obtain a conviction of an American citizen, thereby knowingly depriving him of all his Constitutional and legal rights accorded by laws of the Republic of Iraq, Defendant Iraqi Kurdistan Regional Government, and the United States, by the law of nations, and by international treaty and convention.

485. The arrest of Sidqi Bradosti caused severe and traumatic emotional and psychological harm and distress to his spouse, suffering from the agonizing uncertainty of not knowing whether her husband was dead or alive, and to their three children, each a citizen of the United States of America, who were terrified and overcome by fear and paranoia which is not imaginary nor wholly speculative. See *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Upon Sidqi's arrest, Defendant Ismat Argoshi, with subordinate colleagues, acting as part of Defendants' criminal enterprise to gain wealth and maintain power ordered his subordinates to go to the Bradosti residence, where, by use of force and illegal entry, and having the apparent cloak of authority over the Bradosti household, and using foreboding, inflammatory, and threatening phraseology, pillaged and violently destroyed its furnishings, removed money and personal items, causing members of the Bradosti family to fear, which is not imaginary nor wholly speculative, for their lives and suffer from immense mental and emotional dread and terror. Haza Mustafa Mahmood Bradosti, spouse of Sidqi Bradosti, suffered horrific violation and deprivation of

220

dignity, a profound sense of injustice and pain, that has caused her immense physical and emotional trauma that she will carry for the rest of her life.

486.  Sidqi Bradosti was incarcerated in the summer of 2019 in a jail operated by the Kurdistan Democratic Party and held against his will and inhumanely treated and tortured during the time he was incarcerated in the perilous Asayish jail in Erbil, Kurdistan, Iraq – a facility responsible for the custody, control, care and safety of inmates, including "pretrial detainees" (people who have been detained following arrest, but have not yet been convicted of committing an offense).

487.  In its *2020 Country Reports on Human Rights Practices: Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, the United States Department of State published a report supporting Sidqi Bradosti's account of his arrest:

> *"Impunity effectively existed for government officials and security force personnel, including the Iraqi Security Forces, Federal Police, Popular Mobilization Forces, and certain units of Kurdistan Regional Government Asayish internal security services."*

> *"There were numerous reports of arbitrary arrest or unlawful detention by government forces, including the ISF [Iraqi Security Forces], NSS [National Security Service], PMF [Popular Mobilization Forces], Peshmerga, and Asayish."*

> *"Officials in federal Iraq and the IKR [Iraqi Kurdistan Region] frequently engaged in corrupt practices with impunity."*

The Asayish, reporting directly to and commanded by Defendants Masrour Barzani and Waysi Barzani, are responsible for maintaining the internal security of the Defendant Iraqi Kurdistan Regional Government alongside the Defendant Iraqi Kurdistan Regional Government police, also controlled, commanded, and directed by Defendants Masrour Barzani and Waysi Barzani as employees and agents of the Defendant Iraqi Kurdistan Regional Government.

221

488.    The courts of the Defendant Iraqi Kurdistan Regional Government have no judicial independence, conduct themselves in a manner incompatible with the role of courts in the administration of justice, are puppet operatives of the corrupt, tyrannical, and dictatorial Barzani regime which controls all the levers of power, and serves the criminal enterprise operated by Defendants to inhumanely treat, torture, kill, and bring fear, which is not imaginary nor wholly speculative, and coercion to silence and eliminate all opposition – all with the object of obtaining money and wealth and power by unlawful means, and provide the financial capacity to harm the Plaintiffs.

489.    A senior official of the U. S. Department of Defense, in a published written document, reported "The highly centralized judicial system under the two KRG Ministries of Justice (MOJ) was not independent and lacked a constitutional court and uniform legal code."

490.    In its *2022 Country Report on Human Rights Practices: Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, the United States Department of State report supports Sidqi Bradosti's account of the continuing actions by Defendants to maintain power and gain wealth:

> *The Kurdistan Judicial Council is legally, financially, and administratively independent from the KRG Ministry of Justice, but KRG senior leaders reportedly influenced politically sensitive cases. The IKR's strongest political parties, the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK) also reportedly influenced judicial appointments and rulings.*
>
> *Corruption or intimidation reportedly influenced some judges in criminal cases at the trial level and on appeal at the Court of Cassation.*
>
> *Numerous threats and killings by sectarian, tribal, violent extremist, and criminal elements impaired judicial independence.*

222

*... Defendants and their attorneys were not always granted access to evidence, or government officials demanded a bribe in exchange for access to the case files. In numerous cases judges reportedly relied on forced or coerced confessions as the primary or sole source of evidence in convictions, without the corroboration of forensic evidence or independent witness testimony. ...*

*...Although the constitution prohibits torture and forced confessions, there is no law setting out the legal conditions and procedural safeguards to prevent torture. Torture in jails, detention facilities, and prisons was often hidden from effective legal oversight. Moreover, the types of conduct that constitute torture are not legally defined under the law, and the law gives judges full discretion to determine whether a defendant's confession is admissible, often without regard for the way it was obtained. Courts routinely accepted forced confessions as evidence, which in some ISIS-related counterterrorism cases was the only evidence considered. Numerous reports from local and international NGOs indicated government officials employed torture and other cruel, inhuman, or degrading treatment or punishment. Federal Police, the PMF, and certain units of Kurdistan Regional Government (KRG) Asayish internal security services operated with impunity.*

*Human rights organizations reported both Interior Ministry and Defense Ministry personnel tortured detainees. According to government forensics officials, some victims showed signs of extensive beatings, in addition to bone fractures. Local NGOs reported deaths at pretrial detention facilities, deportation prisons, and prisons were due to the continuation of systematic torture and the poor conditions in detention centers.*

*On March 21, the GCHR issued a report documenting dozens of allegations of torture of detainees including through beating, hanging, and suffocation between 2019 and year's end. In a September report, the GCHR alleged "systematic perpetration of torture in places of detention [and] the fostering of a culture of impunity through a reliance on forced confessions and a lack of effective investigations into allegations of torture."*

*In April the UN Committee against Torture (CAT) reported in its second periodic report the committee received reports "indicating that persons in custody, including in the facilities under the authority of security forces and facilities reportedly unknown to detainees' families, were subjected to torture or ill treatment, particularly during the investigation stage of the proceedings." The committee also observed that the existing mechanisms to receive*

> *and investigate complaints of torture were "not leading in practice to meaningful accountability for perpetrators."*
>
> *Prison and detention center conditions were harsh and occasionally life threatening due to food shortages, gross overcrowding, physical abuse, inadequate sanitary conditions and medical care, and the threat of communicable illnesses.*
>
> *In May the United Nations Committee against Torture reported its concern "about continued reports of torture or ill treatment in detention facilities"*
>
> *Human rights organizations reported the ISF, among them the Federal Police, the NSS, the PMF, as well as the Peshmerga and Asayish security forces in the Kurdistan Region, frequently ignored the law.*
>
> *According to the IHRCKR, some detainees remained in KRG internal security service facilities for extended periods even after court orders were issued for their release.*
>
> *Reports from international human rights groups stated government forces, including Federal Police, the NSS, the PMF, and Asayish, abused prisoners and detainees...*

491.    In the United Nations High Commissioner for Human Rights report entitled *Human Rights and Freedom of Expression: Trials in the Kurdistan Region of Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, an evidence-based analysis of the administration of justice in Defendant Iraqi Kurdistan Regional Government documented and observed the following:

> *"...a consistent lack of respect for the legal conditions and procedural safeguards necessary to guarantee fair judicial proceedings before an independent and impartial tribunal." "In breach of the principle of legality, the criminal law provisions applied in these cases were formulated in broad and imprecise terms, leading to inconsistent interpretation of these provisions by the courts and a lack of clarity relating to the specific charges. In addition, the prosecution failed to clearly identify which specific underlying alleged acts formed the basis of the criminal charges, nor did it provide concrete evidence to substantiate those charges.*

*Although at least eight of the accused submitted in court that their confessions had been extracted under torture, the trial judge dismissed these submissions without further examination. Safeguards in place to prevent torture, including medical exams, access to defence lawyers, video-recording of interrogation, and processes for reporting torture and other ill-treatment, were not respected. Systematic barriers prevented defence lawyers from preparing an effective defence. All were denied regular access to their families. Additionally, various actions by the authorities - which could be perceived as attempts to unduly influence the outcome of the judicial proceedings - were observed."*

*"...documented several statements by Kurdistan Regional authorities that may amount to undue influence in the judicial process, including over the outcome of any subsequent appeal proceedings. Such statements bear the risk of undermining the presumption of innocence, which is fundamental to the protection of human rights."*

*"The OHCHR/UNAMI findings highlight a number of human rights concerns in relation to the trials against these individuals, placing the accused at a serious disadvantage, and casting considerable doubt on the overall fairness and legality of the proceedings. All were charged with serious crimes, based on broad and imprecise provisions without sufficient reasoning with regards to the judgments of the court and after failing to identify or sufficiently substantiate the underlying individual conduct."*

*"In addition, the initiation of legal proceedings against persons who had questioned the proceedings and outcome, and disregarding complaints made to the authorities, including in court, about violations of procedural safeguards, in effect deters those, who are denied their fair trial rights, from seeking justice and an effective remedy."*

These documented and impartial United Nations observations are consistent with the improper judicial treatment accorded Sidqi Bradosti.

492.    In the case of Sidqi Bradosti's torture while incarcerated, the judge of the Defendant Iraqi Kurdistan Regional Government court overseeing Sidqi's case, having a duty under the laws of Iraq and Defendant Iraqi Kurdistan regional Government to promote confidence in the independence, integrity, and impartiality of the judiciary and an obligation over provision of due

process, but the judge was deprived of authority by Defendants Masrour Barzani and Waysi Barzani to decide the issues before the court, unavoidably and irreparably tainting these proceedings. This judge cautiously came to the Bradosti home and, acknowledged the judicial misconduct, and in ascribing brazen malintent said that he was taking orders from the Barzani's, who had clear and present disqualifying interests and little interest in complying with the terms of international treaties, Iraq law or Defendant Iraqi Kurdistan Regional Government law that did not further the interests of the Barzani Continuing Criminal Enterprise and which were unconstitutional, illegal, and ethically improper for this court and disrupting the administration of justice, stating to family members present in a stunning factual admission: "I was forced to do this by the Barzani's," acknowledging orders issued by Masrour Barzani, Waysi Barzani, and Ismat Argoshi which were contemptuous, disrespectful, and constitute a knowing disobedience of judicial rules and duty of truthful inquiry of the tribunal – a calculated abolishment of the Court's impartiality and independence, and purposeful political meddling with sweeping implications of corruption and deceit, and a willful abrogation of Sidqi Bradosti' rights under Iraq and Defendant Iraqi Kurdistan Regional Government law and international treaties, constituting a self-admission that the Court's posture in this matter was adversarial, not adjudicatory.

493.     This judicial conduct in Sidqi Bradosti's case was not merely the appearance of impropriety; this conduct was and is actual judicial impropriety, designed to settle this matter in collaboration with and at the direction and command of a coordinate branch of government. There was no presumption of innocence, no provision of due process, and was prejudicial to the administration of justice and contrary to law. This was an emasculation of judicial power by Defendant Masrour Barzani, a commanded judicial misconduct, and prejudicial to the administration of justice. In the words of the United States Supreme Court in *Mistretta v. United*

*States,* 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), allowing the reputation of the Judicial Branch to be "borrowed by the political Branches to cloak their work in the neutral colors of judicial action." Judges in Defendant Iraqi Kurdistan Regional Government are employees of the Defendant Iraqi Kurdistan Regional Government, controlled absolutely by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.

494. It was impossible for Sidqi Bradosti, a citizen of the United States of America, to receive a fair and impartial trial, and no just outcome was available to him. The entire judicial proceeding was tainted by a lack of Iraq and Defendant Iraqi Kurdistan Regional Government law-based procedural guarantees, by the close internal cooperation of the Defendant Iraqi Kurdistan Regional Government ministerial ecosystem, and by legally improper influences, including assaulting the integrity of the judiciary by a corrupted legal establishment weaponized by Defendant Masoud Barzani and by Defendant Masrour Barzani who had and has a duty of his Prime Ministerial of Defendant Iraqi Kurdistan Regional Government office to the law and to the administration of justice. This unlawful weaponization had and has the purpose of pronouncing and condemning Barzani's political opponents, which had a harmful chilling effect on witnesses and adversely affected the fair administration of justice in Sidqi Bradosti's prosecution. Prosecution was in bad faith, nefarious, and a representative instance of prosecutorial misconduct. Sidqi Bradosti's rights were violated. Having no concern for justice or their compliance with law or codes or judicial standards, at the direction of Defendants Masrour Barzani, Waysi Barzani, and their subordinates, particularly Ismat Argoshi and Dilshad Yousef, Defendants knowingly falsified and made a false entry in a record and document with the intent to impede, obstruct, and influence the investigation and adjudication of the matter, and Sidqi Bradosti was knowingly prosecuted by the Defendant Iraqi Kurdistan Regional Government, under the command and control of

227

Defendant Masrour Barzani, for crimes he did not commit.

495.    Sidqi Bradosti continues to suffer from the long-term psychological effects of his torture.

496.    Notwithstanding the repeated pleas by Sidqi Bradosti and his wife and family, and by U.S. Government diplomatic officials, there was never an official misconduct investigation by any agency or office of the Defendant Iraqi Kurdistan Regional Government.

497.    Defendant Masrour Barzani, having resident permanent alien status granted by the United States Government, and at the time Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, as a condition of said status known to him has a legal obligation of United States law and said permanent alien status to obey and venerate all laws and Constitutional rights of the United States and its citizens – something fully and clearly known to Defendant Masrour Barzani as a prerequisite, provision, and requirement of permanent alien status.  Defendant Masrour Barzani's autocratic actions and commands in the arrest, incarceration, trial, and imprisonment of Sidqi Bradosti, none of which were authorized by Iraq law or regulation or by Defendant Iraqi Kurdistan Regional Government law or regulation or treaty or international law, were and are a brazen lack of respect for the U.S. Constitution and a knowing abandonment, rejection, and denial of those rights of American citizenship of Sidqi Bradosti and was deliberate and premeditated civil rights intimidation against a fellow American which includes the right of a pretrial detainee to be free from a jail official's deliberate indifference to his serious medical needs.  As U.S. Citizenship and Immigration Services of the U.S. Department of Homeland Security clearly declares: "As a permanent resident, you are required to obey all laws of the United States and localities."  Defendant Masrour Barzani, a permanent resident of the United States, knowingly abandoned,

rejected, and intentionally and purposefully, and to further the Barzani Continuing Criminal Enterprise forsook his duties of permanent resident alien status to faithfully promote the rule of law, prevent executive overreach, protect due process and equal protection, and ensure to Sidqi Bradosti the individual rights guaranteed under the Constitution and laws and treaties of the United States. Defendant Masrour Barzani had a duty of care which he knowingly and intentionally abrogated in order to further the ends of the Barzani Continuing Criminal Enterprise and to injure Sidqi Bradosti.

498.   A report by Amnesty International describes conditions of prisons in Iraq as overcrowded, lacking requirements to meet basic needs, steeped with nauseating, pervasive, and inescapable aromas of human waste, and have poor medical facilities, resulting in the prevalence of diseases such as scabies, allergies, skin infections and other conditions:

> *"Detainees had been blindfolded, stripped and suspended by their wrists or hung in contorted stress positions for hours at a time. In addition to being subjected to electric shocks to the genitals, ears, tongue and fingers; beaten on the soles of their feet (falaqa), whipped and beaten with canes, hosepipes and metal rods; burnt with cigarettes or having their hands pierced by electric drills or having their toe or fingernails ripped out."*

499.   The Independent Human Rights Commission Kurdistan Region (IHRCKR), at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reported Defendant "IKR [Iraqi Kurdistan Region] correctional centers suffered from long-term problems of overcrowding, inadequate water, sanitation, and hygiene facilities, use of violence during preliminary detention, and outdated infrastructure at women's and juvenile centers. Limited medical staff was unable to provide adequate medical services to all prisoners," including Sidqi Bradosti.

500.    The United Nations Committee Against Torture, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reported to the Defendant Iraqi Kurdistan Regional Government and to the world its concern "about continued reports of torture or ill treatment in detention facilities" [operated by Defendant Iraqi Kurdistan Regional Government or its partners] and observed the "existing mechanisms to investigate the acts of torture and ill treatment committed by officials do not effectively hold the perpetrators to account." Both local and international human rights organizations asserted judges frequently failed to investigate credible allegations that security forces tortured terrorism suspects and often convicted defendants based solely on both overtly and covertly coerced confessions.  In addition, despite their concerns being raised, authorities ignored physical signs of torture, and the complaints procedures appeared to be neither fair nor effective.  Many detainees chose not to report such mistreatment due to a lack of trust or fear, that is not imaginary or wholly speculative, of reprisals.

501.    At the direction of Defendants Masrour Barzani and Waysi Barzani, and implemented by subordinates Defendants Ismat Argoshi and Dilshad Yousef and others, Sidqi Bradosti was inhumanely treated and medically tortured while imprisoned.  It was and is widely known in Erbil and was and is fully known to the Barzani's and their subordinates Defendants Ismat Argoshi and Dilshad Yousef and others, including Asayish jailers, that Sidqi Braqdosti suffers the acute chronic noncommunicable disease of epilepsy, a severe neurological disorder of the brain characterized by repeated and potentially fatal seizures.  Yet under the direction of Defendant Masrour Barzani, while acting under imagined color of law, but without legal authority of Iraq or Defendant Iraqi Kurdistan Regional Government, and while aiding and abetting one another, these individuals willfully, directly and indirectly, deprived Sidqi of all medications that

230

are required for an epilepsy sufferer and of the right, protected and secured by the Constitution and

laws of the United States, to due process of law, which includes the right of a pretrial detainee to

be free from a jail official's deliberate indifference to his serious medical needs.

502.    Sidqi Bradosti's family exceedingly feared, which is not imaginary nor wholly

speculative, that as a result of his inhumane imprisonment he might die.  This vicarious suffering

in family members, itself a recognized type of psychological torture, left permanent mental damage

to victims.

503.    The National Library of Medicine of the U.S. National Institutes of Health, an

agency of the United States Government, characterizes the health impacts of traumatic events:

> *"In general, those exposed to a traumatic event show increased*
> *rates of acute stress disorder, posttraumatic stress disorder (PTSD),*
> *major depression, panic disorder, generalized anxiety disorder, and*
> *substance use disorder.*
>
> *"The childhood experience of traumatic events induces immediate*
> *biological and psychological reactions, some of which may persist*
> *for an extended period."*
>
> *"Youth exposed to traumatic events also can develop depression,*
> *other anxiety disorders, substance use disorders, and problems with*
> *school performance."*
>
> *"This fear can spread rapidly and is not limited to those*
> *experiencing the event directly – others that are affected include*
> *family members of victims and survivors, and people who are*
> *exposed through broadcast images. Psychological suffering is*
> *usually more prevalent than the physical injuries…"*

504.    Missed or withheld medicines can trigger seizures and death in people with both

well-controlled and poorly-controlled epilepsy.  Seizures can happen more often than normal, be

more intense or develop into long seizures called status epilepticus.  Status epilepticus is a medical

emergency and can lead to death if the seizures are not stopped.  If seizures cannot be stopped or

repeated seizures occur one right after another, permanent injury or death can occur.  People with

epilepsy can also die from problems that occur during or after a seizure, such as inhaling vomit. Death can result. The withholding of needed medicine and the resulting fear, that is not imaginary or wholly speculative, was inhumane treatment and torture of Sidqi Bradosti, resulting in prolonged bodily injury all in violation of 18 U.S.C. §§ 242 and 2.

505.   The premeditated and malicious torture of Sidqi Bradosti by Defendants, as directed by Masrour Barzani and his subordinates, particularly Ismat Argoshi and Delshat Najar, resulting in creating a state of helplessness, psychological regression, and depersonalization, continued for months until unremitting and insistent intervention efforts by diplomatic officials of the U.S. Embassy were finally successful in arranging for Sidqi Bradosti to receive his essential life-saving prescription medications.

506.   Categories of psychological torture include debilitation, isolation, implicit and expressed threats, degradation, pharmacological manipulation, food, water, and sleep deprivation, no privacy, and poor ventilation. Defendants repeatedly and continually subjected Sidqi Bradosti to each of these categories of psychological torture, where the pervasive odor of fear, that is not imaginary or wholly speculative, and doubts and the specter of dying clung to him like a constant sharp headache, with a persistent psychological system of pressure akin to combat fatigue.

507.   During his imprisonment, Sidqi was not allowed visitors. No family members or physicians were allowed to see him. Despite concentered and relentless efforts of the Deputy United States Consul General in Erbil to obtain proper treatment, care, and familial visitations, all visitations were denied by the Defendant Iraqi Kurdistan Regional Government at the direction of Defendants Masrour Barzani, Waysi Barzani, Dilshad Yousef, and Ismat Argoshi. Defendants ordered Sidqi Bradosti be deprived of familial comfort and Defendants' orders were obeyed by the jailers.

508.    Section 2340A of Title 18, United States Code, prohibits torture committed by public officials under color of law against persons within the public official's custody or control. Torture is defined to include acts specifically intended to inflict severe physical or mental pain or suffering. (It does not include such pain or suffering incidental to lawful sanctions.) The statute applies only to acts of torture committed outside the United States. There is Federal extraterritorial jurisdiction over such acts whenever the perpetrator is a national of the United States. Defendant Masrour Barzani, under whose command, control, and direction all torture of Sidqi Bradosti occurred and was allowed to occur, is a United States person.

509.    Under the direction and command of Defendant Masrour Barzani, his subordinates Defendants Ishat Argoshi and Dilshad Yousef, acting as private judicial enforcement on behalf of Defendants Masrour Barzani and Waysi Barzani, physically beat Sidqi Bradosti severely.

510.    The Government of the Republic of Iraq became a signatory nation to The International Covenant on Civil and Political Rights with its ratification on 25 January 1971 and which became effective in Iraq on 23 February 1976. In the matter of the arrest and trial and torture of Sidqi Bradosti, a citizen of the United States of America, the relevant provisions of several Articles were knowingly and willfully, directly and indirectly, desecrated, disobeyed, and disregarded by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their agents:

> Part 2, Article 2
> 3. Each State Party to the present Covenant undertakes:
>
> (a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;
>
> (b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided

233

*for by the legal system of the State, and to develop the possibilities of judicial remedy;*

*Article 7*
*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.*

*Article 9*
*1. Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.*

*3. Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgment.*

*4. Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.*

*Article 14 (in part)*
*1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law.*

*Article 17*
*1. No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation.*

*2. Everyone has the right to the protection of the law against such interference or attacks.*

Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their associates, proceeded with their criminal activities to retain power and gain money regardless of who their victims were,

including victims who were citizens of the United States of America. Defendant Masrour Barzani lead these criminal activities against a fellow national of the United States of America in violation of his known legal obligation which resulted from his permanent resident status.

511.    At the pre-trial, trial, and post-trial stages, at the direction of Defendants Masrour Barzani and Waysi Barzani, Sidqi Bradosti was incarcerated in inhuman and degrading conditions by their immediate subordinate agents Defendants Ismat Arogoshi and Dilshad Najar in the Erbil jail operated by the Kurdistan Democratic Party, which Defendants Masrour Barzani and Waysi Barzani control and govern and have directive power and in which appropriate security procedures and protective orders were absent. In its *2022 Country Reports on Human Rights Practices: Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, the United States Department of State described jail conditions:

> "*Prison and detention center conditions were harsh and occasionally life threatening due to food shortages, gross overcrowding, physical abuse, inadequate sanitary conditions and medical care, and the threat of communicable illnesses.*
>
> *The Iraqi War Crimes Documentation Center released a report detailing the deaths of 49 inmates between January 2021 and August that the center concluded resulted from "torture and medical negligence" in federal prisons. The report alleged the government held thousands of detainees in "inhumane conditions," including "overcrowded and unsanitary cells," often due to "revenge and sectarian motivation." The report stated the lack of "sanitary conditions" and cells' "high temperature and humidity '' directly harmed inmates' health.*
>
> *The Independent Human Rights Commission Kurdistan Region (IHRCKR) reported IKR correctional centers suffered from long-term problems of overcrowding, inadequate water, sanitation, and hygiene facilities, use of violence during preliminary detention, and outdated infrastructure at women's and juvenile centers. Limited medical staff was unable to provide adequate medical services to all prisoners.*"

235

512.    In the kangaroo court proceeding on bogus criminal charges against Sidqi Bradosti in the Defendant Iraqi Kurdistan Regional Government court of Erbil, Kurdistan, Bradosti was not accorded "a fair and public hearing by a competent, independent, and impartial tribunal," and in furtherance of their scheme, members of the enterprise harassed Bradosti, intimidated him, and solicited him to falsely confess to crimes that he did not commit, prejudicing the administration of justice.

513.    The courts of the Defendant Iraqi Kurdistan Regional Government lack judicial independence and fail to act as an independent institution, as affirmed by Iraq's Democracy and Human Rights Development Center in concert with the United States Government's National Endowment for Democracy, an agency of the United States Government, declaring them to be fraught with "political and executive power intervention in the judiciary." The judiciary system works as subordinate to the executive power. The judiciary in the Defendant Iraqi Kurdistan Regional Government is not financially independent, as the budget is allocated by the regional cabinet, not by the Judiciary Council as required by the Iraq Judiciary Law.

514.    A cable of the U.S. Department of State, originating through the U.S. Embassy in Baghdad, Iraq, affirms and acknowledges the absence of judicial independence in Defendant Iraqi Kurdistan Regional Government: "The parties' Soviet-style political system in which the formal government, including the judicial and legislative branches, is subordinate to the party robbed both KRGs of independent oversight."

515.    The United States Department of State in its *2022 Country Reports on Human Rights Practices: Iraq*, at a time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, stated: "The constitution and law provide for the right to a fair and

236

public trial, but the judiciary did not enforce this right for all Defendants." "KRG senior leaders reportedly influenced politically sensitive cases. The IKR's [Iraqi Kurdistan Regional Government] strongest political parties, the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK), also reportedly influenced judicial appointments and rulings." The Erbil court sitting in judgment of Sidqi Bradosti lacked judicial independence and freedom from "political and executive power intervention" by Masoud Barzani, Masrour Barzani, Waysi Barzani (collectively the Barzani's) and their subordinate agents and representatives.

516.    The sovereign nation of the Republic of Iraq, of which the Defendant Iraqi Kurdistan Regional Government is a subdivision regional and subordinate governate and instrumentality and from which the Defendant Iraqi Kurdistan Regional Government derives all its subordinate governing authorities, is, as of July 7, 2011, a signatory nation to The Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), at the time Defendant Masoud Barzani was President of Defendant Iraqi Kurdistan Regional Government and Defendant Masrour Barzani was General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistan Regional Government Intelligence and Security Agency (the successor agency to Parastin). In the matter of the arrest and incarceration torture of Sidqi Bradosti, which prolonged torture occurred in the jail operated by the Kurdistan Democratic Party imperiously and tyrannically controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, these (and other) relevant provisions of several Articles were knowingly and willfully, directly and indirectly, violated by the Barzani's and at their direction by their agents:

> *Part 1, Article 1*
> *For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining*

*from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.*

*Article 2.*
*1. Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.*

*2. No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.*

*3. An order from a superior officer or a public authority may not be invoked as a justification of torture.*

*Article 16.*

*1. Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article I, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. In particular, the obligations contained in articles 10, 11, 12 and 13 shall apply with the substitution for references to torture of references to other forms of cruel, inhuman or degrading treatment or punishment.*

*2. The provisions of this Convention are without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion.*

517.    *The International Guidelines on Human Rights and Drug Policy*, developed by United Nations agencies UNDP, the Joint United Nations Programme on HIV/AIDS (UNAIDS), the Office of the United Nations High Commissioner for Human Rights (UNHCR) and the World Health Organization, declares:

*II. Obligations arising from human rights standards*

238

*6. Freedom from torture, cruel, inhuman, or degrading treatment or punishment:*

*The withholding of drugs from those who need them for medical purposes, including for drug dependence treatment and pain relief, is considered a form of torture. Government failure to ensure access to controlled medicines for pain relief may also constitute cruel, inhuman, or degrading treatment or punishment, where, for example, a person's suffering is severe and meets the minimum level of severity under the prohibition against torture and ill-treatment; where the State is, or should be, aware of the person's suffering, including when no appropriate treatment was offered; and where the State failed to take all reasonable steps to protect the person's physical and mental integrity.*

518.   Sidqi Bradosti was tortured in a sustained manner and in several ways in clear violation of international law. First, as a person publicly known to suffer from epilepsy and its accompanying recurrent unprovoked seizures, some of which seizures can be very serious, essential medication was withheld from Sidqi Bradosti, and complaints of pain were ignored. Seizures can disrupt the normal electrical brain pattern by sudden and synchronized bursts of electrical energy that may briefly affect consciousness and which can result in permanent injury, damage, or death.

519.   Sidqi Bradosti's repeated pleas over a prolonged time period for epilepsy medication and treatment were ignored and denied by Defendants Masrour Barzani and Waysi Barzani and their agents and representatives. Jail officers, acting as officials of the Defendant Iraqi Kurdistan Regional Government and the Kurdistan Democratic Party and under the direction and control of Defendants Masrour Barzani and Waysi Barzani, were aware or should have reasonably been aware of Plaintiff Bradosti's suffering, including that no appropriate treatment or medication was offered or accorded or provided; and that the Defendant Iraqi Kurdistan Regional Government and its complementary parallel Kurdistan Democratic Party failed to take any and all reasonable steps to protect Sidqi Bradosti's physical and mental integrity. Sidqi Bradosti's mental health

deteriorated over the course of his incarceration.

520.    The severity of purposefully denied medications, as suffered by Sidqi Bradosti at the Defendants' direction, cannot be overstated, and may cause death.  The U.S. Centers for Disease Control and Prevention, an agency of the United States Government, lists missed medication as the foremost reason people with controlled seizures have breakthrough seizures (sudden, unexpected seizures).  Missing medication can cause seizures to occur more often or to be more intense, and lead to death.

521.    The Epilepsy Foundation considers missed medications as dangerous, and asserts:

> *"Stopping seizure medication without your doctor's advice is dangerous. Missing doses of seizure medicine is the most common cause of breakthrough seizures. Missed medicines can trigger seizures in people with both well-controlled and poorly controlled epilepsy. Seizures can happen more often than normal, be more intense or develop into long seizures called status epilepticus. Status epilepticus is a medical emergency and can lead to death if the seizures aren't stopped. Missing doses of medicine can also lead to falls, injuries and other problems from seizures and changes in medicine levels."*

522.    Nothing in the medical care and attention of Sidqi Bradosti while incarcerated by the Kurdistan Democratic Party met accepted standards of prisoner medicinal care.  Sidqi Bradosti suffered from gross intentional medical negligence, intentionally caused by Defendants Masoud Barzani and Masrour Barzani and their directed subordinates.

523.    Human Rights Watch described prison conditions as "extremely overcrowded, so that no detainee can lie down to sleep.  Because of the overcrowding and lack of proper ventilation, the makeshift prison cells are overheated, with an incredible stench."

524.    Medical science recognizes that olfactory stimulation – smells – can trigger seizures in epilepsy patients.  Sidqi Bradosti, helpless to shield himself and trying to tune out the hell of Kurdish imprisonment, was knowingly engrossed, immersed, and inflected twenty-four hours

daily for two years in teeming, fetid, fusty, malodorous, foul smelling stench of human excrement, human urine, and human sweat, and the din of noise and commotion saturated with the sounds of prisoner agony and desperate cries as political prisoners were being beaten, raped, and interrogated by the Defendants Masrour Barzani's and Waysi Barzani's agents of tyranny, each aggravated and worsened by the oppressive Iraq heat, and all known triggers for epileptic seizures.

525.   Sidqi Bradosti is an American citizen and as such was guaranteed such proper treatment by treaty.  Yet, medical intervention efforts made in behalf of and for Sidqi Bradosti by diplomatic representatives of the Government of the United States of America assigned to the Deputy United States Consul General in Erbil, Kurdistan, Iraq, were repeatedly denied by agents of Defendants Masrour Barzani and Waysi Barzani, operating under their direct command and control, and their subordinate representatives of the Defendant Iraqi Kurdistan Regional Government and of the Kurdistan Democratic Party.  After substantial delays, it was only upon vigorous and repeated appeal and direct intervention by diplomatic representatives of the Government of the United States of America based at the Embassy of the United States of America in Baghdad that permission was granted by prison officers for Sidqi Bradosti to finally and belatedly receive his essential prescribed epilepsy medications.

526.   Compounding torture-effected stress, the long-term consequences of status epilepticus, especially when intentionally unmedicated, are well known to include permanent injury or excessive death of nerve cells (neurons) in the brain and permanent alteration of the neuronal networks in the brain.  The resulting brain damage can have long-term effects on behavior, can impair ability to learn and can cause intellectual disability.

527.   Sidqi Bradosti was subjected to multiple forms of sustained mental, psychological, and emotional torture, sensory deprivation, and life-threatening stress as the Defendants Masrour

241

Barzani and Waysi Barzani directed officials to destroy Sidqi Bradosti's public and respected and established family reputation, vital in Kurdish culture. Defendants publicly and repeatedly defamed Sidqi by fabricated accusations of providing arms to terrorists and aiding an agent assassin of the Turkish Kurdistan Workers' Party (PKK).

528.    In a planned, calculated, and purposeful effort and with no legitimate purpose other than to publicly humiliate and destroy Sidqi Bradosti's respected reputation in the Iraqi Kurdistan region and among the Kurdish people, Defendant Masrour Barzani directed subordinates Defendants Ismat Argoshi, and Dilshad Yousef to walk Sidqi Bradosti, as an arrestee, through a public area so he could be seen and photographed by the media, and to present his face and arrest story on Defendant Iraqi Kurdistan Regional Government-controlled television. The intentional public humiliation committed against Sidqi Bradosti by the Barzani Continuing Criminal Enterprise  is another example of intentional public humiliation acts committed by the Barzani Continuing Criminal Enterprise against Plaintiff, Maki Revend – including false allegations.

529.    Defendants Masrour Barzani and Waysi Barzani and their subordinates willfully and intentionally deprived Sidqi Bradosti of individual liberty, restrained his physical movement, physically abused him, intentionally and recklessly inflicted him with emotional distress, and threatened him with death, all of which acts were expected by Defendants to cause substantial emotional and lasting distress.

530.    A medically documented seizure precipitating factors for patients with epilepsy are stress, including the pervasive and debilitating sounds of racking coughs and agonizing screams and the ever-present wrenching stench of body fluids, misery, and despair while incarcerated. Being imprisoned in an abnormal environment and being tortured induced stress for Sidqi Bradosti in multiple medically devastating, lasting, and irreversible forms: psychological (isolation, sensory

242

deprivation, sensory overload, sleep deprivation, temporal disorientation); psychophysiological (thermal, stress positions), and psychosocial (cultural humiliation), which resulted in a systemic cluster of untreated health extremis.

531.    As a result of the unlawful and wrongful actions of Defendants Masrour Barzani and Waysi Barzani and their subordinates, Sidqi Bradosti suffers long-term effects of being deprived by his KDP jailers of indispensable prescribed medications.  Sidqi Bradosti suffers from complex memory images coupled with dissociation, and from archetype post-traumatic stress disorder (PTSD) symptoms brought on by torture during his wrongful imprisonment, and post-incarceration syndrome (PICS) disorder, all of which conditions are permanent injuries.

532.    As a second and parallel form of mental and psychological torture to Sidqi Bradosti and to his wife and children –Sidqi Bradosti was deprived of visits by his wife and any of his three American citizen children for most of the period he was incarcerated from mid-2019 to mid-2021. This presented severe (and potentially irreversible) mental, psychological, and emotional stress to Sidqi Bradosti and to his wife and their three children.

533.    A third additional form of torture employed by Defendants Masrour Barzani and Waysi Barzani, in coordination with agents of the Government of the Republic of Turkey, persuaded that government to support false accusations against Sidqi Bradosti.  As time passed and Sidqi Bradosti suffered in his prison cell, it was foreign government influence and intervention with Defendant Masrour Barzani which eventually was able to exonerate Sidqi Bradosti.  Realizing that the allegations were false and fabricated by the KDP intelligence officials – Defendants Waysi Barzani, Ismat Argoshi, and Dilshad Yousef – agents of Turkey apologized to the Bradosti family and acknowledged to the court that the accusations and charges were fabricated and executed upon inducements from Defendants Masrour Barzani and Waysi Barzani.

534.    The actual killers of the Turkish intelligence agent were later arrested, and the killers admitted in open Kurdistan court that Sidqi Bradosti had nothing whatsoever to do with the assassination.

535.    The Universal Declaration of Human Rights which is enforced by the Vienna Declaration, provides that "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment".

536.    Sidqi Bradosti, his wife, and their three children were each and all "subjected to torture [and] to cruel, inhuman, [and] degrading treatment [and] punishment," and intentional and reckless infliction of emotional distress, by Defendants Masrour Barzani, Waysi Barzani, and subordinate agents and representatives under their command and control.

537.    The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (commonly known as the United Nations Convention Against Torture (UNCAT)) is an international human rights treaty to which the Republic of Iraq, of which Defendant Iraqi Kurdistan Regional Government is a subordinate part, formalized accession thereto on July 7, 2011.

538.    Defendants Masrour Barzani and Waysi Barzani, as part of their continuing criminal enterprise, and as part of their torture of Sidqi Bradosti, also violated his rights under the United Nations Convention on the Rights of Persons with Disabilities, Article 25, which provides as follows:

> *States Parties recognize that persons with disabilities have the right to the enjoyment of the highest available standard of care without discrimination on the basis of disability. States Parties shall take all appropriate measures to ensure access for persons with disabilities to health services.... In particular, States Parties shall: ...*
>
> *f) Prevent discriminatory denial of health care or health services....*

539.    The torture of Sidqi Bradosti did not arise from and was not inherent in or incidental to lawful actions.

540.    At the time of the torture of Sidqi Bradosti, he was in the custody or physical control of Defendants Masrour Barzani and Waysi Barzani and/or their subordinates.

541.    In torturing Plaintiff Maki Revend, Sidqi Bradosti, Ayoub Barzani, and thousands of other John Doe Plaintiffs, Defendants and others, acting under the direction of Defendant Masrour Barzani, were knowingly and willingly in violation of the laws of the government of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government, under arrogated color of whose law they conducted and do conduct their murderous and unlawful criminal enterprise. Under the Convention Against Torture, which the Republic of Iraq joined in 2011, torture is defined as the deliberate infliction of severe pain or suffering, physical or mental, by a public official for a specific purpose such as obtaining information or confession or as punishment. The torture of Plaintiff Maki Revend, and others, violates laws of the United States which prohibit torture and provide a civil remedy in the United States courts for those who are torturened.

542.    The Barzani Defendants and their subordinate judges, each of whom is required by Defendants Masoud Barzani and Masrour Barzani, without lawful authority, to be a member of the Iraqi KDP to receive a judicial appointment, and jailers under their command and control, had actual knowledge, as repeatedly affirmed to them by officials of the United States Embassy and Consulate, that Sidqi Bradosti, and his three minor children were and are American citizens. Sidqi's wife, Haza Mustafa Mahmood Bradosti, at the time held the status of a permanent resident of the United States, ensuring her the same inalienable Constitutional rights and protections as a U.S. citizen, which Defendant Masrour Barzani as himself a legal permanent resident knows full well. Their American citizenship status was wholly and intentionally ignored by Defendants.

245

543.   Under the doctrine of command responsibility, Defendants Masrour Barzani and Waysi Barzani are legally responsible for the torture of Plaintiff Maki Revend, and of Sidqi Bradosti, his family members, and Ayoub Ibrahim.

544.   Sidqi Bradosti's driver, Ayoub Ibrahim, a citizen of the Kurdistan province of Iraq, was severely physically tortured – they beat him severely – by agents of Defendants Masrour Barzani and Waysi Barzani, to forcibly induce and overtly and covertly coerce him to make knowingly false statements, confessions, declarations, and testimony that Sidqi Bradosti and his brothers, many of whom were involved in businesses competing with the Barzani's, had a role in the assassination of a Turkish intelligence agent working at the Turkish Consulate in Erbil.

545.   The torture of Ayoub Ibrahim did not arise from and was not inherent in or incidental to lawful actions.

546.   At the time these acts occurred, Ayoub Ibrahim was in the custody or physical control of Defendants Masrour Barzani and Waysi Barzani and/or their subordinates.


I.   **Commercial Corruption Orchestrated by the Barzani Continuing Criminal Enterprise**

547.   The multi-billion-dollar Barzani Continuing Criminal Enterprise, a group of individuals associated in fact, including Barzani family members and family members by marriage, well documented in media and by the United States Government and others, is a continuous large-scale transnational criminal monopoly with no apparent limitations, which poses a threat of continued criminal activity, and its de facto monarchic rule over the Iraqi Kurdistan autonomous constituent region of Iraq.  It is a tightly controlled family conspiracy enterprise with a clearly identified hierarchy engaged for decades in significant criminal activity, acting in concert with others, not in furtherance of the interests of the sovereign Republic of Iraq; but is a personal

246

and private criminal conspiracy that exercises the type of criminal actions by which a private party criminally engages in unlawful trade and traffic or commerce.

548.   Secrecy and concealment are predominant, essential, and fundamental features of their successful continuing criminal conspiracy while operating their Barzani Continuing Criminal Enterprise.

549.   The Defendants and other members and associates of the enterprise, including Barzani family members and family members by marriage, had and have connections and relationships with one another and with the Barzani Continuing Criminal Enterprise.

550.   The Barzani Continuing Criminal Enterprise constitutes an ongoing organization whose members and associates function as a continuing and continuous unit for a common purpose of achieving the objectives of the Barzani Continuing Criminal Enterprise.   The Barzani Continuing Criminal Enterprise has operated for a period of time sufficient to permit its members and associates to pursue its objectives.

551.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, were enabled to commit the offenses, over a substantial decades-long period of time, because of their positions in the Barzani Continuing Criminal Enterprise and their involvement in and control over the enterprise's affairs, and served as a central force in the conspiracy, as part of a long-term association that exists for criminal purposes, and with relationships among those associated with the Barzani Continuing Criminal Enterprise, with longevity sufficient to permit those associates to pursue the enterprise's purposes, with a common or shared purpose amongst its members, having continuity of structure and hierarchy, and a goal of maintaining and expanding political power, minimizing or eliminating perceived or real political opposition, maximizing revenues and

receiving proceeds from the illicit activities, preventing the infiltration of legitimate enterprise competition, and protecting and securing the discreet continuing criminal scheme for future continuity.

552.    An internal cable of the United States Department of State, a department within the Executive Branch of the United States Government, noted that "The KDP consists of family clans, operating very much like a mafia organization." Another United States Department of State internal cable noted the Defendant Iraqi Kurdistan Regional Government directed and governed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzzani, is "an often-stifling authoritarian style of democracy and pervasive corruption."

553.    A third internal cable of the United States Department of State, originating through the U.S. Embassy in Iraq, further describes, characterizes, acknowledges, and assesses, in these unambiguous quoted excerpts, the pervasive systemic corruption of the Defendant Iraqi Kurdistan Regional Government governance leaders (including Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani) and their impact on democracy:

    (a)    "Corruption is Kurdistan's biggest economic problem."

    (b)    "In Kurdistan corruption spread from the top down."

    (c)    "Corruption relies on family-clan and/or peshmerga ties. Kurdish corruption starts at the top with a few political 'godfathers' who quietly distribute contracts among themselves."

    (d)    "The biggest complaint most ordinary Kurds have about both the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK) is their extreme corruption. Most Kurds believe corruption permeates every level of the parties and the two Kurdistan Regional Governments (KRGs) they control: KRG-Erbil (KRG-E) and KRG-Sulaymaniyah (KRG-S). Most believe the two parties see the ubiquitous political controls they put on public life as necessary to protect their respective sources of illicit funds. Thus, common wisdom in Kurdistan links corruption and the democracy deficit."

    (e)    "Corruption in Kurdistan follows a patron-client model. KRG-E corruption

centers more on the Barzani clan."

(f)    "Government contracting is predictably rife with corruption."

(g)    "Corruption has warped the growth of the entire Kurdistan economy. For example, the leading private companies in Kurdistan are all vertically integrated cross-sectoral conglomerates, e.g., Diyar Group, Eagle Group, Falcon Group, KAR Group, Nasri Group, Sandi Group, Silver Star Group and Ster Group. These conglomerates tend to have construction, import-export, logistics, real estate and security subsidiaries.   All of these companies are alleged to be allied to one or more non-competing 'godfathers' in the local ruling party."

(h)    "The economies and governments of the Kurdish north are tightly wrapped in the tentacles of the KDP…"

(i)    "Corruption is the main economic problem in the north. Corruption chases away much legitimate investment (although the Kurds have been wise enough to wield corruption as a tax and not a confiscatory device), delegitimizes the whole idea of free markets and democracy, increases the (still small but growing) support for Islamic parties and increases the power of the corrupt, making it less likely they can be pried out of their positions. Furthermore, intra-Kurd corruption feeds the fears of Arab, Christian and Turcoman minorities in Kirkuk that they will be completely shut out of government jobs (still the vast majority of all jobs here), contracts and markets by KDP and PUK loyalists."

554.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their agents and representatives including Barzani family members and family members by marriage, are "responsible for and complicit in ordering, controlling, or otherwise directing, acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation of or transfer of the proceeds of corruption to foreign jurisdictions," and have "materially assisted, sponsored, or provided financial, material or technological support for, or goods and services in support of" such acts, in knowing and willful violation of the Foreign Assistance Act of 1961 and subject to immediate Presidential sanctions. By their knowing and willful violation of the Foreign Assistance Act, Defendants have been enabled to finance the

Barzani Continuing Criminal Enterprise and obtain the means to harm Plaintiffs.

555.    The World Bank, of which the Republic of Iraq is a member nation, defines corruption as "the abuse of public power for private benefit."

556.    Defendant Masrour Barzani, having the status of legal permanent resident of the United States, albeit a status fraudulently obtained, has responsibilities under U.S. statutes that are known to him and result from his status as a United States person (a green card holder).

557.    In but one example of the responsibilities of U.S. resident status, Defendant Masrour Barzani, as a resident alien (a green card holder) having a legal obligation to follow the same tax laws as U.S. citizens, including reporting worldwide income from all sources, that is, income from both within and outside the United States, and annually report financial assets outside the United States, with willful and criminal intent, at all times relevant to this complaint, did not and does not submit the required annual truthful reporting to the United States Government. The failure to truthfully declare and pay U.S. taxes on Defendant's earnings provides a substantial part of the means enabling the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

558.    At all times relevant to this complaint, in a knowing and willful conspiracy to defraud the United States in furtherance of the Barzani Continuing Criminal Enterprise, Defendant Masrour Barzani, a resident alien of the United States – a "United States person" – together with others did knowingly and willfully, directly and indirectly, and with criminal intent conspire to defraud the United States. Defendants designed and implemented a fraudulent, dishonest, and deceitful scheme to divert criminal proceeds and misappropriated Defendant Iraqi Kurdistan Regional Government, Republic of Iraq Government, and United States foreign assistance funds, and conceal income and assets traceable to the conspiracy.  Defendant Masrour Barzani used undeclared bank accounts, the assets held therein, and the income earned thereon, and monies from

unlawful conduct passed through intermediary accounts, to conceal the true source of the funds from the Internal Revenue Service. Defendants used fraudulent, deceitful, and dishonest means to conceal the existence of bank accounts maintained by and for Defendants Masrour Barzani and Waysi Barzani, and others known and unknown, including Barzani family members and family members by marriage, in order to help the Defendants purposefully evade U.S. taxes. Defendant Masrour Barzani, having financial accounts in a foreign country with an aggregate value of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, has failed to be truthful in his filings of a Report of Foreign Bank and Financial Accounts with the U.S. Department of Treasury, thereby financially facilitating a criminal activity. By defrauding the United States, the Barzani Continuing Criminal Enterprise gains additional resources to harm the Plaintiffs, as described herein.

559. Defendants have, through their unlawful conduct, willfully and knowingly impeded impaired, obstructed and defeated the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue, specifically, by knowingly and willfully failing to comply with the Foreign Account Tax Compliance Act (FATCA) and the Corporate Transparency Act (CTA), to fraudulently, in whole or in part, conceal, misrepresent, and disguise the nature, location, source, control and true beneficial ownership interests in offshore accounts, various assets including real property and money accounts, investments, and income, in the United States and outside the United States.

560. For example, 983 Washington SB, LLC, owner of record of a commercial property in Miami, Florida; an office building in Delaware owned by the CT Corporation, an American branch of a Dutch company; multi million dollar residential properties owned by LLCs in McLean,

Virginia and Beverly Hills, California; all purchased and acquired with illicit proceeds of the unlawful activities of the Barzani Continuing Criminal Enterprise. Defendant Masrour Barzani exercised full dominion and control over these and other hidden assets, and willfully and criminally failed to report foreign bank accounts, and willfully and criminally submitted false offshore disclosure submissions, all of which actions were taken to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue. Defendant Masrour Barzani, by failing to comply with FATCA and CTA and other statutes, used monies gained by hiding his assets to promote the carrying on of unlawful activity and to harm Plaintiffs. Defendant Masrour Barzani further knowingly and willfully, directly and indirectly, violated numerous U.S. criminal statutes including 18 U.S.C § 2314 in the international transfer of monies stolen, converted, or taken by fraud, artiface, bribery and misrepresentation, and violated 18 U.S.C. § 1956, knowing that the property involved in Defendant's financial transactions represents proceeds of unlawful activity.

## II.  Counterfeiting of Pharmaceuticals and Cigarettes, Production and Distribution of Illicit Drugs

561.  The extensive and financially significant international counterfeiting component of the Barzani Continuing Criminal Enterprise (BCCE), which is a substantial component of financing the BCCE harm to Plaintiffs, and is directed by Defendants Masoud Barzani and Masrour Barzani. Defendant Masrour Barzani is in partnership with co-conspirator Defendants Nizar Hanna Nasri, Shimal Jawhar Salin, Sarwar Pedawi, and Ghafoor Khoshnaw who manage, oversee, profit, and money launder proceeds from counterfeiting operations of the Barzani Continuing Criminal Enterprise. Additionally, Defendant Sarwar Pedawi, a major co-conspirator with Defendants Masrour Barzani and Waysi Barzani, acting as a co-conspirator for Defendant

Masrour Barzani, is a principal representative of Defendant Masrour Barzani in business transactions, directs Defendant Masrour Barzani's illicit oil trades, and directs uses of illicit proceeds to purchase properties in the United States and elsewhere for Defendant Masrour Barzani and his shell companies and other camoflaged entities. These Defendants, in managing this financially significant criminal enterprise element, with the intent to deceive and defraud the rightful owners of the companies whose products are being counterfeited, report directly to the Prime Minister of Defendant Iraqi Kurdistan Regional Government, Defendant Masrour Barzani.

562.    All of these willful and knowing counterfeiting of pharmaceuticals and cigarettes violations occurred and do occur at a time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power.

563.    Defendants, directed by Masrour Barzani, knowingly engaged, attempted to engage, and aided, abetted, and caused others to engage and attempt to engage in transactions, dealings, the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing of illicit drugs and narcotics, and with one or more foreign persons designated by the U.S. Secretary of the Treasury as foreign terrorists or foreign terrorist organizations and willfully evaded and avoided, and do evade and avoid, the provisions of law prohibiting activity and dealings with such individuals.

564.    The illicit drug operation, including cocaine trafficking, punishable by death or life imprisonment under Iraq law, is headed by co-conspirator Defendant Nihad Barzani, brother of Defendant Masoud Barzani. Defendant Nihad Barzani reports this criminal operation directly to Defendant Masrour Barzani. Co-conspirator Defendant Ghafoor Khoshraw assists Defendant Nihad Barzani (a major director of oil smuggling and construction) and directs the highly

profitable smuggling of cigarettes to Iran and the counterfeiting of U.S. brand cigarettes, along with electronic and technology product smuggling to Iran. Revenue received by the Barzani Continuing Criminal Enterprise from this illicit drug operation is used directly to finance Barzani Continuing Criminal Enterprise's actions against Plaintiffs including attempted murder, murder, and torture, and other atrocity crimes.

565.   The core of the Barzani Continuing Criminal Enterprise counterfeiting, piracy, and smuggling operations is its partnering with U.S.-designated anti-American terrorist organizations. The products the Barzani Continuing Criminal Enterprise counterfeits include primarily U.S. registered and trademarked brands, thereby knowingly and intentionally creating a negative economic impact on the United States economy and on U.S. commercial interests. By simultaneously channeling substantial financial resources to the Barzani Continuing Criminal Enterprise and its criminal networks which disrupt and corrupt Kurdistan society and knowingly, and lacking all moral integrity as leaders of the Defendant Iraqi Kurdistan Regional Government, Defendants Masoud Barzani, Masrouro Barzani, and Waysi Barzani, and their associate co-conspirators, imperil the physical health of the citizenry, which they govern, through inferior product quality, hazardous material, and substandard and uninspected manufacturing standards, and with wanton disregard for human life potentially killing innocent consumers. In addition to the established link between counterfeiting and piracy and organized crime, Interpol has highlighted a disturbing relationship of counterfeiting and piracy with terrorist financing, with intellectual property crime becoming the preferred method of financing for a number of terrorist groups, including those partnering and/or collaborating with the Barzani Continuing Criminal Enterprise.

566.   The Barzani Continuing Criminal Enterprise counterfeiting operations, in pursuit

of illicit profits, continually, knowingly, and intentionally violates numerous international treaties and conventions to which the controlling superior federal Government of the Republic of Iraq is a signatory nation, including the Paris Convention for the Protection of Industrial Property, to which the Government of the Republic of Iraq confirmed its accession on January 24, 1976.

567.   The Barzani Continuing Criminal Enterprise, in pursuit of illicit profits, also continually, knowingly, and intentionally violates the established protocols of the World Intellectual Property Organization (WIPO).

568.   The Barzani Continuing Criminal Enterprise, in pursuit of illicit profits, also continually, knowingly, and intentionally violates and infringes on registrations issued by the U.S. Patent and Trademark Office ("USPTO"), an agency of the United States Government.

569.   While the overall magnitude of counterfeiting and piracy cannot be easily measured, counterfeiting and piracy are illicit activities in which the organized crime of the Barzani Continuing Criminal Enterprise networks thrive and with which revenue they finance their BCCE and make possible the damages inflicted upon Plaintiffs. Confidential Human Sources #1 and #8, who have direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, estimate that the financial revenue from various counterfeiting operations of the Barzani Continuing Criminal Enterprise exceeds U.S. twenty million dollars per month – thus totaling billions of dollars to date as the Barzani Continuing Criminal Enterprise continues unabated and unhampered.

570.   The counterfeit items produced by the Barzani Continuing Criminal Enterprise are substandard or even dangerous, lack compliance with basic safety standards, are manufactured in manufacturing facilities not compliant with universally accepted industry Good Manufacturing Practice (GMP) standards, and possess no licenses from the trademark owner(s) to manufacture

specific products.  Evidence documents several Kurd cases of blindness resulting from illicit and unlawful activities of the Barzani Continuing Criminal Enterprise.

571.    With the knowing and willful authorization of Defendants Masrour Barzani and Waysi Barzani, counterfeit items and illicit items produced by the Barzani Continuing Criminal Enterprise are transported in trucks along the route used to transport illicit drugs.  The trucks were unlawfully diverted and provided by the Barzani's from Hummer vehicles issued to the Defendant Iraqi Kurdistan Regional Government by the United States Government under foreign aid and defense aid agreements for official use by the Defendant Iraqi Kurdistan Regional Government Peshmerga military and Parastin intelligence agents in furtherance of U.S. national security and foreign policy purposes.  Use of trucks and other equipment and materiel, provided by the United State Government through its foreign assistance programs and Defense agreements, for transportation of counterfeit pharmaceuticals and illicit drugs violates U.S. law and directly provides funds to enable Defendants to harm Plaintiffs.

572.    Counterfeit items produced by the Barzani Continuing Criminal Enterprise, with the knowing and willful authorization of Defendants Masrour Barzani and Waysi Barzani, knowingly pose substantial health and safety risks to consumers, including U.S. citizens residing in or visiting the areas of Defendant Iraqi Kurdistan Regional Government in Iraq.

573.    In its report *The Economic Impact of Counterfeiting and Piracy*, the Organisation for Economic Co-operation and Development, an intergovernmental organization of which the United States is a member nation, emphasized the potential mortal danger of counterfeit pharmaceuticals, willfully and knowingly ignored by the Barzani Continuing Criminal Enterprise:

> *"In the case of pharmaceuticals, trademark-infringing products may include* correct *ingredients in incorrect quantities or may be composed according to a wrong formula. Products can furthermore contain non-active or even toxic ingredients. Ailments which could*

*be remedied by genuine products may go untreated or worsen; in*
*some cases, this may lead to death."*

574.    The unlawful Barzani Continuing Criminal Enterprise illegal activities, directed and controlled by Defendants Masrour Barzani and Waysi Barzani, undermine American enterprise innovation, which is key to American economic growth, and which negatively affects United States relations with legitimate trading partners and the economy of the United States. Revenue derived from Barzani Continuing Criminal Enterprise illegal activities provided the means for Barzani Continuing Criminal Enterprise to harm Plaintiffs.

575.    This illegal counterfeiting and trafficking, directed and controlled by Defendants Masrour Barzani and Waysi Barzani, harm American commercial interests that comply with law, and thus those of American citizen shareowners, including American public employee and union pension plans, investors, employees, contractors, suppliers, lenders, banks, and rights holders because of the impact that they have on (i) sales and licensing, (ii) brand value and firm reputation, and (iii) the ability of firms to benefit from the breakthroughs they make in developing new products.    Revenue derived by illegal counterfeiting and trafficking provides substantial revenue to the Barzani Continuing Criminal Enterprise enabling the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

## III.    Counterfeiting of United States Brand Alcohol

576.    In the small Kurdistan village of Kalak, operating under the protective direction of co-conspirators Defendants Masrour Barzani, Shimal Jawhar Salih, and Sarwar Pedawi (as head of the STER's Jack Daniels™ operation), with the intent to deceive and defraud, Sarwar Pedawi manages the counterfeiting of industry-leading and internationally trademark-protected whiskey brand Jack Daniels™. The ownership of STER is purposefully hidden and concealed, but a United

States Department of State internal cable from the Baghdad U.S. Embassy reveals Defendant Masrour Barzani as majority owner of STER.  STER is part of the Barzani Continuing Criminal Enterprise.

577.    The Barzani-owned STER Group, through its officers, employees, and agents, knowingly and willfully manage and operate its alcohol counterfeiting operations.  Alcoholic beverage counterfeiting comprises a substantial part of the Barzani Continuing Criminal Enterprise counterfeiting revenue, and provide substantial means for the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

578.    Jack Daniels™ is a brand of Tennessee whiskey.  It is legally produced in Lynchburg, Tennessee, by the Jack Daniels Distillery, which is owned by the Brown–Forman Corporation, a major American business enterprise operating worldwide with licensed products and representatives.  STER and its criminal whiskey counterfeiting operation are not licensed by Jack Daniels, its parent company, or any related entity thereof.

579.    The counterfeit whiskey alcohol product produced by the Barzani Continuing Criminal Enterprise – illegally and deceptively and fraudulently packaged, branded, marketed, and distributed as Jack Daniels™ – is sold to consumers and local marketers in Iraq, and illegally exported to Turkey and beyond, all in direct financial harm to Brown-Forman and its millions of individual shareowners, to the trade detriment of the United States of America and its balance of trade, to the pecuniary detriment of U.S. financial capital and financial transfers, and to the criminal and unjust enrichment of the Barzani Continuing Criminal Enterprise, thus enabling Defendants to damage and injure Plaintiffs.

**IV.    Smuggling of Counterfeit United States Brand Products and U.S. Currency**

580.    Co-conspirator Defendant Sihad Barzani is the Barzani Continuing Criminal Enterprise go-between with government officials of the government of Iran and its anti-American terrorist operatives and the smuggling operation operated by the Barzani Continuing Criminal Enterprise.  Defendant Sihad Barzani is Defendant Masoud Barzani's brother and under the direction of Defendant Masoud Barzani and Defendant Masrour Barzani, Defendant Sihad Barzani manages all Barzani Continuing Criminal Enterprise counterfeiting and money laundering operations.  He has offices in Haji Umran, Iraqi Kurdistan, a known smugglers' border post near the Iran-Iraq border.

581.    Defendant Sihad Barzani holds the titular rank of General in the Kurdish Peshmerga (the military force of Defendant Iraqi Kurdistan Regional Government), and acting under the command of Defendant Masrour Barzani, unlawfully diverts Peshmerga personnel and resources – very substantially funded by the United States Government – to the Barzani Continuing Criminal Enterprise to provide security and armed force for the Barzani Continuing Criminal Enterprise, and provide a part of the means to use violence against Plaintiffs and further the Barzani Continuing Criminal Enterprise.

582.    Under the direction of Defendants Masoud Barzani and Masrour Barzani, and with the intent to deceive and defraud, Defendant Sihad Barzani also supervises the Barzani Continuing Criminal Enterprise money laundering.  The Barzani Continuing Criminal Enterprise is engaged in the unlawful sale of oil to Iran.  Sales of oil and diesel to Iran, much of which is directed by co-conspirator Defendant Nihad Barzani for Defendant Masrour Barzani, very significant amounts of which has been resold by Defendant Nihad Barzani to U.S. military installations in the area of Defendant Iraqi Kurdistan Regional Government as falsely labeled Iraq product, are contrary to and in circumvention of U.S. trade law and sanctions imposed by the Government of the United

States. By knowingly and purposely taking advantage of illegal exchange rate manipulation, Confidential Human Source #8, having clandestine access to those in the Barzani inner circle, reports that every unlawful US$1million sale of oil to Iran nets the Barzani Continuing Criminal Enterprise US$200,000 on the exchange rate, diverted through German and Dubai banks and elsewhere and back to the Iraqi Kurdistan region, providing means for the Barzani Continuing Criminal Enterprise to damage and harm Plaintiffs.

583.    Confidential Human Source #8 reports that every day the Barzani Continuing Criminal Enterprise unlawfully receives an estimated US$100mm U.S. currency through its oil sales. Until March 2023, Confidential Human Source #1, who has direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, estimated that the Barzani Continuing Criminal Enterprise was selling 450,000 barrels per day – that number has since been reduced by the Iraq central government to an estimated 150,000 barrels per day. Currency derived from illegal oil sales is transported inside oil tankers to the Islamic Revolutionary Guard Corps ("IRGC"), which is short of currency. The United States Treasury Department has verified Iran then transfers these proceeds to Hezbollah, an organization designated by the United States as a Foreign Terrorist Organization. Defendants knew Hezbollah was a designated Foreign Terrorist Organization. Revenue from its unlawful trade with Iran enables the Barzani Continuing Criminal Enterprise to harm and damage Plaintiffs.

584.    As part of its criminal conspiracy to disguise its true criminal activity, and with the intent to deceive and defraud, the Barzani Continuing Criminal Enterprise, acting through the Defendant Iraqi Kurdistan Regional Government which it controls in its entirety, has issued numerous well-documented intentionally and calculated misleading and deceptive statements, including communiques to and filings with the United States Government, often by its Washington

representatives, agents, and advisors, including to the White House and the Executive Office of the President of the United States, condemning the Islamic Revolutionary Guard Corps (IRGC).

585.    The United States Government placed the IRGC on its Foreign Terrorist Organizations list in 2019, at a time Defendant Masrour Barzani was and is the Prime Minister. Despite the IRGC being designated a Foreign Terrorist Organization, the Barzani Continuing Criminal Enterprise has continued unrestrained its unlawful trade with the IRGC, providing the means to continue its criminal enterprise to harm and damage Plaintiffs.

586.    The International Emergency Economic Powers Act authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

587.    Beginning with Executive Order No. 12,170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

588.    On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12,957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat," and 12,959, prohibiting, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, and/or services from the United States or by a United States person; and on August 19, 1997, issued Executive Order No. 13,059 clarifying the previous orders (collectively, the "Executive Orders"). This included persons in a foreign country with knowledge or reason to know

that such goods, technology, or services were intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to the Islamic Republic of Iran or the Government of the Islamic Republic of Iran.  On August 19, 1997, the President issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2012, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

589.    The most recent continuation of this national emergency was executed on March 12, 2020. 85 Fed. Reg. 14731 (Mar. 13, 2020), at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power.  Pursuant to this authority, the U.S. Secretary of the Treasury promulgated the Iranian Transaction Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Effective October 22, 2012, the U.S. Department of the Treasury renamed and reissued the Iranian Transaction Regulations as the Iranian Transactions and Sanctions Regulations ("ITSRs").

590.    The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States or provided outside the United States by a United States person. See 31 C.F.R. § 560.410.

591.    The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to the Islamic Republic of Iran or the Government of the Islamic

Republic of Iran is a prohibited export, re-export, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

592.     The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

593.     On October 25, 2007, the U.S. Department of the Treasury designated the IRGC-Qods Force ("IRGC-QF") pursuant to Executive Order No. 13224 for providing lethal support to multiple terrorist organizations.

594.     According to the U.S. Department of the Treasury, the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction ("WMD") and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.

595.     On November 5, 2018, providing lethal support to multiple terrorist organizations the U.S. Department of the Treasury designated the National Iranian Oil Company ("NIOC") as a prohibited entity.  Public documents noted that NIOC is owned by the Government of the Islamic Republic of Iran through the Iranian Ministry of Petroleum. and is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.  It further noted the close relationship between the IRGC, which OFAC designated in 2007 because of its ties to Iran's ballistic missile program, and NIOC.

596.     On November 5, 2018, the U.S. Department of the Treasury designated National Iranian Tanker Company ("NITC") for providing lethal support to multiple terrorist organizations.

Public documents noted that NITC was a Government of Iran entity which employed various front companies.

597.    On April 8, 2019, the President of the United States designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism.

598.    On January 23, 2020, the U.S. Department of the Treasury described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies."

599.    Pursuant to 50 U.S.C. § 1705, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under IEEPA.  The Defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the IEEPA.

600.    At all times relevant to this complaint, Defendant Masrour Barzani was and is a United States person, knowingly and willfully combined, conspired, confederated, and agreed, with persons including the IRGC, an entity of the Government of the Islamic Republic of Iran, without a U.S. government license, to deceive and defraud the United States and to commit offenses against the United States, more particularly by, among other things:

> (a)    being complicit in or engaging in actions that materially assist, sponsor, or provide financial, materiel, or technological support for, or goods or services to, individuals or organizations so designated; and

> (b)    defrauding the United States, including the U.S. Department of the Treasury, by knowingly and willfully, directly and indirectly, interfering with and obstructing lawful government functions, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from and to Iran, without authorization or a license, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371;

264

and

(c)     committing offenses against the United States, by knowingly and willfully. directly and indirectly, exporting, attempting to export, conspiring to export, or causing to be exported, oil to Iran, without obtaining the required license or other written authorization from the U.S. Department of the Treasury, in violation 18 U.S.C. § 371 (conspiracy to defraud the United States, including the U.S. Department of the Treasury), 50 U.S.C. §§ 1701-1706 (the International Emergency Economic Powers Act, or "JEEP A"), and 31 C.F.R. Part 560 (the Iranian Transactions and Sanctions Regulations, or "ITSRs").

601.    The goals of the conspiracy by Defendant Masrour Barzani, his agents and representatives and their co-conspirators were:

(a)     conduct oil sales transactions with the IRGC, an entity of the Government of Iran, without a required license from OFAC;

(b)     conduct sales of spare parts and other materials to entities in Iran, without a required license from OFAC;

(c)     to receive financial profits and other benefits without the required license from OFAC;

(d)     to conceal from U.S. persons and mislead the U.S. government, including OFAC, regarding the end user, use, and destination of oil and oil revenues shipped to or from Iran without the required license from OFAC; and

(e)     to evade and cause others to evade or violate the regulations, prohibitions, and licensing requirements of IEEPA and the ITSRs.

Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their agents and representatives, and Barzani family members including those by marriage, by violatinug U.S. anti-terrorism laws and sanctions, and conspiring with Iranian sponsors of terrorism, have significantly enriched themslvbes and obtained substantial resources enabling them to harm Plaintiffs.

602.    It was a calculated part of the conspiracy and scheme of Defendants Masoud Barzani Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, to knowingly and willfully conspire, deceive, defraud, and violate IEEPA to enrich the earnings of the Barzani Continuing

265

Criminal Enterprise, all to the harm, detriment, and injury of Plaintiffs and the people of Iraqi Kurdistan.

603.    Prior to the U.S. State Department designating the IRGC as a foreign terrorist organization (FTO) in April 2019, the U.S. Department of the Treasury, a department within the Executive Branch of the United States government, designated the IRGC-QF as an FTO and designated former IRGC-QF Commander Qassim Soleimani as a Specially Designated Global Terrorist, in October 2007; and the U.S. Department of the Treasury also sanctioned current IRGC-QF Commander Esmail Ghani as a Specially Designated Global Terrorist in March 2012. The Barzani Continuing Criminal Enterprise was doing business with, and receiving substantial money, from unlawful trade with the IRGC long before U.S. State Department FTO designation in April, 2019 – providing illicit resources for the Barzani Continuing Criminal Enterprise to damage and harm Plaintiffs.

## V.    Production and Distribution of Counterfeit United States Pharmaceuticals

604.    The Barzani Continuing Criminal Enterprise, with the intent to deceive and defraud, operates an unlawful network trading in counterfeiting of pharmaceuticals and medications owned by corporations licensed in the United States.

605.    In its *Counterfeit Pharmaceutical Inter-Agency Working Group Report* to the Vice President of the United States and to Congress, the Inter-Agency Working Group reported:

> *"Counterfeit medicines use a falsified mark in connection with a genuine medication with the intent to deceive consumers. Subsequently, counterfeit medicines have not undergone regulatory review and thus must be considered substandard. ...They pose a significant and growing threat to health at both the individual and the community levels, potentially causing treatment failure or death and contribution to increased anti-microbial resistance. ...they are a global health problem."*

266

606.   The Barzani Continuing Criminal Enterprise counterfeit medications, dangerous to public health, have not been tested by any government agency for safety, efficacy, content, or quality.

607.   The pharmaceutical counterfeiting by the Barzani Continuing Criminal Enterprise knowingly violates U.S. trade laws, regulations, agreements, and intellectual property rights, and undermines and impairs trusted medicine supply chains, and knowingly and intentionally thereby defrauds and deprives U.S. license holders and product manufacturers of substantial revenue, earnings, and profits for shareowners – profit that has been diverted to the Barzani Continuing Criminal Enterprise to fund its operations that damage and harm Plaintiffs.

608.   Counterfeit pharmaceuticals, with active pharmaceutical and drug formulation ingredients, are substandard and unapproved medicines and present significant health and safety concerns.

609.   Iraq has been a member nation of the World Customs Organization ("WCO") since June 6, 1990.  Its mission includes "to develop international standards and to protect society and to secure a fair revenue collection."   The Barzani criminal counterfeiting operation, operating under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, is in clear and knowing and purposeful contravention of each of these principles and standards.

610.   The Barzani Continuing Criminal Enterprise produces, markets, and distributes a large volume of counterfeit U.S. pharmaceuticals and medications that, according to Confidential Human Source #8, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, comprise a substantial part of the minimum U.S. $20,000,000 per month pharmaceutical counterfeiting revenue that funds the Barzani Continuing Criminal

Enterprise operations that damage and harm Plaintiffs.

611.    The principal pharmaceuticals, counterfeited by the Barzani Continuing Criminal Enterprise are only legally manufactured by Pfizer Inc., an American multinational pharmaceutical and biotechnology corporation headquartered in New York City, and publicly owned by millions of shareowners – each of whom are financially damaged by the Barzani Continuing Criminal Enterprise.

612.    Legitimate Pfizer pharmaceuticals are manufactured for distribution and prescribed use in Turkey and cannot legally be exported from Turkey.  In addition to its own counterfeit Pfizer products, the Barzani Continuing Criminal Enterprise, directed by Defendant Masrour Barzani and operated by Defendants Shimal Jawhar Salin and Sarwar Pedawi, illegally and without license exports legitimate Pfizer pharmaceuticals from Turkey to Erbil, Kurdistan, Iraq where it markets and distributes them – with intent to deceive and defraud and with knowledge that Pfizer products are prohibited for sale outside of Turkey.  These unlawful actions by the Barzani Continuing Criminal Enterprise deprives Pfizer of sales revenue.  The Barzani Continuing Criminal Enterprise actions deprive Pfizer shareowners of earnings and share value, and provide the Barzani Continuing Criminal Enterprise with the means to fund its operations that damage and harm Plaintiffs, including paying the costs of hit men to murder and sow fear, which is not imaginary nor wholly speculative, in anyone in partisan or political opposition to the Barzani Continuing Criminal Enterprise.

613.    Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members, know and have full knowledge that no entity or person of the Barzani Continuing Criminal Enterprise is licensed by Pfizer, Inc. or any subsidiary or any related entity thereof.

614.    Another U.S. pharmaceutical counterfeited by the Barzani Continuing Criminal Enterprise, with the intent to deceive and defraud, is Eli Lilly medicines. The procedure to profit from counterfeiting Lilly medicines is essentially the same as that for Pfizer. These unlawful activities also fund the Barzani Continuing Criminal Enterprise to provide the means to damage and harm Plaintiffs.

615.    Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, know and have full knowledge that no entity or person of the Barzani Continuing Criminal Enterprise is licensed by Eli Lilly and Company or any subsidiary or any related entity thereof.

616.    The largest source of illegal drug revenue for the Barzani Continuing Criminal Enterprise, according to Confidential Human Source #8, who has direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, is crystal meth and cocaine. The cocaine is unlawfully imported and distributed principally to Europe and Asia. The Barzani Continuing Criminal Enterprise partners with international drug cartels and the IRGC to obtain cocaine, and manufacture crystal meth. In the business association with the IRGC and international drug cartels, the IRGC is the lead member because of Iran's desperate need for cash. Defendant Masrour Barzani manages the illegal drug operation through the intelligence agency of the Defendant Iraqi Kurdistan Regional Government, which is controlled by the Barzani Continuing Criminal Enterprise. Raw material of Sudafed is imported from China and India in blister packaging. In Erbil, the capital city of the Defendant Iraqi Kurdistan Regional Government, the Sudafed is taken out of the blister packs and shipped in bulk to Iran for chemical processing. The product comes back to Erbil as meth and is then distributed to world markets, principally Europe and Asia. Under the direct control and command of Defendant Masrour Barzani,

269

Defendant Sihad Barzani manages the crystal meth and cocaine operation for the Barzani Continuing Criminal Enterprise. Profits from the crystal meth and cocaine operation provide a substantial part of the revenue that enables the Barzani Continuing Criminal Enterprise to damage and harm Plaintiffs.

## VI.   Production and Distribution of Counterfeit U.S. Brand Cigarettes

617.   Counterfeiting of U.S. brand cigarettes is a substantial financial component of the Barzani/STER counterfeiting business, directed principally by Defendant Masrour Barzani, with intent to deceive and defraud, frequently in partnership with Defendant Nizar Hanna Nasri, and managed by Defendants Shimal Jawhar Salin, Sarwar Pedawi and Ghafoor Knosnaw. The largest volume product is counterfeit Marlboro cigarettes, a U.S. cigarette brand owned and manufactured by Philip Morris USA (a branch of Altria) within the United States and by Philip Morris International (now separate from Altria) outside the United States.

618.   The counterfeiting scheme operated by the Barzani Continuing Criminal Enterprise had and has a direct, substantial, and reasonably foreseeable effect on U.S. export trade and commerce, and to the harm of American national economic interests, to shareowners, corporate earnings, and harms the Plaintiffs.

619.   Cigarette counterfeiting as part of the Barzani Continuing Criminal Enterprise, according to Confidential Human Source #8, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, is operated from a covert production facility in the marketplace city of Zakho, at the center of the eponymous Zakho District of the Duhok Governorate, located a few kilometers from the Iraq–Turkey border. The Barzani Continuing Criminal Enterprise controls the entire operation and counterfeit cigarettes are then

sold throughout Iraq, providing substantial means to the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

620.    The raw material tobacco used by the Barzani Continuing Criminal Enterprise is sourced globally and meets no U.S. tobacco production or health standards and no standards of Philip Morris USA and/or Philip Morris International.

621.    Defendants Masrour Barzani, Waysi Barzani, Ghafoor Khoshnaw, and their agents and representatives, including Barzani family members, know and have full knowledge that no entity or person of the Barzani Continuing Criminal Enterprise is licensed by Philip Morris USA or Philip Morris International or Altria Group Inc. or any subsidiary or any related entity thereof.

622.    Through the Barzani Continuing Criminal Enterprise and its illegal terrorist organization collaborators, the Barzani Continuing Criminal Enterprise is funding terrorists directly and indirectly.   This collaboration with terrorists facilitates the harm to Plaintiffs and others. In testimony to the U.S. Congress, the U.S. Department of Justice, in the section "Narcotics Trafficking, Gun Running and Terrorism are Supported by Cigarette Smuggling", declared:

> *"Current investigations have identified instances of terrorist groups forming alliances with tobacco traffickers to generate monies used to support their organizations and activities."*

623.    Key findings of the U.S. Government Accounting Office, an agency of the United States Government, in its report *Terrorist Financing – U.S. Agencies Should Systematically Assess Terrorists' Use of Alternative Financing Mechanisms* include:

> *"Cigarette Smuggling Finances Terrorism."*

> *"Terrorists have earned assets through the highly profitable illicit trade in cigarettes. According to officials from the ATF, Hizballah, HAMAS, and al Qaeda have earned assets through trafficking in contraband cigarettes or counterfeit cigarette tax stamps."*

*"Terrorist Groups Receive Substantial Funds from Smuggling Cigarettes." "[T]obacco smuggling also provides a lucrative source of funding for terrorists and other criminal organizations."*

The Barzani Continuing Criminal Enterprise is part of the terrorism being financed.

624.    Though the Islamic Republic of Iraq is not a member nation of the World Trade Organization, it uses counterfeiting and piracy as terms used to describe a range of illicit activities linked to intellectual property rights (IPR) infringement.   The Barzani Continuing Criminal Enterprise counterfeiting constitutes infringement and willful infringement of IPRs described in the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS); including trademarks, copyrights, patents, design rights, as well as a number of related rights – all of which are infringed by the Barzani Continuing Criminal Enterprise, are large in scope and magnitude, and fund in substantial part the Barzani Continuing Criminal Enterprise activities that have damaged and harmed Plaintiffs.

## VII.    Financial Payments, Bribes, and Inducements

625.    The United States Supreme Court recognized that "No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud." "A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public." *See Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed 968 (1924). Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, and Barzani family members and family members by marriage, have knowingly, willfully, wantonly, and repeatedly violated and besmirched their "sacred duties" as public officials and

corruptly schemed to obtain advantage from U.S. officials and solicited violation of oath by public officers, thereby defrauding the American public to enrich themselves and harm Plaintiffs.

626.    To harm Plaintiffs, the Barzani Continuing Criminal Enterprise violates the Foreign Extortion Prevention Act (FEPA) which prohibits conferring any improper advantage in connection with obtaining or retaining business for or with, or directing business to, any person. "Foreign official" is defined broadly to mean (1) any official or employee of a foreign government or any department, agency, or instrumentality thereof; (2) any senior foreign political figure; (3) any official or employee of a public international organization; or (4) any person acting in an official or unofficial capacity for or on behalf of a government, department, agency, instrumentality, or a public international organization.   FEPA includes people acting in an "unofficial capacity" and "any senior foreign political figure" including an official's close associates and immediate family members.   Defendants U.S. Public Official #1 and US. Public Official #2 and other employees and representatives of the United States which substantially benefited from knowing and willful violations of the FEPA by Defendants.

627.    Concurrently according to Confidential Human Sources #1 and #5, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, with respect to U.S. contracts and decisions and to improperly pressure and induce and influence U.S. officials, for corrupt purposes, to breach their official duties, and under color of official right, to deprive the American public of their intangible right to Public Officials' honest services, in furtherance of the conspiracy and to effect its illegal object, the following illegal acts, among others, were committed and caused to be committed: Bribes and other inducements and favors of value, directly or indirectly, are and were paid to Defendants U.S. Public Official #1 and Public Official #2, two of many U.S. officials who were bribed and co-opted by the Barzani Continuing

273

Criminal Enterprise, and who each and jointly possessed non-public information and substantial influence over U.S. Government and Coalition Provisional Authority decisions, including contracts, in the strategically important relationship between the United States and the Republic of Iraq.

628.   The U.S. officials bribed by the Barzani Continuing Criminal Enterprise were assigned to and possessed influence over the Coalition Provisional Authority, an instrumentality of the United States and having U.S. Government authority for procurement services, including but not limited to, acquisition planning, contract negotiations, cost and price analysis, and contract administration and possessing influence over, among other things, and including providing truthful analytical counsel and recommendations to the President of the United States, the U.S. national security hierarchy, and the U.S. Congress, regarding decisions to provide foreign military sales, foreign military financing, and other United States and allied aid or support to or for the benefit of the Iraqi Kurdistan Regional Government.

629.   U.S. federal regulations prohibit executive branch employees from accepting gifts. Pursuant to Title 5, Section 2635.202 of the Code of Federal Regulations and to other titles, federal employees shall not directly or indirectly solicit or accept a gift that is either (1) from a prohibited source or (2) given because of the employee's position.  A "gift" includes any gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value.

630.   Under 5 U.S.C. § 7342, federal employees are prohibited from receiving gifts above a "minimal value" as prescribed by regulations, from a "foreign government", a term that includes "any agent or representative" thereof.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are officials of a "foreign government" for purposes of 5 U.S.C. § 7342.

631.   Defendants U.S. Public Officials #1 and #2 conspired with Defendants Masoud

Barzani, Masrour Barzani, and Waysi Barzani to fraudulently hide their close and continuing financial connections, as well as gifts, monies, and services provided to Defendants U.S. Public Officials #1 and #2 as part of and in furtherance of the scheme to financially benefit the co-conspirators of the Barzani Continuing Criminal Enterprise and their own personal enrichment and gratification, and to harm Plaintiffs.

632.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani did enter into a conspiracy and did engage in a corrupt relationship to commit bribery and honest services fraud, and corruptly give, offer, and promise something of value to Defendants U.S. Public Officials #1 and #2, with intent to influence an official act, and induce the employees to do acts in violation and breach of the lawful duty of such employees, in violation of Title 18, United States Code, Section 201(b)(l)(A) & (C) and 2.). The purpose of the conspiracy was for Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their co-conspirators, agents, and representatives, to enrich themselves by paying bribes in the form of a complex series of cash payments, lucrative real property concessions, oil and gas concessions, and other non-cash inducements, favors, and favoritism, privilege and improper advantage, and other things of value, to Defendants U.S. Public Officials #1 and #2, who intended to be influenced and rewarded in connection with a business, transaction, and series of transactions, in exchange for Defendants U.S. Public Officials #l's and #2's agreement, assistance, and use of their official positions and official authority and influence to make false and misleading representations and grant favorable and discriminatory treatment of and special consideration to, including but not limited to, their business and energy interests and transactions with agencies and instrumentalities of the United States Government. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their co-conspirator agents and representatives  and Barzani family members and family

members by marriage, carried out the conspiracy through the following manner and means, among

others, in pursuit of their private illicit financial interests:

      (a)      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani coordinated in preparing and submitting inflated bids for U.S. Government contracts to create a false appearance of competitive bidding.

      (b)      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani paid bribes for the contracts that Defendants U.S. Public Officials #1 and #2 awarded to their commercial interests.

      (c)      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani met with Defendants U.S. Public Official #1 and paid him a bribe in exchange for receiving a specific contract for which Barzani interests had submitted inflated bids.

      (d)      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani concealed the conspiracy by, among other things, demanding Defendants U.S. Public Officials #1 and #2 conceal and keep secret their payment of bribes and inducements, and Defendants U.S. Public Officials #1 and #2 did conceal the nature and purpose of the scheme and artifice to defraud.

## VIII.  Corruption of U.S. Public Officials to Further Schemes of Barzani Continuing Criminal Enterprise

633.    In furtherance of the conspiracy, and to effect its objects and purposes, Defendants

Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their co-conspirator agents and

representatives and Barzani family members and family members by marriage, committed the

following overt acts, in furtherance of the Barzani Continuing Criminal Enterprise, among others,

and Defendants U.S. Public Official #1 and U.S. Public Official #2 acting in willful and knowing

concert with them, while each a public official of the United States military and government, did

corruptly give, offer, scheme, and promise something of value to public officials, directly or

indirectly, with intent to influence an official act, in violation of Title 18, United States Code,

Section 201(b)(l)(A) & (C); these actions by Defendants aided and abetted the harm which was

done to Plaintiffs.

634.    Defendants U.S. Public Official #1 and U.S. Public Official #2, were and are, as are all employees of the United States Government, prohibited from soliciting or accepting anything of value from a person . . . whose interests may be substantially affected by the performance or nonperformance of the individual's official duties." 5 U. S. C. § 7353(a)(2). Further, at the times relevant, Defendants U.S. Public Official #1 and U.S. Public Official #2 each received periodic intelligence and counterintelligence training and briefings that detailed their obligations to, among other things, complete a Foreign Contact Report after any contact with a person he or she "knows or suspects is a member of a foreign intelligence agency." Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were "member(s) of a foreign intelligence agency," a fact known to Defendants U.S. Public Officials#1 and #2 who failed to submit such mandatory reports.

635.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their agents and representatives both known and unknown, including Barzani family members and family members by marriage, did knowingly and willfully conspire and corruptly give, offer, and promise something of value to and did engage in a corrupt relationship with Defendants U.S. Public Officials #1 and #2 with the intent to influence official acts and to induce Defendants U.S. Public Officials #1 and #2 to do and to omit acts in violation of Defendants U.S. Public Official #1's and #2's lawful and official duty, and the conspirators would and did conceal Defendants U.S. Public Officials #1's and #2's involvement; that is, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzzani, and their agents and representatives, did corruptly commit acts in furtherance of an offer, payment, promise to pay, and authorize the payment of any money, offer, gift, promise to give, and authorize of the giving of anything of value, and offered and gave Defendants U.S. Public Official #1 and #2, directly and indirectly,  money, concessions, real property oil and gas rights,

and interests in real property oil and gas rights, and residential housing, and other things of value, for influencing acts and decisions of Defendants U.S. Public Officials #1 and #2 in the performance of official acts and to induce Defendants U.S. Public Officials #1 and #2 to do and omit to do acts in violation of the lawful duty of such officials and to violate lawful and official duties to the United States Government in awarding contracts and favors to the Barzani Continuing Criminal Enterprise and their partners and co-conspirators – all of which acts provided means for Defendants to damage and harm Plaintiffs.

636.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, known and unknown, including Barzani family members and family members by marriage, and Defendants U.S. Public Officials #1 and #2, being senior public officials of the United States Government who compromised to act against the United States Government's best interests, directly and indirectly, knowingly and corruptly did combine, conspire, confederate, and agree together and with each other to engage in bribery, and did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act(s), in violation of 18 U.S.C. § 201(b)(2), and did devise and intend to devise a scheme and artifice to defraud and deprive the United States Government and the citizens of the United States of their intangible right to the honest services of Defendants U.S. Public Officials #1 and #2 through bribery, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, in violation of 18 U.S.C. §§ 1343 and 1346 – all of which acts contributed to the success of the Barzani Continuing Criminal Enterprise to the damage and harm of Plaintiffs.

637.   Defendants Masoud Barzani, Mansour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, known and unknown, including Barzani family members

and family members by marriage, willfully conspired and agreed with others and did engage in a corrupt relationship to corruptly provide millions of dollars in payments or real property, mineral, and energy concessions of very high value worth millions of dollars, to, and for the benefit of, Defendants U.S. Public Officials #1 and #2, and others, to secure an improper advantage and to influence those public officials in order to obtain and retain unlawful financial, policy, and contractual favoritism.

638.   Under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, enormous amounts of American taxpayer dollars disappeared into this web of corrupt contractors and subcontractors, which permitted Defendants to harm Plaintiffs.

639.   Under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, and facilitated by Defendants U.S. Public Official #1 and U.S. Public Official #2, and others known and unknown, the Barzani Continuing Criminal Enterprise global scheme relied on a litany of criminal tactics, including but not limited to: (a) fraudulent reports that concealed corrupt relationships; (b) sham contracts used to corruptly route value to illicit recipients; (c) fake invoices used to further conceal corrupt payments; (d). the creation, maintenance, and use of off-the-books slush funds to make corrupt payments; (e) deliberate mischaracterization of corruption-related expenses including as being related to "travel," "consulting," "supply costs," "material consumption," "customer service," "cost of sales," "entitlements," "settlements," and "marketing and sales support"; (f) willful failure to implement internal controls necessary to prevent corrupt payments; and (g) the improper recording of corrupt payments on books and records, which were frequently submitted to agencies of the

U.S. Government and the Coalition Provisional Authority.

640.    The purpose of the conspiracy was: (a) to engage in a corrupt relationship with and use Defendants U.S. Public Officials #1's and #2 official position as senior United States military officers to benefit and enrich the Barzani Continuing Criminal Enterprise; (b) to defraud the United States Government and the citizens of the United States and senior Coalition Provisional Authority – Iraq officers and specialists; (c) to conceal the nature and purpose of the scheme and artifice to defraud; and (d) to induce and convince Defendants U.S. Public Officials #1 and #2 and others to misuse their public offices for personal gain, to the harm of U.S. taxpayers, with the desired and successful result of providing the means to harm and damage Plaintiffs.

641.    During the multi-year period when Defendants U.S. Public Officials #1 and #2 and others were aiding and abetting in furtherance of unlawful activity and receiving cash payments and no-cash grants and concessions of significant value from the Barzani Continuing Criminal Enterprise, Defendants U.S. Public Officials #1 and #2 supervised, negotiated, administered, and made decisions and recommendations on United States Government and Defendant Iraqi Kurdistan Regional Government contracts and benefits awarded to the Barzani Continuing Criminal Enterprise and its business partners.  Defendants U.S. Public Officials #1 and #2, and others, purportedly acting in their official capacities but actually acting *ultra vires*, routinely communicated and met with Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and co-conspirator representatives of Barzani Continuing Criminal Enterprise's business partners and associates, including Basrzani family members and family members by marriage, and signed, recommended, administered, authorized, and supervised numerous contract awards and contract modifications and policy positions, which awarded millions of dollars to the Barzani Continuing Criminal Enterprise and its business partners.

642.    Defendants U.S. Public Officials #1 and #2, being public officials of the United States, directly and indirectly, knowingly, corruptly, and as part of the criminal conspiracy conduct, did demand, seek, receive, and accept, and agree to receive and accept anything of value personally or for another person and entity – specifically a stream of cash payments from the Barzani Continuing Criminal Enterprise and substantial oil drilling concessions and plats of real property land oil and gas rights and interest in real property oil and gas rights and residential housing "on the Hill" [the elite residential area where the Barzani Defendants live in Erbil, Kurdistan, Iraq] – in return for Defendants U.S. Public Officials #1 and #2 and others being influenced in the performance of official acts or for being induced to do an act and omit to do an act in violation of his/their official duties, specifically a series of official acts relating to procurements and contracts for the purpose of benefiting the Barzani Continuing Criminal Enterprise and its business interests – all of which enabling actions to the Barzani Continuing Criminal Enterprise provided means for Defendants to damage and harm Plaintiffs.

643.    In reports to superior officers and officials of the United State Government, each of Defendants U.S. Public Officials #1 and #2, and others, each had a duty and were required by Policy Directives and policy generally, and as holders of U.S. national security clearances, to report accurate and complete information of financial assets, liabilities, and income, and did falsely, conceal, and cover-up conceal by trick, scheme, and device material facts and consistently hid aspects and nature of their corrupt relationship with Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, and their private interests, and knowingly (a) did not report any unexplained sources of income; (b) declared they had not engaged in any deceptive, illegal, or irresponsible financial practices; (c) had not been involved in any crime, and had not associated with anyone involved in illegal activities to his

knowledge; (d) had not deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations, determine employment qualifications, award benefits or status, determine security clearance eligibility or trustworthiness or award fiduciary responsibilities; (e) had not deliberately provided false or misleading information concerning relevant and material matters to an investigator in connection with a personnel security or trustworthiness determination; (f) had not engaged in personal conduct or concealment of information that may increase vulnerability to coercion, exploitation or duress such as engaging in activities which, if known, may affect their personal, profession, or community standing or render them to be susceptible to blackmail; and (g) has not had association with any person, group or business venture that could be used, even unfairly, to criticize, impugn, or attack their character or qualifications for a government position. These statements and representations were materially false because, as Defendants U.S. Public Officials #1 and #2 and others then and there knew, they were receiving cash payments and valuable oil and real property concessions from Defendants Masoud Barzani, Masrour Barzani, their representatives, and the Barzani Continuing Criminal Enterprise in exchange for preferential treatment concerning United States Government contracts awarded to Barzani's companies and business partners, contemporaneous with the time period of the Barzani Continuing Criminal Enterprise.

644.    Defendants U.S. Public Official #1, in his official duties, charged with the safekeeping, transfer, or disbursement of public money, free from deceit, craft, trickery, corruption and dishonest means, who without authority of law further engaged in criminal misconduct in apparent and actual conflict with his official and lawful duties, by impairing, impeding, and obstructing the lawful functions of the United States Army and the United States Department of

Defense and U.S. foreign military assistance programs free from deceit, craft, trickery, corruption and dishonest means, in concert with Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, known officials of a foreign government, and co-conspirator agents and representatives of the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, by knowingly, willingly, and unlawfully disguising the bribes in the form of facially legitimate transactions. Defendant U.S. Public Official #1 committed the overt illegal acts of soliciting and accepting kickbacks by charging fees of as much as $10,000 to numerous American and international businesses to obtain appointments, meetings, and conferences with representatives of the Defendant Iraqi Kurdistan Regional Government and the Barzani regime, and to secure improper advantage and to influence acts and decisions of such government and agencies and instrumentalities. Defendant U.S. Public Official #1 corruptly accepted and agreed to accept cash payments and things of value, and did perform and attempt to perform acts to carry on and facilitate the promotion and carrying on of said unlawful activities, and concealed criminal conduct, corrupt payments, and evidence, and failed to disclose such income as required, and misrepresented and concealed facts from his superiors and subordinates, all in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts of facially legitimate transactions. In violation of Title 18, United States Code, Section 371.

645.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, knew the United States Government operated and operates in Iraqi Kurdistan with a limited number of qualified contracting officers who had a vast network of contracts to supervise. Defentants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents

and representatives, including Barzani family members and family members by marriage, knew the United States government lacked the resources to investigate every payment made by Defendants or their subcontractors. Defendants were thereby able to exploit those resource constraints to conceal their unlawful and illegitimate conduct from U.S. government personnel, when Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani should have been the ones to flag such issues for the agencies funding their projects with U.S. taxpayer money.

646. Defendants, as recipients and beneficiaries of U.S. monetary and resource assistance, had and have a duty to ensure that funds acquired from the U.S. Government do not end up supporting terrorist activity, and the resources, expertise, and obligation to ensure that their practices did not materially support al-Qaeda, al-Qaeda-in-Iraq, or Islamic State. Defendants did just the opposite as they enriched themselves through the Barzani Continuing Criminal Enterprise, allowing them to the harm of the Plaintiffs.

647. Defendants actively and fraudulently concealed these violations to cloak their illegal activities. Defendants fraudulently concealed their illegal activities, as alleged herein, by, inter alia, making false and misleading entries on their books and records, fashioning deliberately deficient internal controls and accounting systems, filing false and/or misleading documents with the U.S. government, and issuing false press releases, reports, and other statements concerning, inter alia, their compliance program, all of which actions made and makes possible the continuing operation of the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

648. Defendants' affirmative actions as alleged herein, including by their Washington D.C. agents, representatives, and advisors, were wrongfully concealed and carried out in a manner that was intended to, and did, preclude detection; allowing the Barzani Continuing Criminal Enterprise to harm Plaintiffs in the past and to continue to harm Plaintiffs to the present time.

## IX.    THEFT CONCERNING PROGRAMS RECEIVING U.S. FEDERAL FUNDS

649.    Theft concerning programs receiving U.S. Federal Funds is yet another criminal scheme and conspiracy of extraordinary monetary magnitude, and in direct criminal opposition to the interests and national security of the United States.  To enrich themselves and fund their criminal acts against Plaintiffs, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives known and unknown, including Barzani family members and family members by marriage, with the intent to deceive and defraud, entered into an agreement to defraud the United States and to obstruct the lawful functions of its agencies by deceitful and dishonest means, have willfully, knowingly, and voluntarily perpetuated a theft structure, plan, and scheme, and did knowingly and willfully, directly and indirectly, commit and cause to be committed offenses and acts, against the United States Government and its agencies including but not limited to the U.S. Agency for International Development, the U.S. Department of State, and the U.S. Department of Defense and its military service branches, and knowingly obtained or attempted to obtain a benefit from the United States Government by means of false and fraudulent pretenses, representations, promises, or material omissions and with the intent to deprive the United States Government of such services with an aggregate value of more than $1 billion.

650.    It was a purpose of the conspiracy for Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani to enrich themselves by embezzling, stealing, obtaining by fraud, and otherwise without authority knowingly converting to the use of any person other than the rightful owner and intentionally misapplying property and money that was owned by the United States Government or the Defendant Iraqi Kurdistan Regional Government.  This property and money

was under the care, custody, and control of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani in their official positions, and was stolen by them to enrich the Barzani Continuing Criminal Enterprise, which actions provided the means and enabled the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

651.   As integral and indispensable to the Barzani Continuing Criminal Enterprise, the Defendant Iraqi Kurdistan Regional Government Peshmerga (military), formally under the command of the Defendant Iraqi Kurdistan Regional Government's Ministry of Peshmerga Affairs and its subordinate employees and agents, but while in reality the Peshmerga force itself, has become the armed unofficial standing army of the Defendant Iraqi Kurdistan Regional Government, commanded by Defendant Masrour Barzani.  Confidential Human Source #1, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, states that Defendants Masrour Barzani and Waysi Barzani treat the Peshmerga as personal enforcers; and have engaged the services of Azhi Amin, a former member of an Al Qaeda affiliate, a designated foreign terrorist organization, a fact well known to Defendants Masrour Barzani and Waysi Barzani.  Aziz Amin now holds a Peshmerga command position directed by Defendants Masrour Barzani and Waysi Barzani to direct a substantial part of their criminally violent acts against Plaintiffs.

652.   During the period of operation of the Barzani Continuing Criminal Enterprise, the Defendant Iraqi Kurdistan Regional Government has received in excess of two billion dollars through the U.S. Government's Agency for International Development and its American Foreign Military Sales (FMS) and Foreign Military Assistance (FMA) programs, and other programs of the United States of America.  The Defendant Iraqi Kurdistan Regional Government has been supplied by the United States with thousands of M16 rifles, dozens of .50-caliber machine guns,

286

more than 100 Humvees and armored vehicles, and dozens of 105 mm howitzers, along with other equipment and spare parts, ammunition, food, pay and medical equipment, among other resources and materiel. All of these resources have been used by the Barzani Continuing Criminal Enterprise and Defendants to further their criminal and tortious intent and to harm the Plaintiffs.

653.   The 2022 National Defense Authorization Act included $260 million for the Defendant Iraqi Kurdish Regional Government Peshmerga, a wholly subordinate agency of the Defendant Iraqi Kurdistan Regional Government commanded and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their co-conspirator agents and representatives. The White House has signaled its intention to continue its financial support for the Kurdish militia (the Defendant Iraqi Kurdistan Regional Government Peshmerga).   H.R.5232, the Iraqi and Kurdish Peshmerga Forces Defense Act of 2023, is presently before Congress.

654.   From these funds, the United States government has paid monthly stipends ranging from $100 to $400 per Peshmerga soldier.

655.   Confidential Human Sources #1 and #5, who have direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Rregional Government, disclosed Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, aided and abetted by their co-conspirator agents and representatives, including Barzani family members and family members by marriage, and others known and unknown to Plaintiffs, as central and integral to the funding of the Barzani Continuing Criminal Enterprise and its calculated injury to Plaintiffs, and to enriching themselves and others by fraudulently obtaining money from the United States and the agencies thereof, did knowingly conspire and devise and intended to devise a scheme and artifice to defraud and deprive the United States Government, to endanger United States national and economic security, to knowingly and willfully, directly and indirectly, endanger the lives and wellbeing of

American military, diplomatic, and intelligence personnel in Iraqi Kurdistan, and to knowingly and willfully, directly and indirectly, commit the following offenses against the United States Government, which enables and furthers the objectives of the Barzani Continuing Criminal Enterprise: Theft concerning programs receiving Federal Funds, by corruptly and fraudulently obtaining money from the United States Government by knowingly falsifying invoices, records, documents, reports, representations, pretenses, and promises, and by knowingly making materially false, fictitious, fraudulent, and misleading statements, and knowingly failing to disclose material facts with a duty to disclose, including fictitious and false names, and knowingly transmitted and caused to be transmitted by means of wire communications writings, for services of Peshmerga personnel, designed in whole or in part to conceal and disguise the falsity of specified unlawful activity, and falsely state the number of Peshmerga soldiers and the amounts of their payment and willfully conceal true numbers and amounts, and retaining substantial portions of the fraudulently secured proceeds, and that while conducting and attempting to conduct such financial transactions knowing that the funds involved in the financial transactions represented the proceeds of unlawful activity, and continuing to present time – which activity continues to the present time and makes possible the continuing harm to the Plaintiffs.

656.    Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, assert, affirm, and declare the means and methods of enacting the criminal acts, and the scheme was carried out, in substance, generally, by something called "ghost" or "alien" employees. These are employees on paper who either do not really exist or do not show up for work or do not perform the work for which the United States was billed – and for which the Barzani Continuing Criminal Enterprise criminally, knowingly, and fraudulently caused one or more inflated materially false

invoices or otherwise communicated accounts, and falsified oral and written certifications, statements, and accounting records regarding the reliability of financial reporting, with the United States Government for payment, and failed to disclose, among other things, the existence of false documents and fabricated accounting records related to the payments, and knowingly and repeatedly accepted bloated improper payments from the United States Government, their affirmative legal obligation requiring true and correct accounting notwithstanding. Those involved in the scheme have diverted and are diverting millions of dollars of U.S. financial assistance to the Barzani Continuing Criminal Enterprise criminal purposes, which enables the Defendants and the Barzani Continuing Criminal Enterprise to continue to harm Plaintiffs.

657.    Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, have identified Peshmerga commanders under the command and control of Defendants Masrour Barzani and Waysi Barzani who, with their agents and representatives, including Barzani family members and family members by marriage, are thereby amassing enormous fraudulently obtained personal wealth. Peshmerga commanders, in return for this substantial illicit wealth, have served the Barzani Continuing Criminal Enterprise to harm and continue to harm Plaintiffs.

658.    In an effort to legitimize fraudulent financial transactions of Defendants and the Barzani Continuing Criminal Enterprise, Defendants were and are layering funds through multiple levels of offshore entities and bank accounts throughout the world, often transferring the illicit proceeds through up to four levels of offshore bank accounts before reaching the final recipient. Members of the Barzani Continuing Criminal Enterprise conspiracy have sought to distance the origin of the funds from the final beneficiaries and disguise the nature, location, source, ownership, and control of the proceeds of said unlawful activity, knowing that the proceeds represented the

proceeds of unlawful activity.

659.    The fraudulently obtained funds were also disbursed by financial operators who acted on behalf of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, known and unknown, including but not limited to the beneficial owners of the accounts, who delivered the payments in cash in Iraqi Kurdistan or in foreign countries, in packages or suitcases at locations predetermined by the beneficiary of the funds; or made the payments to members via wire transfer through one or more of the camouflaged offshore entities.

660.    Additionally, it was part of the conspiracy that, for the purpose of establishing relationships that could further the interests and objects of the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise, including advocacy to the United States Government for funding of Peshmerga military forces of Defendant Iraqi Kurdistan Regional Government, Defendant Masrour Barzani, and his co-conspirator agents and representatives, would and did recruit and induce representatives within the United States and elsewhere, not herein named as Defendants, who did willfully and knowingly, directly and indirectly, combine, conspire, confederate, and agree together and with each other to commit an offense against the United States to wit, willingly and knowingly act as an agent of a foreign principal, namely of Defendant Masrour Barzani and the Defendant Iraqi Kurdistan Regional Government, without registering with the United States Attorney General.  These unregistered representatives of Defendant Masrour Barzani engaged in direct actions, and were compensated indirectly and primarily through oil and energy concessions and other concealed arrangements.  At no time did co-conspirators notify the National Security Division's Foreign Agent Registration Act Unit ("FARA Unit") within the U.S. Department of Justice that they would and did act in the

United States as an agent of a foreign government and official, and under the direction of Defendant Masrour Barzani, a United States person for the period of the conspiracy, would and did and do unlawfully perform acts and make statements to further Defendant Iraqi Kurdistan Regional Government interests in the United States and influence the acts and decisions of such U.S. government, agencies, and instrumentalities including its foreign policy and expenditures, who did and do and cause to be misrepresented, hidden, and concealed, the purpose of the conspiracy and the criminal acts committed in furtherance thereof, all in violation of 18 U.S.C. § 371. These hidden actions by unnamed co-conspirators have enabled the Barzani Continuing Criminal Enterprise to have substantial means to harm Plaintiffs.

661. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and Barzani family members and family members by marriage, and their agents and representatives, in furtherance of the conspiracy and to effect the illegal object thereof, committed and caused to be committed, among others, the following overt acts, in furtherance of the Barzani Continuing Criminal Enterprise. Defendants have participated by deceitful and dishonest means in, facilitated, furthered, controlled, organized, and profited from the violent Barzani Continuing Criminal Enterprise, and enjoy the proceeds, fruits, and instrumentalities of its crimes including properties in the United States and elsewhere derived from or obtained, directly or indirectly, through the commission of the offenses, and whose members and associates conspired and engaged in acts, in furtherance of the Barzani Continuing Criminal Enterprise, and the manner and methods used by the Defendants and other members and associates of the enterprise to further the goals of the enterprise and to achieve its purposes included, but were not limited to, involving murder and attempted murder, extrajudicial execution, enforced disappearances, torture, intimidation, narcotics trafficking, counterfeiting, money laundering, fraud, obstruction of justice, tax fraud,

immigration fraud, fraud against the United States Government, illicit sale and delivery of defense articles between sanctioned foreign countries without having received a license or approval from the United States Department of State, engaged in commercial trade with nations sanctions by the United States and prohibited by the Directorate of Defense Trade Controls ("DDTC"), conduct with designated terrorist organizations against the interests of the United States, and committed other crimes against the United States and its citizens and its national security interests, and the citizens of Iraqi Kurdistan, and thereby benefitting by receiving billions of illicit dollars. Defendants have hidden and attempted to hide under the false, deceptive, and legally unmerited cloak of anonymity and/or officialdom.  None of their criminal actions are legitimate official, permissible, or lawful acts of a foreign sovereign or any subordinate governate, subdivision, or instrumentality thereof.  And each and every criminal act committed by Defendants engaged in the Barzani Continuing Criminal Enterprise has provided the means to harm Plaintiffs.

662.  In another illustrative example of an overt act in furtherance of the Barzani Continuing Criminal Enterprise, financial transaction records in the possession of Confidential Human Source #1 document removal of US$832 million from Iraqi Kurdistan to South Korea to Germany by Barzani subordinate Defendant Ashti Hawrami, the then Defendant Iraqi Kurdistan Regional Government Minister of Oil.

663.  To harm Plaintiffs and exceedingly enrich themselves, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate criminal co-conspirators, as part of the Barzani Continuing Criminal Enterprise, have willfully, recklessly, knowingly, purposefully, and with wanton disregard ignored and violated, at a minimum, international treaties, agreements, and conventions to which the Republic of Iraq is a signatory nation despite being obligated to follow each and every provision of said treaties, agreements, and conventions.

292

## IX.   UNITED STATES TAX CRIMES IN FURTHERANCE OF THE BARZANI CONTINUING CRIMINAL ENTERPRISE

664.   In order to provide means to harm Plaintiffs and exceedingly enrich themselves, and elude, evade, and circumvent requisite disclosure requirements and tax obligations of the U.S. Department of the Treasury and its Internal Revenue Service, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate criminal co-conspirators, including Barani family members and family members by marriage, and others known and unknown, as part of the Barzani Continuing Criminal Enterprise through abusive criminal tax schemes and fraudulent and deceptive practices, did voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with individuals both known and unknown, and with wanton disregard for and as part of a pattern of illegal activity, ignored and violated, at a minimum, multiple federal tax laws and federal tax regulations having force of law of the United States, thereby interfering with the proper administration of the Internal Revenue Laws and harming Plaintiffs, in "a *conscious* course of *deliberate* ignorance, *i.e.,* of purposeful blinding while knowing that a crime was likely in progress...." *United States v. Masse*, 816 F.2d 805, 812 (1st Cir.1987).

665.   Defendants acted with the object of criminally enriching themselves and to provide means to harm Plaintiffs, by committing and causing to be committed various corrupt acts, including but not limited to: (a) providing false documents in connection with tax matters and (b) making false statements in connection with tax matters of the United States government, and (c) knowingly and willfully not paying taxes due the United States, all in violation of 26 U.S.C. 7212(a).

293

666.    As part of the Barzani Continuing Criminal Enterprise to provide the means to damage Plaintiffs, the defendant[s] knowingly and wilfully concealed material facts from the Internal Revenue Service in matters under its jurisdiction by making false or fraudulent representations to a federal agency or department, which were sufficiently repeated and related to form a "pattern of illegal activity".   The illegal activities alleged herein were "within the jurisdiction of [a] department or agency of the United States." 18 U.S.C. § 1001.

667.    To provide the means to harm plaintiffs and criminally enrich themselves, Defendants Masrour Barzani, Entifadh Kamal Qanbar, and Omar Barzani, and others did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with other individuals to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service (IRS) in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

668.    The extreme amount of revenue raised by evasion and financial harm to the United States provides the means to harm Plaintiffs as set forth herein.


**Defendant Entifadh Kamal Qanbar**

669.    As part of the Barzani Continuing Criminal Enterprise and according to the respective documents submitted by Defendant Entifadh Qanbar to the Internal Revenue Service, the Kurdish Protection Action Committee was purportedly organized for charitable purposes and "approved by Kurdish Prime Minister [Defendant] Masrour Barzani." Defendant Entifadh Qanbar submitted a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the

Internal Revenue Code ("Tax Exempt Status Application"), on behalf of the Kurdish Protection Action Committee (KPAC).

670. Specifically, the IRS granted 501(c)(3) charity tax exempt status to KPAC on the Tax-Exempt Status Applications based on the false documents prepared and submitted by Defendant Entifadh Qanbar.

671. As part of the Barzani Continuing Criminal Enterprise and to further its object, Defendants Masrour Barzani and Aziz Ahmed, purportedly on behalf of the Council of Ministers of Defendant Iraqi Kurdistan Regional Government controlled by Defendant Masrour Barzani, in 2023 engaged Defendant Entifdh Qanbar for the sole purpose of filing false documents to obtain tax exempt status and to operate through a United States-incorporated Internal Revenue Service-issued non-profit 501(c)(3) tax exempt political, economic, and educational action committee named Kurdish Protection Action Committee incorporated in the State of Virginia.

672. Defendant Entifdh Qanbar is the architect of this fraudulent charitable giving tax scheme in furtherance of the Barzani Continuing Criminal Enterprise. He promotes, organizes, and executes every material aspect of the scheme that gives rise to the participants' bogus charitable status – from the creation of the bogus charity and the incorporation thereof to the completion and submission of the necessary tax documents.

673. Defendant Entifdh Qanbar formed the entity, secured tax identification numbers for the entity, drafted or directed the drafting of all fraudulent documents necessary to create and operate the entity, and filed or directed the filing of all necessary paperwork with state and local authorities.

674. The purpose of said Kurdish Protection Action Committee self-declared in documents filed by Defendant Entifdh Qanbar with the U.S. Government is to "meet with

American representatives and staff to educate them" on Kurdistan and "ask the Congress for support of the Kurdish American alliance... by focusing on certain acts and legislation..." Defendant Entifdh Qanbar "will also prepare and disseminate informational materials and may engage in lobbying, promotion, perception management, and public relations."

675.    Contrary to this declaration submitted under oath by Defendant Entifadh Qanbar to the U.S. Department of Justice made pursuant to the Foreign Agents Registration Act, the Articles of Incorporation for the Kurdish Protection Action Committee ("KPAC"), filed with the State of Virginia in 2022 by Defendant Entifdh Qanbar, declare under oath "the corporation is organized exclusively for charitable, religious, education, and scientific purposes, including, for such purposes, the making of distributions to organization that qualify as exempt organization under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code."

676.    Defendant Entifadh Qanbar, as the Incorporator of said corporation, in direct and purposeful contravention of the above sworn federal declaration, further declared to the State Corporation Commission of the Commonwealth of Virginia: "No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation..."   Further, the By-Laws submitted by Defendant Entifadh Qanbar to the Commonwealth of Virginia declare, "The organization is organized exclusively for purposes pursuant to section 501(c)(4) of the Internal Revenue Code."

677.    Defendant Entifadh Qanbar knew and had reason to know that these statements were false or fraudulent.  Specifically, Defendant Qanbar made many false statements regarding the validity of his scheme; the tax-exempt status of KPAC; and the propriety of the scheme participant's donations and resulting charitable contribution deductions.  Defendant Qanbar

296

prepared and presented, or assisted others in preparing and presenting, documents and portions of documents that they know (or had reason to know) would be used in connection with material matters arising under the internal revenue laws. Defendant Entifdh Qanbar knew and had reason to know the statutory purposes and permissible functions and activities of a 501(c)(3) and a 501(c)(4) organization are significantly different, and that the primary activities in which he and KPAC engage are explicitly prohibited within a 501(c)(3) tax example organization. All these fraudulent actions were taken to hide income from the United States and provide means to damage the Plaintiffs.

678.    In furtherance of and aiding and abetting the concealment by trick, scheme or device of material facts from the IRS, this scheme "approved by Kurdish Prime Minister [Defendant] Masrour Barzani," Defendant Entifdh Qanbar did knowingly and willfully falsify, conceal, and coverup by a trick, scheme, and device, a material fact, and the defendant made materially false, fictitious, and fraudulent statements and representations, and the defendant made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in a matter within the jurisdiction of the executive branch of the Government of the United States. Under the banner of KPAC, a 501(c)(3) tax exempt charitable organization, he has falsely, publicly, purposefully, knowingly, and maliciously accused former United States Ambassador Ryan Crocker and American Enterprise Institute scholars Danielle Pletka and Michael Rubin of being party to an Iranian information operations scheme after attending an ordinary conference in Baghdad, Iraq during which the Prime Minister of Iraq spoke.

679.    To aid the Barzani Continuing Criminal in committing harm to Plaintiffs, in serious yet knowing violation of the legally permissible activities of a tax-exempt 501(c)(3) organization,

Defendant Entifdh Qanbar coordinated with a foreign entity or foreign official, working together as a cohesive structure, over time, to manipulate the legislative process, obtain and retain political power on behalf of Defendants Masoud Barzani and Masrour Barzani, benefit financially, obfuscate the nature of their activities, and with longevity sufficient to pursue the Barzani Continuing Criminal Enterprise's purpose, thus providing substantial means to enable Defendants to damage Plaintiffs. These fraudulent activities enabled Defendants to use the KPAC as a vehicle, directly and indirectly, to provide means to damage Plaintiffs.

680.    Defendant Entifadh Qanbar prepared and submitted documents to the U.S. Department of the Treasury through its Internal Revenue Service, and to the State Corporation Commission of the Commonwealth of Virginia which documents are materially, substantively, and factually different from each other. Defendant Qanbar's media appearance and X (formerly Twitter) feed, unreservedly available to a worldwide audience, appear only to promote Defendant Masrour Barzani's propaganda, attack his political opponents, dismiss human rights concerns, and generally act to amplify partisan media in a manner that often crosses into libel and slander and remains functionally, wholly, and impermissibly different from the activities for which Defendant Qanbar registered with the Department of the Treasury. These activities were false and fraudulent and were taken with the object and means to damage Plaintiffs.

681.    The long-time, continuing, and cumulative pattern of criminal conduct by Defendant Masoud Barzani, his agents and representatives including family members and family members by marriage, and the Barzani Continuing Criminal Enterprise, aided and abetted by Defendant Entifdh Qanbar, has been and is one of purposeful, willing, knowing, and continual misrepresentation, fabrication, deceit, and falsification, which fraudulent activities substantially contributed to providing means to damage and harm Plaintiffs.

682.     As a co-conspirator with and representative of the Barzani Continuing Criminal Enterprise, and to perpetuate the Barzani Continuing Criminal Enterprise to provide the means to harm Plaintiffs, Defendant Entifdh Qanbar made a willful concealment of material facts to officials of agencies of federal and state governments of the United States.

683.     In order to maintain its tax exemption, and use the charitable organization as a means to provide means to harm Plaintiffs, KPAC was required to file annually IRS Form 990, truthfully disclosing the earnings and activities of the organization.  To continue to use KPAC's tax-exempt status, and Defendant Entifdh Qanbar and others directed by  Defendant Entifdh Qanbar filed IRS Forms 990 which intentionally omitted their transactions with persons and entities in Iraq and elsewhere and failed to disclose relevant requested information regarding the control. history and affiliations of the KPAC.  Defendant Entifdh Qanbar made knowingly false public statements and knowingly false statements to officials of the United States Government, and used funds to harm Plaintiffs which acts were not in furtherance of the KPAC's purported charitable mission authorized by the Internal Revenue Service.

684.     To be a sponsoring organization, the KPAC is required to report certain information on the annual "tax return" for tax exempt entities – Form 990, Return of Organization Exempt from Tax ("Form 990").  Defendant Entifdh Qanbar completed the bogus charity's Tax-Exempt Status Applications and Forms 990 and knew that the bogus charity did not truthfully report the required information, which fraudulent forms enable KPAC to continue to operate and damage Plaintiffs.

685.     At all times, Defendant Qanbar controlled the bogus charity, KPAC, which was formed to further the object of the Barzani Continuing Criminal Enterprise and to damage Plaintiffs.

**<u>Defendant Omar S. Barzani:</u>**

686.     Defendant Omar Barzani is the self-declared principal officer of the Texas-based Barzani Charitable Foundation.

687.     Defendant Masrour Barzani, a U.S. person, is listed on documents filed by Defendant Omar S. Barzani with the Internal Revenue Service as chairman of the Barzani Charity Foundation.

688.     As part of the criminal scheme of Defendants and the Barzani Continuing Criminal Enterprise to use the Barzani Charity Foundation to harm Plaintiffs, Defendant Omar Barzani as the Fund's principal officer, who acting under direction of Defendant Masrour Barzani as Fund chairman, committed or caused to be committed perjury on submitted Internal Revenue Service forms, as described in more detail below, conspired to fraudulently obstruct the federal tax function, and with premeditated deceit, fraudulently or unlawfully obtained, as a benefit to the Barzani Continuing Criminal Enterprise to avoid U.S. taxes, a charitable non-profit tax designation and treatment in that he/they knowingly and with deliberate disregard of the clearly delineated requirements of law falsely declared or caused to be falsely declared to the Internal Revenue Service.

689.     Defendants Masrour Barzani and Omar Barzani conspired and knowingly and purposefully failed to disclose the defendants noncompliance with a statutory, regulatory, or contractual requirement, while omitting critical qualifying information, including making actionable misrepresentation and providing materially false information by knowingly and purposefully answering NO to at least the following qualifying questions: (a) Did the organization maintain an office, employees, or agents outside of the United States?; (b) Did the organization

have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign Investments valued at $100,000 or more?; (c) Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization?; (d) Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals?; (e) At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)?; and knowingly and willfully failed to disclose officers, directors, and trustees. *See Universal Health Servs. Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 2001 (2016).* Defendants Masrour Barzani and Omar Barzani knew and had reason to know that these statements were false or fraudulent, and if answered truthfully would result in IRS denial of the application for tax exempt status.

690.    Defendant Omar Barzani formed the entity, the Barzani Charity Foundation, secured tax identification numbers for the Barzani Charity Foundation, drafted or directed the drafting of all documents necessary to create and operate the Barzani Charity Foundation, and filed or directed the filing of all necessary paperwork with state and local authorities for the formation and continuance of the Barzani Charity Foundation.

691.    Defendant Omar Barzani knew and had reason to know the statutory requirements of a 501(c)(3) organization, yet made false statements as set forth herein regarding the validity of his scheme, to wit: The lawful tax-exempt status of the Barzani Charity Foundation, thereby aiding and abetting Defendants and the Barzani Continuing Criminal Enterprises' concealment by trick, scheme or device of material facts from the IRS.    Defendant Omar Barzani made false representations of a material fact knowing that the representations were false, and with the

intent to mislead, obfuscate the nature of their activities, and with longevity sufficient to pursue the Barzani Continuing Criminal Enterprise's purpose of evading taxes to provide substantial means to damage Plaintiffs. As co-conspirators with and representative of the Barzani Continuing Criminal Enterprise, and to perpetuate the Barzani Continuing Criminal Enterprise to provide the means to harm Plaintiffs, Defendants Masrour Barzani and Omar Barzani made a willful concealment of material facts to officials of agencies of federal and state governments of the United States.

692.    The Barzani Charity Foundation was incorporated in the State of Texas in 2015, operated in the intervening years, and has been forfeited by the Texas Comptroller of Public Accounts in 2024. At all times, Defendants Masrour Barzani and Omar Barzani controlled the bogus charity, which was formed to further the object of the Barzani Continuing Criminal Enterprise and to damage Plaintiffs.

### Defendant Masrour Barzani

693.    Defendant Masrour Barzani, as a U.S. person resident alien (a green card holder), is required by statute, as a term of such granted immigration status, to follow the same tax laws as U.S. citizens and must report worldwide income from all sources, that is, income from both within and outside the United States, must report financial assets outside the United States, and must disclose foreign bank accounts and other offshore international assets & investments.

694.    Defendant Masrour Barzani, as the head of the Barzani Continuing Criminal Enterprise, willfully and criminally, and to further the criminal object of the enterprise and harm Plaintiffs, conspired with others unnamed to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation,

assessment and collection of revenue, specifically, failing to comply with the Foreign Account Tax Compliance Act (FATCA), in an effort to defraud the United States, increase illicit wealth, and use wealth to injure Plaintiffs.

695.   For numerous tax years, Defendant Masrour Barzani grossly, knowingly, and willingly evaded or defeated any tax imposed by or due and owing the United States, and signed, filed, and caused to be filed false and fraudulent or elected to not file U.S. tax documents, U.S. Individual Income Tax Returns, Form 1040, and other forms, knowing it/them to be false and fraudulent, and failed to properly and honestly comply with his legal and substantial tax obligations as a United States person, knowing the returns and/or omissions to be false and fraudulent.  By these criminal acts, Defendant Masrour Barzani failed to declare and pay proper taxes in very significant amounts, thereby enriching the criminal enterprise which directly provided the means for Defendants to commit brutal criminal and tortious acts to harm Plaintiffs.

## HIDING FRUITS OF THE BARZANI CRIMINAL ENTERPRISE

696.   Defendants willfully and knowingly, directly and indirectly, combined, conspired, confederated, and agreed together, and with other individuals and groups known and unknown, including Barzani family members and family members by marriage, to engage in fraudulent schemes and organized, established, and operated front corporations as a part and object of the conspiracy, a personal and private action and the type of actions by which a private party engages in trade and traffic or commerce, holding and increasing its monopolistic market share and continuing to generate enormous profits, and to which defendants diverted the proceeds of unlawful activity of the Barzani Continuing Criminal Enterprise, traceable to the commission of their offenses, including but not limited to a sum of money in United States currency, knowing

that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activity, to wit: received proceeds from various criminal and tortious schemes or artifice, which have been comingled with other illicit proceeds, and transferred and directed others to transfer those proceeds among the shell companies, investments, holdings, and offshore bank accounts, in such locales as Dubai and elsewhere, controlled by participants in the schemes in order to conceal and disguise the source, location, ownership and control of the funds. (Title 18, United States Code, Section 1956 (h).)

697. With multiple illicit schemes, Defendant Masrour Barzani and his co-conspirators created and did structure a complex network of co-conspirator front corporations, subsidiaries, and affiliates in multiple countries, including but not limited to STER Group and its multiple subsidiary entities, Daline Group, Sardar Holdings, and Falcon Group, through which the conspirators, executives, employees, and nominees, with the intent to deceive and defraud, and by means of false and fraudulent pretenses and representations, coordinated the fraud activity around the globe including knowingly and willfully, directly and indirectly, concealing the ongoing criminal schemes.

698. Defendants' collected and aggregated cash in the United States and elsewhere, and laundered the proceeds of the criminal enterprise in order to promote and conceal their transnational criminal schemes, and caused false statements to be made to, and to destroy and conceal documents and records to evade detection from, regulatory and law enforcement authorities in the United States, Iraq, and elsewhere, and transmitted said proceeds throughout the world. Through a network of limited liability corporations and other concealing entities, Defendants also purchased and aggregated commercial, rental, and residential real property in the

United States and elsewhere that were and are in fact the proceeds of Barzani transnational criminal activity.

699.     Defendant Lina Barzani, possibly a fictitious person but represented to be the 29-year-old daughter of another Barzani family member, Defendant Sirwan Barzani, and an American citizen born in Virginia in 1994, is the alleged owner of record of U.S.-based Lina Holdings and its many properties, allegedly including 526 residential units and a Hard Rock Cafe, that are estimated by Confidential Human #15, who has direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, to exceed US$1 billion.  Defendant Lina Barzani allegedly administers a disguised repository, in the United States, of substantial illicit criminal earnings of the Barzani Continuing Criminal Enterprise.  Documents allegedly reveal that Lina Holdings owns 26 different companies, 14 hotels, six factories, 286 cafes, 540 apartments, 48 restaurants, 8 diverse centers, two tourism projects, one hospital, and one bank.  Defendant Lina Barzani presents herself online as a Vice President of J.P. Morgan.  However, J.P. Morgan does not list her in its global employee directory.  Earnings from assets managed and "owned" by Defendant Lina Barzani and entities she "controls" flow to the Barzani Continuing Criminal Enterprise and are substantially used to harm Plaintiffs.

700.     All Barzani family members named and unnamed herein, including Barzani family members and family members related to the tortfeasors by marriage, as individuals, have enjoyed the trappings of profuse illicit wealth and benefited from and are used in and/or intended to be used in facilitating and/or committing the subject offenses of the Barzani Continuing Criminal Enterprise, including willfully concealing the proceeds derived from it, often through a series of transactions and shell companies located in the United States and abroad, with full knowledge, support and participation in Barzani family criminal activities.

701.    It was a part and object of the conspiracy that all Barzani family members named and unnamed herein, including Barzani family members related by marriage, and others known and unknown, as individuals, knowing that the property or money involved represented the proceeds of some form of illegal activity, would and did conduct and attempt to conduct financial transactions, which in fact involved proceeds of unlawful activity including violations of IEEPA and multiple U.S. statutes, knowing that their involvement was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activity.

702.    "It defies credulity that" family members and family members by marriage "did not know that something illegal was afoot." *See Halberstam v. Welch,* 705 F.2d 472, 486 (D.C. Cir. 1983). Family members knew and know full well the purpose of the forays and the means by which Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and Barzani family members and family members by marriage, and other co-conspirators, had risen from "rags to riches" in a relatively short period of time. Family members were compliant, but neither dumb nor duped, so long as their personal comfort and fortune were assured. Each was a willing partner in these criminal activities. (*See Halberstam v. Welch,* No. 81-0903, mem. op. at 5 (D.D.C. Mar. 24, 1982) [herein cited as District Court Opinion]).

703.    "Secondary liability for aiding and abetting 'reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.'" (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 208 (D.C. Cir. 2022). *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 176, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

704.    The support of all named and unnamed Barzani family members and family members by marriage in the Barzani Continuing Criminal Enterprise, from which each has

substantially, luxuriously, and illicitly financially benefited and does benefit from proceeds traceable to violations of the subject offenses, has made it possible for the Barzani Continuing Criminal Enterprise to have the means, management, dominance, and absolute control necessary to enable it to damage and otherwise injure Plaintiffs.

705.    The Court of Appeals for the District of Columbia Circuit held that "accountability does not depend inexorably upon personal performance of the acts comprising an offense. He who assists the perpetrator of crime in its commission is as much answerable as if he had engaged in all of its essential aspects himself." (*See United States v. Staten*, 581 F.2d at 886 (D.C. Cir. 1978)). Through assistance, facilitation, enablement, abetment, collaboration, concealment, disguise, dissimulation, duplicity, deception, endorsement, misrepresentation, commercial advantage, and financial participation, inclusion, and benefit, and other means, the co-conspirator Barzani family and family members by marriage, and their agents, representatives, employees, and contractors, are equally accountable for the prodigious criminal and tortious acts of the transnational Barzani Continuing Criminal Enterprise conducted over many years and in many nations to enrich and empower Defendants and to enable Defendants to relentlessly harm Plaintiffs.

### KURDISH VICTIMS FUND, A NON-PROFIT 501(C)(3) FOUNDATION

706.    Documentary evidence confirms the Barzani Continuing Criminal Enterprise, often acting under the false and intentionally misleading cloak of officialdom, has been responsible for the extrajudicial murder of in excess of five thousand men, women, and children during the decades of its continuing criminal activity.   John Doe victims have surviving families and dependents that deserve compensation for the loss of their loved ones.   Members of surviving families fear reprisals and imminent threats, which are not imaginary nor wholly speculative, and

are afraid to come forward and seek redress because in their autocratic control of the Kurdistan judicial system Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, and others known and unknown, have purposefully limited all avenues and access for victims and their families, including the impossibility of safely conducting investigation and discovery in provincial Iraqi Kurdistan, to obtain justice and redress. These victims and their families have no realistic hope to obtain justice in the Republic of Iraq or Defendant Iraqi Kurdistan Regional Government or from any court of Defendant Iraqi Kurdistan Regional Government controlled and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barani, and lacking protection from reprisals or other intimidation and retributive measures, they severely fear, which is not imaginary nor wholly speculative, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and the Barzani Continuing Criminal Enterprise.

707.    Plaintiffs have established and incorporated a United States non-profit 501(c)(3) charitable Foundation, the "Kurdish Victims Fund", an entity with grave responsibility on behalf of victims and permitted to hold an interest in property under federal and state law, to compensate from any recovery in the instant case the John Doe victims and their families; and have included the Kurdish Victims Fund as an additional plaintiff.

708.    The United States District Court for the District of Columbia held in *Beer* "that foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards." *Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d at 56 (D.D.C.2012), citing *Beer v. Islamic Republic of Iran*, 789 F.Supp.2d 14, 16-26 (D.D.C.2011) (Lamberth, C.J.). Defendant Iraqi Kurdistan Regional Government is *not* a foreign sovereign, and even if it was it could not shield itself from punitive damages awards.

709.     Moreover, punitive damages – a type of civil remedy – are by definition intended to punish.     The United States Supreme Court has declared, punitive damages "are not compensation for injury.     Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974)

710.     The United States District Court for the District of Columbia noted in *Oveissi* that Iran is a foreign state "with substantial wealth and has expended significant resources sponsoring terrorism." Though Iraqi Kurdistan is *not* a foreign state, the same characterization and description is germane, relevant, material, and applicable to the Barzani Continuing Criminal Enterprise, "with its substantial wealth", and Defendant Iraqi Kurdistan Regional Government both of which Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani control absolutely. *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, at 56 (D.C. 2012).

### COUNT I
### (TORTURE VICTIMS PROTECTION ACT OF 1991, 28 U.S.C. §1350)

711.     Plaintiffs reallege and incorporate by reference the allegations and preceding paragraphs as if fully stated herein.

712.     When Congress enacted the Torture Victim Protection Act (TVPA) in 1991, it explicitly created a new cause of action against individuals who commit torture or extrajudicial killing in violation of international law "under actual or apparent authority, or color of law", of any foreign nation. *See* 28 U.S.C. § 1350 note § 2(a). (Torture Victim Protection); *Nestlé USA, Inc. v. Doe,* 141 S. Ct. 1931, 1937-38 (2021) (opinion of Thomas, J.)   "28 U.S.C. § 1350 provides that a district court shall have original jurisdiction over civil actions 'by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.'" *Tel-Oren v. Libyan*

*Arab Republic,* 726 F.2d 774,777 (D.C. Cir. 1984).

713.    In its 2023 opinion *Doe v. Cisco Systems, Inc.,* No. 15-16909 (9th Cir. July 7, 2023),

the 9th Circuit stated:

> *"Congress enacted the TVPA in 1992 to "establish[ ] a civil action*
> *for recovery of damages from an individual who engages in torture*
> *or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (1992)*
> *(codified at 28 U.S.C. § 1350 note). The statute provides that "[a]n*
> *individual who, under actual or apparent authority, or color of law,*
> *of any foreign nation . . . subjects an individual to torture shall, in a*
> *civil action, be liable for damages to that individual." 28 U.S.C. §*
> *1350 note § 2(a)."*

714.    The statute provides liability for an individual who "*subjects* an individual to

torture." 28 U.S.C. § 1350 note § 2(a).  It does not specify that an individual must directly "torture"

another.  The statute defines "torture" as the "intentional[ ] inflict[ion]" of any act causing "severe

pain or suffering." 28 U.S.C. § 1350 note § 3(b).  Defendant's intentional infliction of severe pain

and suffering on Plaintiffs was done for the purpose of discrimination, intimidation, or

punishment.  If Congress had intended to restrict TVPA liability to those who themselves

intentionally commit acts causing severe pain or suffering, it could have used the term "tortures"

or "inflicts torture" in section 2(a), the liability provision.  Instead, the term used was "subjects an

individual to torture."  The dictionary definition of the verb "subject" includes "to cause or force

to undergo or endure (something unpleasant, inconvenient, or trying).' *Subject,* Merriam-Webster,

https://www.merriam-webster.com/dictionary/subject (last visited Feb. 24, 2023); *see also*

*Subject,*               American               Heritage               Dictionary,

https://www.ahdictionary.com/word/search.html?q=subject (last visited Feb. 24, 2023) (defining

the verb "subject" as "[t]o cause to experience, undergo, or be acted upon").  "Subjects . . . to

torture" thus encompasses not only individuals who directly torture another but also those who in

some respect *cause* another to undergo torture.

715.    Cruel, inhuman or degrading treatment constitutes acts that "inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of torture or do not have the same purposes as torture." *Chiminya Tachiona v. Mugabe,* 216 F. Supp. 2d 262, 281 (S.D.N.Y. 2002). The dividing line between the two violations "derives principally from a difference in the intensity of the suffering inflicted." *In re S. Afr. Apartheid Litig.,* 617 F. Supp. 2d 228, 254 (S.D.N.Y. 2009) (citing Restatement (Third) of Foreign Relations Law § 702 Reporter's Note 5 (1987)). The Defendants actions as set forth herein constituted extreme infliction of mental and physical suffering, anguish, humiliation, fear and debasement upon Plaintiffs.

716.    The TVPA extended the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350 (1991), *See* H. R. Rep. No. 102-367, at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86. Additionally, other international agreements impose liability for torture, killing, and mistreatment. *See e.g.,* Universal Declaration of Human Rights, U.N. General Assembly Res. 217(III)(A) (1948); International Covenant on Civil and Political Rights, U.N. General Assembly Res. 2200(XXI)A, U.N. Doc. A/6316 (1966); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, European Treaty Series No. 5 (1968). *See Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir. 2005).

717.    The TVPA encompasses claims against those who aid and abet torture and extrajudicial killing and other acts of atrocity crimes.

718.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and the other named defendants, as individuals acting deceitfully under actual or apparent authority, or color of law, of the Republic of Iraq and the subordinate Defendant Iraqi Kurdistan Regional Government thereof have directly and indirectly subjected Plaintiffs to torture, enforced disappearances, extrajudicial killing, summary executions, and other tortious acts. These killings were not authorized through

any kind of judicial judgment or court authorization falling within the TVPA's exception. 28 U.S.C. § 1350 note § 3(a).

719.    The District Court of the District of Columbia has held that "summary executions" and "a course of indiscriminate brutality, known to result in deaths", such as those committed by Defendants, can be "extrajudicial killings" under the TVPA. *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 17 (D.D.C. 1998), *abrogated on other grounds as recognized in Christie v. Islamic Republic of Iran,* No. CV 19-1289 (BAH), 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).

720.    Defendants have created a regime of pervasive fear, which is not imaginary nor wholly speculative, and Plaintiffs and others have reasonable fear of retributive reprisals against themselves or members of their families, coupled with the impossibility of safely conducting investigation and discovery in geographical areas and government agencies controlled by Defendant Iraqi Kurdistan Regional Government that prevents the personal representatives of the five thousand murder victims and most victims of torture from stepping forward to seek redress in United States Courts pursuant to the provisions of the Torture Victim Protection Act of 1991.  For that reason, Plaintiffs have established the Kurdish Victims Fund that will provide a means to provide aid to the families of murder and torture victims and who will continue to suffer from the emotional and psychological scars of these acts of torture for years to come.  Plaintiffs are still grappling with the trauma: entire families murdered, tortured and mutilated, children and elderly people ripped from the arms of their loved ones and disappeared.  All these atrocities are well documented.

721.    Moreover, awarding damages also serves United States national security interests by deterring foreign actors who sponsor terrorism and torture.

722.    In the instant case, remedies for Plaintiffs theoretically offered by Kurdistan courts are ineffective, unobtainable, unduly prolonged, inadequate, and obviously and patently futile, and Plaintiffs would suffer retaliation for bringing claims in Kurdistan. *See Jean v. Dorelien,* 431 F.3d 776, 783 (11th Cir. 2005)   There has been no criminal or civil accountability for crimes or human rights violations by Defendant Iraqi Kurdistan Regional Government or its leaders Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives. The Defendant Iraqi Kurdistan Regional Government Peshmerga military justice system, operated under and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, did not discipline anyone involved in the crimes. The Defendant Iraqi Kurdistan Regional Government judiciary, directed and controlled by Defendants Mawoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, appears unable or unwilling to provide an adequate forum for the pursuit of claims rooted in these violations. The Defendant Iraqi Kurdistan Regional Government judiciary does not function in a manner that allows Plaintiffs to reasonably pursue their claims. *See, e.g., Ahmed v. Magan,* No. 2:10-CV-342, 2011 WL 13160129, at *5 (S.D. Ohio Nov. 7, 2011). It is well and publicly documented by agencies of the United States and the United Nations that the Defendant Iraqi Kurdistan Regional Government judiciary suffers from a lack of due process, political independence, opacity, and corruption.

723.    Under the TVPA, "[a] court shall decline to hear a claim under [the TVPA] if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note, sec.2(c). Where local remedies are not "adequate" or "available" then a TVPA claimant need not first attempt to exhaust such remedies before suing. "The legal remedies offered by the [local] courts were [ ] ineffective, unobtainable,

unduly prolonged, inadequate or obviously futile." *Enahoro v. Abubakar,* 408 F.3d 877, 892 (7th Cir. 2005). The District Court of the District of Columbia has likewise acknowledged that plaintiffs need not meet the exhaustion requirement under certain circumstances. For example, plaintiffs need not exhaust their local remedies if the plaintiffs would suffer retaliation for bringing their claims locally. *See, e.g., Doe v. Exxon Mobil Corp.,* 393 F.Supp.2d 20, 25 (D.D.C. 2005).

724.     The perpetrators of atrocity crimes, torture, extrajudicial killing, and human rights abuses detailed herein remain ensconced in positions of power and authority in the Defendant Iraqi Kurdistan Regional Government, coupled with the fact that the Defendant Iraqi Kurdistan Regional Government has taken no action against any accused offenders, Plaintiffs' had and have reasonable, justified, substantial, and persistent fear of violent reprisal for bringing claims of such violations. See *Jane W. v. Thomas*, Civil Action No. 18-0569 (E.D. Pa. Nov. 14, 2018). *Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021).

725.     Plaintiffs have established Defendant's liability under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, for the acts of extrajudicial killing of Plaintiffs' decedents, attempted extrajudicial killings, and torture. These are acts for which the TVPA creates an "unambiguous and modern basis" for liability. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 728, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing H.R. Rep. No. 102-367, at 3 (1991)).

726.     The District Court of the District of Columbia has interpreted the TVPA to allow liability for attempted extrajudicial killings, such as the attempts on Plaintiff Maki Revend, "even if no one died as a result of [the] attempt." *Gill v. Islamic Republic of Iran,* 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (citing *Warfaa v. Ali,* 33 F. Supp. 3d 653, 666 (E.D. Va. 2014)) *aff'd,* 811 F.3d 653 (4th Cir. 2016).

727.     The United States Supreme Court expressly held that Plaintiffs in a federal cause

of action under §1605A(c) may seek retroactive punitive damages for pre-enactment conduct and explicitly made a new cause of action available to remedy certain past acts of terrorism and related actions. *See Opati v. Republic of Sudan*, 140 S. Ct. 1601, 590 U.S., 206 L. Ed. 2d 904 (2020).

728.   The private right of action in 28 U.S.C. § 1605A(c) also authorizes "punitive damages," which "serve to punish and deter the actions for which they are awarded." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 87. (D.C. 2010). Courts balance four factors to determine the appropriate amounts of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023), (quoting *Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d at 56 (D.D.C.2012) and *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d at 30 (D.C. 2008) citing *Acosta*, 574 F.Supp.2d at 30 (citing *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 32 (D.D.C.1998)).

729.   Defendants' individual conduct of torture and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear." *See Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019).

730.   In the instant case, all four factors weigh overwhelmingly in favor of awarding significant punitive damages. Wherefore, Plaintiffs demand judgment against Defendants, recognizing their massive illicit wealth, for compensatory damages, including solatium, in an amount sufficient to compensate them for injuries perpetrated by Defendants and for solace; and for punitive damages sufficient to punish Defendants, acting as individuals, for the willful torture and extra judicial killings and associated criminal acts and atrocity crimes, and sufficient to "yield the desired deterrent effect." *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C.

2010).

## COUNT II
### (ANTI-TERRORISM ACT – 18 USC 2333)

**[All Defendants: Aiding-And-Abetting Liability, Attack Predicate]**

731.    Plaintiffs reallege and incorporate by reference the allegations and preceding paragraphs as if fully stated herein.

732.    The Anti-Terrorism Act (ATA) is an exercise in universal civil jurisdiction, as it extends domestic judicial jurisdiction over actions that occurred abroad to foreign plaintiffs; it has historically been a means for non-U.S. citizens to seek redress for serious human rights violations committed outside of the U.S.   It provides in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."   28 U.S.C.  § 1350.   Before the ratification of the Constitution and the passage of the Judiciary Act of 1789 to implement its provisions, several international scandals had resulted from the "inability to provide judicial relief to foreign officials injured in the United States."   *Kiobel,* 569 U.S. at 123; see also *Jesner,* 138 S. Ct. at 1396-97 (majority op.).  Noting the problems caused by the lack of a forum in which aggrieved foreigners – in particular, ambassadors – could find an appropriate remedy, the Supreme Court in *Jesner* concluded that the First Congress of the United States enacted the ATS as part of the Judiciary Act of 1789 to "promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable."   138 S. Ct. at 1396-97, 1406 (majority op.); *see* also *Kiobel,* 569 U.S. at 123, and *Doe v. Cisco Systems, Inc.,* No. 15-16909 (9th Cir. July 7, 2023).

733.    Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism

Act ("ATA"), through which Defendants are liable because they aided and abetted terrorist acts in

Iraqi Kurdistan and elsewhere. 18 U.S.C. § 2333(d)(2). Plaintiffs accordingly seek justice under

the ATA's aiding-and-abetting provision, which Congress enacted "to provide civil litigants with

the broadest possible basis, consistent with the Constitution of the United States, to seek relief

against persons, entities, and foreign countries, wherever acting and wherever they may be found,

that have provided material support, directly or indirectly, to foreign organizations or persons that

engage in terrorist activities against the United States." *Justice Against Sponsors of Terrorism Act*

("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016). *See Owens v. BNP PARIBAS,*

*SA,* 897 F.3d 266, 277 (D.C. Cir. 2018).

734.    (On January 4, 2022, the United States Court of Appeals for the D.C. Circuit

decisively rejected every core legal argument advanced by the defendants in *Atchley v.*

*AstraZeneca UK Ltd.,* 22 F.4th 204 (D.C. Cir. 2022), broadly ruling that corrupt payments to

terrorists in Iraq, which includes Defendant Iraqi Kurdistan Regional Government, including

protection payments, supported liability under the ATA. The D. C. Circuit Court further held the

ATA "authorizes victims of terrorism to recover against anyone shown to have played a primary

(direct) or secondary (aiding-and-abetting) role." (*See Atchley v. AstraZeneca UK Ltd.,* 22 F.4th

204, 208 (D.C. Cir. 2022). Defendants, through their Washington D.C. representatives and

attorneys and other advisors, knew or should have known about the D.C. Circuit's *Atchley* ruling,

which received significant media coverage, and further incentivized Defendants to continue

concealing their corrupt payments and transferal of materiel and transferal of sensitive and

classified U.S. national defense information, gathered and owned by the United States government,

including information from agencies that comprise the United States Intelligence Community and

the United States Department of Defense, received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. The corrupt payments and transfers of materiel and intelligence information have materially provided means to operate and perpetuate the criminal enterprise that has harmed Plaintiffs.

735.    There are reasonable grounds and sufficient evidence to prove that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives including Barzani family members and family members by marriage, are jointly and severally liable for the aforementioned acts which harmed Plaintiffs, and continue to harm Plaintiffs, none of which were permitted, sanctioned, or authorized by international law, international treaty or convention, Iraq law, or Defendant Iraqi Kurdistan Regional Government law, (i) for having committed or caused to be committed the acts, in furtherance of the Barzani Continuing Criminal Enterprise, directly, jointly with others and/or through others, and (ii) for his/their failure to exercise control properly over civilian, police, custodial, and military subordinates who committed the acts, or allowed for their commission, and who operated under his/their effective authority and control, pursuant to superior responsibility.

736.    As a result of their torture and abuse, Plaintiffs, in their individual capacities, have suffered damages and will continue to suffer from the emotional and psychological scars and lack of sense of safety, protection, and security of these acts of terror for years to come.

737.    The character of the acts and omissions of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, servants, and Barzani family members and family members by marriage, were deliberate, willful, knowing, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages.

738.    The private right of action in 28 U.S.C. § 1605A(c) also authorizes "punitive

damages," which "serve to punish and deter the actions for which they are awarded." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 87. (D.C. 2010). Courts balance four factors to determine the appropriate amounts of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023), (quoting *Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d at 56 (D.D.C.2012) and *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d at 30 (D.C. 2008).

739.    In the instant case, all four factors weigh strongly in favor of awarding significant punitive damages. Wherefore, Plaintiffs Maki Revend and 5,000 John Does, merit judgment against Defendants in an amount sufficient to compensate them for injuries perpetrated and continuing injuries and threatened future injury, and it is absolutely clear the alleged wrongful behavior could reasonably be expected to recur, by Defendants and for significant losses and damages suffered from their plan, scheme, conspiracy, and course of conduct, and the fruits of their multitudinous crimes, in which each of the Defendants participated directly or indirectly, and willfully, directly and indirectly, intentionally, knowingly, and repeatedly in violation of the law of nations and willfully, intentionally, knowingly, and repeatedly, directly and indirectly, ignored laws and international treaties and conventions  governing malum in se offenses, which dictate civilized and lawful behavior, of the sovereign Republic of Iraq, the provincial Defendant Iraqi Kurdistan Regional Government, and the United States of America; and by reason of the acts, transactions, and omissions alleged herein; and solatium damages; and for treble damages as provided by law, sufficient to "yield the desired deterrent effect," (*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010)) along with costs of suit, including attorney's fees.

740.   Solatium is "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *See Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 at 22 (D.C. 2009).  It also includes mental suffering as a result of injury to a loved one. E.g., *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 85 (D.C. 2010).  A solatium claim under § 1605A(c) is "indistinguishable" from a claim for intentional infliction of emotional distress, *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 1at 140 (D.C. 2018), and courts have applied elements of intentional infliction of emotional distress from the Second Restatement of Torts to FSIA solatium claims, *(see,* e.g., *Selig v. Islamic Republic of Iran*, 2021 WL 5446870 at 12 (D.D.C. Nov. 22, 2021)).  Although, in a traditional tort context, a family member must generally be present at the time of an attack to recover for intentional infliction of emotional distress, Restatement (Second) of Torts § 46(2)(a) (Am. Law Inst. 1965), FSIA claimants need not meet this requirement because "a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families," *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); accord, e.g., *Valore,* 700 F. Supp. 2d at 80 ("[T]errorism [is] unique among the types of tortious activities in both its extreme methods and aims . . . . One . . . need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." (citation omitted). *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, at 93 (JDB) (D.C. Jan. 27, 2023).

741.   Courts may "presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish" … as sufficient for entitlement to solatium damages. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015).

742.    Defendants conduct of terrorism and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear." *See Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019).

743.    Wherefore, Plaintiffs demand judgment against Defendants, recognizing their massive illicit wealth, for compensatory damages, including solatium, in an amount sufficient to compensate them for injuries perpetrated by Defendants and for solace; and for punitive damages sufficient to punish Defendants, acting as individuals, for the willful torture and extra judicial killings and associated criminal acts and atrocity crimes, and sufficient to yield the desired deterrent effect. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010).

## COUNT III
### (EXTRAJUDICIAL KILLING)

744.    Plaintiffs reallege and incorporate by reference the allegations set forth herein.

745.    The killings of Plaintiffs' Decedents by Defendants constitute extrajudicial killings as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. §1350 Note).  Additionally, the killings constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. §1350, in that they were in violation of customary international law prohibiting extrajudicial killings as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

746.    The killings, committed by Defendants as individuals, were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

747.    Defendants are also liable for crimes against humanity under the ATS.  These crimes are inhumane acts that include "murder, enslavement, deportation or forcible transfer, [or] torture" and are "committed as part of a widespread [or] systematic attack directed against a civilian population." *Talisman Energy*, 582 F.3d at 257; *ICC Elements of Crimes, Art. 7* ("These elements clarify the requisite participation in and knowledge of a widespread or systematic attack against a civilian population."). Persecution and extermination, the crimes against humanity under which Plaintiffs seek liability, are actionable under the ATS.  *See, e.g. Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 286-287, n.1(2d Cir.2007) Hall, J . concurring)* (acknowledging extermination as a crime against humanity cognizable under the ATS); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 316-17 (D. Mass. 2013) ("persecution that rises to the level of a crime against humanity has repeatedly been held to be actionable under the ATS").  All crimes against humanity require Plaintiffs to demonstrate the crimes were (1) part of a widespread or systematic attack against civilians, and (2) the defendant "intended to further such an attack." *ICC Elements of Crimes, Art. 7*. These elements exist here.  Plaintiffs also claim Defendant's liability for the crime against humanity of persecution under the ATS.  This crime requires: (1) "denial of fundamental rights" and (2) "the intentional targeting of an identifiable group." *Lively*, 960 F. Supp. 2d at 317; *see also ICC Elements of Crimes, Art. 7(1)(h)*.

748.    Plaintiffs have demonstrated Defendant's liability for the crime against humanity of extermination under the ATS.  This crime requires that (1) one or more persons were killed; (2) as part of "a mass killing of members of a civilian population"; and (3) "[t]he perpetrator knew that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population." *See ICC Elements of Crimes, Art. 7(1)(b)*.  Plaintiffs' decedents and hundreds of others were killed in the Yazidi Massacre, a mass killing that was pure

terror targeting Iraqi Kurdistan's most innocent and part of a systematic assault on non-combatant civilians of Yazidi ethnicity, and where violence against women and children is characteristic, even doctrinal, leaving women to recoil in horror, disgust, and anguish.

749.   The law of nations sets worldwide norms of conduct, prohibiting certain universally condemned heinous acts. That body of law, however, takes no position on whether its norms may be enforced by civil actions for compensatory damages. It leaves that decision to be separately decided by each nation. The ATS confers on the U.S. courts jurisdiction to entertain civil suits for violations of the law of nations. In the United States, if a plaintiff in a suit under the ATS shows that she is the victim of a tort committed in violation of the norms of the law of nations, the court has jurisdiction to hear the case and to award compensatory damages against the tortfeasor. That is what the Supreme Court explained in *Sosa*." *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010). *Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2s 718 (2004)*.

750.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are directly liable for the killings. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also directly and indirectly exercised command responsibility over subordinates in the Defendant Iraqi Kurdistan Regional Government Peshmerga, the Defendant Iraqi Kurdistan Regional Government, the Defendant Iraqi Kurdistan Regional Government's Asayish security forces, and KDP personnel who participated in the killings. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also engaged in a joint criminal enterprise with, conspired with, and/or aided and abetted their subordinates, as well as officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish security forces, ISIS and IRGC and their affiliates, and KDP who planned and/or carried out commands and plans to commit the killings. Furthermore, Defendants

Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known that their subordinates had committed, were committing, or were about to commit human rights abuses, and they failed to prevent the abuses or to punish those responsible.

751.    Acts or omissions of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani described above, and the acts committed by their subordinates and officers in the Defendant Iraqi Kurdistan Regional Government's Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Defendant Iraqi Kurdistan Regional Government's Asayish security forces, and KDP, and Barzani family members and family members by marriage, who planned and/or carried out or participated in said plans, caused the killings, and caused Plaintiffs to suffer severe mental pain and suffering.

752.    Defendants Masoud Barzani's, Mansour Barzani's, and Waysi Barzani's acts or omissions described above, and the acts committed by their subordinates and officers in the Defendant Iraqi Kurdistan Regional Government's Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Defendant Iraqi Kurdistan Regional Government's Asayish security forces, and KDP, and Barzani family members and family members by marriage, who planned and/or carried out said plans, were committed under apparent or feigned or falsified authority or color of law of the government of provincial Defendant Iraqi Kurdistan Regional Government.  These Defendants directed or ordered these illegal tortious acts in an existing superior-subordinate relationship, knowing that their orders would result in the substantial likelihood that human rights abuses will follow.  Defendants were in a position of authority that would compel one to commit human rights abuses at their order.  *See Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021). at 212; *see also Abebe-Jiri v. Negewo*, No. 1:90-CV-2010-GET, 1993 WL 814304, at *4 (N.D. Ga. Aug. 20, 1993), *aff'd sub nom. Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) ("Defendant

is responsible under international law for his own acts, for acts which he directed, ordered, aided, abetted or participated in, and for acts committed by forces under his command which he authorized.").

753.    As a result of these killings, Plaintiffs, in their individual capacities, have suffered damages and will continue to suffer from the emotional and psychological scars of these killings for years to come.

754.    Plaintiffs' claims are based on primary and secondary theories of liability and are recognized under the ATS and TVPA. *See, e.g.,* TVPA, S. Rep. No. 102-249, at 8-9 (1991) (explaining that "[a] higher official need not have personally performed or ordered the abuses in order to be held liable"); *Mohamad v. Palestinian Auth.,* 566 U.S. 449, 458, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012) ("the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing"); *Hilao v. Estate of Marcos,* 103 F.3d 767, 777 (9th Cir. 1996) (recognizing command responsibility under the TVPA and ATS, and citing the TVPA Senate Report in support).

755.    Defendants conduct of targeted extrajudicial killing and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear." *See Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019). Wherefore, Plaintiffs demand judgment against Defendants in an amount sufficient to compensate them for the damages suffered and damages Plaintiffs continue to suffer as a result of the extrajudicial killings as set forth above in amounts to be determined at trial.

756.    The character of Defendants Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's acts or omissions, and those of their associates and collaborators, including Barzani family members and family members by marriage, were deliberate, targeted, willful, intentional,

325

wanton, malicious, oppressive, and knowingly unlawful, the harm to the Plaintiffs that the Defendants caused or intended to cause was extreme and monstrous, the need for deterrence from future criminal acts is paramount and essential, and the illicit massive wealth of the defendants is excessive affluence and stolen riches in the billions of illicit dollars, and should be punished by an award of punitive damages sufficient to punish Defendants for their extrajudicial killings and other atrocity crimes and crimes against humanity to "yield the desired deterrent effect" to deter future extrajudicial killings and associated criminal conduct and atrocity crimes. (*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010)). Moreover, awarding damages also serves national security interests by deterring those foreign actors that sponsor extrajudicial killings.

## **PRAYER OF RELIEF**

757.    Plaintiffs request that the Court:

(a)    Enter judgment against Defendants in the amount of Nine Billion Dollars ($9,000,000,000.00), finding them jointly and severally liable under the Torture Victims Protection Act of 1991, 28 U.S.C. § 1350;

(b)    Award Plaintiffs compensatory, consequential, and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Torture Victims Protection Act of 1991 pursuant to 28 U.S.C. § 1350;

(c)    Award Plaintiffs their attorney's fees and costs and expenses incurred in this action, pursuant to 28 U.S.C. § 1350);

(d)     Enter judgment against Defendants in the amount of Nine Billion Dollars ($9,000,000,000.00) finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(e)     Award Plaintiffs compensatory, consequential, and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act, pursuant to 18 U.S.C. § 2333;

(j)     Award Plaintiffs prejudgment interest; and

(k)     Award Plaintiffs any such further relief the Court deems just and proper.

**JURY DEMAND**

758.    In accordance with Federal Rules of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 30, 2024

*Counsel for Plaintiffs Kurdistan Victims Fund, et. al.*
**TATE BYWATER PLC**

By:     _____/s/_____
        Tate Bywater
        Paul Mickelsen (D.C. Bar Number 500750)
        Benjamin Ader (D.C. Bar Number 1616990)
        2740 Chain Bridge Road
        Vienna, VA 22181
        Tel: 703-938-5100
        Email: pmickelsen@tatebywater.com


        _____/s/_____
        Tate Bywater
        James R. Tate, *pro hac vice*
        2740 Chain Bridge Road
        Vienna, VA 22181
        Tel: 703-938-5100
        Email: jtate@tatebywater.com

# EXHIBIT B



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

JUVENTUS PRO MUSICA, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        JUVENTUS PRO MUSICA, INC.; *File # 7579942*

Dear *JUVENTUS PRO MUSICA, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

MINDFUL VALOR FOUNDATION, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:   Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
      MINDFUL VALOR FOUNDATION, INC.*; File # 7281076*

Dear *MINDFUL VALOR FOUNDATION, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

THE TRAUMA-SENSITIVE AWARENESS FOUNDATION, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:   Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
       THE TRAUMA-SENSITIVE AWARENESS FOUNDATION, INC.; *File # 7132080*

Dear *THE TRAUMA-SENSITIVE AWARENESS FOUNDATION, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

MANDELLI US, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:   Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
      MANDELLI US, INC.; *File # 7129389*

Dear *MANDELLI US, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

MASCH RISK MANAGEMENT FOUNDATION, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        MASCH RISK MANAGEMENT FOUNDATION, INC.; *File # 7118968*

Dear *MASCH RISK MANAGEMENT FOUNDATION, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
## DEPARTMENT OF STATE
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

MONZESI, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
         MONZESI, INC.; *File # 6922565*

Dear *MONZESI, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

TEKIMA NORTH AMERICA, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        TEKIMA NORTH AMERICA, INC.*; File # 6655054*

Dear *TEKIMA NORTH AMERICA, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

**STATE OF DELAWARE**
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

CAVALLINO CLASSIC FOUNDATION, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        CAVALLINO CLASSIC FOUNDATION, INC.; *File # 6426377*

Dear *CAVALLINO CLASSIC FOUNDATION, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

PINHEAD CORPORATION
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:   Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
PINHEAD CORPORATION; *File # 6424569*

Dear *PINHEAD CORPORATION*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

**STATE OF DELAWARE**
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

CENTER FOR DIALOGUE WITH EVANGELICALISM, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        CENTER FOR DIALOGUE WITH EVANGELICALISM, INC.; *File # 6335035*

Dear *CENTER FOR DIALOGUE WITH EVANGELICALISM, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

BALSAM CORP.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        BALSAM CORP.*; File # 6209236*

Dear *BALSAM CORP.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

SERRALVES US CIRCLE, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        SERRALVES US CIRCLE, INC.*; File # 5975080*

Dear *SERRALVES US CIRCLE, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

TIMUCUA HOLDINGS LIMITED
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:     Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
        TIMUCUA HOLDINGS LIMITED; *File # 4079393*

Dear *TIMUCUA HOLDINGS LIMITED*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator



STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
401 FEDERAL STREET, SUITE 4
DOVER, DELAWARE 19901

DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

GENERAL INFORMATION
www.CORP.DELAWARE.GOV
(302) 739-3073

August 30, 2023

MLS111 LEGACY FOUNDATION, INC.
1 WOOD ROAD
WILMINGTON, DE 19806

INGOMAR FIDUCIARY SERVICES, INC
1 WOOD ROAD
WILMINGTON, DE 19806

RE:      Non-Compliant Principal Place of Business Per 8 *Del. C.* § 502;
         MLS111 LEGACY FOUNDATION, INC.*; File # 3358589*

Dear *MLS111 LEGACY FOUNDATION, INC.*:

Pursuant to 8 *Del. C.* § 502(a)(3), companies are prohibited from using a registered agent's address as that company's principal place of business. In your company's most recent Annual Franchise Tax Report filing, you listed *1 WOOD ROAD, WILMINGTON, DE 19806* as your principal place of business. As you are aware, that is the same address as your registered agent for service of process. Our records do not indicate that you are acting as your own registered agent, therefore your Annual Franchise Tax report has been deemed incomplete.

Accordingly, you have 45 days from the date of this letter to come into compliance with Delaware law by submitting an amended Annual Franchise Tax report online for your company listing your company's actual principal place of business. Failure to comply with the law may result in a restriction of services or other legal action including loss of good standing with the Division of Corporations. A compliant amended Annual Franchise tax report must be filed or this entity will be declared void March 1, 2024. The amended Annual Franchise tax report can be filed online at corp.delaware.gov/paytaxes.

We trust that this is an oversight given the recent changes to this law. If you have non-legal questions about how to update your principal place of business address, please contact Franchise Tax at 302-739-3073, option 3. If you have legal questions about compliance, please contact your chosen legal counsel.

Best Regards,

*April M Wright*

April M. Wright
Corporations Administrator

# EXHIBIT C

| a Employee's social security number | OMB No. 1545-0008 | Safe, accurate, | FAST! Use | | Visit the IRS website at www.irs.gov/efile |
|---|---|---|---|---|---|
| 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 | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 52-2227436 | 1000.00 | 250.00 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| | 1000.00 | 62.00 |

INGOMAR FIDUCIARY SERVICES, INC.
134 THREE MILE HARBOR ROAD
EAST HAMPTON, NY 11937

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 1000.00 | 14.50 |

| 7 Social security tips | 8 Allocated tips |
|---|---|
| | |

| d Control number | 9 | 10 Dependent care benefits |
|---|---|---|

| e Employee's first name and initial | Last name | Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|---|
| MAHTAUB L | MOORE | | | |

| 13 Statutory employee | Retirement plan | Third-party sick pay | 12b |
|---|---|---|---|
| | | | |

| 14 Other | 12c |
|---|---|

| | 12d |
|---|---|

1 WOOD ROAD
WILMINGTON, DE 19806
f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| DE | 0112232.7 | 1000.00 | 50.00 | 1000.00 | 12.50 | DE - WII |

Form **W-2** Wage and Tax Statement      **2023**      Department of the Treasury—Internal Revenue Service

Copy B—To Be Filed With Employee's FEDERAL Tax Return.
This information is being furnished to the Internal Revenue Service.

# EXHIBIT D



# Forensic Litigation Consultants LLC

**102 Feather Hill Lane**
**Media, PA 19063**

Ms. Mattie Moore
1 Wood Road
Wilmington, DE 19806

Ms. Moore:

I have been engaged by you to provide my expert opinion on the propriety of entries made to (1) a draft (proposed) 2022 Form 1040 U.S. Individual Income Tax Return for Jonathon R. and Mahtaub L. Moore of 1 Wood Road, Wilmington, DE; (2) a related 2022 Form PIT-RES Delaware Individual Resident Income Tax Return filed March 11, 2023; and (3) made to the 2021 and 2022 Form 1120 U.S. Corporation Income Tax Returns for Ingomar Fiduciary Services, Inc.

Specifically, as stated below, I have opined on the propriety of medical and dental expenses recorded on the "Schedule A – Itemized Deductions" of both the draft federal and final (as filed) state returns.  I've also opined on the propriety of deductions to gross receipts taken by Ingomar Fiduciary Services, Inc. (IFS) on its 2021 and 2022 Form 1120, specifically deductions taken for compensation to officers, for employee benefit programs, "medical reimbursements," and employee medical insurance premiums as regard you as a purported "employee" of IFS.  You've told me that you are not now, nor have you ever been, an employee of IFS.

**Introduction**

By way of background, I am qualified to opine as an expert on the matters contained herein based upon my forty years of accounting experience, forensic accounting, internal/occupational fraud, and due diligence investigations.  I am a former licensed Certified Public Accountant and Certified Information Systems  Security Professional, and am currently a Certified Fraud Examiner.

I enjoyed a 25-year FBI career, retiring as the senior executive in charge of the Philadelphia Division of the FBI, its sixth largest field office. There, I led Counter Terrorism, Counter Intelligence, Cyber Security, Public Corruption, Criminal Enterprise, Financial Crimes, Major Corporate Fraud, and Violent Crime investigations and physical and information security programs. Throughout my FBI career I held several positions including Special Agent in Charge of the Louisville Division, FBI Finance Division Assistant Director and Chief Financial Officer, Inspector-In-Charge of the 1996-1999 Campaign Finance Task Force, and others through assignments in Boston, Washington, Norfolk, New Orleans, Louisville, Philadelphia, and elsewhere. As an FBI Special Agent, I specialized in white-collar crime / public corruption investigations, recording a multitude of convictions in the areas of financial institution fraud, bankruptcy fraud, bribery and corruption, economic extortion, false claims, mail and wire fraud, money laundering, and computer fraud and abuse.

Before joining the FBI, I led criminal tax evasion and tax-money laundering investigations as an IRS Criminal Division special agent in New Orleans, LA. I also worked in an audit and public accounting practice in Providence, RI with the former Peat, Marwick, Mitchell & Company, today known as KPMG. For 12 years I led Global Security and Fraud Operations for Vanguard, the world's largest investment management and mutual fund company, with responsibility for the protection of its personnel, assets, reputation, and client assets of $5.1 trillion.

A copy of my CV is attached hereto as Exhibit A. A list of the documents I reviewed are attached hereto as Exhibit B.

My fees are not contingent in any way with the outcome of any litigation you may pursue in this matter. I reserve the right to amend or supplement this report should additional documentation and information be provided. I further reserve the right to provide a rebuttal to any report or analysis submitted by any defendant(s) in any prospective litigation, if requested to do so.

**Background**

Jonathon R. Moore is an attorney licensed to practice in New York and the District of Columbia. The Law Offices of Jonathan R. Moore PLLC, file number L0000057532, registered January 12, 2012, is an active professional limited liability company in Washington, DC, with an address of 5335 Wisconsin Avenue NW, Suite 440, Washington DC 20015. Its registered agent is Jonathon R. Moore. He's also

shown as a beneficial owner and executing officer.  The PLLC last filed its biannual report in March 2023.

On his law offices' website, Moore describes his practice areas as corporate and commercial, private client, estate planning, and charitable and exempt organizations.  Through its "Private Client" services, the firm devises domestic and international trusts for families and family businesses, as well as charitable structures for both U.S. and international families.  Additionally, the firm structures investments of foreign individuals and families in United States real estate, including commercial and retail properties, residences, and the acquisition and maintenance of vacation properties.  Structuring typically focuses on privacy, shielding the owners from disclosure through web search engines and avoiding potential exposure to U.S. federal and state taxation.  Once a structure is in place, an "affiliated company" known as Ingomar Fiduciary Services, Inc. (IFS) maintains it, including making use of accounting professionals to ensure utilities, taxes, and insurance are paid and to also manage any needed capital improvements.[1]

IFS is a domestic Delaware Corporation in good standing, incorporated on March 30, 2000, file Number 3204299.  Its registered agent is Jonathon R. Moore, 1 Wood Road, Wilmington, DE 19806.  It is licensed by Delaware for general business through 12/31/2023.

IFS is also a Washington, DC, for-profit corporation (file number 202670) registered July 19, 2000, with a local address of 1050 17th Street NW, Suite 301, Washington, DC, and a principal address of 1 Wood Road, Wilmington, DE 19806.  Its registered agent is Jonathon R. Moore at the 17th Street address.  Moore is also noted as a beneficial owner of IFS as its president.  The corporation last filed a report in April 2015, and its District of Columbia status is shown as "withdrawn."

Public records show Jonathon R. Moore and IFS to be a registered agent and/or officer of 82 legal entities registered in New York, Delaware, Washington, DC., Indiana, North Carolina and Florida.[2]  Moore is an officer of 48 entities – 36 in Delaware, six in the District of Columbia, three in Florida, and one each in the remaining states.  IFS is a registered agent/ officer of 27 Delaware and seven District of Columbia entities.[3]

---

[1] Law Offices of Jonathon R. Moore, PLLC - Private Client (moorelawoffices.us) Accessed 08/16/2023
[2] https://opencorporates.com/ Accessed 08/16/2023 and 09/05/2023
[3] Ibid. Accessed 08/16/2023 and 09/05/2023

Julie Sanford is a long-time associate and apparent office manager of Moore's law office. Public records show she is either a registered agent or officer (including CEO) of 22 active or inactive entities – seven in the District of Columbia, 11 in Virginia, two in North Carolina, and one each in Florida and Texas. Her home address of 30 Saint Roberts Drive, Stafford, VA 22556, or her use of the law firm address, connects her to these entities.[4][5]

You are the spouse of Jonathon R. Moore, having become married on October 6, 2016. Since then, and continuing through this report, Jonathon Moore as President of IFS has caused IFS to carry you as an "employee" on its books, despite you having never been employed by IFS. For not less than tax years 2021 and 2022, IFS expensed on its Form 1120 U.S. Corporation Income Tax Return (and associated state return) officer "compensation" purportedly paid you as an employee; health and life insurance premiums connected to you as an IFS "employee;" and certain "medical reimbursements," again in connection with your purported employment with the company. Further, IFS "medical reimbursement" disbursements were made annually to either Jonathon R. Moore personally or to the Law Offices of Jonathon R. Moore and expensed by IFS on its books. Since you've received a W-2 from IFS reporting taxable wages since 2017, you have no reason to believe the same employee-related expenses were not deducted by IFS from its 2017-2020 returns.

On June 30, 2023, Jonathon R. Moore abandoned your marriage, abandoned the home at 1 Wood Road, Wilmington, DE, and moved himself to a summer home in East Hampton, NY. Divorce proceedings followed, including settlement discussions via email between you and Jonathon. In a settlement "Counteroffer Term Sheet" dated August 25, 2023, Jonathon demanded that you remain an employee of IFS and twice demanded that you agree to "cease and desist any further arguments that she [you] is not an employee."[6] He also demanded that you consent to filing a joint 2022 federal income tax return, that you cease and desist from any independent review of prior income tax returns jointly filed, and that you covenant not to correspond with the IRS or Delaware Department of Revenue on any aspect of your prior tax returns, which

---

[4] Ibid. Accessed 09/05/2023
[5] That Jonathon Moore, IFS, and Sanford are registered agents and/or officers of over 100 legal entities in nine U.S. states is consistent with the law office's "Private Client" services practice of creating legal structures designed to shield the beneficial owners of those entities from public disclosure
[6] You'd notified Julie Sanford through an email dated July 15, 2023, followed by a letter sent certified mail, that you are not an employee of IFS with a demand that you be sent no further checks and be removed from their books as an "employee."

correspondence will be his sole responsibility.[7] In making this demand he offered to indemnify and hold you harmless for any additional taxes due that may result from an IRS audit relating to the 2022 return.

You've reviewed the 2022 Form 1040 U.S. Individual Income Tax Return prepared by (or at the direction of) Jonathon Moore through which he demands you consent to filing "Married filing jointly." Through an extension, the return is due to be filed on or about October 15, 2023. You are particularly leery of and concerned about $67,047 in purported Medical and Dental Expenses reported on Form 1040 Schedule A, because you know of your own personal knowledge that over $49,000 in expenses regard medical care costs (deductible and non-deductible) of Jonathon's oldest daughter, Lucy, who is 36 years old and not a dependent for tax purposes. You know other expenses to regard non-deductible marriage counseling fees, transportation fees for your mother (also not a dependent for tax purposes), and possibly non-deductible amounts for over-the-counter medicines and items of personal hygiene. Finally, you know Jonathon to have been "reimbursed" $10,000 from IFS in 2022 and don't believe the $67,047 is net of that reimbursement.

You've reviewed a 2022 Form PIT-RES Delaware Individual Resident Income Tax Return filed jointly with Jonathon R. Moore on March 11, 2023, and hold the same concerns. It reported identical medical and dental expenses of $67,047.

### Conclusions

In my professional opinion, and based on my experience, I conclude to a reasonable degree of professional certainty that in an IRS audit of the 2021 and 2022 Form 1120 U.S. Corporation Income Tax returns of IFS, a reasonable examiner would find your IFS "employment" a pretext having as its main purpose the improper avoidance of federal income tax. I conclude with a high degree of confidence that the examiner would disallow IFS deductions taken for purported wages paid you as an "employee" of the company; for the cost of health care and life insurance provided you as an "employee"; and for "medical reimbursements" made to you (or to Jonathon) for "reimbursable" medical expenses you incurred as a purported "employee". My conclusion applies to any IFS tax return in which the pretext of you being an IFS employee facilitated improper deductions to be taken against IFS gross receipts, thereby reducing its taxable income - from 2017 through the 2022 corporate return.

---

[7] Jonathon R. Moore Counteroffer Term Sheet dated 230825

Because a reasonable IRS examiner would disallow the specified deductions, the IRS would likely require that IFS amend its 2021 and 2022 federal tax returns (and any other tax year returns at issue), and further likely assess penalties for underpayment of taxes (and possible negligence or fraud) and levy accrued interest against the corporation.  I believe a reasonable examiner would also possibly impute as taxable income to Jonathon the value of annual "medical reimbursements" made for non-deductible medical expenses you purportedly incurred as an IFS "employee."

Regarding the Medical and Dental Expenses recorded as part of the draft 2022 Form 1040 U.S. Individual Income Tax Return, I conclude to a reasonable degree of professional certainty that no less than $58,618 of the total $67,047 in expenses claimed are non-deductible. I believe in a prospective audit of the return a reasonable IRS examiner would disallow the deductions as either non-qualifying or made for a non-dependent (irrespective of their qualified deductibility under the IRC).  The examiner would find the permissible medical and dental expense deduction to be <u>zero</u> dollars, and not the claimed $46,795.[8]

Your 2022 Delaware PIT-RES income tax return reported the identical $67,047 in medical and dental expenses.  I believe in an audit of that return a Delaware Division of Revenue examiner would disallow no less than $58,618 of those deductions and require the return be amended accordingly. I conclude to a reasonable degree of certainty you and Jonathon would be personally at risk of being assessed additional taxes, penalty for understatement of taxes (and possibly negligence or fraud), and accrued interest on the tax deficiency.

### Recommendations

I recommend you write the IRS and explicitly advise the agency that you were not an employee of IFS in tax years 2021 and 2022, nor in any other tax year for which IFS showed you to be so through a Form W-2 Wage and Tax Statement. If you have a copy of a Form W-2, enclose it.  You may want to include a copy of your email of July 15, 2023 and follow-up letter to Julie Sanford in your letter to the IRS.  In short, to permit the pretext of you being an IFS employee to continue would implicate you in that false pretext.

---

[8] The $58,618 in non-deductible expenses alone is sufficient to reduce the permissible medical and dental expense deduction on Line 4 of Schedule A to zero.  One need not consider the impact of the $10,000 IFS "reimbursement" to Jonathon which should be netted against the claimed amounts.  Under the IRC you cannot deduct medical and dental expenses for which you are reimbursed. If you do, amounts paid you in reimbursement are considered taxable income up to the amount the deductions reduced your taxable income.

Regarding your 2022 federal income tax return, I recommend you file "Married filing separately" and report your own income items (including the IFS purported wages and profit or loss from the LLCs of which you are the sole member), adjustments to income, standard or itemized deductions, credits, and record of payments. Out of an abundance of caution, as part of the return you may choose to notice the IRS that you are not now, nor have you ever been, a W-2 Wage employee of IFS.

I do not recommend filing jointly. If you so choose you must satisfy yourself that all reported income, adjustments to income, standard or itemized deductions, credits, and record of payments are accurate. Determining the accuracy and propriety of entries made to the return's Schedule C for The Law Offices of Jonathon R. Moore PLLC may prove challenging. For a federal tax return filed jointly when married, both spouses are liable to the IRS. It can collect 100% of any debt (tax, penalties, and interest) from either spouse. This is true after divorce, even if the spouse that is obligated per the divorce decree fails to pay. Why assume that risk?

As for your Delaware tax return filed in March of this year, the figures you reported are taken directly from your federal return. Consequently, if your federal return changes for any reason you're required to report such changes to the Delaware Division of Revenue within 90 days of the change. Given your federal itemized deduction for medical and dental expenses will change by no less than $58,618, and your filing status may also change, I recommend you file a Delaware PIT-RES Amended tax return within 90 days of filing your final 2022 Form 1040 U.S. Individual Income Tax Return.

### Analysis

The following facts, conditions, and events underlie my conclusions:

*IFS 2021 and 2022 Form 1120 U.S. Corporation Income Tax Returns*

A.      You are not an employee of IFS. You've explicitly said so, and an objective reading of the IRS definition of an "employee" confirms so. According to the IRC, the term employee includes every individual performing services if the relationship between him and the person for whom he performs such services is the legal relationship of employer and employee. Generally the relationship of employer and employee exists when the person for whom services are

performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished.  That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. [9]

Objectively read, you are not and have never been an employee of IFS.

B.      Given you are not an IFS employee, the corporation is not entitled to deduct from gross receipts amounts "paid" you as purported wages, or amounts expended for your personal health insurance premiums (Highmark Delaware) and life insurance (Guardian).   The 2021 and 2022 IFS corporate tax returns improperly show deductions from gross receipts for amounts paid you, or paid for your benefit, under these expense categories.

C.      Given you are not an IFS employee, and therefore not permitted to participate in a company sponsored Health Reimbursement Arrangement (HRA), the corporation is not entitled to deduct from gross receipts amounts paid to Jonathon R. Moore as your spouse or to you for "medical reimbursables."[10] The 2021 and 2022 IFS corporate tax returns improperly include deductions from gross receipts for such reimbursements.

According to the IRS, an HRA is an employer-established benefit plan designed to reimburse employees [emphasis added] tax free for qualified [emphasis added] medical expenses up to a maximum dollar amount for a coverage period.  Contributions made by the employer can be excluded from an employee's gross income, and reimbursements may be tax free if the employee paid for qualified medical expenses, i.e., distributions from an HRA must be paid to reimburse the employee for qualified medical expenses he or she incurred. Notably, if any distribution is made for other than the reimbursement of qualified medical expenses, any distribution made in the current tax year is included in gross

---

[9] 26 CFR § 31.3401(c)-1 - Employee. | Electronic Code of Federal Regulations (e-CFR) | US Law | LII / Legal Information Institute (cornell.edu) Accessed 09062023

[10] The payment of "medical reimbursables" by IFS to Jonathon Moore as your spouse, based on the pretext that you are an IFS "employee," has the appearance of an HRA.  I had no records available that might confirm or refute the existence of a formal IRS-qualified HRA.

income. Finally, any unused amounts in an HRA can be carried forward for reimbursements in later years.[11]

Whether or not IFS has in place an IRS qualified HRA is moot. You are not an employee of IFS and Jonathon as your spouse was and is not entitled to tax-free reimbursement for your medical expenses. The same can be said for the requirement that medical expenses be "qualified." In this instance no less than $58,618 in 2022 medical and dental itemized deductions are non-qualifying deductions. That alone is disqualifying, irrespective of your "employee" status with IFS.

D.     Because you are neither today, nor have you ever been, an employee of IFS, a reasonable IRS examiner might impute as taxable income to Jonathon any and all "medical reimbursable" payments made him over the years. IFS tax return documentation shows $10,000 was paid him in both 2021 and 2022. That a "carry forward" balance of medical reimbursables is shown in both years suggests IFS payments have likely been made to Jonathon since tax year 2017.

*The 2022 Form 1040 U.S. Individual Income Tax Return for Jonathon R. and Mahtaub L. Moore*

E.     Schedule A to your draft 2022 Form 1040 reports $67,047 in qualified medical and dental expenses before application of a 7.5% AGI threshold. The $67,047 total is drawn from a document saved as "JRM/2022 reimbursable medical expenses-IFS," found within the IFS files. It notes in minute detail every charge constituting the total. The net medical and dental expense deduction entered on Line 4 of Schedule A is $46,795.

As indicated above, no less than $58,618 of the $67,047 in claimed deductions is non-deductible as either non-qualifying or as having been expended for the benefit of a non-dependent, Jonathon's 36-year-old daughter. She does not meet the IRC definition of a dependent "qualifying child," and notably was not claimed as a dependent on the return. The IRS tests to be a qualifying child are:[12]

---

[11] Department of The Treasury, Internal Revenue Service, **Publication 969 *Health Savings Accounts and Other Tax-Favored Health Plans***
About Publication 969, Health Savings Accounts and Other Tax-Favored Health Plans | Internal Revenue Service (irs.gov)

[12]Department of The Treasury, Internal Revenue Service, **Publication 501 (2022), Dependents, Standard Deduction, and Filing Information** Publication 501 (2022), Dependents, Standard Deduction, and Filing Information | Internal Revenue Service (irs.gov)

1. The child must be your son, daughter, stepchild, foster child, brother, sister, half-brother, half-sister, stepbrother, or stepsister, or a descendant of any of them.
2. The child must be (a) under age 19 at the end of the year and younger than you (or your spouse if filing jointly); (b) under age 24 at the end of the year, a student, and younger than you (or your spouse if filing jointly); or (c) any age if permanently and totally disabled.
3. The child must have lived with you for more than half of the year.[2]
4. The child must not have provided more than half of the child's own support for the year.
5. The child must not be filing a joint return for the year (unless that joint return is filed only to claim a refund of withheld income tax or estimated tax paid).

At age 36, not permanently and totally disabled, living on her own outside the home with neither you nor Jonathon, Lucy doesn't meet tests two or three. In that she squarely fails the dependent qualifying child test, there's no need to examine the qualifying nature of her medical deductions, many of which on their face are <u>not</u> qualifying. I submit with a high degree of confidence that in a prospective audit an IRS examiner would disallow both the non-qualifying deductions and the deductions for Lucy's medical costs, and find the permissible medical and dental expense deduction at Line 4 of Schedule A to be <u>zero</u> dollars, and not the claimed net amount of $46,795.[13]

A spreadsheet detailing my medical and dental expense analysis is attached as Exhibit C to this report.

*The 2022 Form PIT-RES Delaware Individual Resident Income Tax Return*

F.      The entries made to your Delaware Individual Resident Income Tax Return are derived directly from your corresponding Form 1040 U.S. Individual Income Tax Return. Your 2022 Delaware Form PIT-RES was filed on 3/11/2023. Resident Schedule A – Itemized Deductions at Line 1 reports Medical and dental expenses

---

[13] The $58,267 in non-deductible expenses alone is sufficient to reduce the permissible medical and dental expense deduction on Line 4 of Schedule A to zero. One need not consider the impact of the $10,000 IFS "reimbursement" to Jonathon which should be netted against the claimed amounts. Under the IRC you cannot deduct medical and dental expenses for which you are reimbursed. If you do, amounts paid you in reimbursement are considered taxable income up to the amount the deductions reduced your taxable income.

of $67,047, the precise amount reported on your draft Form 1040 federal return. The net amount shown after deducting the threshold 7.5% of AGI is $46,794.

For the same rationale as stated in Paragraph E. above, in an audit of your 2022 state return I believe a reasonable Delaware Division of Revenue examiner would disallow the deductions and find the permissible medical and dental expense deduction at Line 4 of Schedule A to be zero dollars, not the claimed net amount of $46,794.

It follows that your Delaware joint taxable income would be understated by no less than $47,794, and you and Jonathon would personally be at risk of being assessed additional taxes, penalty for understatement of taxes (and possibly negligence or fraud), and accrued interest on the tax deficiency.

All opinions expressed herein are to a reasonable degree of professional certainty.

Jeffrey A. Lampinski
Principal
Forensic Litigation Consultants, LLC
Certified Fraud Examiner
Dated: September 7, 2023

**EXHIBIT A**



**Jeffrey A. Lampinski, CFE, CPA**
**Principal**
**Forensic Litigation Consultants LLC**
**Media, PA**

A retired FBI senior executive and corporate chief security officer, Jeff brings forty years of criminal investigative and accounting experience to forensic accounting, internal/occupational fraud, sensitive Human Resources and employment law, and due diligence investigations.  He is also deeply experienced in fraud risk management, financial services fraud prevention, detection, and response, fraud risk and controls, and fraud governance.

**Senior Security and Fraud Executive – Vanguard**

For 12 years, Jeff led Global Security and Fraud Operations for the world's largest investment management company, with responsibility for the protection of its personnel, assets, reputation, and client assets of $5.1 trillion.  Jeff specialized in internal/external fraud, information security, and physical security risk assessments; fraud and cybercrime prevention, detection, and response; workplace threat assessment and response; travel risk management; and executive protection.  He also led crisis management planning and response and related strategic planning, policy development and implementation, as well as fraud and security training and awareness programs across 15 offices operating in 80 countries worldwide.

**Senior Executive – Federal Bureau of Investigation**

Jeff enjoyed a 25-year FBI career, retiring as the senior executive in charge of the Philadelphia Division of the FBI, its sixth largest field office.  There he led Counter Terrorism, Counter Intelligence, Cyber Security, Public Corruption, Criminal Enterprise, Financial Crimes, Major Corporate Fraud, and Violent Crime investigations as well as physical and information security initiatives.  Throughout his FBI career he held several positions including Special Agent in Charge of the Louisville Division, FBI and Finance Division Assistant Director and CFO, Inspector-In-Charge of the 1996-1999 Campaign Finance Task Force, and others through assignments in Boston, Washington, Norfolk, New Orleans, Louisville, Philadelphia, and elsewhere.  As an FBI executive, he also helped develop police training standards as a gubernatorial appointee to both the Kentucky Law Enforcement Council and the Pennsylvania Municipal Police Officers Education & Training Commission.

As an investigator Jeff specialized in white-collar crime investigations, recording a multitude of convictions in the areas of financial institution fraud, bankruptcy fraud, bribery and corruption, economic extortion, false claims, mail and wire fraud, money laundering, and computer fraud and abuse.  Before joining the FBI, Jeff led criminal tax evasion and tax-money laundering investigations as an IRS Criminal Division special agent, and enjoyed audit practice experience with KPMG.

**Education and Certifications**

Jeff is a former Certified Public Accountant, Certified Information Systems Security Professional, and a current Certified Fraud Examiner.  He earned his undergraduate degrees from Bryant University and attended Saint Joseph's University's Haub Business School as part of its MS in Financial Services program. As an FBI executive, he also earned graduate level certificates from the Kellogg School of Management and the Police Scotland College, Kincardine Fife, Scotland.

**EXHIBIT B**

1. 2021 Ingomar Fiduciary Services, Inc. Form 1120 U.S. Corporation Income Tax Return and associated schedules

2. 2021 Ingomar Fiduciary Services, Inc., Profit & Loss Statement; Profit & Loss Detail; General Ledger, Balance Sheet, and Balance Sheet Detail as of December 31, 2021

3. 2022 Ingomar Fiduciary Services, Inc., Form 1120 U.S. Corporation Income Tax Return and associated schedules

4. 2022 Form 1040 U.S. Individual Income Tax Return of Jonathon R. and Mahtaub L. Moore and associated schedules

5. 2021 Form 1040 U.S. Individual Income Tax Return of Jonathon R. and Mahtaub L. Moore and associated schedules

6. 2022 Delaware Division of Revenue Form PIT-RES Individual Resident Income Tax Return with associated schedules

7. 2021 Delaware Division of Revenue Form PIT-RES Individual Resident Income Tax Return with associated schedules

8. Certificate of Incorporation of Ingomar Fiduciary Services, Inc., filed 03/30/2000; various certificates of change in registered agent

9. State of Delaware Annual Franchise Tax Reports of IFS 2001-2019

10. Jonathon R. Moore Counteroffer Term Sheet dated 230825

11. JRM/2022 reimbursable medical expenses-IFS

12. Reconciliation of Medical and Dental Expenses, dated September 7, 2023

**EXHIBIT C**

**RECONCILIATION OF MEDICAL AND DENTAL EXPENSES 2022**

| Date | Provider | Charge | Charge Non-Qualifying (a) | Charge Non-Dependent | Ins. Reim. | Net Due | Comments |
|------|----------|--------|---------------------------|----------------------|------------|---------|----------|
| 4/16/22 | Walgreens | $12.88 | | | | $12.88 | |
| 7/29/22 | Walgreens | $40.78 | | | | $40.78 | |
| 8/14/22 | Walgreens | $37.85 | | | | $37.85 | |
| 10/13/22 | Walgreens | $12.49 | | | | $12.49 | |
| 10/26/22 | Walgreens | $9.09 | | | | $9.09 | |
| 9/23/22 | Walgreens | $311.90 | | | | $311.90 | |
| 10/27/22 | Walgreens | $424.99 | | | | $424.99 | |
| 11/8/22 | Walgreens | $65.09 | | | | $65.09 | |
| 11/27/22 | Walgreens | $34.90 | | | | $34.90 | |
| 12/12/22 | Walgreens | $30.00 | | | | $30.00 | |
| 12/16/22 | Walgreens | $23.19 | | | | $23.19 | |
| 7/24/22 | CVS | $2.62 | | | | $2.62 | |
| 1/24/22 | Rothman Institute | $90.00 | | | | $90.00 | |
| 4/12/22 | 16 PT Sessions @ $17 | $272.00 | | | | $272.00 | |
| 3/16/22 | Joseph Danyo, MD | | | $686.00 | | $686.00 | Cosmetic surgery |
| 9/20/22 | Joseph Danyo, MD | | | $535.00 | | $535.00 | Cosmetic surgery |
| 12/2/22 | Joseph Danyo, MD | | | $1,500.00 | | $1,500.00 | Cosmetic surgery |
| 1/15/22 | DE IMANGING | $125.00 | | | | $125.00 | |
| 4/5/22 | Alfieri Cardiology | $50.00 | | | | $50.00 | |
| 4/13/22 | Alfieri Cardiology | $90.00 | | | | $90.00 | |
| 6/7/22 | Alfieri Cardiology | $90.00 | | | | $90.00 | |
| 6/14/22 | Alfieri Cardiology | $35.00 | | | | $35.00 | |
| 7/29/22 | Alfieri Cardiology | $25.00 | | | | $25.00 | |
| 8/30/22 | Alfieri Cardiology | $25.00 | | | | $25.00 | |
| 8/12/22 | Alfieri Cardiology | $35.00 | | | | $35.00 | |
| 8/29/22 | Alfieri Cardiology | $19.53 | | | | $19.53 | |
| 9/23/22 | Alfieri Cardiology | $19.53 | | | | $19.53 | |
| 10/21/22 | LACOMS | | | $350.00 | | $350.00 | Los Angeles Center for Oral and Maxillofacial Surgery - Lucy |
| 6/8/22 | Charles Wang MD | $109.18 | | | | $109.18 | |
| 3/13/22 | Labcorp | $152.00 | | | | $152.00 | |
| 4/7/22 | Labcorp | $45.50 | | | | $45.50 | |
| 11/20/22 | Exodus Wellness | | | $165.00 | | $165.00 | Portland OR Medical or Recreational Marijuana |
| 12/7/22 | Exodus Wellness | | | $18.00 | | $18.00 | Portland OR Medical or Recreational Marijuana |
| 11/20/22 | Trinity Health | $284.00 | | | | $284.00 | |
| 12/20/22 | Trinity Health | $106.00 | | | | $106.00 | |
| 4/17/22 | Ellen Wolf CS | $350.00 | | | | $350.00 | |
| 9/10/22 | Ellen Wolf CS | $450.00 | | | | $450.00 | |
| 6/8/22 | Margie Trans | | | $351.00 | | $351.00 | Transportation for M. Moore mother |
| 5/4/22 | Dr. Smith | $130.21 | | | | $130.21 | |
| 7/19/22 | Dr. Smith | $350.00 | | | | $350.00 | |
| 7/29/22 | Dr. Smith | $361.50 | | | | $361.50 | |
| 8/3/22 | Dr. Smith | $116.04 | | | | $116.04 | |
| 8/11/22 | Dr. Smith | $18.40 | | | | $18.40 | |
| 9/23/22 | Dr. Smith | $18.40 | | | | $18.40 | |
| 9/26/22 | Dr. Smith | $222.46 | | | | $222.46 | |
| 9/28/22 | Dr. Smith | $12.94 | | | | $12.94 | |
| 10/10/22 | Dr. Smith | $12.94 | | | | $12.94 | |
| 11/23/22 | Dr. Smith | $111.23 | | | | $111.23 | |
| 11/23/22 | Dr. Smith | $28.54 | | | | $28.54 | |
| 11/23/22 | Dr. Smith | $385.36 | | | | $385.36 | |
| 11/23/22 | Dr. Smith | $205.00 | | | | $205.00 | |
| 12/29/22 | Dr. Smith | $140.00 | | | | $140.00 | |
| 11/4/22 | Dr. Fudemberg | $38.94 | | | | $38.94 | |
| 12/9/22 | Dr. Fudemberg | $38.92 | | | | $38.92 | |
| 9/7/22 | Dr. Ferrari | | | $3,250.00 | | $3,250.00 | Lucy |
| 10/12/22 | Dr. Ferrari | | | $813.00 | | $813.00 | Lucy |
| 2/5/22 | Heritage Medical | $60.00 | | | | $60.00 | |
| 5/26/22 | Heritage Medical | $90.00 | | | | $90.00 | |
| 8/16/22 | Heritage Medical | $15.81 | | | | $15.81 | |

| Date | Provider | | | | Notes |
|------|----------|--|--|--|-------|
| 9/6/22 | Heritage Medical | $63.03 | | $63.03 | |
| 10/26/22 | Heritage Medical | $47.22 | | $47.22 | |
| 11/15/22 | Brandywine Imaging | $125.00 | | $125.00 | |
| 2/17/22 | Dr. Lyons | $151.00 | | $151.00 | |
| 4/19/22 | Dr. Lyons | $188.00 | | $188.00 | |
| 5/2/22 | Dr. Lyons | $498.00 | | $498.00 | |
| 5/19/22 | Dr. Lyons | $456.00 | | $456.00 | |
| 5/19/22 | Dr. Lyons | $360.00 | | $360.00 | |
| 9/13/22 | Dr. Lyons | $350.00 | | $350.00 | |
| 12/13/22 | Dr. Lyons | $215.00 | | $215.00 | |
| 12/23/22 | Dr. Lyons | $251.00 | | $251.00 | |
| 12/3/22 | Actitech | | $44.76 | $44.76 | Personal care products |
| 9/10/22 | SF Dentist Periodontist | | $2,240.00 | $2,240.00 | Lucy |
| 9/15/22 | Dr. Movehed | | $275.00 | $275.00 | Lucy |
| 11/19/22 | Geroge Jaber DDS | | $5,229.00 | $5,229.00 | Lucy |
| 11/18/22 | Pasquinello, Ortho | | $4,150.00 | $4,150.00 | Lucy |
| 12/18/22 | Pasquinello, Ortho | | $1,384.00 | $1,384.00 | Lucy |
| 7/1-12-31/22 | Dr. Walt Clerko 10 Sessions @$150 | $1,500.00 | | $1,500.00 | Marriage counseling |
| 12/6/22 | Sierra Tucson | | $36,000.00 | $36,000.00 | Lucy |
| 10/26/22 | RX Dental | | $126.90 | $126.90 | Lucy |
| Totals | | $8,439.46 | $4,265.76 | $54,351.90 | $67,057.12 (b) |
| Total Non-Qualifying Medical | | | $4,265.76 | | |
| Grand Total Non-qualifying Medical and Non-Dependent | | | $58,617.66 | | |

Notes:
(a) Identified as associated with Lucy by M. Moore or through internet research
(b) Differs from JRM report by $9.98

Date: 09/07/2023 JAL

# EXHIBIT E

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.



| Receipt Number<br>SRC2404150277 | | Case Type<br>I129 - PETITION FOR A NONIMMIGRANT WORKER |
| --- | --- | --- |
| Received Date<br>11/13/2023 | Priority Date | Petitioner<br>DAIKI INC |
| Notice Date<br>11/15/2023 | Page<br>1 of 2 | Beneficiary<br>KOP, MAURITS HARALD |

DAIKI INC
c/o JONA BOEDDINGHUS
1 WOOD ROAD
WILMINGTON  DE  19806

**Notice Type:** Premium Processing
Receipt Notice
Amount received: $2960.00 U.S.
Class requested: O1A
ETA Case Number: N/A

We have mailed an official notice about this case (and any relevant documentation) according to the mailing preferences you chose on Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. This is a courtesy copy, not the official notice.

**What the Official Notice Said**

Thank you for choosing to use the U.S. Citizenship and Immigration Services' Premium Processing service. We have received the application or petition ("your case") listed above and accepted it as a Premium Processing case. You should receive a notice regarding your case within 15 calendar days from the date shown as the "Received Date" above. If we need to contact you regarding your case, we may do so by mail, telephone, facsimile, or e-mail using the information you provided.

If you need to contact us regarding your Premium Processing case, you can do so using the information immediately below. The mailing address, e-mail address, and phone number listed below are for use in relation to Premium Processing Program cases only. You can obtain case status information from our automated system 24 hours a day with a touch-tone phone and the receipt number for this case shown above by calling the phone number listed below.

Texas Service Center (TSC) Premium Processing:

| | |
| --- | --- |
| I-129 PP Routine Mail: | I-129 Premium Processing, USCIS, Texas Service Center<br>6046 N Belt Line Rd., STE 907, Irving, TX 75038-0022 |
| I-129 PP Courier address: | I-129 Premium Processing, USCIS, Texas Service Center<br>6046 N Belt Line Rd., Irving, TX 75038-0001 |
| I-129 PP Fax: | 972-413-3160 |
| I-129 PP Phone: | 1-866-315-5718 |
| Email address: | tscpremiumi1291@uscis.dhs.gov |

This notice shows that your case was filed on the "Received Date" listed above. It does NOT grant the beneficiary any immigration status, and it is not evidence that your case is still pending. We will notify you in writing when we make a decision on your case or if we need additional information.

Work authorization will only continue while this application or petition remains pending if expressly provided by statute or regulation and subject to any limitations prescribed therein.

Please save this and any other notices about your case for your records. You should also keep copies of anything you send us, as well as proof of delivery. Have these records available if you contact us about your case.

**If your address changes** - If you move while your case is pending, please visit www.uscis.gov/addresschange for information on how to update your address. Remember to update your address for all your receipt numbers.

Number of workers: 1

| Name<br>KOP, MAURITS HARALD | DOB<br>05/28/1976 | COB<br>NETHERLANDS | Class<br>O1A | Consulate/POE | OCC |
| --- | --- | --- | --- | --- | --- |

Please see the additional information on the back. You will be notified separately about any other cases you filed.
USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

Texas Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd., STE 110
Irving TX  75038-0012
USCIS Contact Center: www.uscis.gov/contactcenter



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.                    Form I-797C   10/13/21

# EXHIBIT F

| Name | Client No. | PNC Account No. | JRM Signatory? | JMS Signatory? | JRM on line Access? | JMS on line Access? | Is Acct Linked |
|---|---|---|---|---|---|---|---|
| 70 Larson Drive Holdings | 01452 | ████ | Yes | Yes | Yes | Yes | Yes |
| ACHEST | 01364 | | | | | | |
| American Friends of Paris Moma | 01494 | | Yes | | | | |
| American Friends of the Ranger Foundation, Inc. | 01439 | | Yes | | | | |
| Chesham Georgetown, Inc. | 01330 | | Yes | Yes | | | |
| COHRED | 01278 | | Yes | | | | |
| Freedom 1947, LLC | 01519 | | Yes | Yes | | | |
| GEET | 01089 | | Yes | | Yes | | Yes |
| Independence 1947, Inc. | 01488 | | Yes | Yes | | | |
| Ingomar Fiduciary Services, Inc. | N/A | | Yes | Yes | Yes | | Yes |
| JRM PLLC Iolta | N/A | | Yes | Yes | Yes | | Yes |
| JRM Money Market (Mustafa and Muksi funds) | N/A | | Yes | | Yes | | Yes |
| JRM PLLC Operating | N/A | | Yes | | Yes | | Yes |
| Kings Point | 01409 | | Yes | Yes | Yes | | Yes |
| Liberty 1947, Inc. | 01477 | | Yes | | Yes | | Yes |
| MLS111 Legacy Foundation | 01565 | | Yes | Yes | | | |
| Nanotronix Computing, Inc. | 01516 | | Yes | | Yes | | no |
| Timucua Holdings Limited | 01206 | | Yes | | Yes | | no |
| | | | Yes | | Yes | Yes | Yes |

_Sessdess · US Circle, Inc._
_AML Sfound Atty Acct_   01602   57-0042   4325
                                              yes   ys   ys   ys   yr

# EXHIBIT G

**IRS** Department of the Treasury
Internal Revenue Service

OGDEN  UT  84201-0038

In reply refer to: 0436000005
Feb. 06, 2024  LTR 2644C  KO
90-1895813    202109 01
Input Op:  0509906108 00024423
                              BODC: WI

ONE PARK CREST UNIT 1808 LLC
1 WOOD RD
WILMINGTON  DE  19806-2021

9095

        Taxpayer Identification number: ███████████
                    Tax periods: Sep. 30, 2021

                        Form: 941

Dear Taxpayer:

We previously sent you a letter about your inquiry received
Feb. 27, 2023.  Although we try to respond quickly, we often need
additional time for research. We can't provide a complete response at
this time because:

We need more time to provide you with a complete response to your
inquiry.

While waiting to hear from us, if you have a balance, you can still
make payments to reduce your tax liability and interest charges. To
help us apply payments properly, make your check or money order
payable to the United States Treasury and provide on each payment:
      - Name
      - Address
      - Social security or employer identification number
      - Daytime telephone number
      - Tax year
      - Tax form

Please allow an additional 60 days for us to obtain the information
we need and let you know what action we're taking. You don't need to
do anything else right now.

If you have questions, you can call customer service at
267-941-1000 between 5:00 AM and 10:00 PM CT.

If you prefer, you can write to us at the address at the top of the
first page of this letter.

When you write, please include a copy of this letter and provide your
telephone number and the hours we can reach you in the spaces below.
Keep a copy of this letter for your records.

Your Telephone Number (____)_____ Hours _____

Thank you for your cooperation.

# EXHIBIT H

Mahtaub Moore
1 Wood Road
Wilmington, DE 19806
M22strategies@gmail.com
703-946-3704


February 8, 2024


Mr. William Green
Mr. Ted Kittila
Halloran, Farkas, Kittila, LLP
5801 Kennett Pike
Suite C/D
Wilmington, DE 19807

RE: Moore v. Moore/Fraudulent W-2

Dear Bill and Ted,

      This letter is to serve as a cease and desist demanding your clients refrain from the issuing of a fraudulent W-2 from Ingomar Fiduciary Services, Inc. and any and all corporations associated with the defendants. I recently received a fraudulent W-2, as reported to the IRS last year with my forensic consultant Jeff Lampinski, for the tax year of 2023. The recent W-2 has been forwarded to the investigative team at the IRS in Wilmington, DE whom I met with in September 2023.

      The defendants have until February 12, 2024 to a) rescind this W-2 b) refile their 1120 if one has been filed c) amend all returns from 2022-2023. I have never worked for Ingomar Fiduciary Services, Inc.

      Further, recently I have been receiving corporate mail for the defendants and other shell corporations including packages from Paul Hastings in New York. Defendants seemingly admit they are no longer physically present in Delaware and any suggesetion otherwise would be defrauding the state of Delaware's corporation commission. I demand all corporate mail cease to be delivered to my personal home address. If this W-2 is not rescinded I will file a Motion for Injunctive Relief with the court.

      Sincerely,

      /s/Mahtaub Moore

# EXHIBIT I

 Gmail

Mattie Moore <m22strategies@gmail.com>

## Moore & Bruce 401K Sanford changing EINS

**Edward Luria** <ed@alvordlaw.com>
To: Mattie Moore <m22strategies@gmail.com>                Thu, Sep 7, 2023 at 11:38 AM
Cc: "Spoltore, Leslie" <leslie.spoltore@obermayer.com>, Jonathon Moore <jmoore@moorelawoffices.us>

Mattie,

You are right that the plan sponsorship was shifted to Ingomar Fiduciary Services then.

Jonathon reminded me that I forgot to mention that. He just now wrote me, "One other wrinkle here which is not covered in your email— we broadened the plan a few years ago to include Ingomar Fiduciary Services, Inc., since Mattie was an employee, and we wanted to make a small contribution to the plan, so that if I were hit by a truck, all of my plan assets could flow seamlessly to her and remain in the plan."

My recollection is, the thought was that Ingomar (whose employees have been covered by the plan since 2008) would for sure survive Jonathon's death and manage the plan, whereas Jonathon's law office company might not for long.

Best - Ed

[Quoted text hidden]

 Gmail

Mattie Moore <m22strategies@gmail.com>

## Moore & Bruce 401K Sanford changing EINS

**Mattie Moore** <m22strategies@gmail.com>
To: Edward Luria <ed@alvordlaw.com>
Cc: "Spoltore, Leslie" <leslie.spoltore@obermayer.com>, Jonathon Moore <jmoore@moorelawoffices.us>

Thu, Sep 7, 2023 at 11:49 AM

Ed
This is very problematic and disconcerting. Jonathon seems to have been flipping lots of things and this is a huge problem.
It has major implications and I have never been an employee doing any work for IFS
Mattie

Sent from my iPhone
[Quoted text hidden]

ttps://mail.google.com/mail/u/0/?ik=d4f0d5e73c&view=pt&search=…msgid=msg-f:1776394461996278908&simpl=msg-f:1776394461996278908

Page 1 of 1

# EXHIBIT J

Assets for Constructive Trust

Real Property:
One Wood Revocable Trust
1 Wood Road
Wilmington, DE 19806

Moore Family Trust
134 Three Mile Harbor Road
East Hampton, NY 11937

PNC Money Markets and other accounts
Accounts PNC Accounts ending in 5013
Alternative Accounts ending in 9742

Al-Rushaid (also known as Al Rushaid and Al Rashaid) Aviation Ltd. (2007)
Incorporated 2007 EIN #20-8852491
Jonathon Moore, Signing Executive Officer
of 1120 Federal Corporate Return

Ludwig and Associates, Inc.
US corporation
EIN #59-3450489
Stock ownership of Al-Rushaid (Al Rushaid) Aviation, Ltd.
Signed by Executive Officer Jonathon Moore

Ingomar Fiduciary Services, Inc.
Delaware (March 30, 2000-Present)
100% ownership
1 Wood Road
Wilmington, DE 19806

Ingomar Fiduciary Services, Inc.
District of Columbia (July 2000-December 2016)
100% ownership
1050 17th Street, NW Suite 301
Washington, DC

Timucua Holdings Ltd.
Delaware (2005)
Florida (2009)
Executive Officer Signatory for 1120 Corporate
Tax Returns
Place of business:

Barbosa Holdings, Ltd.

Hook Pond Revocable Trust

Grape Arbor, LLC

GioDet, LLC

Sylvania, NC, LLC

4SBG, LLC

Loopards Chae, LLC

Angus Cross, LLC

GEET, Inc.

Moore & Bruce Profit Sharing Plan

Ingomar Fiduciary Services, Inc.

Ingomar Services, Inc.

Jonathon R Moore Revocable Trust

Law Offices of Jonathon Moore, PLLC

Atlantic Noca, LLC
Executive Officer
Delaware (2012)
Branch Location:
176 Mine Lake Court, Suite 100
Raleigh, NC 27615